David R. Marriott (SBN 2682565)
Noah Joshua Phillips (*pro hac vice*)
Vanessa A. Lavely (*pro hac vice*)
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

Christopher C. Wheeler (SBN 224872)
**FARELLA BRAUN + MARTEL LLP**
One Bush Street, Suite 900
San Francisco, California 94104
Telephone: (415) 954-4979
Facsimile: (415) 954-4480

*Counsel for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VIRGINIA M. LAMBRIX, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br>　v.<br><br>TESLA, INC.,<br>　　　　　　Defendant. | Case No. 3:23-cv-1145-TLT (Lead Case)<br>Case No. 3:23-cv-1496-TLT<br>Case No. 3:23-cv-1543-TLT<br>Case No. 3:23-cv-2035-TLT<br>Case No. 3:23-cv-2352-TLT<br><br>Judge:　　　　Honorable Trina L. Thompson<br>Hearing Date:　September 5, 2023<br>Hearing Time:　2:00 p.m.<br><br>**DEFENDANT TESLA, INC.'S MOTION TO DISMISS CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR FAILURE TO STATE A CLAIM** |

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ................................................................................... ii

**NOTICE OF MOTION AND MOTION** ............................................................... vii

**MEMORANDUM OF POINTS AND AUTHORITIES** .......................................... 1

**PRELIMINARY STATEMENT** ............................................................................. 1

**RELEVANT BACKGROUND** ............................................................................... 3

**LEGAL STANDARD** ............................................................................................. 5

**ARGUMENT** ........................................................................................................... 5

I.    The Sherman Act Claims Fail Because Plaintiffs Plead No Plausible Relevant Antitrust Markets. ................................................................................................... 5

    A.    Relevant Legal Standard. ................................................................... 5

    B.    Plaintiffs' Alleged Foremarket Fails. ................................................. 7

    C.    Plaintiffs' Alleged Aftermarkets Fail. .............................................. 14

II.    Plaintiffs Do Not Plausibly Plead Monopolization or Attempted Monopolization Claims Under Section 2 of the Sherman Act. ....................................................... 17

    A.    Plaintiffs Have Not Plausibly Alleged Monopoly Power, or a Dangerous Probability of Achieving it, in the Alleged Aftermarkets. ................... 18

    B.    Plaintiffs Have Not Adequately Pleaded Any Anticompetitive Conduct. ...................... 20

III.    Plaintiffs Do Not Plausibly Allege a Combination in Restraint of Trade under the Cartwright Act. .................................................................................................. 28

IV.    Plaintiffs Do Not Plausibly Allege a Tying Claim Under the Sherman or Cartwright Acts. ..... 29

    A.    Plaintiffs Have Not Plausibly Alleged a Tie. .................................... 29

    B.    Plaintiffs Have Not Plausibly Pleaded Market Power in the Alleged Tying Markets. .... 31

    C.    Plaintiffs Plead No Basis for *Per Se* or "Quick Look" Review of the Section 1 Claim. ................................................................................................ 32

V.    Plaintiffs Fail to State a Claim Under § 17200 of California's Unfair Competition Law. ......... 33

    A.    Plaintiffs' UCL Claim Fails for the Same Reasons That Their Federal Claims Fail ...... 33

    B.    Conduct Consistent with Magnuson-Moss Does Not Violate the UCL. ...................... 33

    C.    Plaintiffs Fail To State a Claim Under the UCL's "Unfair" Prong. ............................... 35

**CONCLUSION** .......................................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) .................................................................................... *passim*

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
948 F.2d 536 (9th Cir. 1991) ............................................................................................ 24

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010) ..................................................................................... 20, 22

*Apple, Inc. v. Psystar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008) ................................................................. 6, 9, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................................................................ 5, 23, 25, 28

*Avaya Inc., RP v. Telecom Labs, Inc.*,
838 F.3d 354 (3d Cir. 2016) .............................................................................................. 6

*Brantley v. NBC Universal, Inc.*,
675 F.3d 1192 (9th Cir. 2012) ......................................................................................... 26

*Cal. Dental Ass'n v. Fed. Trade Comm'n*,
526 U.S. 756 (1999) ......................................................................................................... 33

*California ex rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ................................................................................... 32, 33

*Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*,
710 F.2d 1366 (9th Cir. 1983) ......................................................................................... 32

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ............................................................................................... 33, 34

*Chavez v. Whirlpool Corp.*,
93 Cal. App. 4th 363 (2001) ............................................................................................ 33

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
611 F.3d 495 (9th Cir. 2010) ........................................................................................... 21

*Coronavirus Reporter v. Apple Inc.*,
No. 21-CV-05567-EMC, 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021) .......................... 7

*Davis v. HSBC Bank Nevada, N.A.*,
691 F.3d 1152 (9th Cir. 2012) ......................................................................................... 35

*Doe v. CVS Pharmacy, Inc.*,
982 F.3d 1204 (9th Cir. 2020) ......................................................................................... 35

*Dream Big Media Inc. v. Alphabet Inc.*,
No. 22-CV-02314-JSW, 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022) .......................... 30

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ............................................................ 18, 20, 21, 27

*DSM Desotech, Inc. v. 3D Sys. Corp.*,
  749 F.3d 1332 (Fed. Cir. 2014) ....................................................................... 6

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
  504 U.S. 451 (1992) ............................................................................... 14, 29

*Eastman v. Quest Diagnostics Inc.*,
  No. 15-CV-00415-WHO, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ..................... 28

*Epic Games, Inc. v. Apple Inc.*,
  559 F. Supp. 3d 898 (N.D. Cal. 2021) ......................................................... *passim*

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ..................................................................... *passim*

*Epicor Software Corp. v. Alt. Tech. Sols., Inc.*,
  No. SACV1300448CJCRNBX, 2013 WL 12130024 (C.D. Cal. Dec. 2, 2013) ............... 19

*Exxon Corp. v. Superior Ct.*,
  51 Cal. App. 4th 1672 (1997) ................................................................... 28, 31

*Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*,
  114 Cal. App. 4th 309 (2003) ................................................................... 28, 32

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
  394 U.S. 495 (1969) ..................................................................................... 32

*Free Freehand Corp. v. Adobe Sys. Inc.*,
  852 F. Supp. 2d 1171 (N.D. Cal. 2012) ............................................................ 24

*FTC v. Arch Coal, Inc.*,
  329 F. Supp. 2d 109 (D.D.C. 2004) ................................................................ 17

*FTC v. Facebook*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ................................................................... 20

*FTC v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) .......................................................................... 5

*FTC v. Sysco Corp.*,
  113 F. Supp. 3d 1 (D.D.C. 2015) ................................................................... 10

*Hicks v. PGA Tour, Inc.*,
  897 F.3d 1109 (9th Cir. 2018) ................................................................... 8, 17

*In re eBay Seller Antitrust Litig.*,
  545 F. Supp. 2d 1027 (N.D. Cal. 2008) ........................................................... 26

*In re German Auto. Mfrs. Antitrust Litig.*,
  497 F. Supp. 3d 745 (N.D. Cal. 2020) ........................................................ *passim*

*In re German Auto. Mfrs. Antitrust Litig.*,
  612 F. Supp. 3d 967 (N.D. Cal. 2020) ............................................................ 11

iii

*Kaplan v. Burroughs Corp.*,
    611 F.2d 286 (9th Cir. 1979) ....................................................................................... 13

*Klein v. Facebook Inc.*,
    580 F. Supp. 3d 743 (N.D. Cal. 2022) ........................................................................ 10

*MLW Media LLC v. World Wrestling Ent., Inc.*,
    No. 22-CV-00179-EJD, 2023 WL 1975241 (N.D. Cal. Feb. 13, 2023) ...................... 6, 20

*Morrison v. Viacom, Inc.*,
    66 Cal. App. 4th 534 (1998) ................................................................................. 29, 31

*Nazemi v. Specialized Loan Servicing, LLC*,
    No. 2:22-CV-05006-MCS-PVC, 2022 WL 17220707 (C.D. Cal. Oct. 31, 2022) .......... 35

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
    513 F.3d 1038 (9th Cir. 2008) ......................................................................... 8, 15, 29

*Ohio v. Am. Express Co.*,
    138 S. Ct. 2274 (2018) ................................................................................................ 5

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
    No. 5:16-CV-06370-EJD, 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) .................... 25

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
    555 U.S. 438 (2009) ............................................................................................ 20, 25

*PNY Techs., Inc. v. SanDisk Corp.*,
    No. 11-CV-04689-WHO, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ........................ 27

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
    104 F.3d 811 (6th Cir. 1997) ....................................................................................... 6

*PSKS, Inc. v. Leegin Creative Prods., Inc.*,
    615 F. 3d 412 (5th Cir. 2010) ..................................................................................... 17

*RealPage, Inc. v. Yardi Sys., Inc.*,
    852 F. Supp. 2d 1215 (C.D. Cal. 2012) ...................................................................... 31

*Rebel Oil Co. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................................................... 13

*Reilly v. Apple*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................... 7, 17

*Reveal Chat Holdco, LLC. v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) ........................................................................ 18

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ..................................................................................... 31

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
    133 Cal. App. 4th 1277 (2005) ................................................................................... 29

*Rojas-Lozano v. Google, Inc.*,
    159 F. Supp. 3d 1101 (N.D. Cal. 2016) ...................................................................... 35

DEFENDANT TESLA, INC.'S MOTION TO DISMISS; Case No. 3:23-CV-1145-TLT

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) .................................................................................... 22

*S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*,
    72 Cal.App.4th 861 (1999) ...................................................................................... 35

*SC Manufactured Homes, Inc. v. Liebert*,
    162 Cal. App. 4th 68 (2008) .................................................................................... 31

*Sidibe v. Sutter Health*,
    4 F. Supp. 3d 1160 (N.D. Cal. 2013) ....................................................................... 32

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
    188 F.3d 11 (1st Cir. 1999) ....................................................................................... 7

*Somers v. Apple, Inc.*,
    729 F.3d 953 (9th Cir. 2013) ............................................................................... 5, 19

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) .................................................................................... 24

*Spectrum Sports Inc. v. McQuillan*,
    506 U.S. 447 (1993) ................................................................................................. 18

*Streamcast Networks v. Skype Techs., SA*,
    547 F. Supp. 2d 1086 (C.D. Cal. 2007) ................................................................... 14

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ................................................................................... 6

*Tele Atlas N.V. v. Navteq Corp.*,
    397 F.Supp. 2d 1184 (N.D. Cal. 2005) .................................................................... 31

*Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*,
    No. 11-1999, 2013 WL 2154793 (S.D. Cal. May 17, 2013) .................................... 19

*United States v. E.I. du Pont de Memours & Co.*,
    351 U.S. 377 (1956) ................................................................................................... 6

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) ................................................................................... 22

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) ................................................................... 13

*Univ. Grading Serv. v. eBay, Inc.*,
    No. C-09-2755, 2012 WL 70644 (N.D. Cal. Jan. 9, 2012) ...................................... 27

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*,
    540 U.S. 398 (2004) ................................................................................................. 20

**Statutes & Rules**

15 U.S.C. § 1 ................................................................................................................ *passim*

15 U.S.C. § 2 ................................................................................................................ *passim*

15 U.S.C. § 2302 ............................................................................................................ 34

16 C.F.R. § 700.10 ......................................................................................................... 34

Cal. Bus. & Prof. Code § 17200 .................................................................................... 33

Fed. R. Civ. P. 12 ........................................................................................................... vii

**Other**

Areeda & Hovenkamp, Antitrust Law ¶ 1740a ............................................................... 6

DEFENDANT TESLA, INC.'S MOTION TO DISMISS; Case No. 3:23-CV-1145-TLT

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on September 5, 2023 at 2:00 p.m., in Courtroom 9 of the U.S. District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Hon. Trina L. Thompson, Defendant Tesla, Inc. will and hereby does move the Court to dismiss Plaintiffs' Consolidated Amended Class Action Complaint ("CAC"). Specifically, this Motion seeks to dismiss the Complaint in its entirety for failure to state claims pursuant to Fed. R. Civ. P. 12(b)(6). This Motion is supported by this Notice of Motion and Motion; a Memorandum of Points and Authorities; the accompanying Request for Judicial Notice and Incorporation by Reference; the Declaration of Vanessa A. Lavely ("Lavely Decl."); the [Proposed] Order filed herewith; other previously and concurrently filed documents in this action; the arguments of counsel; and any other matter that the Court may properly consider.[1]

The issues to be decided are:

1.   Whether the Court should dismiss Plaintiffs' claims brought under Section 2 of the Sherman Act (Counts I-IV), where Plaintiffs fail to plausibly allege any cognizable antitrust market, that Tesla has monopoly power in any relevant market, or any actions that constitute anticompetitive conduct.

