1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    VIRGINIA M LAMBRIX, et al.,                  Case No.  23-cv-01145-TLT

8                   Plaintiffs,

9             v.                                  **ORDER GRANTING DEFENDANT'S
                                                  MOTION TO DISMISS**
10   TESLA, INC.,                                 Re: ECF No. 76

11                  Defendant.

12          Plaintiffs Virginia M. Lambrix, Sean Bose, Patrick Doyle, Philomena Nana-Anyangwe,

13   Andrew Ragone, Anthony Adjuder and Jason Pratti bring this antitrust putative class action

14   lawsuit against Tesla, Inc., individually and on behalf of all persons that have been purportedly

15   forced to pay supracompetitive prices and suffer exorbitant wait times to maintain and repair their

16   Tesla vehicles.  Consolidated Am. Class Action Compl. 1, ¶ 177 ("first amended complaint" or

17   "FAC"), ECF No. 63.

18          Before the Court is Defendant's motion to dismiss Plaintiffs' first amended complaint.

19   Def.'s Mot. to Dismiss ("Mot."), ECF No. 76.  In support of its motion, Defendant also requests

20   that the Court take judicial notice or incorporate by reference several documents.  Req. for Judicial

21   Notice ("RFJN"), ECF No. 76-23.  The Court heard oral argument on September 5 and 6, 2023,

22   and the matter was submitted.

23          Having carefully considered the parties' briefs, oral arguments, relevant legal authority,

24   and for the reasons stated below, Defendant's motion to dismiss is hereby **GRANTED** with

25   **LEAVE TO AMEND.**

26   I.     **BACKGROUND**

27          A.      **Procedural History**

28          This case arises from five related lawsuits.  On March 14, 2023, Plaintiff Virginia Lambrix

United States District Court
Northern District of California

filed a complaint against Tesla, Inc.  *See* Compl., ECF No. 1.  Three days later, she filed a motion to consider whether her case should be related to a similar action, *Orendain v. Tesla, Inc*., Case No. 23-cv-01157 (N.D. Cal) (filed Mar. 15, 2023).  *See* ECF No. 14.  In April, Plaintiff Sean Bose asked the Court to consider whether two additional actions—*Bose v. Tesla, Inc*., Case No. 23-cv-01496, (N.D. Cal) (filed Mar. 29, 2023), and *Doyle v. Tesla, Inc.*, Case No. 23-cv-01543 (N.D. Cal) (filed Mar. 31, 2023)—were also related.  *See* ECF No. 24.  And in May, Chief Magistrate Judge Donna Ryu referred *Nana-Anyangwe v. Tesla, Inc*., Case No. 23-cv-02035 (N.D. Cal) (filed Apr. 26, 2023), to this Court to determine if it was related, and Plaintiff Andrew Ragone asked the Court to consider whether *Ragone v. Tesla, Inc.*, Case No. 5:23-cv-02352-VKD (N.D. Cal) (filed May 16, 2023), was related.  *See* ECF Nos. 40, 44.  The Court ordered all the cases related to the Lambrix case.  *See* ECF Nos. 21, 35, 41, 45, 49.

"At the initial case management conference, all the parties stated that they either agreed to consolidate the Related Actions or that they did not oppose consolidation."  *See* Order Consolidating Actions, ECF No. 60.  Accordingly, the Court consolidated five of the cases.[1]  *See id.*

Plaintiffs then filed their amended complaint, bringing claims under the Sherman Act, the California Cartwright Act, and California's Unfair Competition Law ("UCL").  *See* FAC ¶¶ 193–261.  Two weeks later, Defendant filed a motion to dismiss the first amended complaint and a motion to compel arbitration of three plaintiffs, Danielle Thys, Cary Phillips, and Levi Stoffal.  *See* ECF Nos. 75–76.  The Court granted Defendant's motion to compel arbitration and stayed the proceedings as to Thys, Phillips, and Stoffal only.  *See* ECF No. 112.  Plaintiffs have filed a motion to certify the Court's arbitration decision for interlocutory appeal.  *See* ECF No. 114.

### B.    Factual Background

Plaintiffs are individuals who reside in California, Colorado, Florida, and Maryland.  *See* FAC ¶¶ 9–14, 16, 28.  They are owners or lessors of battery-electric motor vehicles, commonly known as EVs.  *Id.*  Defendant is a multinational automotive and clean energy company that

---

[1] The Plaintiff in *Orendain v. Tesla, Inc.* voluntarily dismissed his case under Federal Rule of Civil Procedure 41(a).  *See id.* at 4.

