1  David R. Marriott (SBN 2682565)
   Noah Joshua Phillips (*pro hac vice*)
2  Vanessa A. Lavely (*pro hac vice*)
   **CRAVATH, SWAINE & MOORE LLP**
3  Worldwide Plaza
   825 Eighth Avenue
4  New York, New York 10019
   Telephone: (212) 474-1000
5  Facsimile: (212) 474-3700

6  Christopher C. Wheeler (SBN 224872)
   **FARELLA BRAUN + MARTEL LLP**
7  One Bush Street, Suite 900
   San Francisco, California 94104
8  Telephone: (415) 954-4979
   Facsimile: (415) 954-4480

9
   *Counsel for Defendant Tesla, Inc.*
10

11              **UNITED STATES DISTRICT COURT**

12            **NORTHERN DISTRICT OF CALIFORNIA**

13               **SAN FRANCISCO DIVISION**

14
   VIRGINIA M. LAMBRIX, individually        Case No. 3:23-cv-1145-TLT (Lead Case)
15 and on behalf of all others similarly     Case No. 3:23-cv-1496-TLT
   situated,                                 Case No. 3:23-cv-1543-TLT
16                                           Case No. 3:23-cv-2035-TLT
                Plaintiffs,                  Case No. 3:23-cv-2352-TLT
17
        v.                                   Judge:        Honorable Trina L. Thompson
18                                           Hearing Date: April 2, 2024
                                             Hearing Time: 2:00 p.m.
19 TESLA, INC.,
                Defendant.                   **DEFENDANT TESLA, INC.'S**
20                                           **MOTION TO DISMISS SECOND**
                                             **CONSOLIDATED AMENDED CLASS**
21                                           **ACTION COMPLAINT FOR**
                                             **FAILURE TO STATE A CLAIM**
22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

NOTICE OF MOTION AND MOTION ............................................................................... vii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ............................................................................................. 1

LEGAL STANDARD ........................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      The Sherman Act Claims Fail Because Plaintiffs Plead No Plausible Antitrust Markets. ........... 3

        A.      Relevant Legal Standard. ....................................................................... 3

        B.      Plaintiffs' Alleged EV-Only Foremarket Fails. ..................................... 4

        C.      Plaintiffs' Alleged Aftermarkets Fail. ................................................... 6

II.     Plaintiffs Do Not Plausibly Plead Monopolization or Attempted Monopolization Claims. ......... 10

        A.      Plaintiffs Have Not Plausibly Alleged Monopoly Power in the Alleged Aftermarkets. ...................................................................................... 11

        B.      Plaintiffs Have Not Adequately Pleaded Anticompetitive Conduct. .............. 13

III.    Plaintiffs Do Not Plausibly Allege a Combination in Restraint of Trade under State Law. ...... 19

IV.     Plaintiffs Do Not Plausibly Allege a Tying Claim under the Sherman or Cartwright Acts. ...... 21

        A.      Plaintiffs Have Not Plausibly Alleged a Tie. ....................................... 21

        B.      Plaintiffs Have Not Plausibly Pleaded Market Power in the Alleged Tying Markets. .... 23

        C.      Plaintiffs Plead No Basis for *Per Se* or "Quick Look" Review of the Section 1 Claim. ............................................................................................ 23

V.      Plaintiffs Fail to State a Claim Under § 17200 of California's Unfair Competition Law. ......... 24

        A.      Plaintiffs Have Failed to Sufficiently Allege any Unlawful Conduct. ............ 25

        B.      Plaintiffs Fail to State a Claim under the UCL's "Unfair" Prong. ................. 25

CONCLUSION .................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
   141 F.3d 947 (9th Cir. 1998)........................................................................20

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
   836 F.3d 1171 (9th Cir. 2016)...............................................................passim

*Alaska Airlines, Inc. v. United Airlines, Inc.*,
   948 F.2d 536 (9th Cir. 1991)........................................................................16

*Alliance for Auto. Innovation v. Massachusetts*,
   2020 WL 10141195 (D. Mass. Nov. 20, 2022)............................................16

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
   592 F.3d 991 (9th Cir. 2010)..................................................................13, 14

*Apple, Inc. v. Psystar Corp.*,
   586 F. Supp. 2d 1190 (N.D. Cal. 2008) .........................................................4

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).................................................................................2, 16

*Avaya Inc., RP v. Telecom Labs, Inc.*,
   838 F.3d 354 (3d Cir. 2016)...........................................................................4

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
   166 F. Supp. 3d 988 (N.D. Cal. 2015) .........................................................12

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007)......................................................................................12

*Brantley v. NBC Universal, Inc.*,
   675 F.3d 1192 (9th Cir. 2012).......................................................................18

*Cal. Dental Ass'n v. Fed. Trade Comm'n*,
   526 U.S. 756 (1999)......................................................................................24

*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011).......................................................................24

*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*,
   20 Cal. 4th 163 (1999)..............................................................................24, 25

*Chavez v. Whirlpool Corp.*,
   93 Cal. App. 4th 363 (2001)..........................................................................25

*Clear Connection Corp. v. Comcast Cable Commc'ns Mgmt., LLC*,
   2020 WL 6742889 (N.D. Cal. Nov. 17, 2020)..............................................21

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
   611 F.3d 495 (9th Cir. 2010).........................................................................14

ii

*Coronavirus Rep. v. Apple Inc.*,
 2021 WL 5936910 (N.D. Cal. Nov. 30, 2021)..................................................4

*Dimidowich v. Bell & Howell*,
 803 F.2d 1473 (9th Cir. 1986)........................................................................21

*Disney Enters., Inc. v. VidAngel, Inc.*,
 2017 WL 6883685 (C.D. Cal. Aug. 10, 2017)................................................12

*Dream Big Media Inc. v. Alphabet Inc.*,
 2022 WL 16579322 (N.D. Cal. Nov. 1, 2022)...........................................21, 22

*Dreamstime.com, LLC v. Google LLC*,
 54 F.4th 1130 (9th Cir. 2022)..........................................................10, 13, 18

*DSM Desotech, Inc. v. 3D Sys. Corp.*,
 749 F.3d 1332 (Fed. Cir. 2014)........................................................................4

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
 504 U.S. 451 (1992)..........................................................................................6

*Eastman v. Quest Diagnostics Inc.*,
 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018) ................20

*Epic Games, Inc. v. Apple Inc.*,
 559 F. Supp. 3d 898 (N.D. Cal. 2021), *aff'd in part and rev'd in part*, 67 F.4th 946
 (9th Cir. 2023)................................................................................4, 6, 9, 11, 24

*Epic Games, Inc. v. Apple, Inc.*,
 67 F.4th 946 (9th Cir. 2023)...................................................................*passim*

*Epicor Software Corp. v. Alt. Tech. Sols., Inc.*,
 2013 WL 12130024 (C.D. Cal. Dec. 2, 2013) ...............................................11

*Exxon Corp. v. Superior Ct.*,
 51 Cal. App. 4th 1672 (1997)..........................................................................20

*Facebook Inc. v. Power Ventures, Inc.*,
 2009 WL 3429568 (N.D. Cal. Oct. 22, 2009).................................................12

*Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*,
 114 Cal. App. 4th 309 (2003)....................................................................19, 24

*Flaa v. Hollywood Foreign Press Ass'n*,
 55 F.4th 680 (9th Cir. 2022)............................................................................20

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
 394 U.S. 495 (1969).........................................................................................23

*Frame-Wilson v. Amazon.com, Inc.*,
 591 F. Supp. 3d 975 (W.D. Wash. 2022)........................................................21

*Free Freehand Corp. v. Adobe Sys. Inc.*,
 852 F. Supp. 2d 1171 (N.D. Cal. 2012) .........................................................17

*FTC v. Facebook*,
 560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................................12

*FTC v. Qualcomm Inc.*,
 969 F.3d 974 (9th Cir. 2020)...........................................................................................3

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*,
 723 F.3d 1019 (9th Cir. 2013)..........................................................................................5

*Groupon, Inc. v. Shin*,
 2022 WL 60526 (N.D. Ill. Jan. 6, 2022) ..........................................................................5

*Illinois Brick Co. v. Illinois*,
 431 U.S. 720 (1977) ..........................................................................................................3

*In re eBay Seller Antitrust Litig.*,
 545 F. Supp. 2d 1027 (N.D. Cal. 2008) ..........................................................................18

*In re German Auto. Mfrs. Antitrust Litig.*,
 497 F. Supp. 3d 745 (N.D. Cal. 2020) ..........................................................................3, 5

*In re German Auto. Mfrs. Antitrust Litig.*,
 612 F. Supp. 3d 967 (N.D. Cal. 2020), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26,
 2021) .................................................................................................................................5

*MLW Media LLC v. World Wrestling Ent.., Inc.*,
 2023 WL 1975241 (N.D. Cal. Feb. 13, 2023)................................................................12

*Morrison v. Viacom, Inc.*,
 66 Cal. App. 4th 534 (1998)......................................................................................21, 23

*Nicolosi Distrib., Inc. v. Finishmaster, Inc.*,
 2019 WL 1560460 (N.D. Cal. Apr. 10, 2019) ................................................................22

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
 2017 WL 4310767 (N.D. Cal. Sept. 28, 2017) ...............................................................17

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
 555 U.S. 438 (2009)..................................................................................................13, 17

*PNY Techs., Inc. v. SanDisk Corp.*,
 2014 WL 2987322 (N.D. Cal. July 2, 2014) ..................................................................19

*PSI Repair Servs., Inc. v. Honeywell, Inc.*,
 104 F.3d 811 (6th Cir. 1997)............................................................................................4

*RealPage, Inc. v. Yardi Sys., Inc.*,
 852 F. Supp. 2d 1215 (C.D. Cal. 2012)..........................................................................23

*Reilly v. Apple Inc.*,
 2022 WL 74162 (N.D. Cal. Jan. 7, 2022) ..................................................................4, 10

*Reveal Chat Holdco, LLC. v. Facebook, Inc.*,
 471 F. Supp. 3d 981 (N.D. Cal. 2020) ...........................................................................10

iv

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
  532 F.3d 963 (9th Cir. 2008)................................................................................23