2.   Whether the Court should dismiss Plaintiffs' claim brought under California's Cartwright Act for alleged combinations in restraint of trade (Count VII), where Plaintiffs fail to plausibly allege that Tesla's conduct has led to substantial market foreclosure in either of the alleged aftermarkets.

3.   Whether the Court should dismiss Plaintiffs' claims brought under Section 1 of the Sherman Act (Count V) and California's Cartwright Act (Count VI) relating to allegedly unlawful tying, where Plaintiffs fail to plausibly allege a tie, that Tesla has market power in any of the alleged tying markets, or that a *per se* or "quick look" analysis is appropriate.

4.   Whether the Court should dismiss Plaintiffs' claims brought under California's Unfair Competition Law ("UCL") (Count VIII) where Plaintiffs (i) fail to adequately plead Sherman Act and Cartwright Act claims; (ii) fail to allege conduct prohibited under the Magnuson-Moss Warranty Act ("Magnuson-Moss"); and (iii) fail to state a claim under the UCL "unfair" prong.

---

[1] Tesla is concurrently filing a Motion To Compel Arbitration with respect to three of the newly added plaintiffs—Danielle Thys, Cary Phillips, and Levi Stoffal.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Plaintiffs' Consolidated Amended Complaint adds new claims and allegations and drops others, but no amount of repackaging or rewording can address the fundamental problem—Plaintiffs fail to state a claim under any federal or state law.

The Complaint's core argument—based on a highly disfavored antitrust theory—is that Tesla monopolizes the repair/parts business for its vehicles and takes actions to "keep as much of the market share for that business" as it can. Not only do Plaintiffs fail to allege Tesla's market share for either repairs or parts, but they also do not and cannot explain why Tesla would deliberately worsen the Tesla customer experience—thereby jeopardizing future vehicle sales, which the Complaint concedes are more profitable—in order to control alleged aftermarkets that, as Plaintiffs acknowledge, provide Tesla with a tiny fraction of its revenues compared to EV sales. That defies common sense.

Plaintiffs claim that Tesla violated Sections 1 and 2 of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law by allegedly (1) designing cars so that maintenance and repair require information and tools "exclusively accessed by Tesla"; (2) limiting access to diagnostic and repair resources and parts; (3) discouraging the use of non-Tesla repair shops and parts through the terms of the car's warranty; (4) entering into *de facto* exclusivity agreements with parts suppliers; and (5) entering into *de facto* exclusivity agreements with independent repair shops. But Plaintiffs do not allege any cognizable antitrust market, monopoly power, anticompetitive conduct, any illegal "tie," or any unfair business practices. Their claims depend on gerrymandered markets, conclusory and unsupported allegations of market power, and a mischaracterization of Tesla's practices and agreements. The Complaint is a maze of contradiction, and Plaintiffs' allegations actually undercut their claims, showing that the alleged foremarket is highly competitive and not limited to electric vehicles, the alleged aftermarkets are not cognizable and Tesla's practices are perfectly lawful. Plaintiffs' claims should be dismissed for multiple reasons.

*First*, Plaintiffs fail to plausibly allege any cognizable relevant antitrust market, which should result in dismissal of all the Sherman Act and Cartwright claims. Plaintiffs assert the existence of an EV-only "foremarket," but common sense, the Complaint and the documents it cites acknowledge that

electric vehicles ("EVs") compete with various non-EVs. As Tesla CEO Elon Musk stated in 2014 (and has reiterated many times since): "Our true competition is not the small trickle of non-Tesla electric cars being produced, but rather the enormous flood of gasoline cars pouring out of the world's factories every day."[2] Plaintiffs' allegations regarding the purported EV-only market—including the fact that EVs have zero-carbon emissions and are manufactured and fueled differently than non-EVs—merely establish product differentiation. And Plaintiffs do not come close to plausibly pleading the rare and judicially disfavored single-brand "aftermarket" in either Tesla parts or Tesla repair services, which dooms all their antitrust claims. (Section I.)

*Second*, Plaintiffs' claims under Section 2 of the Sherman Act (that Tesla is monopolizing or attempting to monopolize the alleged aftermarkets) fail for the independent reasons that Plaintiffs do not establish Tesla's purported monopoly power in the alleged aftermarkets, or a dangerous probability of achieving it. Monopoly power means the long-term ability to control prices or exclude rivals. The Complaint, however, does not specify any market shares, much less at the scale needed to plead monopoly power. Nor does it provide any allegations to support the exercise of monopoly power or barriers to entry that would be required to sustain it. And Plaintiffs concede that consumers have options, access to repair resources is expanding, and prices are dropping—the *opposite* of monopoly conditions. (Section II.A.)

Plaintiffs also have not sufficiently alleged any anticompetitive conduct. The Complaint must allege facts plausibly showing that Tesla's alleged monopoly power in the alleged aftermarkets was achieved through intentionally exclusionary or predatory conduct that harmed the competitive process. Plaintiffs focus on conduct that is not remotely anticompetitive, such as Tesla selling its EVs directly to consumers; designing its EVs to use lightweight aluminum and to allow remote repairs; training and certifying repair shops that *compete* with Tesla (and listing those repair shops on its website); providing free access to its service manuals and parts catalog; charging a modest fee (consistent with industry standards) for diagnostic software; informing customers that damage caused by improper repairs may not be covered by the warranty (again, consistent with industry standard); and having an allegedly exclusive agreement with one supplier. (Section II.B.)

---

[2] Lavely Decl. Ex. L (Tesla website post regarding patent policy).

*Third*, Plaintiffs do not plausibly allege a restraint of trade under the Cartwright Act. The Complaint fails to allege the key elements of a Cartwright Act exclusive dealing claim, including how many purportedly exclusive dealing arrangements exist and what foreclosure, if any, can be attributed to those arrangements. (Section III.)

*Fourth*, Plaintiffs' Sherman Act Section 1 claim and Cartwright Act claim fail for the independent and legally sufficient reasons that the Complaint does not sufficiently allege any "tie" or market power in any of the alleged "tying" markets. Plaintiffs try to plead alleged ties in multiple directions: (1) EVs as the tying product with Tesla parts and/or repair services as the tied products; (2) Tesla parts as the tying product with Tesla repair services as the tied product; and (3) Tesla repair services as the tying product with Tesla parts as the tied product. The Complaint offers only conclusory assertions that such ties exist. Entirely absent are plausible allegations of conditionality, an essential element of any tie. Plaintiffs also fail to plausibly plead that Tesla has the requisite antitrust market power in any of the alleged "tying" markets. (Section IV.)

*Fifth*, Plaintiffs fail to state a claim under California's Unfair Competition Law. This claim is largely derivative of Plaintiffs' Sherman and Cartwright Act claims and fails for the same reasons. In addition, Plaintiffs try to base their UCL claim on an alleged Magnuson-Moss violation, after having abandoned their standalone Magnuson-Moss claim. But Plaintiffs have not and cannot establish the requirements of a Magnuson-Moss violation, and the UCL cannot be used as an end-run around those statutory requirements. Finally, Plaintiffs' argument under the UCL's "unfair" prong relies only on conclusory assertions that Tesla's conduct meets the relevant standards. That is not close to enough. (Section V.)

The Court should not permit Plaintiffs to proceed into costly and protracted class action discovery based on disfavored antitrust theories and implausible, unsupported allegations. Their claims should be dismissed.

## **RELEVANT BACKGROUND**

Tesla is an automotive and clean energy company founded in 2003. (CAC ¶ 19.) Tesla designs, manufactures, and sells high-performance EVs. (*Id.* ¶¶ 19, 21.) It also designs and manufactures certain parts for its EVs and runs Service Centers and Collison Centers that provide repair and maintenance

1  services for its EVs. (*Id.* ¶¶ 21-22, 55.) Tesla's primary business is selling vehicles to consumers; its

2  "Automotive Sales" segment drives the Company's overall revenue and profits. (*Id.* ¶ 109.) Tesla's

3  "Services and Other" segment, which includes repair services and parts (as well as sales of used vehicles

4  and certain other sales and insurance revenue),[3] brings in less than 10% of the revenue attributable to

5  Tesla's EV sales and leases. (*Id.* ¶ 109 n.83.)

6        Plaintiffs purport to be Tesla vehicle owners or lessors who claim to have paid Tesla for Tesla-

7  compatible parts and Tesla repair services between March 2019 and the present. (*Id.* ¶¶ 9-18, 177.)

8  Plaintiffs and other Tesla drivers have various options for servicing and repairing their vehicles. (*Id.*

9  ¶¶ 54-55, 109-110.)

10        For routine service, Tesla drivers can choose to service their vehicle through Tesla or elsewhere.

11  Tesla itself offers two options: (1) Tesla service centers (there are more than 150 across the United

12  States) (*id.* ¶¶ 22, 94); and (2) Tesla's Mobile Service Technicians, who will perform certain services at

13  the vehicle owner's location (*id.* ¶ 54). Tesla also provides a free diagnostic software option that

14  customers can use to address their most common repair and maintenance needs, which is directly

15  embedded into the vehicle's touchscreen.[4]

16        Tesla drivers can also get routine service at non-Tesla-owned facilities. (*Id.* ¶ 107.) Tesla makes

17  its service manuals available online for free, for any individual or independent service center to use. (*Id.*)

18  To the extent an independent shop needs diagnostic software for a service appointment, Tesla provides

19  that software through a service subscription for a modest subscription fee of $3,000 per year. (*Id.* ¶ 105.)

20  Daily and monthly subscriptions are also available for workshops with shorter duration temporary

21  needs.[5]

22        For major collision repairs, Tesla drivers also have several options:

23      •  Tesla Collison Centers, which are owned, trained, and operated by Tesla. (*Id.* ¶ 55.)

24      •  Tesla-Approved Collision Centers, which are independently owned and operated and

25         compete with Tesla. To obtain certification, they receive certain training from Tesla.

26

27     [3] Lavely Decl. Ex. B (Tesla 2022 Form 10-K).

28     [4] Lavely Decl. Ex. N (Tesla Service Subscription Information).
   [5] Lavely Decl. Ex. R (Tesla Service Subscription Pricing).

1     Once certified, they are listed on Tesla's website. (*Id.* ¶¶ 55 & n.35, 110(d).) As shown

2     on Tesla's website, that there are currently 734 Tesla-Approved Collision Centers across

3     the country.[6] (CAC ¶ 110(d).)

4         Tesla manufactures certain EV parts in-house; other parts are purchased from suppliers across

5     the world. (CAC ¶¶ 21, 115.) Independent repair shops can purchase parts directly from Tesla's website;

6     the parts catalog is publicly accessible. (*Id.* ¶ 106.) They can also purchase parts at a Tesla Service

7     Center or at an independent parts supplier, as can consumers. (*Id.* ¶¶ 122, 145.)

8         Additional relevant facts are set forth in the Argument section below.

9                                  **LEGAL STANDARD**

10        "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as

11    true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

12    (quotations omitted). "[I]nsistence on specificity of facts is warranted before permitting a case to

13    proceed into costly and protracted discovery in an antitrust case." *Somers v. Apple, Inc.*, 729 F.3d 953,

14    966 (9th Cir. 2013). "Plausibility requires pleading facts, as opposed to conclusory allegations or the

15    formulaic recitation of the elements of a cause of action." *Id.* at 959-60 (quotations omitted).

16                                     **ARGUMENT**

17    I.    **The Sherman Act Claims Fail Because Plaintiffs Plead No Plausible Relevant Antitrust**

18          **Markets.**

19          A.    **Relevant Legal Standard.**

20        "A threshold step in any antitrust case is to accurately define the relevant market, which refers to

21    'the area of effective competition'" in which the challenged conduct supposedly has harmed

22    competition. *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020) (quoting *Ohio v. Am. Express*

23    *Co.*, 138 S. Ct. 2274, 2285 (2018)).[7] "A [relevant] market comprises any grouping of sales whose

24

25          [6] Lavely Decl. Ex. O (Tesla Collision Support).
      [7] In *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 974 n.6 (9th Cir. 2023), the Ninth Circuit noted
26    that a precisely defined market is not required in two limited categories of antitrust cases: those subject
      to the *per se* rule (such as price-fixing cases), and those applying a "quick look" liability standard.
27    Plaintiffs do not dispute that their Section 2 claims are subject to the "rule of reason" for which a
      cognizable relevant market is essential, nor could they. And, as explained below (Section III.C), they
28    offer no basis for *per se* or quick-look treatment of their Section 1 tying claim.