United States District Court
Northern District of California

designs, manufactures, and sells EVs that are meant to be operated on public streets. *See id.* ¶¶ 19, 28. In addition to its EVs, Defendant designs and manufactures compatible parts for its vehicles, and services them at over 150 centers across the United States. *See id.* ¶¶ 22, 94. If not referring drivers to its own service centers, Defendant directs them to "Tesla-Approved Collision Centers" or "Tesla-Preferred Collision Centers" that are independently owned and operated but rely on Defendant for parts. *See id.* ¶ 55.

### 1. Tesla EV Servicing and Maintenance Structure

Consumers that drive traditional internal combustion engines, or "ICE," vehicles have many options for maintaining and repairing them. *See id.* ¶ 2. They can "perform the work themselves, bring their vehicle to a dealership, or bring their vehicle to an independent repair shop." *Id.* In doing so, they can choose parts made by their vehicle's manufacturer or by a third party. *Id.*

In contrast, Tesla EV operators have one option—"schedule service with Tesla itself" or, if body work is required, consult "the limited network of Tesla-Approved Collision Centers." *Id.* ¶ 3. Either way, their only option is to use parts manufactured by Defendant. *Id.*

Plaintiffs allege that Defendant can maintain this system because it "has market power in the United States [EV] market" and "leverages that power to monopolize and restrain markets for Tesla Repair Services and Tesla Compatible Parts." *Id.* ¶ 4; *see also id.* ¶ 195. Defendant maintains and leverages its power in three principal ways: First, it designs vehicle warranties and polices that discourage owners from procuring replacement parts from other sources. *See id.* ¶ 4. Second, it designs "its vehicles so that maintenance and repairs require access diagnostic and telematic information" that can be accessed only by Defendant. *See id.* And third, it limits access to its "manuals, diagnostic tools, vehicle telematic data, and . . . replacement parts." *Id.*

Defendant's market power creates a negative feedback loop. Plaintiffs allege that Defendant "leverages its market power in the EV market . . . to coerce [consumers] into purchasing Tesla Repair Services and Tesla-Compatible Parts." *Id.* ¶ 220. Defendant likewise leverages its power in the Tesla repair services market to force consumers into buying Tesla-compatible parts, and leverages its power in the Tesla-compatible parts market to force them into

1    purchasing Tesla repair services only through Defendant or its authorized collision centers.  *Id.*

2    ¶¶ 221–22

3        Multiple consequences flow from Defendant's actions.  Defendant "has prevented

4    independent providers from entering the Tesla Repair Services market, prevented its [ ] parts

5    manufacturers from producing Tesla-Compatible Parts for anyone other than Tesla, and prevented

6    market entry by [ ] Tesla-Compatible Parts manufacturers."  *Id.* ¶ 6.  And consumers have had to

7    "suffer lengthy delays in repairing or maintaining their EVs, and pay supracompetitive prices for

8    those parts and repairs."  *Id.* ¶ 7.

9        According to Plaintiffs, these allegedly anticompetitive practices violate the Sherman Act,

10    the California Cartwright Act, and California's UCL.  *Id.* ¶ 1.

### 2.   Relevant Markets

12        Plaintiffs' allegations hinge on the existence of three markets: the market for EVs, the

13    market for Tesla repair services, and the market for Tesla-compatible parts.  *See* FAC ¶¶ 28–67.

### a.   The EV Market

15        The EV market consists of EVs sold to be operated on public streets.  *See* FAC ¶ 28.

16    Plaintiffs allege that ICE vehicles and EVs are distinct, for a number of reasons.  *See id.* ¶ 29.  For

17    one, Plaintiffs allege that EVs and ICE vehicles require separate manufacturing processes and

18    production facilities.  *See id.* ¶ 41.  For example, ICE vehicle plants are not accustomed to

19    sourcing, producing, and manufacturing battery packs for EVs.  *See id.*  Additionally, EVs are

20    constructed with a different kind of chassis, or frame, than ICE vehicles, and as a result, ICE

21    production facilities cannot easily be converted in EV production facilities.  *Id.*

22        Plaintiffs further allege that EVs cost more than similarly equipped ICE vehicles.  *See id.*

23    ¶ 29.  For example, in April 2022, the average price of EVs was above $65,000, while all other

24    motor vehicles cost an average of $20,000 less.  *See id.*  The amended complaint also alleges that

25    EVs and ICE vehicles are used for different reasons.  *See id.*  ¶ 33.  "EVs are more appropriate for

26    local travel instead of long-distance trips" and commute 5,300 miles annually—half as much as

27    ICE vehicles.  *Id.*  According to the amended complaint, "consumers do not view EVs and ICE

28    vehicles as interchangeable products"—indeed, a recent study reports that "96% of EV owners

will only buy another EV for their next vehicle," no matter the price. *Id.* ¶ 35. Likewise, the public and industry analysts recognize EVs as a separate product market, or submarket. *See id.* ¶ 39. For example, Ford—a U.S. automaker—publicized its decision to reorganize its company and separate EVs and ICE vehicles into separate businesses. *See id.* ¶ 40.