*RLH Indus., Inc. v. SBC Commc'ns, Inc.*,
  133 Cal. App. 4th 1277 (2005)............................................................................21

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987)...............................................................................14

*SC Manufactured Homes, Inc. v. Liebert*,
  162 Cal. App. 4th 68 (2008).................................................................................23

*Sidibe v. Sutter Health*,
  4 F. Supp. 3d 1160 (N.D. Cal. 2013)...................................................................24

*SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*,
  188 F.3d 11 (1st Cir. 1999)....................................................................................4

*Somers v. Apple, Inc.*,
  729 F.3d 953 (9th Cir. 2013)............................................................................2, 11

*Sosa v. DIRECTV, Inc.*,
  437 F.3d 923 (9th Cir. 2006)...............................................................................16

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993).............................................................................................11

*Streamcast Networks v. Skype Techs., SA*,
  547 F. Supp. 2d 1086 (C.D. Cal. 2007).................................................................6

*Tele Atlas N.V. v. Navteq Corp.*,
  397 F. Supp. 2d 1184 (N.D. Cal. 2005)...............................................................23

*Terminalift LLC v. Int'l Longshore & Warehouse Union Loc. 29*,
  2013 WL 2154793 (S.D. Cal. May 17, 2013).......................................................12

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)...............................................................................14

*Universal Grading Serv. v. eBay, Inc.*,
  2011 WL 846060 (N.D. Cal. Mar. 28, 2011)........................................................20

*Universal Grading Serv. v. eBay, Inc.*,
  2012 WL 70644 (N.D. Cal. Jan. 9, 2012).............................................................18

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*,
  540 U.S. 398 (2004).............................................................................................13

**Statutes & Rules**

15 U.S.C. § 1.........................................................................................21, 22, 23, 24

15 U.S.C. § 2...............................................................................................passim

Cal. Bus. & Prof. Code § 17200 .................................................................24, 25

v

**Other Authorities**

Areeda & Hovenkamp, Antitrust Law ¶ 1740a ......................................................................4

DEFENDANT TESLA, INC.'S MOTION TO DISMISS SCAC; Case No. 3:23-CV-1145-TLT

### NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on April 2, 2024, in Courtroom 9 of the U.S. District Court for the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California, before the Hon. Trina L. Thompson, Defendant Tesla, Inc. will and hereby does move the Court to dismiss Plaintiffs' Second Consolidated Amended Class Action Complaint ("SCAC"). Specifically, this Motion seeks to dismiss the Complaint in its entirety for failure to state claims pursuant to Fed. R. Civ. P. 12(b)(6). This Motion is supported by this Notice of Motion and Motion; a Memorandum of Points and Authorities; a Request for Judicial Notice and Incorporation by Reference; the Declaration of Vanessa A. Lavely ("Lavely Decl."); the [Proposed] Order filed herewith; other previously and concurrently filed documents in this action; the arguments of counsel; and any other matter that the Court may properly consider.[1]

The issues to be decided are:

1.   Whether the Court should dismiss Plaintiffs' claims brought under Section 2 of the Sherman Act (Counts I-IV), where Plaintiffs fail to plausibly allege any cognizable antitrust market, that Tesla has monopoly power in any relevant market, that Tesla conspired with Tesla-Approved Collision Centers in violating Section 2 of the Sherman Act, or any actions that constitute anticompetitive conduct.

2.   Whether the Court should dismiss Plaintiffs' claim brought under California's Cartwright Act for alleged combinations in restraint of trade (Count VII), where Plaintiffs fail to plausibly allege that Tesla's conduct has led to substantial market foreclosure in either of the alleged aftermarkets, that Tesla conspired with Tesla-Approved Collision Centers in violating the Cartwright Act, or that Tesla has engaged in a group boycott.

3.   Whether the Court should dismiss Plaintiffs' claims brought under Section 1 of the Sherman Act

---

[1] Tesla is concurrently filing with this Motion a Request for Judicial Notice and Incorporation by Reference. On December 20, 2023, Tesla and Plaintiffs jointly filed a stipulation regarding the newly added plaintiffs Connor Shore and Adriana Ferreira, who are parties to binding arbitration agreements with Tesla. (Dkt. 133.) The Court denied the stipulation as premature. (Dkt. 134.) Tesla still intends to enforce these arbitration agreements. In the interest of judicial efficiency and to avoid unnecessary briefing, the Parties have agreed to promptly refile a stipulation substantially similar to their previously filed stipulation upon receipt of the Ninth Circuit's decision on Plaintiffs' petition for interlocutory appeal. (Dkt. 125.)

(Count V) and California's Cartwright Act (Count VI) relating to allegedly unlawful tying, where Plaintiffs fail to plausibly allege a tie, that Tesla has market power in any of the alleged tying markets, that Tesla conspired with Tesla-Approved Collision Centers in violating Section 1 of the Sherman Act, or that a *per se* or "quick look" analysis is appropriate.

4.   Whether the Court should dismiss Plaintiffs' claims brought under California's Unfair Competition Law ("UCL") (Count VIII) where Plaintiffs (i) fail to adequately plead Sherman Act and Cartwright Act claims; (ii) fail to allege conduct prohibited under the Magnuson-Moss Warranty Act ("Magnuson-Moss"); and (iii) fail to state a claim under the UCL "unfair" prong.

## MEMORANDUM OF POINTS AND AUTHORITIES

### PRELIMINARY STATEMENT

Last month, this Court correctly dismissed Plaintiffs' deficient first amended complaint ("FAC") in its entirety primarily because Plaintiffs did not plausibly allege cognizable single-brand antitrust aftermarkets. ("Order," Dkt. 122.) In their FAC, among other failures, Plaintiffs failed to plead the elements required in this Circuit to allege single-brand aftermarkets. The SCAC's attempt to remedy those deficiencies fails. This is Plaintiffs' third failed attempt to plead antitrust claims premised on implausible allegations and highly disfavored theories. It should be their last. The SCAC should be dismissed with prejudice.

In addition to not remedying its deficient market allegations (Section I.C), the SCAC is still based on the illogical theory that Tesla intentionally degrades repairs/services for its EVs (a relatively tiny fraction of Tesla's revenue) while jeopardizing its EV sales/leases (by far its most profitable business). Afforded a third bite at the apple, with the benefit of two motions to dismiss and the Court's Order, Plaintiffs once again fail to plausibly allege (i) that EVs are insulated from non-EV competition (dooming their alleged foremarket) (Section I.B); (ii) monopoly power (Section II.A); (iii) anticompetitive conduct (Section II.B); (iv) a combination in restraint of trade under California law (Section III); (iv) a tie under any standard of review (Section IV); or (v) a UCL claim (Section V). Each deficiency provides an independent basis for dismissing the SCAC.

### RELEVANT BACKGROUND

Tesla is a clean energy company that designs, manufactures, and sells high-performance EVs. (SCAC ¶¶ 29, 31.) It also designs and manufactures certain parts for its EVs and runs Service Centers and Collison Centers that provide services for its EVs. (*Id.* ¶¶ 31-32, 66.) Tesla's primary business is selling vehicles to consumers. Its "Automotive Sales" segment drives the company's overall revenue and profits. (*Id.* ¶ 150.) Tesla's "Services and Other" segment, which includes services and parts,[2] brings in less than 10% of the revenue that Tesla's EV sales and leases do. (*Id.* ¶ 150 n.91.)

Plaintiffs purport to be Tesla vehicle owners or lessors who paid for Tesla-compatible parts and

---

[2] SCAC ¶ 150 n.91; Lavely Decl. Ex. B (Tesla 2022 Form 10-K) at 4, 37.

Tesla repair services between March 2019 and the present. (*Id.* ¶¶ 9-28, 218.) Plaintiffs and other Tesla

drivers have various options for servicing and repairing their vehicles. (*Id.* ¶¶ 65-66, 150-51.)

 For routine service, Tesla drivers can service their vehicle through Tesla or elsewhere. Tesla

offers two options: (1) Tesla service centers (150+ in the U.S.) (*id.* ¶¶ 32, 133); and (2) Tesla's Mobile

Service Technicians, who perform certain services at the vehicle owner's location (*id.* ¶ 65). Tesla also

provides free diagnostic software that customers can use to address common repair and maintenance

needs, which is directly embedded into the vehicle's touchscreen.[3] Tesla drivers can also get routine

service at non-Tesla facilities. (*Id.* ¶ 92.) Tesla makes its manuals available online for free, for anyone to

use. (*Id.* ¶ 144.) If an independent shop needs diagnostic software, Tesla provides that software through

a subscription for $3,000 per year. (*Id.*) Daily and monthly subscriptions are also available.[4]

 For major repairs, Tesla drivers also have options: Tesla Collison Centers, which are owned,

trained, and operated by Tesla (*id.* ¶ 66); and Tesla-Approved Collision Centers ("TACCs"), which are

independently owned and operated and compete with Tesla. To get certification, TACCs receive training

from Tesla. Once certified, they are listed on Tesla's website. (*Id.* ¶¶ 66 & n.33, 151(d).) There are more

than 730 TACCs across the country.[5] (SCAC ¶ 151(d).)

 Tesla manufactures certain parts; other parts are purchased from suppliers. (*Id.* ¶¶ 31, 156.)

Independent shops and individuals can buy parts from Tesla's website; the parts catalog is public. (*Id.*

¶ 145.) They can also buy parts at a Tesla Service Center or an independent supplier. (*Id.* ¶¶ 163, 186.)

## LEGAL STANDARD

 "To survive a motion to dismiss, a complaint must contain sufficient factual material, accepted as

true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quotations omitted). "[I]nsistence on specificity of facts is warranted before permitting a case to

proceed into costly and protracted discovery in an antitrust case." *Somers v. Apple, Inc.*, 729 F.3d 953,

966 (9th Cir. 2013). "[T]he Court is not required to assume the truth of legal conclusions merely because

they are cast in the form of factual allegations." (Order 6, quotations omitted.)