                                          5

sellers, if unified by a monopolist or a hypothetical cartel could profitably raise prices above a competitive level." *Epic*, 67 F.4th at 975. "If the sales of other producers could substantially constrain the price-increasing ability of the monopolist or hypothetical cartel, these other producers must be included in the market." *Id.* (quotations omitted). Put differently, if sellers outside the alleged market put competitive pressure upon those inside it, the market is not plausibly alleged. Though it is possible to have relevant submarkets within a broader relevant market, a submarket is cognizable only where it is plausibly shown to be "meaningfully insulated from competition with other products in the broader market." *In re German Auto. Mfrs. Antitrust Litig.* ("*German Auto*"), 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020) (Breyer, J.), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) (quotations omitted). Failure to plead a plausible relevant antitrust market on these terms is grounds for dismissal of the Sherman Act claims. *See id.*; *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001); *MLW Media LLC v. World Wrestling Ent., Inc.*, No. 22-CV-00179-EJD, 2023 WL 1975241, at *2 (N.D. Cal. Feb. 13, 2023).

Plaintiffs claim that Tesla restrained competition in single-brand aftermarkets for "Tesla-Compatible Parts" and "Tesla Repair Services," deriving from an EV-only "foremarket." (CAC ¶¶ 1, 28.) But as the Supreme Court has recognized, the "power that . . . automobile . . . manufacturers have over their trademarked products *is not the power that makes an illegal monopoly*." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 393 (1956) (emphasis added). As such, "[s]ingle-brand markets are, at a minimum, extremely rare and courts have rejected such market definitions even where brand loyalty is intense" so as not to transform every unique brand into a monopoly. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) (quotations omitted), *aff'd in part and rev'd in part*, 67 F.4th 946 (9th Cir. 2023). "[I]t is an understatement to say that single-brand markets are disfavored." *Id.* (quotations omitted); Areeda & Hovenkamp, Antitrust Law ¶ 1740a (explaining that single-brand aftermarkets are cognizable only in narrow circumstances). This Circuit and others have repeatedly rejected antitrust claims based on single-brand aftermarkets.[8] In fact, since the Sherman Act

---

[8] *See, e.g.*, *Epic Games*, 67 F.4th at 981; *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016); *DSM Desotech, Inc. v. 3D Sys.*

was passed more than 100 years ago, courts have "found that a single firm's brand constitutes a relevant market in only a few situations." *Coronavirus Reporter v. Apple Inc.*, No. 21-CV-05567-EMC, 2021 WL 5936910, at *9 (N.D. Cal. Nov. 30, 2021) (citations omitted); *see Reilly v. Apple*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) ("From nearly the inception of modern antitrust law, the Supreme Court has expressed skepticism of single-brand markets.").

Plaintiffs come nowhere close to pleading the "rare" and judicially "disfavored" cognizable single-brand aftermarket. *First*, because an aftermarket is "wholly derivative from and dependent on" a foremarket, *Reilly*, 578 F. Supp. 3d at 1107, Plaintiffs cannot establish their alleged aftermarkets without plausibly alleging a cognizable relevant "foremarket." Plaintiffs fail at this foundational step because the Complaint does not plausibly plead the alleged EV-only foremarket. (Section I.A.) *Second*, regardless of the plausibility of the foremarket, Plaintiffs must plead facts demonstrating the additional required criteria for aftermarket claims. Plaintiffs' claims fail here as well. (Section I.B.)

## B.    Plaintiffs' Alleged Foremarket Fails.

Plaintiffs' alleged EV-only foremarket (CAC ¶ 28) is implausible because the Complaint demonstrates that Tesla's current business model *depends on competition between EVs and non-EVs*. Plaintiffs' arguments to try to support an alleged EV-only market defy common sense.

### 1.    Plaintiffs' Complaint and Binding Precedent Undermine Their Alleged EV-only Foremarket Theory.

Tesla is a pioneer in EV development. (CAC ¶¶ 88-92.) Tesla has stated that its mission is to "accelerate the advent of sustainable transport."[9] By definition, that requires Tesla to attract consumers who currently drive non-EVs, the vast majority of car-driving consumers. As Elon Musk explained, "Our first product was going to be expensive no matter what it looked like, so we decided to build a sports car, as that seemed like it had the best chance of *being competitive with its gasoline alternatives*."[10] As part of its stated core mission, Tesla has *promoted* competition, including by not

---

*Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999).

[9] Lavely Decl. Ex. M (Tesla Company Mission).
[10] *Id.* (emphasis added).

enforcing its patents.[11] And other companies have "increased their EV product offerings" (*id.* ¶ 42), including large incumbent automakers such as Ford, Chevy, and Nissan (*id.* ¶¶ 29, 40, 162),[12] as well as new entrants such as Rivian and Lucid Motors (*id.* ¶ 49). Tesla's share of sales within the alleged EV market has dropped more than 18% within the past three years (*id.* ¶ 42).

Another court in this district recently dismissed market definition allegations strikingly similar to Plaintiffs' allegation of an EV-only foremarket. *German Auto*, 497 F. Supp. 3d at 757 (Breyer, J.). In *German Auto*, too, the plaintiffs asserted a market limited to a specific automobile type—there, diesel passenger vehicles. Noting that "[j]udicial experience and common sense help determine whether a submarket is insulated from competition in the relevant sense," the court observed that the plaintiffs' alleged market "simply defies common sense" because it depended on the implausible proposition that "other vehicles, including other purportedly environmentally friendly vehicles, lack the potential ability to deprive diesel passenger vehicles of significant levels of business." *Id.* at 757 (quotations omitted).

Where consumers can and do substitute between products, competition exists and the market must include those substitutes. *Id.* at 759; *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121-23 (9th Cir. 2018). The *German Auto* court held that the plaintiffs had "not plausibly alleged any genuine barrier to customer cross-over between diesel passenger vehicles and other passenger vehicles," and that they failed to plead facts sufficient to "overcome the commonsense inference that diesel passenger vehicles compete with other passenger vehicles." 497 F. Supp. 3d at 757. For these reasons, the court found that "[d]iesel passenger vehicles do not constitute a relevant market because that market would exclude obvious 'economic substitutes.'" *Id.* at 756-57 (quoting *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). Like the alleged "diesel-only" market in *German Auto*, Plaintiffs' purported EV-only foremarket depends on the contention that other types of cars do not meaningfully compete with EVs, which "simply defies common sense." *German Auto*, 497 F. Supp. 3d at 757.

The Complaint itself directly undermines Plaintiffs' foremarket theory; for example, Plaintiffs

---

[11] Lavely Decl. Ex. L (Tesla official website regarding patents).

[12] Plaintiffs rely on Ford's recent decision to run its ICE and EV business units separately. (CAC ¶ 40.) But there is no support for Plaintiffs' assumption that Ford's decision was due to "just how distinct the EV and ICE vehicle industries are." (*Id.*) Such conclusory allegations should be given no weight.

plead that (1) EVs compete in a "worldwide automotive market"; (2) that market is "highly competitive"; and (3) EVs face competition "from other types of alternative fuel vehicles, plug-in hybrid electric vehicles and high fuel-economy internal combustion engine vehicles."[13] And Plaintiffs do not allege any "genuine barrier" to customers crossing over between EVs and other types of vehicles. Although adoption of EVs "has accelerated dramatically" (CAC ¶ 93), EVs had only a "5% share" of U.S. vehicle sales as of 2021,[14] confirming that EVs face significant competition from ICE vehicles.

> 2.   Plaintiffs' Other Allegations Fail To Plausibly Support an EV-only Market.

Plaintiffs' allegations in support of the supposed EV-only foremarket are nowhere near enough to "overcome the commonsense inference" that EVs compete with other cars. *See German Auto*, 497 F. Supp. 3d at 756-57 ("At bottom, economic distinction depends on whether the purported submarket is meaningfully insulated . . . from competition with other products in the broader market.") (citations and quotations omitted).

*References to EV Market*: Plaintiffs contend that Tesla "acknowledges that EVs are a distinct product market by consistently promoting 'the development of the electric vehicle market'" and touting "the superiority and 'attractiveness'" of its vehicles compared to the internal combustion vehicle ("ICE") market. (CAC ¶ 39.) Tesla promotes those qualities of EVs compared to ICE vehicles precisely *because* they compete. In fact, the SEC filing on which Plaintiffs rely is replete with statements that EVs compete with non-EVs in a highly competitive market.[15] That Tesla compares its EVs to ICE vehicles "is a sign of competition, not a lack thereof." *Psystar Corp.*, 586 F. Supp. 2d at 1199.

Similarly, Plaintiffs contend that "the public, as well as industry analysts and insiders" recognize EVs as a separate product market or submarket. (CAC ¶ 39.) Even if Plaintiffs had provided support for that allegation (which they do not), it has no bearing on whether EVs are insulated from competition

---

[13] *See* Lavely Decl. Ex. A (Tesla 2021 Form 10-K) at 15, 17.

[14] *See* Lavely Decl. Ex. F (IEA car registration study).

[15] *See, e.g.*, Lavely Decl. Ex. A (Tesla 2021 Form 10-K) at 11 ("Model S and Model X [vehicles] compete primarily with premium sedans and premium SUVs and Model 3 and Model Y [vehicles] compete with small to medium-sized sedans and compact SUVs, which are extremely competitive markets"); (ii) Tesla's EVs face competition "from other types of alternative fuel vehicles, plug-in hybrid electric vehicles and high fuel-economy internal combustion engine vehicles"; and (iii) competing products "typically include internal combustion vehicles from more established automobile manufacturers.").

with other vehicles. The Court in *German Auto* rejected a nearly identical argument from the plaintiffs in that case: "That certain journalists and industry analysts have referred to a diesel vehicle 'segment' says nothing about whether that segment was insulated from competition with other vehicles . . . these allegations show only that diesel engines are a thing that automotive writers can address by name." 497 F. Supp. 3d at 757 (citation omitted).

*Zero-Carbon Emissions*: Plaintiffs suggest EVs constitute a separate market because they have "the ability to comfortably transport multiple individuals to specific destinations, located many miles apart, with zero carbon emissions." (CAC ¶ 28.) As pleaded, Plaintiffs establish mere product differentiation. "A product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 25 (D.D.C. 2015). Thus, relevant markets often include differentiated products, reflecting the reality that many differentiated products across the economy compete with one another. Convertible cars enable comfortable travel without a roof but they still compete with hard top cars. Plaintiffs fail to "explain why products without" the zero-carbon emission characteristic "are not reasonably interchangeable" with EVs, nor could they plausibly do so. *Klein v. Facebook Inc.*, 580 F. Supp. 3d 743, 766 (N.D. Cal. 2022).

*Different Fueling and Manufacturing*: Plaintiffs contend that EV charging times put EVs in their own market. (CAC ¶¶ 32-33.) Plaintiffs confuse product differentiation with an antitrust market definition. Plaintiffs posit that because EVs take longer to charge than ICE vehicles take to refuel, EVs must be used for different purposes than ICE vehicles. But Plaintiffs' comparison of charging/refueling times in inapposite. As Plaintiffs admit, many EV owners charge their vehicles at home (*id.* ¶ 31); therefore, EV owners effectively may spend less time charging than ICE owners spend to refuel.