Moreover, Plaintiffs assert that Defendant holds a dominant position in the EV market. *See id.* ¶ 42. In the first half of 2020, Defendant held almost 80% of the EV market share in the United States, and after other EV competitors increased product offerings, Defendant possessed 65% of the domestic EV market in 2022. *See id.*

### b.     The Tesla Repair Services Market

The Tesla Repair Services Market consist of services to repair and maintain Tesla EVs. *See* FAC ¶ 44. Plaintiffs claim there are "no viable substitutes for Tesla Repair Services," as "they are not interchangeable with services designed for other vehicles"; thus, "the Tesla Repair Services market is derivative of the EV market" and "comprises its own distinct service market." *Id.* ¶ 46. Moreover, the amended complaint states that consumers are locked into repair and maintenance services for their Tesla EVs and cannot forecast costs to fix their EVs prior to purchasing an EV. *See id.* ¶ 47. Plaintiffs claim that Defendant misleads consumers into thinking that EVs are "specifically designed to require little or no maintenance" and that Defendant does not inform consumers that EV repairs may take months or years. *Id.*

Further, Plaintiffs contend that EVs cost more than maintenance and repairs, and this price gap makes it infeasible for them to switch from a Tesla EV to another kind of EV. *Id.* ¶ 48. "Thus, competition in the EV market does not and cannot discipline prices or anticompetitive conduct in the Tesla Repair Services aftermarket." *Id.* ¶ 50. Plaintiffs allege that as a result, "there is an insignificant number of independent service providers to whom Tesla owners may turn to repair or maintain their EVs." *Id.* ¶ 52.

### c.     Tesla-Compatible Parts Market

The Tesla-compatible parts market consists of the parts utilized to repair and maintain Tesla EVs not covered under warranty. *See* FAC ¶ 58. Plaintiffs allege that consumers expect "an adequate network of repair shops . . . [and] available replacement parts to repair and maintain their

1    EVs." *Id.* ¶ 60.  But Plaintiffs allege that most Tesla Compatible Parts are not interchangeable

2    with other manufacturers' vehicles.  *See id.* ¶ 63.  Plaintiffs assert that as a result the Tesla-

3    compatible parts aftermarket is its own distinct product market.  *See id.*

4    **II.     LEGAL STANDARD**

5            Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an

6    action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell*

7    *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

8    plaintiff pleads factual content that allows the court to draw the reasonable inference that the

9    defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The

10   plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

11   possibility that a defendant has acted unlawfully." *Id.*  For purposes of ruling on a Rule 12(b)(6)

12   motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the

13   pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire &*

14   *Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

15           Still, the Court is not required to "assume the truth of legal conclusions merely because

16   they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir.

17   2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere "conclusory

18   allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."

19   *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678.

20   Furthermore, "a plaintiff may plead herself out of court" if she "plead[s] facts which establish that

21   [s]he cannot prevail on h[er] . . . claim." *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 763 n.1

22   (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).  "If there are two

23   alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of

24   which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."

25   *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

26   **III.    REQUEST FOR JUDICIAL NOTICE**

27           In support of its motion to dismiss, Defendant requests that the Court either take judicial

28   notice of or incorporate by reference twenty-four exhibits.  *See generally* RFJN.  These exhibits

United States District Court
Northern District of California

6

include Defendant's SEC filings, its website and other publicly availably websites, and its warranties for new vehicles.  *See* RFJN 1, 8–9.  Because review of these documents is not necessary to rule on Defendant's motion, the Court declines to rule on its requests.  *See Ward v. Crow Vote LLC*, 634 F. Supp. 3d 800, 807 (C.D. Cal. 2022) (collecting cases).

## IV.   DISCUSSION

Plaintiffs allege eight causes of action: under Sections 1 and 2 of the Sherman Act; Sections 16720, 16726, and 16727 of the California Cartwright Act; and Section 17200 of California's UCL.  *See* FAC ¶ 1.  Defendant argues that Plaintiffs do not state any viable claims under federal and state law.  *See* Mot 1.; *see also* Fed. R. Civ. P. 12(b)(6).  The Court addresses Plaintiffs' claims below, first under the Sherman Act, then under the California Cartwright Act, and finally under the UCL.