---

[3] Lavely Decl. Ex. G (Tesla Service Subscription Information).
[4] SCAC ¶ 144 n.87; Lavely Decl. Ex. K (Tesla Service Subscription Pricing).
[5] SCAC ¶ 66 n.33; Lavely Decl. Ex. H (Tesla Collision Support) (website letting users find TACCs).

2

1

**ARGUMENT**

2

**I.    The Sherman Act Claims Fail Because Plaintiffs Plead No Plausible Antitrust Markets.**

3

**A.    Relevant Legal Standard.**

4

"A threshold step in any antitrust case is to accurately define the relevant market" in which the

5

challenged conduct supposedly has harmed competition.[6] *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992

6

(9th Cir. 2020); *see* Order 7.[7] "A [relevant] market comprises any grouping of sales whose sellers, if

7

unified by a monopolist or a hypothetical cartel could profitably raise prices above a competitive level."

8

*Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 975 (9th Cir. 2023) (quotations omitted). "If the sales of

9

other producers [could] substantially constrain the price-increasing ability of the monopolist or

10

hypothetical cartel, these other producers must be included in the market." *Id.* (quotations omitted). A

11

submarket is cognizable only where "the alleged submarket is economically distinct from the general

12

product market." (Order 8, quotations and citations omitted.) Courts can identify economically distinct

13

submarkets based on "practical indicia," but those are not dispositive. *Id.*; *In re German Auto. Mfrs.*

14

*Antitrust Litig.*, 497 F. Supp. 3d 745, 756 (N.D. Cal. 2020). "At bottom, economic distinction depends

15

on whether the purported submarket is meaningfully insulated . . . from competition with other products

16

in the broader market, which is determined by judicial experience and common sense." (Order 8,

17

quotations and citations omitted.) Sherman Act claims should be dismissed for failure to plead a

18

plausible antitrust market. *See German Auto.*, 497 F. Supp. 3d at 756; Order 12.

19

Plaintiffs again try to allege single-brand aftermarkets for "Tesla-Compatible Parts" and "Tesla

20

Repair Services," deriving from a purported EV-only "foremarket." (SCAC ¶¶ 1, 39.) But "[s]ingle-

21

22

---

[6] Plaintiffs must establish antitrust standing to bring their claims. Plaintiff Shore's claims should be
stayed because of his arbitration agreement. (*See* Dkt. 133.) Alternatively, Plaintiff Shore's Sherman Act

23

claims should be dismissed because he admittedly purchased services and/or parts from only a TACC,
rather than directly from Tesla. (SCAC ¶ 27.) Accordingly, Plaintiff Shore, as well as any other Plaintiff

24

or putative class members in the same position, lack antitrust standing for their Sherman Act claims
because they are indirect purchasers. *See Illinois Brick Co. v. Illinois*, 431 U.S. 720, 756-57 (1977).

25

[7] Plaintiffs' Section 2 claims are subject to the "rule of reason" for which a cognizable relevant
market is essential. In *Epic*, the Ninth Circuit noted that a precisely defined market is not required in two

26

limited categories of antitrust cases: those subject to the *per se* rule (such as price-fixing cases), and
those applying a "quick look" liability standard. 67 F.4th at 974 n.6. This Court correctly found that

27

Plaintiffs "offer no authority and proffer no facts for why their Section 2 claims should be assessed

28

under the *per se* or quick look standards." (Order 11.) Nothing in the SCAC changes that.

brand markets are, at a minimum, extremely rare and courts have rejected such market definitions even where brand loyalty is intense" so as not to transform every unique brand into a monopoly. *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1021 (N.D. Cal. 2021) (quotations omitted), *aff'd in part and rev'd in part*, 67 F.4th 946 (9th Cir. 2023).[8]

Plaintiffs again fail to plead the "rare" and "disfavored" cognizable single-brand aftermarket. Not only do they fail to plausibly allege an EV-only "foremarket" (Section I.B), but they also fail to demonstrate the additional required criteria for aftermarkets (Section I.C).

### B. Plaintiffs' Alleged EV-Only Foremarket Fails.

Without deciding "[w]hether or not EVs constitute their own market," the Court tentatively concluded that Plaintiffs had identified an EV submarket based the relevant (but not dispositive) "practical indicia." (Order 7-10.) But because the Court was able to dismiss Plaintiffs' FAC due to its facially deficient aftermarket allegations, it did not rule on Tesla's Motion for Judicial Notice and Incorporation by Reference ("Request") (Dkt. 76-23), which requested that the Court consider the documents that formed the basis of Plaintiffs' foremarket allegations. (Order 6-7.)

Although the Court need not reach this issue if it again concludes (as it should) that Plaintiffs have failed to sufficiently plead a cognizable aftermarket, the deficiencies with respect to the foremarket provide an additional ground for dismissing the SCAC. For the reasons set forth below—and as previously discussed in Tesla's prior motion (Dkt. 76 ("MTD I") at 7-13; Dkt. 90 ("MTD Reply I") at 2-6), as well as Tesla's Request (Dkt. 76-23)—Tesla respectfully submits that the Court should reconsider its tentative conclusion.

---

[8] Courts have repeatedly rejected single-brand aftermarket claims. *See, e.g.*, *Reilly v. Apple Inc.*, 2022 WL 74162, at *5 (N.D. Cal. Jan. 7, 2022) (explaining the Supreme Court's long-held skepticism of single-brand aftermarkets: "It is an understatement to say that single-brand markets are disfavored." (quotations and citation omitted)); *Epic*, 67 F.4th at 981; *Apple, Inc. v. Psystar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008); *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 820 (6th Cir. 1997); *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 405 (3d Cir. 2016); *DSM Desotech, Inc. v. 3D Sys. Corp.*, 749 F.3d 1332, 1346 (Fed. Cir. 2014); *SMS Sys. Maint. Servs., Inc. v. Digit. Equip. Corp.*, 188 F.3d 11, 19 (1st Cir. 1999); *see also* Areeda & Hovenkamp, Antitrust Law ¶ 1740a (explaining that single-brand aftermarkets are cognizable only in narrow circumstances). Moreover, since the Sherman Act was passed more than 100 years ago, courts have "found that a single firm's brand constitutes a relevant market in only a few situations." *Coronavirus Rep. v. Apple Inc.*, 2021 WL 5936910, at *9 (N.D. Cal. Nov. 30, 2021) (citations omitted).

1   Critically, the SCAC fails to plausibly allege that EVs are "insulated from competition" from

2   non-EVs, which is the relevant inquiry for antitrust market (or submarket) definition. *German Auto.*, 497

3   F. Supp. 3d at 757. To the contrary, the alleged foremarket rests entirely on the implausible notion that

4   non-EVs do not even have the "*potential* ability to deprive [EVs] of significant levels of business." *Id.*

5   (emphasis added). That is belied by the SCAC and "simply defies common sense." *Id.*[9]

6   Tesla's mission to "accelerate the advent of sustainable transport" *requires* it to attract

7   consumers who drive non-EVs. (MTD I at 7-9.) The SCAC's potpourri of arguments to the contrary

8   (SCAC ¶¶ 39, 41-46, 52), which are remarkably similar to the ones considered and rejected by Judge

9   Breyer in *German Auto*, fail to show that EVs are insulated from competition with non-EVs. At most,

10   plaintiffs have pled mere product differentiation. *See Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust*

11   *Sys., Inc.*, 723 F.3d 1019, 1025 (9th Cir. 2013) ("[P]erfect fungibility [between products] isn't required.

12   If it were, only physically identical products would be a part of the market.") (quotations and citations

13   omitted); *see also* MTD I at 7-13; MTD Reply I at 2-6.

14   With respect to Plaintiffs' allegations regarding the "SSNIP test" (SCAC ¶¶ 47-48), the Court

15   correctly found that Plaintiffs failed to allege that EVs are insensitive to price changes (Order 9), and the

16   SCAC does nothing to remedy that omission. (*See* MTD I at 12-13.) Plaintiffs' only alleged evidence of

17   economic significance is that "96% of EV owners will *only* buy another EV for their next vehicle—*i.e.*,

18   regardless of the price." (SCAC ¶ 46; *see* Order 9, 10.) But as previously explained (MTD Reply I at 5-

19   6; MTD Hr'g 32:8-33:5), Plaintiffs misquote the cited AAA study, which states, "The majority [of

20   respondents] (96%) say they would buy or lease another electric vehicle the next time they were in the

21   market for a new car."[10] It says nothing about price-sensitivity; nor does it say that respondents will ***only***

22   buy another EV. A single *misquoted* allegation cannot be enough to "overcome the commonsense

23   inference" that EVs compete with non-EVs. *German Auto.*, 497 F. Supp. 3d at 757.

24

25   [9] *See* Lavely Decl. Ex. A (Tesla 2021 Form 10-K) at 11, 15, 17 (Tesla EVs compete with non-EVs);
*Groupon, Inc. v. Shin*, 2022 WL 60526, at *4 (N.D. Ill. Jan. 6, 2022) (invoking "common sense" and

26   stating: "There is fierce competition in the car market between the traditional [ICE] cars and electric
cars."); *see also In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 980 (N.D. Cal. 2020),

27   *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ("It is implausible that . . . a buyer looking at a [non-EV] Mercedes would not consider a Tesla if it were cheaper or of higher quality.").

28   [10] SCAC ¶ 46 n.18, Lavely Decl. Ex. C (AAA Article regarding EV consumer habits).

### C.     Plaintiffs' Alleged Aftermarkets Fail.

If the Court concludes that Plaintiffs' foremarket allegations fail, then their aftermarket allegations must fail as well. *Epic*, 559 F. Supp. 3d at 955 ("aftermarket theory" is "tethered to [a] foremarket"). The aftermarket allegations fail for the additional reason that the SCAC does not plausibly plead the factors required to establish a single-brand aftermarket. The Court correctly dismissed the FAC on that basis (Order 10-12), and Plaintiffs have not remedied those deficiencies in the SCAC, nor can they.