Relatedly, Plaintiffs contend that there is an EV-only market because "the infrastructure for charging EVs is entirely separate and distinct from the infrastructure for refueling ICE vehicles" (*id.* ¶ 31) and "[t]he manufacturing of EVs and ICE vehicles are also vastly different" (*id.* ¶ 41). But the question for antitrust market definition is not whether EVs are the same as non-EVs—it is undisputed that they are powered differently, necessitating different manufacturing and different fueling. The question is whether ICE vehicles have "the potential ability to deprive [EVs] of significant levels of business." *German Auto*, 497 F. Supp. 3d 745 at 757. This turns on whether vehicle customers—*not* gas

10

stations or vehicle manufacturers—can readily "substitute" non-EVs. The answer is plainly yes, and the Complaint does not come close to pleading otherwise.[16]

*Local Travel*: Plaintiffs allege that EVs are used "for distinct purposes" (and therefore supposedly constitute a separate market) because "EVs are more appropriate for local travel as opposed to long-distance travel, *e.g.*, road trips." (CAC ¶ 33.) The Complaint cites no support for this conclusion, and the abundance of EVs on the freeway belies the allegation that they are limited to "local travel." Tesla's Supercharger network—which Plaintiffs acknowledge is robust and growing (*id.* ¶ 95)—enables drivers to travel long distances with relative ease. The Complaint states that EVs have a more "limited driving range" (*id.* ¶ 30), but the fact that the average EV allegedly travels 217 miles on a single charge (versus 413 miles for the average ICE vehicle)[17] says nothing about the purpose for which consumers use EVs. Nor does the fact that EV owners allegedly "drive half as much as ICE vehicle drivers" tell us anything about whether consumers can substitute between these products. (*Id.* ¶ 33.)[18]

At most, all these allegations show product differentiation. But that does not mean, and the Complaint does not plausibly allege, that EVs are insulated from competition with non-EVs. As this Court has reasoned, "It is implausible that . . . a buyer looking at a [non-EV] Mercedes would not consider a Tesla if it were cheaper or of higher quality." *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 980 (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).

*Multiple Vehicle Households*: Plaintiffs cite an article stating that "households with EVs are almost four times less likely to be a single-vehicle household" and claim it demonstrates that "consumers do not see EVs and ICE vehicles as interchangeable products."[19] (CAC ¶ 34-35.) But the cited article, published in 2021 and relying on 2017 data, gives a different explanation why some homes

---

[16] *See German Auto*, 497 F. Supp. 3d 745 at 756.

[17] Plaintiffs cite an article highlighting the continuing improvement in batteries (that brings the range of EVs and non-EVs closer). Lavely Decl. Ex. H (Energy Institute article regarding EV ownership).

[18] The article cited by Plaintiffs, which relies on data from 2014 to 2017 (before Tesla had released many of its popular car models) (CAC ¶¶ 91-92), acknowledges that "[t]here are several possible reasons EVs are driven less" and that "[i]t is too early to draw conclusions from the [study's] findings." The article states that "some experts doubt fundamental differences between electric and ICE vehicles account for the difference in driving use." *See* Lavely Decl. Ex. G (Utility Drive article regarding EV driving rates).

[19] *See* Lavely Decl. Ex. H (Energy Institute article regarding EV ownership).

11

have more than one car: "Overall, 60% of households with an EV have a 'large' non-electric vehicle, i.e., an SUV, a truck, or a minivan . . . These larger vehicles provide *differentiation* with regard to exterior and interior dimensions, seating capacity, cargo area, and other attributes."[20] The article also cites research that "households *substitute between attributes* when deciding which vehicle to purchase."[21] Another study cited by Plaintiffs also shows substitution between EVs and non-EVs. The 2020 AAA study of EV owners found that 43% "say they drive *more* now than when they owned a gas-powered car" and 78% "also have a gas-powered car in the household, yet they report doing a majority of their driving (87%) in their electric vehicle."[22] For antitrust purposes, substitutes belong in the same market. *German Auto*, 497 F. Supp. 3d at 756-57.

The sources cited by Plaintiffs establish one key point: consumers not only can but do view ICE vehicles as "obvious economic substitutes" for EVs (and vice versa). *Id.* at 757.

*Chinese Market*: Plaintiffs fail to explain how their allegations relating to a retracted pledge about vehicle pricing in China, a country located outside Plaintiffs' proposed geographic market, demonstrates that EVs are insulated from competition with non-EVs. (CAC ¶ 38.) Plaintiffs' sources disclose that Tesla cut prices to stoke demand in "China's auto market," in which "the share of EVs and plug-ins is rising fast."[23] But if Tesla were a monopolist comfortably competing with only EVs, it would not be facing "intense competitive pressure."[24]

*SSNIP Test*: Plaintiffs contend that their alleged foremarket is supported by the "SSNIP test,"[25] which some courts have used to assess the boundaries of markets when empirical data on consumer demand is available to conduct the test. (CAC ¶ 36.) The SSNIP allegations in the Complaint are

---

[20] *Id.* (emphasis added). The article also addresses the "the significance of the newer generation of EVs which include not only cars, but SUVs [and] trucks . . . . The number of available EV models has expanded considerably and this gives households more flexibility and less need to combine EVs with other non-electric vehicles." *Id.*

[21] *Id.* (emphasis added).

[22] *See* Lavely Decl. Ex. E (Real Simple article regarding EV purchaser habits).

[23] *See* Lavely Decl. Ex. I (Reuters article regarding Chinese market).

[24] *Id.*

[25] The SSNIP test asks whether a hypothetical monopolist of the proposed market could "profitably make a small but significant non-transitory increase in price"; if the empirical data show that consumers would "respond to a SSNIP by making purchases outside the proposed market definition, thereby rendering the SSNIP unprofitable, then the proposed market definition is too narrow" and must be expanded to include other economic substitutes of the defendant's product. *Epic*, 67 F.4th at 975.

woefully inadequate. Plaintiffs contend that EVs "cost more than their similarly equipped, ICE-vehicle counterparts." (*Id.* ¶ 37.) But "price differential alone does not govern the scope of the relevant market." *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979); *Psystar Corp.*, 586 F. Supp. 2d at 1198 ("[A] mere price differential alone does not necessarily signal a distinct market.").

Plaintiffs also contend that "from January to May 2022, EV prices [reportedly] jumped 22% while non-EV motor vehicle prices increased only 14%." (CAC ¶ 37.) But even assuming a rise in EV prices (a generous assumption),[26] in percentage terms, compared to *all* non-EVs (not just energy-efficient vehicles with comparable features) says nothing about whether a SSNIP on EVs would be profitable. *See German Auto*, 497 F. Supp. 3d at 757 (rejecting a similar attempt to rely on "a general 'price premium' for diesel vehicles without reference to comparable premiums for other environmentally friendly vehicles"). Moreover, a relative rise in prices over five months is far from "non-transitory." *See United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1112 (N.D. Cal. 2004) (the non-transitory requirement of a SSNIP means "lasting for the foreseeable future").

Plaintiffs also say the SSNIP test is met because Tesla has been able to increase prices while increasing sales. (CAC ¶ 37.) Yet Plaintiffs concede that Tesla has decreased prices (*id.*),[27] and that Tesla's share of EV sales has declined precipitously even during Plaintiffs' arbitrary timeframe (*id.* ¶ 42). Plaintiffs plead no facts to support the inference that the alleged rise in Tesla prices reflects market power rather than other factors, such as supply constraints, new features, quality improvements, inflation, or any other factors that can impact pricing and have nothing to do with market power. A price increase driven by these factors, which the Complaint does not rule out, would have no bearing on the question of whether a monopolist could profitably impose a SSNIP on EVs. *See, e.g.*, *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995). Plaintiffs' vague and conclusory pricing allegations fail to provide a plausible basis for their SSNIP claim.

Plaintiffs' Sherman and Cartwright Act claims, which all rely on the inadequate foremarket pleading, fail.

---

[26] Plaintiffs ignore that Tesla recently disclosed reduced prices to the market in 2023. *See, e.g.*, Lavely Decl. Ex. C (Tesla Mar. 2023 Form 10-Q) at 26.

[27] *See supra* n.26.

1

### C.      Plaintiffs' Alleged Aftermarkets Fail.

Because Plaintiffs have not pleaded a plausible foremarket, the alleged aftermarkets fail because a plaintiff's "aftermarket theory" is, by definition, "tethered to [a] foremarket." *Epic*, 559 F. Supp. 3d at 955. Plaintiffs' aftermarket allegations fail for the additional reason that they do not plausibly plead the factors required to establish a single-brand aftermarket.

In *Eastman Kodak Co. v. Image Technical Services, Inc.*, the U.S. Supreme Court held that a cognizable relevant aftermarket can exist only where the facts demonstrate that customers are unknowingly "locked in" to the aftermarket "such that competition in the foremarket cannot 'discipline [competition in] the aftermarkets.'" *Epic*, 67 F.4th at 976-77 (quoting *Kodak*, 504 U.S. 451, 486 (1992)). *Kodak* involved a foremarket of photocopiers and an aftermarket for replacement parts and servicing of Kodak-brand photocopiers. Since then, "[c]ourts have been extremely reluctant to . . . extend [single-brand aftermarket theories] to other types of goods," *Streamcast Networks v. Skype Techs., SA*, 547 F. Supp. 2d 1086, 1094-95 (C.D. Cal. 2007).

As noted above, this Court has acknowledged that single-brand markets are "extremely rare," and "it is an understatement to say that single-brand markets are disfavored." *Epic Games*, 559 F. Supp. 3d. at 1021. The Ninth Circuit, in fact, recently affirmed this court's decision rejecting single-brand aftermarket claims in the context of cell-phone app stores. *See Epic*, 67 F.4th at 981. In doing so, the Ninth Circuit confirmed the exacting standard a plaintiff must show to sustain a single-brand aftermarket: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Id.* at 977. Each of these criteria must be established to plead a cognizable single-brand aftermarket.[28] Plaintiffs fail on each one.

*No General Knowledge*: Without the "crucial" showing that "the challenged aftermarket

---

[28] Plaintiffs seem to suggest that they can avoid pleading the lock-in factors based on their claim that Tesla has monopoly power in the alleged EV-only foremarket. (CAC ¶ 30.) That is wrong. A plaintiff "must" establish each lock-in factor to show a cognizable relevant aftermarket—the Ninth Circuit did not identify any exceptions in *Epic*.

1   restrictions are 'not generally known' when consumers make their foremarket purchase," there is an

2   "economic presumption" that "consumers make a knowing choice to restrict their aftermarket options"

3   when they make their foremarket purchase. *Id.* at 976, 977-78 (citing *Newcal*, 513 F.3d at 1050).

4        Plaintiffs do not even attempt to establish this "crucial" requirement. The Complaint lacks any

5   factual allegation that Tesla purchasers are not generally aware of the alleged aftermarket restrictions.

6   To the contrary, Plaintiffs allege that the supposed "shortcomings in Tesla service" (and other alleged

7   restrictions) "are widely documented." (CAC ¶ 158.) For example, they allege: (i) Tesla's SEC filings

8   state that it designs its vehicles to "effectively limit[] anyone other than Tesla from being able to provide

9   maintenance and repair services for its EVs" (*id.* ¶¶ 101-03); (ii) Elon Musk tweeted[29] that Tesla's

10  service locations in North America "have major gaps in geographic coverage!" (*id.* ¶ 156); (iii) Tesla's

11  owner's manual advises, "Use only genuine Tesla parts and accessories" (*id.* ¶ 145); (iv) Tesla's

12  warranty "strongly discourage[s] owners from obtaining parts or services anywhere else, at the risk of

13  voiding their warranties" (*id.* ¶ 140); (v) online forums are "replete with stories by Tesla owners of Tesla

14  invalidating warranties" and "widely discussed" defects (*id.* ¶¶ 146, 166); (vi) Tesla's 2014 and 2015

15  SEC filings disclosed that Tesla purchases some EV components from a single source (allegedly to

16  restrict the availability of Tesla parts) (*id.* ¶¶ 115-18); and (vii) Tesla's online catalog reveals the

17  supposedly inflated prices of Tesla vehicle parts (*id.* ¶ 162).

18       Plaintiffs cannot have it both ways. Either the alleged restrictions are not actually aftermarket

19  restrictions, or they are generally known to consumers (as demonstrated through Plaintiffs' own

20  allegations). Either dooms Plaintiffs' claims.

21       Plaintiffs' claims are not saved by the allegation that Tesla "misleadingly tells consumers that its

22  EVs are specifically designed to require little or no maintenance" (*id.* ¶ 47) and that "its EVs have fewer

23  moving parts that could [possibly] need to be replaced" (*id.* ¶ 61). Supposedly telling consumers that

24  EVs are *designed* to require little or no maintenance and have *fewer* moving parts plainly does not speak

25  to what options are available if and when maintenance and parts are required.[30]

26  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

27  [29] *See* Lavely Decl. Ex. D (Tesla Nov. 2013 Form 8-K) at 1 (disclosing to the market that Musk's Twitter account is an official Tesla communication).