### A.   Plaintiffs' Sherman Act Claims (Counts 1, 2, 3, 4, and 5).

The amended complaint alleges that Defendant monopolized, or attempted to monopolize, the markets for Tesla repair services and Tesla-compatible parts, in violation of Section 2 of the Sherman Act.  FAC ¶¶ 193–214; 15 U.S.C. § 2.  The amended complaint further alleges that Defendant's unlawful tying arrangement violates Section 1 of the Sherman Act.  FAC ¶¶ 215–26. The Court addresses each of these allegations in turn.

#### 1.   Plaintiffs' claims under Section 2 fail because they fail to allege a relevant market.

For most antitrust cases under Section 2, "[a] threshold step . . . is to accurately define the relevant market."  *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020).  "[T]he relevant market for antitrust purposes can be an aftermarket—where demand for a good is entirely dependent on the prior purchase of a durable good in a foremarket."  *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 976 (9th Cir. 2023).  Here, Plaintiffs allege that the relevant markets are the aftermarkets for Tesla repair services and Tesla-compatible parts.  Pls.' Opp'n Def.'s Mot. Dismiss ("Opp'n") 16, ECF No. 79.

##### a.   The Court tentatively concludes that Plaintiffs properly allege an EV submarket.

Defendant first argues that because Plaintiffs have not established that a foremarket for

United States District Court
Northern District of California

1    EVs exist, they cannot establish that aftermarkets for Tesla repair services and Tesla-compatible

2    parts exist.  Mot. 7–13.  Plaintiffs maintain that there is a market, or at least a submarket, for EVs.

3    *See, e.g.*, FAC ¶ 43; Opp'n 11.

4          To define the boundaries of a market, "courts must determine which products have a

5    reasonable interchangeability of use or sufficient cross-elasticity of demand with each other."

6    *Epic Games*, 67 F.4th at 975 (internal quotation marks and citations omitted).  "Often, this inquiry

7    involves empirical evidence in the form of a 'SSNIP' analysis."  *Id.*  "That analysis . . . uses past

8    consumer-demand data and/or consumer-survey responses to determine whether a hypothetical

9    monopolist could profitably impose a Small, Significant, Non-transitory Increase in Price above a

10    competitive level."  *Id.* (emphasis omitted).

11          "Within a general product market, 'well-defined submarkets may exist which, in

12    themselves, constitute product markets for antitrust purposes.'"  *Hicks v. PGA Tour, Inc.*, 897 F.3d

13    1109, 1121 (9th Cir. 2018) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

14    To show a submarket exists, a plaintiff must plausibly allege "that the alleged submarket is

15    economically distinct from the general product market."  *Id.* (quoting *Newcal Indus., Inc. v. Ikon

16    Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)).  Courts can identify economically distinct

17    submarkets based on their "practical indicia"—these include "industry or public recognition of the

18    submarket as a separate economic entity, the product's peculiar characteristics and uses, unique

19    production facilities, distinct customers, distinct prices, sensitivity to price changes, and

20    specialized vendors."  *Id.* (quoting *Newcal*, 513 F.3d at 1045).  These practical indicia are not

21    dispositive.  *See In re German Auto. Manufacturers Antitrust Litig.*, 497 F. Supp. 3d 745, 756

22    (N.D. Cal. 2020), *aff'd*, No. 20-17139, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).  "At bottom,

23    economic distinction depends on whether the purported submarket is meaningfully

24    insulated . . . from competition with other products in the broader market," which is determined by

25    "judicial experience and common sense."  *Id.* (internal quotation marks and citations omitted).

26          Whether or not EVs constitute their own market, the Court tentatively concludes that

27    Plaintiffs have identified a submarket for EVs.  A majority of the practical indicia point towards

28    that conclusion:  To start, Plaintiffs allege that that the public and industry analysts recognize EVs

United States District Court
Northern District of California

8

as a separate product market and distinct submarket.  *See* FAC ¶ 39.  For instance, Plaintiffs allege that Ford announced in March 2022 that it was reorganizing its company to separate its ICE and EV units into separate businesses.  *See id.* ¶ 40.

Plaintiffs also allege that EVs have peculiar characteristics and uses.  EVs travel shorter distances and require frequent charging, compared to ICE vehicles that travel farther and require less refueling.  *See id.* ¶ 30.  Indeed, EV owners typically commute 5,300 miles annually, half as much as ICE vehicles.  *See id.* ¶ 33.  And when traveling, they require a separate infrastructure for recharging, as opposed to refueling.  *Id.* ¶ 31.

Plaintiffs allege that EVs require unique production facilities.  *See id.* ¶ 41.  For example, Plaintiffs allege that ICE production facilities are challenged by sourcing, producing, and manufacturing battery packs for EVs.  *See id.*  Plaintiffs further allege that EVs and ICE vehicles are each manufactured using a different kind of chassis, and as a result, ICE production facilities cannot easily be converted into EV production facilities.  *See id.*

Plaintiffs allege that the EV market has distinct customers.  For example, Plaintiffs explain that consumers do not view EVs and ICE vehicles as "interchangeable products" and allege that 96% of EV owners will only buy another EV, no matter the price. *See id.* ¶ 35 n.18.  Plaintiffs also contend that EVs are used by customers with less of a need to travel longer distances. *See id.* ¶ 33.