A cognizable aftermarket exists only where customers are unknowingly "lock[ed] in" to the aftermarket "such that competition in the foremarket cannot 'discipline [competition in] the aftermarkets.'" *Epic*, 67 F.4th at 976-77 (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 486 (1992)). Since *Kodak*'s analysis of photocopier markets, "[c]ourts have been extremely reluctant to . . . extend [single-brand aftermarket theories] to other types of goods," *Streamcast Networks v. Skype Techs., SA*, 547 F. Supp. 2d 1086, 1094-95 (C.D. Cal. 2007). As such, single-brand markets are "extremely rare," and "it is an understatement to say that single-brand markets are disfavored." *Epic*, 559 F. Supp. 3d. at 1021.

To sustain a single-brand aftermarket, a plaintiff must plausibly show: "(1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market." *Epic*, 67 F.4th at 977, 981. Each of these criteria must be established. Plaintiffs fail on each:

*No General Knowledge:* Without the "crucial" showing that "the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase," there is an "economic presumption" that "consumers make a knowing choice to restrict their aftermarket options" when they make their foremarket purchase. *Id.* at 976, 977-78. As to the FAC, this Court correctly found that "nowhere do Plaintiffs allege that consumers are in fact unaware of the supposedly supracompetitive prices and exorbitant wait times in the relevant aftermarkets. To the contrary, they

allege that such problems are 'widely documented.' Plaintiffs thus fail to allege that any restrictions are not generally known." (Order 11, quotations and citations omitted).

Plaintiffs resort to two unconvincing gambits to save their deficient pleadings:

*First*, Plaintiffs double down on allegations that Tesla misleads customers with respect to service and parts. The Court acknowledged Plaintiffs' prior allegations (repeated in the SCAC) that Tesla "misleadingly tells consumers that its EVs are specifically designed to require little or no maintenance" (Order 11; *see* FAC ¶¶ 47, 61; SCAC ¶¶ 61, 94), but found such allegations insufficient to plead lack of general knowledge. Supposedly telling consumers that EVs are *designed* to require little or no maintenance and have fewer moving parts plainly does not speak to what options are available if and when maintenance and parts are required.[11]

In addition, the SCAC (like the FAC) concedes that the alleged "shortcomings in Tesla service" are "widely documented (*i.e.*, have garnered recent attention from journalists)." Plaintiffs' attempt to split hairs between knowledge about the alleged restrictions and the effects of those restrictions fails. (*Id.* ¶ 199.) The Court correctly concluded that the existence of general knowledge about the effects of the alleged restrictions made it implausible to suggest that there was no general knowledge of the restrictions themselves. (Order 11.) In fact, the SCAC (like the FAC) includes specific examples of such "widely documented" alleged shortcomings: (i) Tesla's SEC filings state that it designs its vehicles to "effectively limit[] anyone other than Tesla from being able to provide maintenance and repair services for its EVs" (SCAC ¶¶ 140-41); (ii) Elon Musk tweeted that Tesla's service locations in North America "have major gaps in geographic coverage!" (*id.* ¶ 197); (iii) Tesla's owner's manual advises, "Use only genuine Tesla parts and accessories" (*id.* ¶ 186); (iv) Tesla's warranty "strongly discourage[s] owners from obtaining parts or services anywhere else, at the risk of voiding their warranties" (*id.* ¶ 181); (v) online forums are "replete with stories by Tesla owners of Tesla invalidating warranties" and "widely

---

[11] Nor are the statements misleading as pleaded. With regard to the claim that EVs are designed to require little or no maintenance, the actual statement from Tesla (quoted in the Complaint) is that Tesla vehicles are designed with the "goal of eliminating the need for service." (SCAC ¶ 138.) The statement is plainly aspirational, not a promise of "no maintenance" (which would be facially unbelievable). With regard to the statement about "fewer moving parts," the Complaint does not even allege that it is untrue—it is silent on whether EVs actually have more or fewer moving parts than ICE vehicles.

discussed" defects (*id.* ¶¶ 187, 208); (vi) Tesla's 2014 and 2015 SEC filings disclosed that Tesla purchases some EV components from a single source (allegedly to restrict the availability of Tesla parts) (*id.* ¶¶ 156-58); and (vii) Tesla's online catalog reveals the supposedly inflated prices of Tesla vehicle parts (*id.* ¶ 203).

Notably, the SCAC cites a 2022 Vox article that demonstrates the implausibility of Plaintiffs' allegation that the "Repair Restrictions themselves are not generally known by consumers." (SCAC ¶ 199 & n.118.)[12] That article describes one of the key alleged restrictions in detail: "Tesla warns customers that damage or failures caused by technicians who aren't Tesla-certified won't be covered by the company's warranty policy."[13] The article also describes the "growing frustration with the company over its approach to maintenance and repairs—discontent that's echoed everywhere from Tesla owner Reddit posts to online forums for Tesla shareholders." The SCAC thus directly undermines Plaintiffs' unsupported position that the alleged restrictions are not generally known.

*Second*, the SCAC alleges that the named Plaintiffs did not know about the alleged restrictions. (SCAC ¶¶ 9-28.) But it is unremarkable that the Plaintiff group has found a handful of people who can allege that they personally did not have such knowledge. And a few anecdotes do not come close to showing the *general* lack of knowledge plaintiffs are required to allege, particularly in light of the allegations in the SCAC that the alleged shortcomings are "widely documented."

<u>*Information Costs*</u>: In addition to showing a lack of general knowledge, a plaintiff must show that information costs prevent accurate life-cycle pricing. *Epic*, 67 F.4th at 977. Plaintiffs allege in conclusory fashion that "[i]t is difficult, if not impossible, for a consumer to accurately forecast how much money will need to be spent on [Tesla-compatible] parts and services over the lifetime of an EV prior to purchase." (SCAC ¶ 103.) But the SCAC itself (like the FAC) documents the average yearly

---

[12] Lavely Decl. Ex. F (Vox article discussing alleged aftermarket restrictions).

[13] The article also undercuts Plaintiffs' allegations of anticompetitive conduct, which are addressed in Section II.B below. Among other things, (1) it quotes an independent EV mechanic as saying "[t]hings are getting better for sure" with respect to Tesla repairs due to Tesla's over-the-air updates; (2) it states that Tesla drivers visit service centers less than the owners of premium gas-powered vehicles; (3) it gives an explanation for why longer wait times may exist for EV repairs compared to ICE vehicle repairs (mechanics have less experience with EVs); and (4) it says independent mechanics who have experience repairing Tesla EVs are now "picking up the slack" with respect to Tesla repairs. *Id.*

cost of maintaining a Tesla. (*Id.* ¶ 204.) Based on that allegation—among other specific allegations that "bely [Plaintiffs]' conclusory allegation" that the life-cycle pricing is "difficult, if not impossible"[14]— the Court correctly concluded that Plaintiffs failed to meet the second *Epic* aftermarket requirement. (Order 11.) Nothing in the SCAC alters the Court's prior analysis on this factor.

*Switching Costs:* Plaintiffs do not adequately plead that existence of material switching costs, which are "the costs borne by leaving one platform to go to a different platform." *Epic*, 559 F. Supp. 3d at 956 n.254. Based on the allegation that "the cost of a Tesla EV dwarfs the cost of an individual maintenance or repair service," Plaintiffs leap to the conclusion that "it is not reasonable or rational for a Tesla EV owner to switch to a different EV in order to avoid the high prices and low supply of an individual Tesla Repair Service or Tesla-Compatible Part needed for a repair." (SCAC ¶ 98.) Although true that buying a new car costs more than repairing a car, that says nothing about the cost of switching from a Tesla to a different vehicle. Consumers sell their cars for a range of reasons. Plaintiffs do not identify a basis to infer that a Tesla owner who is unhappy with the available repair options would find it uneconomical to sell her car and take her business elsewhere. Based on Plaintiffs' bare allegations (largely just repeated in the SCAC), the Court correctly concluded that Plaintiffs failed to show that significant switching costs exist. (Order 11.)

The SCAC's additional allegations regarding switching costs do not save it. For example, Plaintiffs allege that "many Tesla EV owners purchase peripheral or complementary products that only work with their Tesla EVs," and identify at-home charging products as falling into this category. (SCAC ¶ 101.) But Plaintiffs give no indication of how many Tesla EV owners purchase such products, or what it would cost the average Tesla EV owner to go to a different platform. For example, Plaintiffs do not address whether Tesla sells at-home chargers that work for both Tesla and non-Tesla EVs (it does). Without more, Plaintiffs' allegations on this point remain conclusory and insufficient.[15]

---

[14] For example, Plaintiffs assert that Tesla's publicly available parts catalog discloses the cost of Tesla parts (SCAC ¶ 203), and that the purported hourly rate for Tesla Repair Services is documented in blog posts (*id.* ¶ 201).

[15] Plaintiffs also contend that "Tesla EVs have some of the lowest resale values in both the EV market and the automotive industry generally." (SCAC ¶ 100.) But their only support is a comparison of the price drop of two specific models of preowned Tesla EVs versus two non-Tesla EVs. (*Id.*) This

*General Market Definition Principles:* Given that Plaintiffs cannot establish the first three *Epic* requirements, the Court need not reach the fourth, residual requirement that an aftermarket "must bear the 'practical indicia' of an independent economic entity in order to qualify as a cognizable" market, based on "general market-definition principles regarding cross-elasticity of demand." *Epic*, 67 F.4th at 977. But they fail on this factor as well, for various reasons: (1) as the Court correctly found, Plaintiffs did not allege price sensitivity (Order 9), and the SCAC does not correct that deficiency; (2) Plaintiffs still have not described the alleged aftermarkets with nearly the degree of specificity required to establish them under general market-definition principles; as pleaded, there is no way to know what specific services or parts are included (or not) in the alleged aftermarkets (SCAC ¶¶ 56, 71); (3) Plaintiffs still do not plausibly plead a geographic market (*id.* ¶¶ 107-10)—the area "where buyers can turn for alternative sources of supply," *Reilly*, 578 F. Supp. 3d at 1109; they do not, for example, allege how repair services in New Jersey could plausibly be a substitute for repair services in California for a Tesla owner. (*See* MTD I at 16-17.)