28  [30] Nor are the statements misleading as pleaded. With regard to the claim that EVs are designed to

*Information Costs*: As *Epic* makes clear, in addition to showing no general knowledge, a plaintiff also must show that information costs prevent accurate life-cycle pricing. 67 F.4th at 977. Plaintiffs offer only the conclusory allegation that "[i]t is difficult, if not impossible, for a consumer to accurately forecast how much money will need to be spent on Tesla-compatible parts over the lifetime of an EV prior to purchase." (CAC ¶ 61.) Yet other allegations contradict that point. For example, Plaintiffs assert that (i) Tesla's publicly available parts catalog discloses the cost of Tesla parts (*id.* ¶ 162), (ii) the purported hourly rate for Tesla Repair Services is documented in blog posts (*id.* ¶¶ 159-160) and (iii) public sources disclose the "average cost to maintain a Tesla EV . . . per year" (*id.* ¶ 163).

*Switching Costs*: Switching costs are "the costs borne by leaving one platform to go to a different platform." *Epic*, 559 F. Supp. 3d at 956 n.254. Plaintiffs do not adequately plead any such costs. Based on the allegation that "the cost of an EV is considerably higher than the cost of an individual maintenance or repair service," Plaintiffs leap to the conclusion that "it is not economically feasible for a Tesla EV owner to switch to a different EV in order to avoid the high prices and low supply of Tesla Repair Services." (CAC ¶ 48.) Although true that buying a new car costs more than repairing a car, that says nothing about the cost of switching from a Tesla to a different vehicle. Consumers sell their cars for a range of reasons. Plaintiffs do not identify a basis to infer that a Tesla owner who is unhappy with the available repair options would find it uneconomical to sell her car and take her business elsewhere.

*General Market Definition Principles*: Even where an aftermarket satisfies all the above criteria, it still "must bear the 'practical indicia' of an independent economic entity in order to qualify as a cognizable" market, based on "general market-definition principles regarding cross-elasticity of demand." *Epic*, 67 F.4th at 977. Plaintiffs' allegations fail here as well for two independent reasons.

*First*, Plaintiffs have not described the alleged aftermarkets with nearly the degree of specificity required to establish them under such principles. Indeed, as to the make-up of the alleged aftermarkets, the Complaint merely alleges that they comprise the "various parts" and "various services" (not covered

---

require little or no maintenance, the actual statement from Tesla (quoted in the Complaint) is that Tesla vehicles are designed with the "goal of eliminating the need for service." (CAC ¶ 99.) The statement is plainly aspirational, not a promise of "no maintenance" (which would be facially unbelievable). With regard to the statement about "fewer moving parts," the Complaint does not even allege that it is untrue—it is silent on whether EVs actually have more or fewer moving parts than ICE vehicles.

DEFENDANT TESLA, INC.'S MOTION TO DISMISS; Case No. 3:23-CV-1145-TLT

under warranty) used to "repair and maintain Tesla EVs." (CAC ¶¶ 44, 58.) As pleaded, there is no way to know what specific services or parts are included (or not) in the alleged aftermarkets; and there is no way to know whether the alleged aftermarkets encompass the products that a consumer might substitute for repairs or parts they might need, as *Epic* requires. *Epic*, 67 F.4th at 975.

*Second*, Plaintiffs have not plausibly established the geographic component of their alleged aftermarkets. A market includes both a product market and a geographic market, which must be defined by the area "where buyers can turn for alternative sources of supply." *Reilly*, 578 F. Supp. 3d at 1109 (quotations omitted). Plaintiffs assert that the relevant geographic market for its alleged aftermarkets is the United States (CAC ¶ 43), but their allegations are deficient.

For the alleged parts aftermarket, Plaintiffs assert that "American Tesla owners do not and would not turn to parts manufactured for sale outside the United States as a result of shipping costs" and "differing regulatory requirements." (*Id.* ¶ 70.) But there is no support for why these are impediments, especially in a globalized economy. For example, the Complaint does not allege any instances in which parts might have been imported but were not because of shipping costs. It is similarly implausible that there are not at least some parts that can be used in U.S. and foreign vehicles.

For the alleged services aftermarket, Plaintiffs do not explain how repair services in distant parts of the country are competitive substitutes. For instance, Plaintiffs assert that "cost and wait times associated with moving vehicles and parts back and forth" prevent repair services outside the U.S. from competing with repair services inside the U.S. (*id.* ¶ 71), but do not explain why that consideration does not prevent repair services in California from competing with repair services in New Jersey. *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 119 (D.D.C. 2004); *PSKS, Inc. v. Leegin Creative Prods., Inc.*, 615 F. 3d 412, 418 (5th Cir. 2010) (rejecting market definition as "too broad and vague").

Thus, Plaintiffs' alleged single-brand aftermarket claims should be dismissed for the independent reason that they fail to "encompass all interchangeable substitute products" and therefore do not satisfy general market definition principles regarding cross-elasticity of demand. *Hicks*, 897 F. 3d at 1123.

## II. Plaintiffs Do Not Plausibly Plead Monopolization or Attempted Monopolization Claims Under Section 2 of the Sherman Act.

Plaintiffs contend that Tesla monopolized, or attempted to monopolize, the alleged Tesla-

17

Compatible Parts and Tesla Repair Services aftermarkets in violation of Section 2 of the Sherman Act. To prevail on a motion to dismiss, a plaintiff pleading monopolization must establish that the defendant has monopoly power in a relevant market and that it secured or maintained that monopoly power through exclusionary conduct, not competition on the merits. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137-38 (9th Cir. 2022). Attempted monopolization requires that the defendant have a dangerous probability of achieving monopoly power in the relevant market and that it engaged in the conduct with the intent to monopolize. *Reveal Chat Holdco, LLC. v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000-03 (N.D. Cal. 2020).

Even if Plaintiffs had sufficiently pleaded the alleged aftermarkets (and they have not, *see* Section I.B), Plaintiffs' Section 2 claims fail for two independent reasons: (1) Plaintiffs have not plausibly alleged that Tesla has monopoly power or a dangerous probability of achieving it in the alleged aftermarkets; and (2) Plaintiffs have not plausibly alleged anticompetitive conduct.

### A.   Plaintiffs Have Not Plausibly Alleged Monopoly Power, or a Dangerous Probability of Achieving It, in the Alleged Aftermarkets.

Plaintiffs' Section 2 claims fail because they do not sufficiently allege monopoly power or attempted monopoly power in the alleged aftermarkets. "Monopoly power" means a "substantial" or "extreme degree" of market power. *Epic*, 559 F. Supp. at 1028. Whereas market power is "the ability to raise prices above those that would be charged in a competitive market," monopoly power means "the power to control prices or exclude competition." *Id*. at 1027-28. Such power must be "durable and sustaining" to constitute monopoly power. *Id*. at 1028. A "dangerous probability" of achieving monopoly power means the defendant holds a position so proximate to monopoly that the challenged conduct threatens success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 & n.7 (1993).

Plaintiffs assert that Tesla has monopoly power (or a dangerous probability of achieving it) in the alleged aftermarkets but offer *no specific facts* to support that assertion. (CAC ¶ 195.) To the contrary, the Complaint contradicts and undercuts Plaintiffs' monopoly power claim. For example, Plaintiffs concede that Tesla's parts catalog and service manuals *are free and available online*. (*Id*. ¶¶ 105-106.) Tesla also provides diagnostic software that customers can use to address their most common repair and maintenance needs; it does so for free, without a subscription, and directly embedded into the vehicle's

touchscreen.[31] Those are not actions of a company with the ability and intent to control prices and exclude rivals in the alleged aftermarkets. *Somers*, 729 F.3d at 964 (dismissing Section 2 claim where plaintiff's "own allegations do not square with her [monopolization] theory").

The Complaint also says nothing specific about Tesla's supposed share of the alleged aftermarkets or the shares of Tesla's supposed aftermarket rivals (independent and do-it-yourself repairers). Nor does it say when Tesla supposedly acquired a monopoly share (or near monopoly) in the alleged aftermarkets. As detailed above, the Complaint acknowledges that non-Tesla options exist for both services and parts, but alleges no specific facts about the size of the alleged aftermarkets, the shares of any competitors (including Tesla) in the alleged aftermarkets, or the means of calculating share. For instance, the Complaint alleges only that there is "a small handful of Tesla-Approved Collision Centers."[32] (CAC ¶ 120.) In fact, as shown on the Tesla website cited by Plaintiffs,[33] there are currently 734 Tesla-Approved Collision Centers across the country that, by Plaintiffs' admission, *compete* with Tesla.[34] (*Id.* ¶ 110(d).) Similarly, with respect to the alleged parts aftermarket, Plaintiffs allege only that "numerous parts in Tesla's catalog are unavailable for purchase" and that "there is absolutely no alternative to Tesla replacement for the vast majority of parts." (*Id.* ¶¶ 106, 114.) Yet the Complaint cites examples of non-Tesla repair shops providing repairs where "the parts used could mostly be obtained at a local home improvement store."[35]

Plaintiffs' failure to allege market share for the purported aftermarkets is fatal to Plaintiffs' monopolization and attempted monopolization claims. *See Terminalift LLC v. Int'l Longshore & Warehouse Union Local 29*, No. 11-1999, 2013 WL 2154793, at *6 (S.D. Cal. May 17, 2013) ("Because there is no allegation regarding [market shares], Terminalift has failed to plead facts suggesting a

---

[31] Lavely Decl. Ex. N (Tesla Service Subscription Information).

[32] *See also* CAC ¶ 52 ("[T]here is an *insignificant number* of independent service providers to whom Tesla owners may turn to repair or maintain their EVs" (emphasis added)).

[33] Lavely Decl. Ex. O (Tesla Collision Support).

[34] Given the admitted competition between Tesla and the independent Tesla-Approved Collision Centers (CAC ¶ 110(d)), the Tesla-Approved Collision Centers cannot be attributed to Tesla for purposes of determining its share of any market. *Epicor Software Corp. v. Alt. Tech. Sols., Inc.*, 2013 WL 12130024, at *2 (C.D. Cal. Dec. 2, 2013) (finding "market share of an [alleged] monopolizer and its competitors may be aggregated only where the [alleged] monopolizer controls the ersatz competitors to such a degree that all the entities should be considered a single firm for Sherman Act purposes").

[35] Lavely Decl. Ex. J (Substack article regarding Tesla repairs).

dangerous probability of success."); *MLW Media*, 2023 WL 1975241, at *4 (dismissing claims alleging an 85% market share where "Plaintiff does not even allege what it is measuring"); *FTC v. Facebook*, 560 F. Supp. 3d 1, 17-20 (D.D.C. 2021) (dismissing complaint that "do[es] not even provide an estimated actual figure or range for Facebook's market share at any point over the past ten years," "does not even allege what it is measuring," and "does not identify any other providers [in the relevant market]") (citing cases with similar results).

### B.    Plaintiffs Have Not Adequately Pleaded Any Anticompetitive Conduct.

Even if Plaintiffs had adequately pleaded monopoly power in the alleged aftermarkets, the "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Dreamstime.com*, 54 F.4th at 1137. As such, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct.*" *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). Anticompetitive conduct is a limited concept: it does not include any and all conduct that makes it harder for competitors to compete. *Dreamstime.com*, 54 F.4th at 1137-38. After all, the entire point of competition is to attract consumers *to* your products and services and *away* from the products and services of your competitors. Anticompetitive conduct does not include "product improvement," *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010), nor businesses' choices about "the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Conduct is anticompetitive *only* if it (1) was performed "with an 'intent to control prices or exclude competition in the relevant market,'" and (2) "harm[ed] 'the competitive process' as a whole." *Dreamstime.com*, 54 F.4th at 1137. Plaintiffs raises five categories of supposedly anticompetitive conduct. None of the allegations comes close to meeting the required standards. Plaintiffs' Section 2 claims therefore must be dismissed.

#### 1.    Allegations Regarding Tesla's Business Model

Plaintiffs' overarching theory is that "Tesla created the conditions that made timely, reasonably priced Tesla Repair Services and Tesla Replacement Parts unavailable to EV owners in order to maximize its own profits." (CAC ¶ 110.) Although Plaintiffs' theory focuses on Tesla's EV design (*id.*

20

¶ 197(b)), in effect, they attack Tesla's entire business model (*e.g.*, *id*. ¶ 110). All the allegations fail, however, for the same reason: the conduct at issue is not anticompetitive as a matter of law.