Plaintiffs allege that EVs have distinct prices.  In support, Plaintiffs allege EVs cost more than comparable ICE vehicles.  *See id.* ¶ 29.  In April 2022, the average price of EVs was over $65,000, while all other motor vehicles cost $20,000 less.  *See id*.  For instance, the manufacturer-suggested retail price for EVs like the Nissan Leaf and Chevrolet Volt were $29,010 and $34,345, respectively; comparable ICE vehicles, like the Nissan Sentra and Chevrolet Cruz, were priced between $16,000 and $18,000.  *See id.*

Plaintiffs do not allege that EVs are insensitive to price changes.  Though they allege that Defendant has been able to increase sales despite price increase, they do not allege as much for the EV market overall.  *See id.* ¶ 37.  And the amended complaint makes no mention of a separate set of vendors for EVs.  *See generally id.*

Still, all the other "practical indicia" seem to indicate that there is a submarket for EVs.

United States District Court
Northern District of California

1  *Hicks*, 897 F.3d at 1121.  It also appears that the submarket for EVs is "insulated" from the

2  broader vehicle market, given that a vast majority of EV owners will only buy an EV as their next

3  vehicle.  *See* FAC ¶ 35; *In re German Auto. Manufacturers Antitrust Litig.*, 497 F. Supp. 3d at

4  756.

5       As a result, Plaintiffs appear to have properly alleged that there is a foremarket for EVs.

6  But because the Court would ultimately grant the motion to dismiss either way, at this stage of

7  litigation, it assumes without deciding that Plaintiffs have alleged a cognizable submarket for EVs.

8  *Cf. Fed. Trade Comm'n v. Microsoft Corp.*, No. 23-CV-02880-JSC, 2023 WL 4443412, at *11

9  (N.D. Cal. July 10, 2023) (assuming without deciding that product markets exist under the Clayton

10  Act).

        **b.**    **Plaintiffs have not plausibly alleged that the Tesla repair**
11                    **services market and the Tesla-compatible parts market are**
12                    **cognizable single-brand aftermarkets.**

13       Defendant next argues that even if there is a foremarket for EVs, there are no aftermarkets

14  for Tesla repair services and Tesla-compatible parts.  Mot. ¶ 14–17.

15       "[T]o establish a single-brand aftermarket, a plaintiff must show: (1) the challenged

16  aftermarket restrictions are 'not generally known' when consumers make their foremarket

17  purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant'

18  monetary or non-monetary switching costs exist; and (4) general market-definition principles

19  regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic*

20  *Games*, 67 F.4th at 977.  The Court finds that Plaintiffs fail to properly allege the first three of

21  these requirements.

22       The first requirement—that the restrictions in the aftermarket are not generally known—is

23  a "crucial" one.  *Id.* (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 477

24  (1992)).  This unawareness requirement places "the burden on a plaintiff to 'rebut the economic

25  presumption that . . . consumers make a knowing choice to restrict their aftermarket options' when

26  they make a foremarket purchase." *Id.* (quoting *Newcal*, 513 F.3d at 1050).  While the Ninth

27  Circuit has not defined what, exactly, "amounts to general unawareness," a plaintiff must present

28  at least some evidence to fulfill this prong.  *Id.* n.10 (cleaned up).

United States District Court
Northern District of California

Plaintiffs, however, do not meet this requirement.  To be sure, Plaintiffs allege that Defendant misled them about the how much maintenance its EVs are designed to need and how long that maintenance ought to take.  *See* FAC ¶ 47; *see also id.* ¶ 61.  They further allege that consumers "expect there will be an adequate network of repair shops, as well as available replacement parts, to repair and maintain their EVs."  *Id.* ¶ 60.  But nowhere do Plaintiffs allege that consumers are in fact unaware of the supposedly supracompetitive prices and exorbitant wait times in the relevant aftermarkets.  *See generally id.*  To the contrary, they allege that such problems are "widely documented."  *Id.* ¶ 158.  Plaintiffs thus fail to allege that any restrictions are not generally known.  *See Epic Games*, 67 F.4th at 977.

The Court also concludes that Plaintiffs fail to meet the second requirement for an aftermarket, that "'significant' information costs prevent accurate life-cycle pricing."  *See id.*  Plaintiffs levy the conclusory allegation that "[i]t is difficult, if not impossible, for a consumer to accurately forecast how much repair and maintenance [ ] will be required" for their EVs.  FAC ¶ 47.  But their more specific allegations belie this conclusory allegation.  Indeed, they document the average yearly cost of maintaining a Tesla EV.  *See id.* ¶ 163.