## II.     Plaintiffs Do Not Plausibly Plead Monopolization or Attempted Monopolization Claims.

Plaintiffs claim that Tesla monopolized or attempted to monopolize the alleged aftermarkets in violation of Section 2 of the Sherman Act. A plaintiff pleading monopolization must show that the defendant has monopoly power in a relevant market and that it secured or maintained monopoly power through exclusionary conduct, not competition. *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137-38 (9th Cir. 2022). Attempted monopolization requires that the defendant has a dangerous probability of achieving monopoly power in the relevant market and that it had an intent to monopolize. *Reveal Chat Holdco, LLC. v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000-03 (N.D. Cal. 2020).

Plaintiffs have not plausibly alleged that Tesla has monopoly power or a dangerous probability of achieving it in the alleged aftermarkets (Section II.A), nor have Plaintiffs plausibly alleged anticompetitive conduct (Section II.B). Although the Court did not need to reach these issues in its Order, they provide independent, additional grounds for dismissing the SCAC.

random comparison is plainly insufficient to show the switching costs needed to satisfy *Epic*. If anything, it only undermines Plaintiffs' theory that Tesla "has been able to increase prices over time while steadily increasing overall sales." (SCAC ¶ 48.)

**A.**      **Plaintiffs Have Not Plausibly Alleged Monopoly Power in the Alleged Aftermarkets.**

Plaintiffs' Section 2 claims fail because they do not sufficiently allege monopoly power or attempted monopoly power in the alleged aftermarkets. "Monopoly power" means a "substantial" or "extreme degree" of market power. *Epic*, 559 F. Supp. at 1028. Whereas market power is "the ability to raise prices above those that would be charged in a competitive market," monopoly power is "the power to control prices or exclude competition." *Id.* at 1027-28. Such power must be "durable and sustaining." *Id.* at 1028. A "dangerous probability" of achieving monopoly power means the defendant holds a position so proximate to monopoly that the challenged conduct threatens success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 455-56 & n.7 (1993).

Plaintiffs offer no specific facts to support their monopoly power allegations. (SCAC ¶¶ 244, 255.) And the SCAC undercuts the monopoly power claim. It admits that Tesla's parts catalog and service manuals *are free and available online* (*id.* ¶¶ 144-45) and that Tesla provides free diagnostic software that customers can use to address common repair/maintenance needs without a subscription, and directly embedded into the vehicle's screen.[16] Those are not actions of a company with the ability and intent to control prices and exclude rivals. *Somers*, 729 F.3d at 964 (dismissing Section 2 claim where plaintiff's "allegations do not square with her [monopolization] theory").

The SCAC also says nothing specific about Tesla's supposed share of the alleged aftermarkets or that of Tesla's supposed aftermarket rivals (independent and do-it-yourself repairers). Nor does it say when Tesla supposedly acquired a monopoly (or near monopoly) share. The SCAC acknowledges that non-Tesla options exist for services and parts, but alleges no specific facts about the size of the alleged aftermarkets, the shares of any competitors (including Tesla) in the alleged aftermarkets, or the means of calculating share. The SCAC alleges only that there is "a small handful of [TACCs]."[17] (SCAC ¶ 161.) But there are 730+ TACCS that, by Plaintiffs' admission, *compete* with Tesla.[18] (*Id*. ¶ 151(d).)[19]

---

[16] Lavely Decl. Ex. G (Tesla Service Subscription Information).

[17] *See also* SCAC ¶ 63 ("[T]here is an *insignificant number* of independent service providers to whom Tesla owners may turn to repair or maintain their EVs" (emphasis added)).

[18] SCAC ¶ 66 n.33; Lavely Decl. Ex. H (Tesla Collision Support) (website letting users find TACCs).

[19] Given the admitted competition between Tesla and the independent TACCs (SCAC ¶ 151(d)), TACCs cannot be attributed to Tesla for purposes of determining its share of any market. *Cf. Epicor*

With respect to the alleged parts aftermarket, Plaintiffs allege only that "numerous parts in Tesla's catalog are unavailable for purchase" and there is "no alternative to Tesla replacement for the vast majority of parts." (SCAC ¶¶ 145, 155.) Yet the SCAC cites examples of non-Tesla repair shops providing repairs where "the parts used could mostly be obtained at a local home improvement store." (*Id.* ¶ 211 n.130.)[20] Thus, once again, Plaintiffs' own allegations undercut the plausibility of their claim.

Plaintiffs' failure to allege market share for the purported aftermarkets is fatal to their monopolization claims. *See Terminalift LLC v. Int'l Longshore & Warehouse Union Loc. 29*, 2013 WL 2154793, at *6 (S.D. Cal. May 17, 2013); *MLW Media LLC v. World Wrestling Ent.., Inc.*, 2023 WL 1975241, at *4 (N.D. Cal. Feb.  13, 2023); *FTC v. Facebook*, 560 F. Supp. 3d 1, 17-20 (D.D.C. 2021) (dismissing complaint that "do[es] not even provide an estimated actual figure or range for Facebook's market share at any point over the past ten years," "does not even allege what it is measuring," and "does not identify any other providers [in the relevant market]") (citing cases with similar results).

In an attempt to remedy their insufficient market share allegations, Plaintiffs describe TACCs as Tesla's "co-conspirators" for the first time. (*E.g.*, SCAC ¶ 33.) Aside from just assigning that label, however, the SCAC includes *nothing* to support a conspiracy claim. Such bare allegations—which do not describe when or how the alleged conspiracy began or say who specifically conspired—do not come close to stating a conspiracy claim. *See also Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (conspiracy not stated where "who, did what, to whom (or with whom), where, and when?" were not stated with significant particularity); *Facebook Inc. v. Power Ventures, Inc.*, 2009 WL 3429568, at *2 (N.D. Cal. Oct. 22, 2009) (demanding a "high degree of particularity" for such claims under the Cartwright Act); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (same for Sherman Act). The "co-conspirator" theory is plainly insufficient. *See Disney Enters., Inc. v. VidAngel, Inc.*, 2017 WL 6883685, at *7 (C.D. Cal. Aug. 10, 2017) (refusing to aggregate competitors' market shares where conspiracy not sufficiently alleged).

---

*Software Corp. v. Alt. Tech. Sols., Inc.*, 2013 WL 12130024, at *2 (C.D. Cal. Dec. 2, 2013) (finding "market share of an [alleged] monopolizer and its competitors may be aggregated only where the [alleged] monopolizer controls the ersatz competitors to such a degree that all the entities should be considered a single firm for Sherman Act purposes").

[20] SCAC ¶ 211 n.130; Lavely Decl. Ex. D (Substack article regarding Tesla repairs).

12

**B.      Plaintiffs Have Not Adequately Pleaded Anticompetitive Conduct.**

Even if Plaintiffs had adequately pleaded monopoly power, the "mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system." *Dreamstime.com*, 54 F.4th at 1137. "The possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). Anticompetitive conduct does not include any and all conduct that makes it harder for competitors to compete. *Dreamstime.com*, 54 F.4th at 1137-38. After all, the point of competition is to attract consumers *to* your products and services and *away* from the products and services of your competitors. Anticompetitive conduct does not include "product improvement," *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010), nor does it include businesses' choices about "the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). Conduct is anticompetitive *only* if it (1) was performed "with an 'intent to control prices or exclude competition in the relevant market,'" and (2) "harm[ed] 'the competitive process' as a whole." *Dreamstime.com*, 54 F.4th at 1137. Plaintiffs raise five categories of supposedly anticompetitive conduct. None of the allegations comes close to meeting the required standards. Plaintiffs' Section 2 claims therefore must be dismissed.

1.      Allegations Regarding Tesla's Business Model.

Plaintiffs' theory is that Tesla created the conditions that made timely, reasonably priced Tesla repair services and parts "unavailable" to maximize its own profits. (SCAC ¶ 151.) Although this theory focuses on Tesla's EV design (*id.* ¶ 246(b)), it attacks Tesla's entire business model (*e.g.*, *id.* ¶ 151). These allegations fail because the conduct at issue is not anticompetitive as a matter of law.

Plaintiffs have not shown that Tesla engaged in the alleged conduct with an "intent to control prices or exclude competition." *Dreamstime.com*, 54 F.4th at 1137. The premise of Plaintiffs' theory is that repair services and parts were expected to eventually become highly profitable so "Tesla's incentive was to keep as much of the market share for that business as it could." (SCAC ¶ 150.) But there are no allegations supporting this theory. As the SCAC makes clear, Tesla's revenues from EV sales/leases

have always dwarfed its repair/parts revenues. (*Id.*) There is no support offered for saying that Tesla (or anyone) expects the repair/parts business to be "highly profitable" at any point. It defies common sense that Tesla would limit repairs and parts (frustrating customers) to control prices in alleged aftermarkets when doing so could hurt EV sales—the main driver of Tesla's revenue. *See Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010) (on an MTD, "a court must determine whether an antitrust claim is plausible in light of basic economic principles").

With that context, none of the alleged anticompetitive conduct withstands scrutiny:

*Direct Sales Model:* Plaintiffs criticize the decision to sell "directly to consumers." (SCAC ¶ 151(a), 152-53.) But that approach was disclosed years before Tesla began conducting repairs. (*Id.* ¶ 167.)[21] Although there are many procompetitive reasons for this approach, the Court need not consider them because Plaintiffs do not explain why this model is anticompetitive or allege that Tesla chose not to use dealers with an intent to control prices or exclude competition in the alleged aftermarkets.

*EV Design:* Plaintiffs allege that Tesla designs its EVs "such that most maintenance and repairs require access to diagnostics and telematics accessible only . . . by Tesla." (*Id.* ¶ 246(b).) This conclusory allegation, even if true, does not constitute anticompetitive conduct. "[C]ourts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *Allied Orthopedic*, 592 F.3d at 998 (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001)). The antitrust laws are not meant to punish companies that develop innovative products, and they do not require companies to design products to give rivals easy access to them. *Id.*

Plaintiffs allege no facts indicating that Tesla designs its EVs for the *purpose* of excluding repair/parts competitors, as opposed to reasons concerning security, safety, aesthetics, convenience or any other proper purpose. This failure to "allege a specific intent to monopolize" is fatal. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987). For example, the SCAC suggests that Tesla selected aluminum (rather than steel) frames to make it harder to obtain replacement parts. (SCAC ¶¶ 151(b), 154.) There is no support for that allegation. And, again, it defies common sense that Tesla would compromise on the very structure of its vehicles to control prices in a segment of its business that

---

[21] Lavely Decl. Ex. I (Tesla Approach To Distributing and Servicing Cars).

does not drive its profits. Tesla's website provides the actual (and logical) reason: aluminum is lighter than steel, which increases vehicle efficiency and functionality.[22] As with the direct sales model, Tesla developed the fundamental design of its EVs before it began conducting repairs. (*Id.* ¶¶ 127-30, 167.)