Nor have Plaintiffs come close to showing that Tesla engaged in any of the alleged conduct with an "intent to control prices or exclude competition." *Dreamstime.com*, 54 F.4th at 1137. The key premise of Plaintiffs' theory is that "the repair and replacement parts business was expected to eventually become highly profitable in the long-term," so "Tesla's incentive was to keep as much of the market share for that business as it could." (CAC ¶ 109.) (Though, as noted above, Plaintiffs fail to allege a specific market share.) But there is not a single allegation that supports this theory. As the Complaint makes clear, Tesla's revenues from its EV sales/leases have always dwarfed its repair/parts revenues. (*Id*.) And there is no support offered for saying that Tesla (or anyone else) expects the repair/parts business to be "highly profitable" in either the short or long term. It defies common sense that Tesla would intentionally limit the availability of repairs and parts (thereby frustrating customers) in order to control prices in those alleged aftermarkets when doing so could seriously jeopardize future EV sales—the primary driver of Tesla's revenue. *See Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) ("On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is plausible in light of basic economic principles." (quotations omitted)).

With that context, none of the alleged anticompetitive conduct withstands scrutiny:

*Direct Sales Model*: Plaintiffs criticize Tesla's decision to sell "directly to consumers." (CAC ¶ 110(a), 111-112.) Tesla's approach to selling cars has been disclosed for more than a decade,[36] well before Tesla began conducting repairs. (*Id.* ¶ 126.) Although there are numerous procompetitive reasons for this direct sales approach, the Court need not consider those reasons because Plaintiffs offer no explanation why this sales model is anticompetitive, nor do they allege that Tesla opted not to use dealers with the intent to control prices or exclude competition in the alleged aftermarkets.

*EV Design*: Plaintiffs allege that Tesla designs its EVs "such that most maintenance and repairs require access to diagnostics and telematics accessible only through remote management tools exclusively accessed by Tesla." (*Id.* ¶ 197(b).) This conclusory allegation, even if true, does not

---

[36] Lavely Decl. Ex. P (Tesla Approach To Distributing and Servicing Cars).

constitute anticompetitive conduct. "[C]ourts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Allied Orthopedic*, 592 F.3d at 998 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001)). There is nothing in the antitrust laws that requires a company to design its products in a way that gives rivals easier access to them. *Id*. The antitrust laws are not designed to punish companies that develop innovative or superior products.

Plaintiffs allege no facts indicating that Tesla designs its EVs for the specific *purpose* of excluding repair/parts competitors, as opposed to reasons concerning cyber-security, passenger safety, aesthetics, customer convenience or any other non-exclusionary purpose. This failure to "allege a specific intent to monopolize" is fatal. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987). For example, the Complaint suggests that Tesla selected aluminum (rather than steel) frames to make it harder to obtain replacement parts. (CAC ¶¶ 110(b), 113.) There is zero support for that allegation; once again, it defies common sense that Tesla would compromise on the very structure of its vehicles to control prices in a segment of its business that in no way drives Tesla's profits. Tesla's website provides the actual (and logical) reason: aluminum is far lighter than steel, which increases overall vehicle efficiency and functionality.[37] And as with the direct sales model, Tesla developed the fundamental design of its EVs long before it began conducting repairs. (*Id*. ¶¶ 88-91, 126.)

Plaintiffs also fail to allege any facts supporting the inference that the design choices actually exclude any rival in the alleged aftermarkets. In fact, as discussed below (Section II.B.2), Plaintiffs concede that non-Tesla repair shops have access to diagnostic information.

*Certification of Tesla-Approved Collison Centers*: Plaintiffs allege that Tesla has "created barriers to the establishment of independent Tesla repair shops" by requiring "extensive investment and training of personnel of all collision shops that sought Tesla certification." (CAC ¶ 110(c), (d).) As an initial matter, the Complaint's allegations regarding the origin and growth of Tesla-Approved Collison Centers directly undermine Plaintiffs' allegation that "Tesla effectively limits anyone other than Tesla

---

[37] *E.g.*, Lavely Decl. Ex. Q (Tesla Birthplace of the Model S). (*See* CAC ¶ 129 ("The unusual combination allows Tesla to balance affordability and functionality.")

from being able to provide maintenance and repair services for its EVs."[38] (*Id.* ¶¶ 101, 126-127.)

Plaintiffs admit that non-Tesla repair shops existed before Tesla entered the repair market. (*Id.* ¶ 126.) They also admit several other key points about the non-Tesla options: (1) the Tesla-Approved Collision Centers are independent of Tesla (*id.* ¶ 55); (2) Tesla *competes* with these repair shops (*id.* ¶ 110(d)); (3) a certification process for independent repair shops is standard: "all vehicle manufacturers . . . certify independent repair facilities to provide repairs" (*id.* ¶ 120); (4) after obtaining certification, Tesla *promotes* its competitors as options for customers on its website (*id.* ¶ 55 n.35); and (5) there are procompetitive reasons for such certification; for example, as stated by Collision Pros (a Tesla-Approved Collison Center whose website Plaintiffs quote liberally): "Even though it may be difficult to get your car into a certified Tesla auto body repair shop, it will be well worth the wait in the end. Certified shops have the experience and tooling to assure the process is right."[39] There is simply no basis to conclude that the certification of the Tesla-Approved Collision Centers is anticompetitive.

*Lack of Investment in Repair/Parts for Tesla-Owned Facilities*: Plaintiffs strangely allege that in order to *monopolize* the aftermarkets for parts and repairs, Tesla (1) has made "woefully inadequate investment in company-owned Tesla Service Centers and Collision Centers," (2) "allocated substantially all parts to the manufacture of new vehicles instead of making them available to customers who needed repair and replacement parts" and (3) "for some parts, declines to permit repairs even at its own Tesla Service Centers." (CAC ¶ 110(e), (f), (g).) But the Complaint pleads no facts supporting Plaintiff's illogical theory regarding Tesla's supposed motive. *Iqbal*, 556 U.S. at 678.

*Public Statements*: Plaintiffs devote many pages of the Complaint to addressing a selective recitation of "historical background," including allegations that some state legislatures have considered "right to repair" legislation, and that one state, Massachusetts, passed a ballot measure that Tesla allegedly "actively fought."[40] (CAC ¶¶ 75-87.) But even assuming the truth of these allegations, any

---

[38] The Complaint also suggests a Tesla owner may choose from only "two types of services appointments" (both from Tesla). (CAC ¶ 54 n.33.) As the quoted Tesla website makes clear, however, those are the options if you want to make an appointment *through Tesla's app*. Tesla of course has no obligation to enable customers to make appointments at non-Tesla repair shops via Tesla's app.

[39] Lavely Decl. Ex. K (Collision Pros article regarding Model 3 parts).

[40] *See Alliance for Automotive Innovation v. Massachusetts*, No. 20-cv-12090 (D. Mass.) (docket for litigation brought by various car and truck manufacturers challenging Massachusetts SD645, the 2020 ballot initiative). Tesla is not involved in this litigation.

statements that Tesla has or has not made about any legislative initiatives or industry commitments do not constitute anticompetitive conduct, nor do Plaintiffs allege otherwise. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (petitioning government officials is generally immune from antitrust liability). No plausible inferences about anticompetitive conduct can be drawn from Tesla's alleged participation or lack of participation in public debate over *proposed* laws. Plaintiffs also fail to acknowledge that work on the 2023 Automotive Repair Data Sharing Commitment is ongoing. (*Id.* ¶ 80.) (Tesla has, in fact, supported that Commitment.)

2. <u>Allegations Regarding Access to Repair Information and Parts.</u>

Plaintiffs allege that Tesla limits access to its manuals, vehicle telematic data, diagnostic tools, and OEM replacement parts. (CAC ¶¶ 197(c), 201, 208(b), 212.) But the Complaint and the documents on which it relies undermine these allegations.

*Service Manuals*: Plaintiffs admit that Tesla's service manuals are publicly available for free. (*Id.* ¶ 105.) There is no limit on access.

*Telematic Data*: There are no allegations regarding what telematics non-Tesla repair shops can or cannot access.

*Diagnostic Tools*: Tesla offers free diagnostic software embedded into the vehicle touchscreen for most common repairs.[41] The Complaint acknowledges at least one procompetitive reason for Tesla's decision to provide "remote diagnostics and over-the-air software updates": "you'll spend less time in the shop and more time on the road." (*Id.* ¶ 99.)

Tesla also makes diagnostic software available for $3,000 per year, including to "independent facilities." (*Id.* ¶¶ 105, 124.) There is no non-conclusory allegation indicating that these fees are or were unreasonable, inconsistent with industry practice, not assessed to cover costs or, most importantly, exclusionary in any way. There are no facts alleged to support any inference that independent repair shops cannot afford the fee and still stay in the business of servicing Tesla vehicles. *See Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 545 (9th Cir. 1991) (finding no antitrust violation where access fee was not so high as to drive away competition). Firms have no antitrust duty to "give away" their products. *Free Freehand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012);

---

[41] Lavely Decl. Ex. N (Tesla Service Subscription Information).

1   *see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("Competitors are

2   not required to engage in a lovefest.").

3          Plaintiffs' only objection is that the specific diagnostic package that Tesla makes available "does

4   not provide sufficient information for many kinds of repairs." (CAC ¶ 124.) This allegation is

5   nonspecific and conclusory. And even if true, Plaintiffs do not plead any facts suggesting that Tesla

6   intentionally made such information unavailable for the *purpose* of excluding competitors. Nor do they

7   allege any facts from which it can reasonably be inferred that the purported limits on diagnostic tools

8   have excluded any rivals from the alleged aftermarkets. In any event, Tesla has no duty to make every

9   part available to its rivals. "[B]usinesses are free to choose the parties with whom they will deal as well

10  as the prices, terms and conditions of that dealing." *Pac. Bell*, 555 U.S. at 448.

11         *OEM Replacement Parts*: Plaintiffs make various vague allegations regarding the availability of

12  parts. For example, Plaintiffs allege that (1) "most parts are not interchangeable with parts designed for

13  use with other manufacturers' vehicles" (CAC ¶ 63); (2) "there are few if any non-OEM parts

14  manufacturers" and "Tesla limits consumer access to Tesla OEM parts" (*id.* ¶ 65); (3) Tesla requires an

15  "application" to make a parts purchase (with no allegation that any application has been denied) (*id.*

16  ¶ 106); (4) "numerous parts in Tesla's catalog" (unspecified number) are "unavailable for purchase"

17  (*id.*); (5) "Tesla reportedly ignores parts requests from independent repair shops" (*id.* ¶ 107); and

18  (6) "there is absolutely no alternative to Tesla replacement for the vast majority of parts" (*id.* ¶ 114).

19  Plaintiffs plead no specific facts supporting these conclusory allegations. *Iqbal*, 556 U.S. at 678. And the

20  Complaint does not explain how these alleged costs, requirements and unavailability are "so significant

21  as to prevent" entry into the alleged aftermarkets. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No.

22  5:16-CV-06370-EJD, 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017).

23         There is no plausible allegation of anticompetitive conduct relating to the supposed

24  unavailability of certain parts in the catalog. Plaintiffs do not plead any facts suggesting that Tesla

25  intentionally made certain parts unavailable for the purpose of excluding rivals, or that any rivals were

26  actually excluded. To the contrary, an independent repair shop (quoted by Plaintiffs) says that "high

27  demand" was the most likely reason for certain parts shortages, adding, "The staff at Tesla has done a

28

1   good job and[sic] finding their bottlenecks and getting them fixed."[42]

2         Nor do Plaintiffs address the possibility that the unavailability of parts is due to cyber-security or

3   safety concerns, supply constraints, recalls or any other of a range of non-exclusionary reasons.

4   Plaintiffs say nothing about how many parts are unavailable, their importance to competition, or how

5   their supposed unavailability affects rivals' ability to compete in the alleged aftermarkets. These are

6   fatal omissions.