Plaintiffs likewise fail to show that significant switching costs exist.  A plaintiff must show that costs prohibit consumers from switching between foremarket goods.  *See Eastman Kodak Co.*, 504 U.S. at 476–67; *Epic Games*, 67 F.4th at 979–80.  Here, Plaintiffs allege that an EV itself costs much more than maintaining or repairing one; but they do not explain why this fact licenses the conclusion that consumers cannot switch between EVs in the foremarket.  *See* FAC ¶ 48.  Because Plaintiffs have failed to meet these three requirements, they have not properly pled that Tesla repair services and Tesla-compatible parts constitute their own aftermarkets.

Plaintiffs attempt to escape this conclusion by arguing that cases involving per se violations and quick look analysis do not require litigants to precisely define a market.  *See* Opp'n 6–7.  The Ninth Circuit recently clarified that this is the case.  *See Epic Games*, 67 F.4th at 975 n.6 (collecting cases).  However, Plaintiffs offer no authority and proffer no facts for why their Section 2 claims should be assessed under the per se or quick look standards.  In fact, "[i]t is only after considerable experience with certain business relationships that courts classify them as per se

1   violations." *Id.* at 997 (quoting *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 9

2   (1979)).  And Plaintiffs themselves allege that "EVs are a relatively new product and Tesla is a

3   relatively new producer."  FAC ¶ 61.  The Court thus declines to assess Plaintiffs' Section 2

4   claims under a per se or quick look standard, or to free Plaintiffs from the requirement of defining

5   the relevant market.

6           Because Plaintiffs have failed at the threshold step of defining a relevant market, their

7   claims under Section 2 of the Sherman Act fail too.  *See Qualcomm Inc.*, 969 F.3d at 992; *see also*

8   *Coronavirus Rep. v. Apple, Inc.*, --- F.4th ----, 2023 WL 7268325, at *5 (9th Cir. Nov. 3, 2023)

9   ("Failing to define a relevant market alone is fatal to an antitrust claim.").

10                      **2.      Plaintiffs' claim under Section 1 fail because they fail to allege a**
                              **relevant market.**

11

12          "A tying arrangement exists when a seller conditions the sale of one product or service (the

13   tying product or service) on the buyer's purchase of another product or service (the tied product or

14   service)."  *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1157 (9th Cir. 2001) (citing

15   *Northern Pac. Ry. v. United States*, 356 U.S. 1, 5–6 (1958)).  Plaintiffs point to three tying

16   arrangements: first, between EVs (the tying product) and Tesla repair services and Tesla-

17   compatible parts (the tied service and product); second, between Tesla-compatible parts (tying)

18   and Tesla repair services (tied); and third, between Tesla repair services (tying) and Tesla-

19   compatible parts (tied).  FAC ¶¶ 215–26.  They assert these three arrangements constitute *per se*

20   violations of Section 1 of the Sherman Act.  *See id.*  In the alternative, they assert that these tying

21   arrangements violate Section 1 under the rule of reason.[2]  *Id.* ¶225.

22          "For a tying claim to suffer per se condemnation, a plaintiff must prove: (1) that the

23   defendant tied together the sale of two distinct products or services; (2) that the defendant

24   possesses enough economic power in the tying product market to coerce its customers into

25   purchasing the tied product; and (3) that the tying arrangement affects a 'not insubstantial volume

26   _____

27   [2] Plaintiffs also assert that their claims can be assessed under a quick look analysis.  However, ties "can be
     unlawful pursuant to either a modified per se rule or the Rule of Reason," *Epic Games*, 67 F.4th at 996–97,
28   and Plaintiffs offer no authority for assessing their tying claims with a quick look analysis, *see generally*
     Opp'n.

United States District Court
Northern District of California

of commerce' in the tied product market." *Rick-Mik Enterprises*, 532 F.3d at 971 (quoting *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 913 (9th Cir. 2008)).  At bottom, a plaintiff can only establish a per se violation if they establish a market exists for both the tied and tying product.  *See id.* 971–73.  The same is true under the rule of reason.  *See Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1177–78 (N.D. Cal. 2013); *see also Packaging Sys., Inc. v. PRC-Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1083 (C.D. Cal. 2017) ("An antitrust complaint must define the relevant market for both the tying product and the tied product.") (collecting cases).