Plaintiffs also fail to allege that the design choices exclude rivals in the alleged aftermarkets. Rather, they concede that non-Tesla repair shops can access diagnostic information. (Section II.B.2.)

*Certification of TACCs*: Plaintiffs allege that Tesla hindered the establishment of independent repair shops by requiring "extensive investment and training of personnel of all collision shops that sought Tesla certification." (SCAC ¶ 151(c)-(d).) But the allegations regarding the origin and growth of TACCs undermine the allegation that "Tesla effectively limits anyone other than Tesla from being able to provide maintenance and repair services for its EVs."[23] (*Id.* ¶¶ 140, 167-68.)

Plaintiffs admit that non-Tesla repair shops existed before Tesla entered the repair market. (*Id.* ¶ 167.) They also admit other key points about non-Tesla options: (1) TACCs are independent (*id.* ¶ 66); (2) Tesla *competes* with them (*id.* ¶ 151(d)); (3) a certification process for independent repair shops is standard (*id.* ¶ 161); (4) after certification, Tesla *promotes* its competitors as options for customers (*id.* ¶ 66 n.33); and (5) there are procompetitive reasons for certification; for example, as stated by a TACC whose website Plaintiffs quote liberally: "Even though it may be difficult to get your car into a certified Tesla auto body repair shop, it will be well worth the wait in the end. Certified shops have the experience and tooling to assure the process is right."[24] There is simply no basis to conclude that the certification of the Tesla-Approved Collision Centers is anticompetitive.

*Lack of Investment*: Plaintiffs strangely allege that to *monopolize* the alleged aftermarkets, Tesla (1) has made "woefully inadequate investment in company-owned Tesla Service Centers and Collision Centers," (2) "allocated substantially all parts to the manufacture of new vehicles instead of making them available to customers who needed repair and replacement parts," and (3) "for some parts, Tesla declines to permit repairs even at its own Tesla Service Centers." (SCAC ¶ 151(e), (f), (g).) But the

---

[22] *E.g.*, Lavely Decl. Ex. J (Tesla Birthplace of the Model S). (*See* SCAC ¶ 170.)

[23] The SCAC suggests Tesla owners may choose from only "two types of services appointments." (SCAC ¶ 65 n.31.) But those are the options to make an appointment *through Tesla's app*. Tesla of course has no obligation to let customers make appointments at non-Tesla repair shops via Tesla's app.

[24] SCAC ¶ 171 n. 101; Lavely Decl. Ex. E (Collision Pros article regarding Model 3 parts).

SCAC pleads no facts supporting the illogical theory that Tesla intentionally degrades services for its own EVs with the intention of cornering the market for those same services. *Iqbal*, 556 U.S. at 678.

*Public Statements*: The SCAC alleges that state legislatures have considered "right to repair" legislation, and that one state passed a ballot measure that Tesla "fought."[25] (SCAC ¶¶ 114-26.) Even if true, statements that Tesla has or has not made about legislation or industry commitments are *not* anticompetitive conduct, nor do Plaintiffs allege otherwise. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (petitioning government officials is generally immune from antitrust liability). Plausible inferences of anticompetitive conduct cannot be drawn from alleged participation or lack of participation in public debate over *proposed* laws. Plaintiffs also ignore that work on the Automotive Repair Data Sharing Commitment is ongoing. (*Id.* ¶ 119.) (Tesla has, in fact, supported it.)

### 2.    Allegations Regarding Access to Repair Information and Parts.

Plaintiffs allege that Tesla limits access to manuals, telematic data, diagnostic tools, and replacement parts. (SCAC ¶¶ 246(c), 250, 257(b), 261.) But the SCAC and the documents it cites undermine these allegations. Plaintiffs admit that the manuals are free and public. (*Id.* ¶ 144.) The SCAC contains no allegations about what telematics non-Tesla shops can or cannot access. And Tesla offers free diagnostic software embedded into the vehicle's screen[26] for a procompetitive reason the SCAC acknowledges: "you'll spend less time in the shop and more time on the road." (*Id.* ¶ 138.)

The SCAC seeks injunctive relief "requiring Tesla to provide access to manuals, diagnostic tools, and vehicle telematic data, at a *reasonable* cost, to individuals and independent repair shops." (SCAC at 70 (emphasis added).) Tesla already does just that—it makes diagnostic software available for $3,000 per year to "independent facilities." (*Id.* ¶¶ 144, 165.) And there is no non-conclusory allegation indicating that these fees are or were unreasonable, inconsistent with industry practice, not assessed to cover costs or, most importantly, exclusionary. And no allegations support an inference that independent repair shops cannot afford the fee and stay in business. *See Alaska Airlines, Inc. v. United Airlines, Inc.*,

---

[25] *See Alliance for Auto. Innovation v. Massachusetts*, 2020 WL 10141195 (D. Mass. Nov. 20, 2022) (docket for litigation brought by various car and truck manufacturers challenging Massachusetts SD645, the 2020 ballot initiative). Tesla is not involved in this litigation.

[26] Lavely Decl. Ex. G (Tesla Service Subscription Information).

948 F.2d 536, 545 (9th Cir. 1991) (no antitrust violation where access fee was not so high as to drive away competition). Firms have no antitrust duty to "give away" their products. *Free Freehand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1184 (N.D. Cal. 2012); *see Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016) ("Competitors are not required to engage in a lovefest.").

Plaintiffs' only objection is that the freely available diagnostic package "does not provide sufficient information for many kinds of repairs." (SCAC ¶ 165.) This is nonspecific and conclusory. And even if true, Plaintiffs do not plead facts suggesting that Tesla made such information unavailable for the *purpose* of excluding competitors. Nor do they allege facts from which it can reasonably be inferred that the alleged limits on diagnostic tools have actually excluded any rivals. In any event, Tesla has no duty to make every part available to rivals. *Pac. Bell*, 555 U.S. at 448.

*OEM Replacement Parts:* Plaintiffs make vague allegations about the availability of parts. For example: "most parts are not interchangeable with parts designed for use with other manufacturers' vehicles" (SCAC ¶ 73); "there are few if any non-OEM parts manufacturers" and Tesla "limits" access to OEM parts (*id.* ¶ 77); Tesla requires an "application" to make a parts purchase (*id.* ¶ 145); "numerous parts in Tesla's catalog" are "unavailable for purchase" (*id.* ¶ 91); "Tesla reportedly ignores parts requests from independent repair shops" (*id.* ¶ 146); and there is "no alternative to Tesla replacement for the vast majority of parts" (*id.* ¶ 155). Plaintiffs plead no specific facts supporting these conclusory allegations, and they do not explain how the alleged conditions prevent entry into the aftermarkets. *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2017 WL 4310767, at *9 (N.D. Cal. Sept. 28, 2017).

There is no plausible allegation of anticompetitive conduct regarding the supposed unavailability of certain parts in the catalog. Plaintiffs do not plead facts suggesting that Tesla made certain parts unavailable for the purpose of excluding rivals, or even that any rivals were excluded. To the contrary, an independent shop quoted by Plaintiffs says "high demand" was likely the reason for shortages, adding, "Tesla has done a good job and[sic] finding their bottlenecks and getting them fixed."[27]

Nor does the SCAC address the possibility that the unavailability of parts is due to supply constraints, security/safety concerns, recalls or any other legitimate reason. The SCAC says nothing

---

[27] SCAC ¶ 171 n.101; Lavely Decl. Ex. E (Collision Pros article regarding Model 3 parts).

about how many parts are unavailable, their importance to competition, or how their supposed

unavailability affects rivals' ability to compete. These are fatal omissions.

### 3.    Allegations Regarding Warranties.

The allegations about Tesla's warranties do not describe anticompetitive conduct. (*See* SCAC ¶¶

181-91, 246(a).) As described in Section V.B, the warranties comply with federal warranty law.

Plaintiffs acknowledge that the policies do not prevent Tesla owners from using third-party shops or

parts. (*Id.* ¶ 181.) Rather, the warranties say only that coverage "may" be voided if damage is caused by

"improper" maintenance, service or repairs. (*Id.* ¶ 182.) There is no antitrust duty to cover damages

caused by improper service or repairs, and there is nothing anticompetitive about Tesla's warranties,

especially where competitors "are enacting the same repair restrictions." (*Id.* ¶ 82.)

Plaintiffs allege that Tesla's warranties "strongly discourage" consumers from going anywhere

but Tesla for parts and repairs. (*Id.* ¶ 181.) But the SCAC's one-off anecdotes of consumers complaining

online do not support inferences of exclusionary conduct resulting in monopolization of a nationwide

market for all Tesla parts and services.[28] Nothing in Tesla's policy can reasonably be construed as

"harm to the competitive process" under any plausible reading.[29] *See In re eBay Seller Antitrust Litig.*,

545 F. Supp. 2d 1027, 1032 (N.D. Cal. 2008); *Dreamstime.com*, 54 F.4th at 1138 (showing of "harm[]

[to] 'the competitive process' as a whole" is required).

### 4.    Allegations Regarding Exclusivity Agreements with Parts Suppliers.

Plaintiffs do not assert an exclusive dealing claim but ask the court to infer that Tesla's allegedly

"*de facto*" exclusive agreements with "at least some" parts suppliers support a claim of monopolization.

(SCAC ¶ 157.) But the SCAC identifies only one such alleged agreement (a Tesla/Panasonic agreement

filed with the SEC in 2014) (*id.* ¶ 158), and Plaintiffs say nothing about what parts are covered, much

---

[28] *See Aerotec*, 836 F.3d at 1186; *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1203 (9th Cir. 2012).