7                  3.    <u>Allegations Regarding Warranties.</u>

8         Plaintiffs' allegations concerning Tesla's warranties do not describe anticompetitive conduct.

9   (*See* CAC ¶¶ 140-150, 197(a).) As described in Section V.B., below, the warranty terms comply with

10   federal warranty law. Plaintiffs acknowledge that the policies themselves do not prevent Tesla owners

11   from using third-party repair shops or parts. (*Id.* ¶ 140.) Rather, the warranties say only that coverage

12   "may" be voided if damage is caused by "improper" maintenance, service or repairs. (*Id.* ¶ 141.) There

13   is no antitrust duty to extend warranty coverage to damages caused by improper service or repairs, and

14   there is nothing anticompetitive about Tesla's warranty policies, especially where Tesla's competitors

15   "impose similar restraints." (*Id.* ¶ 49.)

16         Plaintiffs claim that, in practice, Tesla's warranties "strongly discourage" consumers from going

17   anywhere but Tesla for parts and repairs. (*Id.* ¶ 140.) That is also insufficient. Plaintiffs' only examples

18   are a handful of consumers complaining about Tesla service in online forums. Such one-off anecdotes

19   do not come close to supporting an inference of exclusionary conduct resulting in monopolization of a

20   nationwide market for all Tesla parts and services.[43] Nothing in Tesla's policy can reasonably be

21   construed as "harm to the competitive process" under any plausible reading.[44] *See In re eBay Seller*

22

---

23       [42] Lavely Decl. Ex. K (Collision Pros article regarding Model 3 parts).

    [43] *See Aerotec*, 836 F.3d at 1186; *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir.
24   2012) (affirming dismissal where plaintiffs "ha[d] not alleged in their complaint how competition (rather
than consumers) is injured"). One of Plaintiffs' anecdotes involves a Tesla owner who resides in
25   Canada—outside Plaintiffs' alleged geographic market—whose window repair was not covered by
warranty where he had modified his car in a way that may have affected window function (as the
26   comments on the blog post note). (CAC ¶ 147 n.106.)

27       [44] Plaintiffs' allegations regarding Tesla's "salvaged" (severely damaged) vehicle policy similarly fall
well short of alleging exclusionary action. (CAC ¶¶ 149-50.) Plaintiffs do not even attempt to connect
28   the policy to any anticompetitive effect. Moreover, there are facially procompetitive reasons supporting

1  *Antitrust Litig.*, 545 F. Supp. 2d 1027, 1032 (N.D. Cal. 2008); *Dreamstime.com*, 54 F.4th at 1138

2  (requiring a showing of "harm[] [to] 'the competitive process' as a whole").

3          4.      Allegations Regarding Exclusivity Agreements with Parts Suppliers.

4          Plaintiffs do not assert an exclusive dealing claim but nonetheless ask the court to infer that

5  Tesla's allegedly "*de facto*" exclusive agreements with "at least some" parts suppliers have an

6  anticompetitive effect supporting a claim of monopolization. (CAC ¶ 116.) But the Complaint identifies

7  only one such alleged agreement (a Tesla/Panasonic agreement filed with the SEC in 2014) (*id.* ¶ 117),

8  and Plaintiffs say nothing about what parts are even covered by that contract, much less the percent of

9  the alleged aftermarket attributable to the covered part(s). There also are no allegations about the

10  duration of the exclusivity, nor anything to indicate that the exclusivity actually foreclosed competitors

11  in the alleged aftermarkets. There is simply nothing in the allegations enabling an inference of

12  substantial market foreclosure relating to the alleged exclusivity, and therefore no basis to infer that the

13  alleged exclusivity is anticompetitive.[45]

14          Plaintiffs have not shown that Tesla used exclusivity agreements to "unlawfully foreclose

15  competition" in the putative market for Tesla parts. *PNY Techs., Inc. v. SanDisk Corp.*, No. 11-CV-

16  04689-WHO, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) (exclusivity agreements "are often

17  entered into for entirely procompetitive reasons, and generally pose little threat to competition").

18          5.      Allegations Regarding Collision Center Exclusivity Agreements with Parts

19                  Suppliers.

20          Plaintiffs allege that Tesla requires Tesla-Authorized Collision Centers "to enter into *de facto*

21  exclusivity agreements, preventing them from conducting repairs and maintenance for Tesla EVs using

22  parts other than those sold and supplied by Tesla." (CAC ¶ 242.) That is the only sentence on the subject

23  in the Complaint, so it is unclear whether Plaintiffs are even alleging that such agreements exist or that

---

24  the policy, such as avoiding risks to repair technicians. (*Id.* ¶ 149 n.107); *see Univ. Grading Serv. v.*

25  *eBay*, *Inc.*, No. C-09-2755, 2012 WL 70644, at *6 (N.D. Cal. Jan. 9, 2012) ("With reasonable, pro-
competitive justifications for the [policy] evident from the face of the complaint . . . plaintiffs' claim

26  cannot withstand scrutiny even on a motion to dismiss."). There is nothing that supports Plaintiffs'
allegation that this is an exclusivity agreement.

27  [45] The quoted (partially redacted) language from the Tesla/Panasonic agreement establishes only that
the manufacturing equipment would remain Tesla property where the work at issue was taking place in a

28  manufacturing facility *owned by Tesla*. (CAC ¶ 117 n.85.)

they constitute anticompetitive conduct. There is not a single example of such an agreement or any other information to support this allegation. Such conclusory assertions are plainly insufficient.

**III.     Plaintiffs Do Not Plausibly Allege a Combination in Restraint of Trade under the Cartwright Act.**

As discussed above, Plaintiffs allege two types of "*de facto* exclusivity agreements": (1) with parts suppliers (identifying only one such alleged agreement); and (2) with Tesla-Approved Collision Centers (identifying no such alleged agreements). (CAC ¶¶ 116-17, 241-242.) Plaintiffs fall far short of alleging a Cartwright Act violation.

California law recognizes that exclusivity agreements "may provide an incentive for the marketing of new products and a guarantee of quality-control distribution" and can therefore be procompetitive. *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 335 (2003) (citations and quotations omitted). Analyzed under the rule of reason,[46] exclusivity agreements are proscribed only when "it is probable that performance of the contract will foreclose competition in a substantial share of the affected line of commerce." *Id.*

The Complaint makes the conclusory assertion that Tesla's alleged agreements "foreclose competition in a substantial share" of the alleged aftermarkets (CAC ¶ 245), but nothing more. *Iqbal*, 556 U.S. at 678. Critically, Plaintiffs fail to plead the number of suppliers or Tesla-Approved Collision Centers that have entered into the alleged arrangements with Tesla or that the alleged foreclosure is "probable" or impacts a "substantial share" of commerce. *See Eastman v. Quest Diagnostics Inc.*, No. 15-CV-00415-WHO, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018). In *Eastman*, this Court held that "plaintiffs have not provided sufficient details about the dynamics of the relevant market to gauge whether [defendant's] alleged exclusive dealing arrangements have resulted in substantial foreclosure." *Id.* at *8. The Court reasoned that plaintiffs had not "identified, for example, the approximate number of medical providers that have entered into such arrangements with [defendant], the approximate number and/or characteristics of the other laboratories operating in the physician billing and plan/outpatient markets, or what competing laboratories have been adversely

---

[46] The rule of reason "measures whether the anticompetitive aspect of a vertical restraint outweighs its procompetitive effects." *Exxon Corp. v. Superior Ct.*, 51 Cal. App. 4th 1672, 1681 (1997).

affected by the arrangements or the extent to which they have been affected." *Id*.

Like the *Eastman* plaintiffs, Plaintiffs here do not sufficiently allege any facts that would enable this Court to infer that Tesla's conduct has led to any market foreclosure, much less substantial foreclosure, in either of the alleged aftermarkets. Plaintiffs' Cartwright Act claim that alleges a combination in restraint of trade (Count VII) should be dismissed.

## IV.   Plaintiffs Do Not Plausibly Allege a Tying Claim Under the Sherman or Cartwright Acts.

To adequately plead a tying claim under Sherman Act Section 1 and the Cartwright Act, a plaintiff must plausibly allege the existence of two separate products or services, that the defendant conditions the sale of the tying product upon the purchase of the tied product, and that the defendant has sufficient power in the market for the tying product to restrain trade in the tied product. *Aerotec*, 836 F.3d at 1178; *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 542 (1998) (requiring proof that "a substantial amount of sale was affected in the tied product" and "the complaining party sustained pecuniary loss as a consequence of the unlawful act" for Cartwright Act claim).

Plaintiffs' Section 1 and Cartwright Act tying claims fail because they have not plausibly alleged any relevant antitrust markets (*see* Section I), which alone is grounds for dismissal. *Newcal*, 513 F.3d at 1044 n.3; *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App. 4th 1277, 1283 (2005). Plaintiffs' tying claims also suffer from other defects, each of which warrants dismissal: (1) Plaintiffs fail to adequately plead the existence of a tie and purport to plead a non-cognizable tie under the Cartwright Act; and (2) Plaintiffs fail to allege market power in any of the alleged tying markets.

### A.   Plaintiffs Have Not Plausibly Alleged a Tie.

Plaintiffs' Section 1 tying claim "falters on the first, most fundamental requirement—the existence of a tie." *Aerotec*, 836 F.3d at 1178; *RLH.*, 133 Cal. App. 4th at 1283-84 (finding the lack of a tying arrangement to be dispositive of a Cartwright Act tying claim). "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Kodak*, 504 U.S. at 461-62 (citation and quotations omitted). "[W]hether there is a tie turns on whether the defendant gave buyers the reasonable impression that it would not sell product A to those who would not buy its B." *Aerotec*, 836 F.3d at 1178 (quotations omitted). Of course, "[w]here the

1    buyer is free to take either product by itself, there is no tying problem." *Dream Big Media Inc. v.*

2    *Alphabet Inc.*, No. 22-CV-02314-JSW, 2022 WL 16579322, at *3 (N.D. Cal. Nov. 1, 2022).

3            Plaintiffs assert, with virtually no explanation, three different alleged tying arrangements:

4    (1) Tesla EVs (tying) and Tesla Repair Services (tied) and Tesla-Compatible Parts (tied); (2) Tesla-

5    Compatible Parts (tying) and Tesla Repair Services (tied); and (3) Tesla Repair Services (tying) and

6    Tesla-Compatible Parts (tied). (CAC ¶¶ 220-22.) As discussed below, none of these alleged

7    arrangements "fit[s] [the Section 1 tying] framework because there is no condition linked to a sale" in

8    any of them. *Aerotec*, 836 F.3d at 1178.

9            *First*, there is no tie. Plaintiffs do not assert any plausible factual allegations to support the

10   inference of an express tie—one memorialized in the form of a contract requiring the consumer to buy

11   Product A in order to buy Product B. *See id.* at 1179. Plaintiffs do not allege that Tesla's written policies

12   dictate that it will sell Tesla parts or services only if a consumer buys a Tesla EV, or vice versa, or that

13   the sale of Tesla parts or services is expressly conditioned on the purchase of one product or the other.

14   There is no allegation that Tesla conditions the sale of its EVs on consumers buying parts or services

15   only from Tesla. The absence of any such allegation alone is grounds to reject the alleged ties with Tesla

16   vehicles as the tying product.

17           Plaintiffs suggest that Tesla ties its vehicle warranty coverage (not its vehicles) to Tesla-supplied

18   parts and services. Plaintiffs acknowledge, however, that Tesla's warranties "do not explicitly require

19   that all such services be performed" by Tesla and "do not expressly require owners to purchase parts or

20   service from their Tesla EVs only through Tesla's app." (CAC ¶¶ 83, 140.) Thus, Plaintiffs effectively

21   admit there is no tie there either. *See Dream Big Media Inc.*, 2022 WL 16579322, at *3 (plaintiffs failed

22   to allege a claim tying Google's mapping API service to any other Google product or service).

23           *Second*, Plaintiffs do not plausibly allege facts that would constitute a *de facto* tie. *Aerotec*, 836

24   F.3d at 1179. Plaintiffs assert that "manufacturers like Tesla" "utilize various methods to discourage

25   consumers from maintaining and repairing their own purchased goods." (CAC ¶ 84.) But Plaintiffs

26   acknowledge that Tesla has made a range of diagnostic and repair resources available to third parties.

27   (*Id.* ¶¶ 105-06.) Such conflicting allegations undermine Plaintiffs' tying claim.