        As discussed above, the Court finds that Plaintiffs fail to establish aftermarkets for Tesla-compatible parts or Tesla repair services.  And all of their tying claims are predicated on the existence of these markets.  *See* FAC ¶¶ 215–26.  Thus, whether analyzed under a per se or reasonableness standard, their tying claims cannot proceed.  *See Rick-Mik Enterprises*, 532 F.3d at 971; *Sidibe*, 4 F. Supp. 3d at 1177.

        In sum, because Plaintiffs fail to establish their alleged aftermarkets, their claims under the Sherman Act fail, and the Court grants Defendant's motion to dismiss as to counts one through five.

### B.      Plaintiffs' California State Law Claims (Counts 6, 7, and 8).

        The amended complaint alleges that Defendant violated the California Cartwright Act and California's UCL.  *See* FAC ¶¶ 227–61.  Plaintiffs contend Defendant's unlawful tying arrangements restrain commerce and prevent market competition, in violation of the Cartwright Act.  *See id.* ¶¶ 230–35.  Plaintiffs further claim Defendant formed combinations to restrain trade in California, also a violation of the Cartwright Act.  *See id.* ¶¶ 240–43.  They also claim that Defendant's violations of the Sherman Act, the Cartwright Act, and the Magnuson-Moss Act constitute unlawful conduct under Section 17200 of the UCL.  *See id.* ¶¶ 249–56.  And they claim that whether or not Defendant's conduct was unlawful, it was unfair under the UCL.  *Id.* ¶¶ 257–61.

        Defendant asks the Court to dismiss the Cartwright Act tying claims because Plaintiffs have not plausibly alleged any relevant antitrust markets.  *See* Mot. 29.  Defendant also argues that Plaintiffs' combination-in-restraint allegations are conclusory.  *Id.* at 28.  Lastly, Defendant asserts

United States District Court
Northern District of California

that Plaintiffs' UCL claims fail because they are predicated on their Sherman Act, Cartwright Act, and Magnuson-Moss claims, which all fail. *See id.* at 33. The Court finds that Plaintiffs fail to state a claim for the Cartwright Act claims; that failure, in combination with their failure to state a claim under the Sherman Act and Magnuson-Moss Act, means their UCL claims fail as well.

### 1. Plaintiffs fail to state claims for unlawful tying and combination in restraint of trade under the Cartwright Act.

#### a. Plaintiffs' tying claims fails under the Cartwright Act.

Plaintiffs allege that the three tying arrangements mentioned above—among EVs, Tesla-compatible parts, and Tesla repair services—violate the Cartwright Act. FAC ¶¶ 227–38. They again allege that these arrangements constitute per se violations of the Act, or, in the alternative, violations under the rule of reason. *Id.* ¶ 236.

Like the Sherman Act, a tying claim under the Cartwright Act requires a plaintiff to identify a market for the tied product. *See UAS Mgmt., Inc. v. Mater Misericordiae Hosp.*, 169 Cal. App. 4th 357, 368–69 (2008); *Belton v. Comcast Cable Holdings, LLC*, 151 Cal. App. 4th 1224, 1234 (2007). Yet, as explained above, Plaintiffs fail to establish that there is a market for Tesla repair services and Tesla-compatible parts. All of the tying claims under the Cartwright Act hinge on the existence of these markets. *See* FAC ¶¶ 231–33. Thus, the tying claims under the Cartwright Act fail, and the Court grants Defendant's motion to dismiss as to count 6.

#### b. Plaintiffs remaining Cartwright Act claim fails.

Plaintiffs next contend that Defendant violates the Cartwright Act by imposing two de facto exclusivity agreements: one between Defendant and suppliers in the market for Tesla-compatible parts, and another between Defendant and Tesla service centers. FAC ¶¶ 241–42.

"California courts have determined . . . exclusive dealing contracts, are not per se unreasonable but instead are subject to a 'rule of reason' analysis." *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1000 (9th Cir. 2008) (citing *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct.*, 114 Cal.App.4th 309, 335 (2004)). As with Plaintiffs' other claims, this analysis under the Cartwright Act requires Plaintiffs to identify a market affected by Defendant's conduct. *See id.* at 1000–01; *see also Fisherman's Wharf Bay Cruis*, 114 Cal.App.4th at 335. So,

1   like Plaintiffs' other claims, their claim regarding exclusivity agreements under the Cartwright Act

2   fails because they fail to establish aftermarkets for Tesla-compatible parts and Tesla repair

3   services.  The Court thus grants Defendant's motion to dismiss as to count seven.

4        **2.**          **Plaintiffs UCL claim fails because their other claims fail.**

5          The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  *See* Cal.

6   Bus. & Prof. Code § 17200.  Plaintiffs assert that Defendant's unlawful conduct under the

7   Sherman and Cartwright Acts, as well as the Magnuson-Moss Act, constitutes unlawful conduct

8   under the UCL.  *See* FAC ¶¶ 248–56.  They also assert that this conduct is unfair under the UCL.