[29] The allegations regarding Tesla's "salvaged" (severely damaged) vehicle policy fall well short of alleging exclusionary action. (SCAC ¶¶ 190-91.) Plaintiffs do not attempt to connect the policy to any anticompetitive effect. And there are procompetitive reasons supporting the policy, such as avoiding risks to repair technicians. (*Id.* ¶ 190 n.115); *see Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *6 (N.D. Cal. Jan. 9, 2012) ("With reasonable, pro-competitive justifications for the [policy] evident from the face of the complaint . . . plaintiffs' claim cannot withstand scrutiny even on a motion to dismiss."). Nothing supports Plaintiffs' allegation that this is an exclusivity agreement.

less the percentage of the alleged aftermarket attributable to the covered part(s). There are no allegations about the duration of the exclusivity, nor anything to indicate that the exclusivity foreclosed competitors in the aftermarkets. The "exclusivity" allegations do not support an inference of substantial market foreclosure, and therefore there is no basis to infer that the alleged exclusivity is anticompetitive.[30]

Plaintiffs have not shown that Tesla used exclusivity agreements to "unlawfully foreclose competition" in the putative market for Tesla parts. *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *4 (N.D. Cal. July 2, 2014) (exclusivity agreements "are often entered into for entirely procompetitive reasons, and generally pose little threat to competition").

### 5.   Allegations Regarding Exclusivity Agreements with TACCs.

Plaintiffs allege that Tesla requires TACCs "to enter into *de facto* exclusivity agreements, requiring them to adhere to Tesla's Repair Restrictions and preventing them from conducting repairs and maintenance for Tesla EVs using parts other than those sold and supplied by Tesla." (SCAC ¶ 293.) That is the only sentence on the subject in the SCAC. There are no examples of such agreements or any other information to support the theory that such agreements (even if they existed) are anticompetitive.

### III.   Plaintiffs Do Not Plausibly Allege a Combination in Restraint of Trade under State Law.

Plaintiffs allege that Tesla's "agreements with its OEM suppliers and with [TACCs] constitute horizontal group boycotts which are *per se* illegal under the Cartwright Act." (SCAC ¶ 294.) The alleged "*de facto* exclusivity agreements" are: (1) with parts suppliers (identifying only one alleged agreement); and (2) with TACCs (identifying no alleged agreements). (SCAC ¶¶ 157-58, 291, 293.) Plaintiffs fall far short of alleging a Cartwright Act violation under either theory.

California law recognizes that exclusivity agreements "may provide an incentive for the marketing of new products and a guarantee of quality-control distribution" and can therefore be procompetitive. *Fisherman's Wharf Bay Cruise Corp. v. Superior Ct. of San Francisco*, 114 Cal. App. 4th 309, 335 (2003) (citations and quotations omitted). Under the rule of reason, exclusivity agreements are proscribed only when "it is probable that performance of the contract will foreclose competition in a

---

[30] The quoted (partially redacted) language from the Tesla/Panasonic agreement establishes only that the manufacturing equipment would remain Tesla property where the work at issue was taking place in a manufacturing facility *owned by Tesla*. (SCAC ¶ 158 n.93.)

substantial share of the affected line of commerce." *Id.* The rule of reason "measures whether the anticompetitive aspect of a vertical restraint outweighs its procompetitive effects." *Exxon Corp. v. Superior Ct.*, 51 Cal. App. 4th 1672, 1681 (1997).

Plaintiffs try to shoehorn a Cartwright group boycott claim into the SCAC for the first time to avoid the application of the rule of reason. But "[m]ere allegation[s] of a group boycott [are] not sufficient to justify per se condemnation because not all concerted refusals to deal are predominantly anticompetitive." *Flaa v. Hollywood Foreign Press Ass'n*, 55 F.4th 680, 689 (9th Cir. 2022). The Ninth Circuit has articulated three characteristics of a *per se* illegal group boycott: "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (quotations omitted).

The SCAC makes the conclusory assertion that Tesla's alleged agreements "foreclose[] competition in a substantial share" of the alleged aftermarkets (SCAC ¶ 298), but nothing more. The SCAC fails to plead the number of suppliers or TACCs that have entered into the alleged arrangements or that the alleged foreclosure is "probable" or impacts a "substantial share" of commerce. *See Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *8 (N.D. Cal. Apr. 26, 2016), *aff'd*, 724 F. App'x 556 (9th Cir. 2018) (dismissing complaint where plaintiffs had "not provided sufficient details about the dynamics of the relevant market to gauge whether [defendant's] alleged exclusive dealing arrangements have resulted in substantial foreclosure"). The SCAC does not sufficiently allege facts to show that Tesla's conduct has led to *any* market foreclosure, much less substantial foreclosure.

Plaintiffs also fail each of the group boycott requirements. They have not sufficiently alleged that Tesla possesses market power (Section II.A), nor explained how the alleged agreements are not "justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power*, 141 F.3d at 950 (quotations omitted). Plaintiffs' allegation that "[t]here are no meaningful procompetitive justifications for Tesla's conduct" (SCAC ¶ 297) is not enough. *Universal Grading Serv. v. eBay, Inc.*, 2011 WL 846060, at *5 (N.D. Cal. Mar. 28, 2011) (dismissing claims where defendants'

1    "activities are not of the kind that lack any redeeming value and do not completely exclude").[31]

2    **IV.    Plaintiffs Do Not Plausibly Allege a Tying Claim under the Sherman or Cartwright Acts.**

3          To plead a tie under Sherman Act Section 1 and the Cartwright Act, a plaintiff must plausibly

4    allege the existence of separate products or services, that the defendant conditions the sale of the tying

5    product upon the purchase of the tied product, and that the defendant has sufficient power in the market

6    for the tying product to restrain trade in the tied product. *Aerotec*, 836 F.3d at 1178; *Morrison v.*

7    *Viacom, Inc.*, 66 Cal. App. 4th 534, 542 (1998) (requiring proof of the same for Cartwright Act claim).

8          Plaintiffs' tying claims fail because they have not plausibly alleged any relevant antitrust

9    markets, which alone is grounds for dismissal. (Order 7.) The tying claims also suffer from other

10   defects, each of which warrants dismissal: (1) Plaintiffs fail to adequately plead the existence of a tie;

11   and (2) Plaintiffs fail to allege market power in any of the alleged tying markets.

12         **A.    Plaintiffs Have Not Plausibly Alleged a Tie.**

13         Plaintiffs' Section 1 tying claim "falters on the first, most fundamental requirement—the

14   existence of a tie." *Aerotec*, 836 F.3d at 1178; *RLH Indus., Inc. v. SBC Commc'ns, Inc.*, 133 Cal. App.

15   4th 1277, 1283-84 (2005). "[W]hether there is a tie turns on whether the defendant gave buyers the

16   reasonable impression that it would not sell product A to those who would not buy its B." *Aerotec*, 836

17   F.3d at 1178 (quotations omitted). Of course, "[w]here the buyer is free to take either product by itself,

18   there is no tying problem." *Dream Big Media Inc. v. Alphabet Inc.*, 2022 WL 16579322, at *3 (N.D.

19   Cal. Nov. 1, 2022) (quotations omitted).

20         Plaintiffs assert, with virtually no explanation, three different alleged ties: (1) Tesla EVs (tying

21

22         [31] The group boycott claim should not be analyzed under the *per se* standard for the independent
     reason that Plaintiffs have also not alleged a purely *horizontal* arrangement, which is what is the
23   Cartwright Act makes *per se* illegal. Where a "Plaintiff argues Defendant's relationship is both vertical
     and horizontal," the Ninth Circuit applies the rule of reason. *Clear Connection Corp. v. Comcast Cable*
24   *Commc'ns Mgmt., LLC*, 2020 WL 6742889, at *5 (N.D. Cal. Nov. 17, 2020); *see also Frame-Wilson v.*
     *Amazon.com, Inc.*, 591 F. Supp. 3d 975, 987 (W.D. Wash. 2022) ("[H]ybrid arrangement" must "be
25   analyzed under the rule of reason"); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1480 (9th Cir. 1986)
     (same). As the SCAC alleges, "Tesla is not only a purchaser of Tesla-Compatible Parts manufactured by
26   OEM parts suppliers, it is also a horizontal competitor of those OEM parts suppliers." (SCAC ¶ 290.)
     And, "[TACCs] compete . . . with Tesla's own Collision Centers." (SCAC ¶ 172.) "Hybrid"
27   relationships must be analyzed under the rule of reason. *See Clear Connection Corp.*, 2020 WL
     6742889, at *5; *see also Dimidowich*, 803 F.2d at 1480.

28

21

and Tesla Repair Services (tied) and Tesla-Compatible Parts (tied); (2) Tesla-Compatible Parts (tying) and Tesla Repair Services (tied); and (3) Tesla Repair Services (tying) and Tesla-Compatible Parts (tied). (SCAC ¶¶ 269-71.) None of these alleged arrangements "fit[s] [the Section 1 tying] framework because there is no condition linked to a sale" in any of them. *Aerotec*, 836 F.3d at 1178.

*First*, Plaintiffs do not assert plausible factual allegations to support an express tie. *See id.* at 1179. Plaintiffs do not allege that Tesla's policies dictate that it will sell Tesla parts or services only if a consumer buys a Tesla EV, or vice versa, or that the sale of Tesla parts or services is expressly conditioned on the purchase of one product or the other. There is no allegation that Tesla conditions EV sales on consumers buying parts or services only from Tesla. The absence of any such allegation is grounds to reject the alleged ties with Tesla vehicles as the tying product. *See Nicolosi Distrib., Inc. v. Finishmaster, Inc.*, 2019 WL 1560460, at *14 (N.D. Cal. Apr. 10, 2019) ("Because [plaintiff] does not, and admittedly cannot, allege that [defendant] conditioned the body shops' purchase of paint on their purchase of supplies, [plainitff's] tying claims fail as a matter of law.").