28           There are also no allegations supporting the inference that Tesla imposes any of the following

1   requirements on consumers (explicitly or implicitly): (i) buy parts and services from Tesla in order to

2   buy a Tesla vehicle; (ii) buy parts from Tesla in order to buy services from Tesla; or (iii) buy services

3   from Tesla in order to buy parts from Tesla. Absent plausible allegations of any such conditions, there

4   can be no viable tying claim. *Aerotec*, 836 F.3d at 1180 ("The claim that Honeywell clogs and

5   complicates the parts distribution pipeline to independent servicers cannot substitute for the necessary

6   evidence of an implied condition embedded in the sale of the tying product."). The alleged restrictions

7   on third-party repairers are insufficient. They are pleaded in wholly conclusory terms, and even as

8   alleged, only "discourage" the use of competing products and services by purportedly making it less

9   desirable for consumers to buy from those third parties. (CAC ¶ 140.) That is not enough. Nothing in

10  Ninth Circuit tying precedent suggests that "arguably manipulative tactics imposed on a third-party

11  competitor are sufficient by themselves to create a tie with respect to a separate buyer simply because

12  they make it less desirable to purchase from the third party." *Aerotec*, 836 F.3d at 1180.

13      *Third*, Plaintiffs' Cartwright Act claim independently fails because Section 16727 (on which

14  Plaintiffs rely, CAC ¶ 229) does not apply when the tying product is a service. *See Morrison*, 66 Cal.

15  App. 4th at 548 (dismissing tying claim under Section 16727 because the statute "does not apply when

16  the tying product is a service"); *Tele Atlas N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal.

17  2005) (explaining that Section 16727 only "forbid[s] tying arrangements with respect to tangible

18  goods"). Plaintiffs' Cartwright Act claim regarding the alleged tying arrangement between Tesla Repair

19  Services (tying) and Tesla-Compatible Parts (tied) therefore must be dismissed.

20      **B.**    **Plaintiffs Have Not Plausibly Pleaded Market Power in the Alleged Tying Markets.**

21      Another essential element of any tying claim is that the defendant possesses market power in the

22  alleged tying market. *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008)

23  (finding that without market power in the tying market, there is no tying claim); *SC Manufactured*

24  *Homes, Inc. v. Liebert*, 162 Cal. App. 4th 68, 91 (2008) (same); *see also Exxon*, 51 Cal. App. 4th at 1681

25  ("[T]he need to prove market power is a threshold consideration in an antitrust case"). In discerning

26  whether a defendant has market power in the tying product, "the Court must focus on 'whether the seller

27  has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any

28  appreciable number of buyers within the market.'" *RealPage, Inc. v. Yardi Sys., Inc.*, 852 F. Supp. 2d

1215, 1226 (C.D. Cal. 2012) (quoting *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 504 (1969)).

Plaintiffs fail to sufficiently plead that Tesla has market power in any of the alleged markets: (1) none of the alleged tying markets is pleaded as a cognizable antitrust market (Section I); (2) the allegations do not support a conclusion of market power (Section II.A); and (3) Plaintiffs fail to identify any plausible entry barriers (Section II.A). Therefore, Plaintiffs' tying claim is not viable.

**C.      Plaintiffs Plead No Basis for *Per Se* or "Quick Look" Review of the Section 1 Claim.**

The "rule of reason" is "the antitrust liability standard applicable to most cases." *Epic*, 67 F.4th at 971. "Rule of reason analysis calls for a thorough investigation of the industry at issue and a balancing of the arrangement's positive and negative effects on competition." *Cascade Cabinet Co. v. W. Cabinet & Millwork Inc.*, 710 F.2d 1366, 1373 (9th Cir. 1983) (citations omitted). A "small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id*. A third standard, the "quick look," applies in the limited circumstances where "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011).

Plaintiffs attempt to reduce their pleading obligations (and burden of proof) by asserting that the tying claim is subject to the *per se* or "quick look" standard of review. To be clear, no standard of proof could save Plaintiffs' deficient tying pleading. For a tying claim, all standards—rule of reason, *per se*, and quick look—require a showing of (i) separate and distinct "tying" and "tied" markets, (ii) the existence of a tie, and (iii) the defendant's market power in the tying market. *See Epic*, 67 F.4th at 996. As shown above, Plaintiffs have not plausibly alleged any of these elements.

That aside, the Complaint asserts no plausible basis for the *per se* rule or quick look standard. As the Supreme Court has repeatedly affirmed, the *per se* rule applies "only after considerable [judicial] experience with certain business relationships shows that a restraint always or almost always tend[s] to restrict competition and decrease output." *Epic*, 559 F. Supp. 3d at 1044-45 (quotations and citation omitted); *see Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1177 (N.D. Cal. 2013) (rule of reason is the "presumptive mode of analysis in Section 1 cases (including tying claims)"); *Fisherman's Wharf*,

1 114 Cal. App. 4th at 334 (same for Cartwright tying claims).

2  The "quick look" is similarly limited. *Safeway*, 651 F.3d at 1138. Plaintiffs fail to establish, as

3 required, that Tesla's repair/parts practices "always or almost always tend to restrict competition and

4 decrease output." *Epic*, 559 F. Supp. 3d at 1044-45. "What is required, rather, is an enquiry meet for the

5 case, looking to the circumstances, details, and logic of a restraint. The object is to see whether the

6 experience of the market has been so clear, or necessarily will be, that a confident conclusion about the

7 principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more

8 sedulous one. And of course what we see may vary over time, if rule-of-reason analyses in case after

9 case reach identical conclusions." *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 781 (1999).

10 **V. Plaintiffs Fail to State a Claim Under § 17200 of California's Unfair Competition Law.**

11  California's Unfair Competition Law broadly prohibits "any unlawful, unfair or fraudulent

12 business act or practice." Cal. Bus. & Prof. Code § 17200. "By proscribing 'any unlawful' business

13 practice, section 17200 'borrows' violations of other laws and treats them as unlawful practices that the

14 unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles*

15 *Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (citation and quotations omitted). The UCL creates three

16 distinct kinds of unfair competition—unlawful, unfair, or fraudulent. *Id.* Plaintiffs claim that the alleged

17 conduct is (1) unlawful as it allegedly violates the Sherman and Cartwright Acts (CAC ¶ 250);

18 (2) unlawful as it allegedly violates Magnuson-Moss; and (3) unfair independent of any alleged

19 violations of law. Each of these claims fails.

20  **A. Plaintiffs' UCL Claim Fails for the Same Reasons That Their Federal Claims Fail.**

21  As discussed above, Plaintiffs' Sherman Act and Cartwright Act claims fail and so their UCL

22 claim predicated upon them must also fail. "If the same conduct is alleged to be both an antitrust

23 violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains

24 competition and harms consumers—the determination that the conduct is not an unreasonable restraint

25 of trade necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool*

26 *Corp.*, 93 Cal. App. 4th 363, 375 (2001).

27  **B. Conduct Consistent with Magnuson-Moss Does Not Violate the UCL.**

28  After abandoning their standalone Magnuson-Moss claim, Plaintiffs now contend that the UCL

somehow transforms legal conduct into illegal conduct. Tesla's warranty terms comply fully with Magnuson-Moss, which prohibits conditioning a warranty on the use of "any article or service" identified by "brand, trade, or corporate name." 15 U.S.C. § 2302(c). As detailed in Defendant's initial motion, Plaintiffs' original Magnuson-Moss claim failed as (1) it did not satisfy two procedural requirements, and (2) Plaintiffs could not plausibly allege that Tesla's warranties violate the statute. Given that Plaintiffs cannot state a Magnuson-Moss claim, they are not permitted to "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." *Cel-Tech*, 20 Cal. 4th at 182 (citation and quotations omitted).

Section 2302(c) prohibits a warranty *conditioned* on a consumer's use of a particular brand of product or service. And the Complaint admits that Tesla does *not* condition its warranty: "Tesla's warranties do not expressly require that Tesla EV owners utilize only Tesla Repair Services or Tesla-Compatible Parts purchased from Tesla." (CAC ¶ 255.) Plaintiffs therefore try to base their UCL claim on the theory that Tesla's warranties contain an unlawful "implicit requirement" by "strongly recommend[ing]" that consumers use Tesla parts and repair services. (*Id.*) But that is not the law, and the regulation Plaintiffs cite undermines their claim.[47] (*Id.* ¶¶ 252-53.) While Tesla "does not cover any vehicle damage or malfunction" caused by "[f]ailure to take the vehicle to . . . a Tesla Service Center or Tesla authorized repair facility upon discovery of a defect covered by this [Warranty]" and limits coverage for instances of "improper repair or maintenance" or damage resulting from "the installation or use of non-genuine Tesla parts or accessories,"[48] the regulation makes clear that is entirely appropriate under Magnuson-Moss.

That defeats the UCL claim. The California Supreme Court has made clear that "[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." *Cel-Tech*, 20 Cal. 4th at 182 ("A plaintiff may thus not plead around an absolute bar to relief simply by recasting the cause of action as

---

[47] The cited regulation states that a warrantor may "expressly exclud[e] liability for defects or damage caused by 'unauthorized' articles or service . . . [or] deny[] liability where the warrantor can demonstrate that the defect or damage was so caused." 16 C.F.R. § 700.10(c); *see* CAC ¶ 253.

[48] Lavely Decl. Ex. S (Tesla 2021 New Vehicle Limited Warranty) at 9-10.

34

one for unfair competition." (quotations omitted)). Tesla's warranties are entirely legal, and Plaintiffs'

UCL claim based on a purported violation of Magnuson-Moss must be dismissed. For this reason,

Plaintiffs' UCL claim fails as a matter of law.

### C.    Plaintiffs Fail To State a Claim Under the UCL's "Unfair" Prong.

"A business practice is unfair within the meaning of the UCL if it violates established public

policy *or* if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which

outweighs its benefits." *Rojas-Lozano v. Google, Inc.*, 159 F. Supp. 3d 1101, 1117 (N.D. Cal. 2016).

Nothing in the Complaint comes close to establishing why the alleged conduct—including

selling cars directly to consumers, making them capable of being fixed remotely, and certifying repair

facilities (as the Complaint admits other car manufacturers also do) and training their workers—is

"immoral, unethical, oppressive or unscrupulous."

As to the cost-benefit question, courts "examine the practice's 'impact on its alleged victim,

balanced against the reasons, justifications and motives of the alleged wrongdoer.'" *Davis v. HSBC*

*Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (quoting *S. Bay Chevrolet v. Gen. Motors*

*Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999)). Plaintiffs' conclusory cost-benefit assessment—

that the impacts of Tesla's conduct "significantly outweigh any theoretical reason or justification

therefor" (CAC ¶ 257)—is not enough to state a claim. *See Doe v. CVS Pharmacy, Inc.*, 982 F.3d 1204,

1215 (9th Cir. 2020) (affirming district court's denial of "unfair" UCL claim where plaintiffs'

"conclusory recitation of one of the UCL's legal standards [did] not clarify what conduct they claim is

unfair"); *Nazemi v. Specialized Loan Servicing, LLC*, No. 2:22-CV-05006-MCS-PVC, 2022 WL

17220707, at *4 (C.D. Cal. Oct. 31, 2022) (rejecting UCL "unfair" claim where plaintiff did not

consider impact of the conduct at issue against the justifications of the defendant).

Plaintiffs do not offer any measurement of how the alleged injury outweighs any reason or

justification for the alleged conduct. The UCL claim based on the "unfair" prong therefore fails.

### <u>CONCLUSION</u>

For the foregoing reasons, the Complaint should be dismissed with prejudice.

1    Dated: July 31, 2023

2

3                                              Respectfully Submitted,

4

5                                  By:     */s/ Vanessa A. Lavely*
                                           David R. Marriott (SBN 2682565)
6                                          Noah Joshua Phillips (*pro hac vice*)
                                           Vanessa A. Lavely (*pro hac vice*)
7                                          **CRAVATH, SWAINE & MOORE LLP**
                                           825 Eighth Avenue
8                                          New York, New York 10019
                                           Telephone: (212) 474-1000
9                                          Facsimile: (212) 474-3700

10                                         *Counsel for Defendant Tesla, Inc.*

11                                         Christopher C. Wheeler (SBN 224872)
                                           **FARELLA BRAUN + MARTEL LLP**
12                                         One Bush Street, Suite 900
                                           San Francisco, California 94104
13                                         Telephone: (415) 954-4979
                                           Facsimile: (415) 954-4480

14
                                           *Counsel for Defendant Tesla, Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28