9   *See id.* ¶¶ 257–61.

10          "[A] claim under [the unlawful] prong hinges upon whether a plaintiff can formulate a

11   claim under the predicate law." *Eidmann v. Walgreen Co.*, 522 F. Supp. 3d 634, 647 (N.D. Cal.

12   2021) (citing *Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1094 (N.D. Cal. 2017)); *see also*

13   *Ingels v. Westwood One Broadcasting Services, Inc.*, 129 Cal.App.4th 1050, 1060 (2005) ("A

14   defendant cannot be liable under § 17200 for committing 'unlawful business practices' without

15   having violated another law.").  The Court concludes that Plaintiffs do not fulfill this requirement.

16          As explained above, Plaintiffs' claims under the Sherman Act and Cartwright Act fail.

17   Under the Magnuson-Moss Act, no claim is cognizable in a federal district court "if the action is

18   brought as a class action and the number of named plaintiffs is less than one hundred."  15 U.S.C.

19   § 2310(d)(3)(C).  Here, only seven plaintiffs are named.  Thus, the requirement is unmet, and

20   Plaintiffs cannot show that Defendant violated the Magnuson-Moss Act.  *See id.*  Because

21   Plaintiffs fail to show that Defendant violated any of the predicate acts, they fail to show that it

22   acted unlawfully under the UCL.  *See Eidmann*, 522 F. Supp. 3d at 647.  Consequently, the Court

23   finds that Plaintiffs' claim under the Magnuson-Moss Act fails as well.

24          As for Plaintiffs claim under the unfairness prong of the UCL, they "cannot survive" if

25   they "overlap entirely with the business practices addressed in the [other] prongs of the UCL," and

26   "the claims under the other [ ] prongs of the UCL do not survive."  *Hadley*, 243 F. Supp. 3d at

27   1105 (first citing *Punian v. Gillette Co.*, No. 14-CV-05028-LHK, 2016 WL 1029607, at *1 (N.D.

28   Cal. Mar. 15, 2016); and then citing *In re Actimmune Mktg. Litig.*, 2009 WL 3740648, at *14

United States District Court
Northern District of California

(N.D. Cal. Nov. 6, 2009), *aff'd*, 464 Fed.Appx. 651 (9th Cir. 2011)).  Here, Plaintiffs' allegations that Defendant's actions are unfair mirror their allegations that its actions are unlawful.  *See* FAC ¶¶ 257–58.  Thus, because Plaintiffs' unlawful claim under the UCL fails, their unfairness claim under the UCL fails.  *See Hadley*, 243 F. Supp. 3d at 1105.

## C.    Leave to Amend

Under Federal Rule of Civil Procedure 15(a)(2), a party may amend its pleadings with leave of the court.  *See* Fed. R. Civ. P. 15(a)(2).  "[L]eave shall be freely given when justice so requires," and this policy is applied with "extreme liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (first quoting Fed. R. Civ. P. 15(a); and then quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001)).  This liberality should not be extended in the face of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . [or] futility of amendment."  *Id.* (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, Plaintiffs requested leave to amend their complaint in their opposition brief.  *See* Opp'n 35.  The Court has not found bad faith, undue delay, or repeated amendments to be at issue in the instant matter.  Similarly, the Court finds that granting Plaintiffs leave to amend will not unduly prejudice Defendant, and the proposed amendment would not be futile.  To the contrary, amending their complaint would give Plaintiffs the opportunity to allege that there are aftermarkets for Tesla-compatible parts and Tesla repair services.

Accordingly, the Court **GRANTS** Plaintiffs **LEAVE TO AMEND** their consolidated class action complaint within 21 days of receipt of this order.

## V.    CONCLUSION

The Court finds that Plaintiffs have not plausibly alleged a cause of action for monopolization, attempted monopolization or unlawful tying under the Sherman Act because they have not established that Tesla repair services and Tesla-compatible parts are relevant single-brand aftermarkets.  For the same reason, Plaintiffs have not plausibly alleged a cause of action for unlawful tying or combination in restraint of trade under the Cartwright Act.  Since their UCL

claims rely on their other claims, the Court finds that Plaintiffs have not plausibly alleged a cause of action under California's UCL.

Accordingly, for the foregoing reasons the Court **GRANTS** Defendant's motion to dismiss Plaintiffs antitrust claims—counts 1, 2, 3, 4, 5, 6, 7, and 8—with **LEAVE TO AMEND**.

This resolves docket number 76.

**IT IS SO ORDERED.**

Dated: November 17, 2023

_____
TRINA L. THOMPSON
United States District Judge

United States District Court
Northern District of California