Plaintiffs suggest that Tesla ties warranty coverage (not vehicles) to Tesla-supplied parts and services. Plaintiffs acknowledge, however, that the warranties "do not explicitly require that all such services be performed" by Tesla and "do not expressly require owners to purchase parts or service from their Tesla EVs only through Tesla's app." (SCAC ¶¶ 122, 181.) Thus, Plaintiffs admit there is no tie there either. *See Dream Big Media Inc.*, 2022 WL 16579322, at *3.

*Second*, Plaintiffs do not plausibly allege facts that would constitute a *de facto* tie. *Aerotec*, 836 F.3d at 1179. Plaintiffs say "manufacturers like Tesla" "utilize various methods to discourage consumers from maintaining and repairing their own purchased goods" (SCAC ¶ 123), but then acknowledge that Tesla makes diagnostic/repair resources available to third parties. (*Id.* ¶¶ 144-45.)

No plausible allegations support the inference that Tesla makes consumers: (i) buy parts/services from Tesla to buy a vehicle; (ii) buy parts from Tesla to buy services from Tesla; or (iii) buy services from Tesla to buy parts from Tesla. As such, there can be no tying claim. *Aerotec*, 836 F.3d at 1180 (allegation that defendant clogged parts distribution pipeline to independent servicers is not a substitute for "evidence of an implied condition embedded in the sale of the tying product"). The alleged

1    restrictions on third-party repairers are insufficient. They are pleaded in conclusory terms and, even as

2    alleged, only "discourage" the use of competing products and services by making it less desirable for

3    consumers to buy from third parties. (SCAC ¶ 181.) That falls short. No Ninth Circuit precedent

4    suggests that "arguably manipulative tactics imposed on a third-party competitor are sufficient by

5    themselves to create a tie." *Aerotec*, 836 F.3d at 1180.

6         *Third*, the Cartwright claim also fails because § 16727 (on which Plaintiffs rely, SCAC ¶ 278)

7    does not apply when the tying product is a service. *See Morrison*, 66 Cal. App. 4th at 548; *Tele Atlas*

8    *N.V. v. Navteq Corp.*, 397 F. Supp. 2d 1184, 1192 (N.D. Cal. 2005). Although Plaintiffs previously

9    acknowledged that their Cartwright claim should be dismissed to the extent it alleges Tesla Repair

10   Services as the tying product (MTD I Opp'n, Dkt. 78 at 30 n.18), the SCAC nevertheless still includes

11   this deficient tying theory (SCAC ¶ 282). By Plaintiffs' own concession, the Cartwright claim alleging a

12   tie between Tesla Repair Services (tying) and Tesla-Compatible Parts (tied) must be dismissed.

13   **B.    Plaintiffs Have Not Plausibly Pleaded Market Power in the Alleged Tying Markets.**

14        An essential element of a tie is that the defendant has market power in the tying market. *Rick-*

15   *Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971 (9th Cir. 2008); *SC Manufactured Homes,*

16   *Inc. v. Liebert*, 162 Cal. App. 4th 68, 91 (2008). In discerning whether there is such market power, "the

17   Court must focus on 'whether the seller has the power to raise prices, or impose other burdensome terms

18   such as a tie-in, with respect to any appreciable number of buyers within the market.'" *RealPage, Inc. v.*

19   *Yardi Sys., Inc.*, 852 F. Supp. 2d 1215, 1226 (C.D. Cal. 2012) (quoting *Fortner Enters., Inc. v. U.S. Steel*

20   *Corp.*, 394 U.S. 495, 504 (1969)). Plaintiffs fail to sufficiently plead that Tesla has market power in the

21   alleged markets: (1) none of the tying markets is pleaded as a cognizable antitrust market (Section I); (2)

22   the allegations do not support a conclusion of market power (Section II.A); and (3) Plaintiffs fail to

23   identify any plausible entry barriers (Section II.B). Therefore, Plaintiffs' tying claim is not viable.

24   **C.    Plaintiffs Plead No Basis for *Per Se* or "Quick Look" Review of the Section 1 Claim.**

25        The "rule of reason" is "the antitrust liability standard applicable to most cases." *Epic*, 67 F.4th

26   at 971. A "small group of restraints are unreasonable *per se* because they always or almost always tend

27   to restrict competition and decrease output." *Id.* A third standard, the "quick look," applies in the limited

28

1   circumstances where "an observer with even a rudimentary understanding of economics could conclude

2   that the arrangements in question would have an anticompetitive effect on customers and markets."

3   *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1138 (9th Cir. 2011) (quotations omitted).

4          Plaintiffs attempt to reduce their pleading obligations (and burden of proof) by asserting that the

5   tying claim is subject to the *per se* or "quick look" standard of review. But no standard of proof could

6   save Plaintiffs' deficient tying allegations. For a tying claim, all three standards require a showing of

7   (i) separate "tying" and "tied" markets, (ii) the existence of a tie, and (iii) the defendant's market power

8   in the tying market. *See Epic*, 67 F.4th at 996-97. Plaintiffs have not plausibly alleged these elements.

9          That aside, the SCAC asserts no plausible basis for the *per se* rule or quick look standard. As the

10  Court correctly found with respect to the Section 2 claims (Order 11-12), the *per se* rule applies "only

11  after considerable [judicial] experience with certain business relationships shows that a restraint always

12  or almost always tend[s] to restrict competition and decrease output." *Epic*, 559 F. Supp. 3d at 1044-45

13  (quotations and citation omitted); *see Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1177 (N.D. Cal. 2013)

14  (rule of reason is the "presumptive mode of analysis in Section 1 cases (including tying claims)");

15  *Fisherman's Wharf*, 114 Cal. App. 4th at 334 (same for Cartwright tying).

16         The "quick look" is similarly limited. *Safeway*, 651 F.3d at 1138. Plaintiffs fail to establish that

17  Tesla's repair/parts practices "always or almost always tend to restrict competition and decrease output."

18  *Epic*, 559 F. Supp. 3d at 1044-45. "The object is to see whether the experience of the market has been so

19  clear . . . that a confident conclusion about the principal tendency of a restriction will follow from a

20  quick (or at least quicker) look." *Cal. Dental Ass'n v. Fed. Trade Comm'n*, 526 U.S. 756, 781 (1999).

21  And as the Court correctly observed, "Plaintiffs offer no authority for assessing their tying claims with a

22  quick look analysis." (Order 12 n.2.)

23  **V.      Plaintiffs Fail to State a Claim Under § 17200 of California's Unfair Competition Law.**

24         California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal.

25  Bus. & Prof. Code § 17200. "By proscribing 'any unlawful' business practice, section 17200 'borrows'

26  violations of other laws and treats them as unlawful practices that the unfair competition law makes

27  independently actionable." *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163,

28

24

180 (1999) (citation and quotations omitted). The UCL creates three kinds of unfair competition—unlawful, unfair, or fraudulent. *Id.* Plaintiffs claim that the alleged conduct is (1) unlawful as it allegedly violates the Sherman and Cartwright Acts (SCAC ¶ 303) and Magnuson-Moss (*id.* ¶ 304); and (2) unfair independent of any alleged violations of law (*id.* ¶ 310). Each of these claims fails.

### A. Plaintiffs Have Failed to Sufficiently Allege any Unlawful Conduct.

Plaintiffs' UCL claim predicated on their Sherman and Cartwright claims fail. (Order 15.) "If the same conduct is alleged to be both an antitrust violation and an 'unfair' business act or practice for the same reason—because it unreasonably restrains competition and harms consumers—the determination that the conduct is not an unreasonable restraint . . . necessarily implies that the conduct is not 'unfair' toward consumers." *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001).

Plaintiffs' UCL claim predicated on an alleged violation of the Magnuson-Moss Act also fails, as the Court previously found. (Order 15-16.) As detailed in Defendant's initial motion, Plaintiffs' original Magnuson-Moss claim failed as (1) it did not satisfy procedural requirements, and (2) Plaintiffs could not plausibly allege that Tesla's warranties violate the statute. Since Plaintiffs cannot state a Magnuson-Moss claim for these reasons (among others),[32] they cannot "plead around an absolute bar to relief simply by recasting the cause of action as one for unfair competition." *Cel-Tech*, 20 Cal. 4th at 182.

### B. Plaintiffs Fail to State a Claim under the UCL's "Unfair" Prong.

The Court correctly dismissed Plaintiffs' UCL claim under the unfairness prong because "Plaintiffs' allegations that Defendant's actions are unfair mirror their allegations that its actions are unlawful." (Order 16.) An "unfair" UCL claim "cannot survive" if it "overlap[s] entirely with the business practices addressed in the [other] prongs of the UCL," and "the claims under the other [ ] prongs of the UCL do not survive." (*Id.* at 15 (quotations omitted); *see* MTD I at 35.)

The SCAC adds nothing new that warrants reconsideration of this ruling. Plaintiffs' UCL claim under the "unfair" prong therefore should be dismissed again.

### CONCLUSION

For the foregoing reasons, the SCAC should be dismissed in its entirely with prejudice.

---

[32] As previously explained, Tesla's warranties comply fully with Magnuson-Moss. (MTD I at 34-35.) *See also* Lavely Decl. Exs. L, M, N (Tesla's Warranties).

1    Dated: December 22, 2023

2

3                                          Respectfully Submitted,

4

5                             By:    */s/ Vanessa A. Lavely*
                                     David R. Marriott (SBN 2682565)
6                                    Noah Joshua Phillips (*pro hac vice*)
                                     Vanessa A. Lavely (*pro hac vice*)
7                                    **CRAVATH, SWAINE & MOORE LLP**
                                     825 Eighth Avenue
8                                    New York, New York 10019
                                     Telephone: (212) 474-1000
9                                    Facsimile: (212) 474-3700

10                                   *Counsel for Defendant Tesla, Inc.*

11                                   Christopher C. Wheeler (SBN 224872)
                                     **FARELLA BRAUN + MARTEL LLP**
12                                   One Bush Street, Suite 900
                                     San Francisco, California 94104
13                                   Telephone: (415) 954-4979
                                     Facsimile: (415) 954 4480
14
                                     *Counsel for Defendant Tesla, Inc.*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT TESLA, INC.'S MOTION TO DISMISS SCAC; Case No. 3:23-CV-1145-TLT