**FREED KANNER LONDON & MILLEN LLC**
Matthew W. Ruan (SBN 264409)
Douglas A. Millen (appearing pro hac vice)
Michael E. Moskovitz (appearing pro hac vice)
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

**SAVERI & SAVERI, INC.**
R. Alexander Saveri (SBN 173102)
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
rick@saveri.com

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page.]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| VIRGINIA M. LAMBRIX, *et al.*, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>TESLA, INC.,<br><br>        Defendant. | Case No. 3:23-cv-1145-TLT (Lead Case)<br>Case No. 3:23-cv-1496-TLT<br>Case No. 3:23-cv-1543-TLT<br>Case No. 3:23-cv-2035-TLT<br>Case No. 3:23-cv-2352-TLT<br><br>**PLAINTIFFS' RESPONSES TO QUESTIONS FOR THE APRIL 2, 2024 HEARING** |

# INTRODUCTION

Plaintiffs respectfully submit the following responses to the questions posed by the Court's April 1, 2024 Order (ECF No. 147). Plaintiffs note that certain questions posed by the Court address factual matters outside of the pleadings, including important disputed factual issues, as explained further below. A Rule 12(b)(6) motion should not be used to contest the truth of Plaintiffs' allegations, or to address matters outside of Plaintiffs' allegations. *Cave Consulting Grp., Inc. v. OptumInsight, Inc.,* No. 15-CV-03424-JCS, 2016 WL 4744165, at *13 (N.D. Cal. Sept. 12, 2016) ("A motion under Rule 12(b)(6) is not an appropriate vehicle to contest the truth of such allegations."); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1202 (N.D. Cal. 2015) ("At bottom, while Defendants characterize their arguments as concerning the sufficiency of Plaintiffs' allegations, the Court finds that Defendants' arguments go to the truth of Plaintiffs' claims.").

**Questions 1 and 2** concern the awareness of Plaintiffs and absent class members of Tesla's warranty and awareness of the challenged aftermarket restrictions (the "Tesla Repair Restrictions").

**Question 3** asks the parties to discuss whether the "evidence" shows that consumers were able to accurately estimate lifecycle costs for their Tesla EVs. The evidence concerning estimates of the value of Plaintiffs' Tesla EVs from a lifecycle-cost perspective will be a key disputed issue at all stages of this litigation, including trial and damages.

**Question 4** considers the availability of information on the Internet as it relates to information costs.

**Question 5** concerns the purported availability of certain diagnostic tools that Plaintiffs allege were unavailable to repair shops. Although these are thoughtful questions about important issues raised by Plaintiffs' allegations, these questions, at least in part, touch on information outside of Plaintiffs' Second Amended Complaint ("SCAC").

**Question 6** posits the "protection of intellectual property" rights. The value of Tesla's intellectual property rights is an affirmative defense that cannot be resolved on the pleadings by a Rule 12(b)(6) motion. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 839 (9th Cir. 2022) ("whether the alleged procompetitive benefits of the [challenged restraint] outweigh its alleged anticompetitive effects is a factual question that the district court cannot resolve on the pleadings"); *Pac. Steel Grp. v. Com.*

1

1    *Metals Co.*, 600 F. Supp. 3d 1056, 1077 (N.D. Cal. 2022) (same); *Lusnak v. Bank of Am., N.A.*, 883 F.3d

2    1185, 1194 n.6 (9th Cir. 2018) ("Ordinarily, affirmative defenses . . . may not be raised on a motion to

3    dismiss  except when the defense raises no disputed issues of fact.").

4    Plaintiffs provide the following responses notwithstanding the principles outlined above, but

5    hereby preserve any objections related thereto.

6    **PLAINTIFFS' RESPONSES**

7    1. ***For Plaintiffs****: Can Plaintiffs talk more about whether Plaintiffs here were aware of the warranty*

8    *prior to or at the time of purchase, and what practices by the Defendant occur that would prevent*

9    *your everyday consumer from reading that warranty?*

10

**Plaintiffs' Response**:

11

12    Each Plaintiff has specifically alleged in the SCAC that he or she was unaware of the Tesla Repair

13    Restrictions – which include, among other things, Tesla designing its vehicle warranties and related

14    policies to discourage Tesla owners from obtaining parts or services anywhere other than from Tesla –

15    prior to purchasing their Tesla EV. (*See* SCAC ¶¶ 4, 10, 12, 14, 16, 21, 23, 25, and 28.) This alone is

16    sufficient for pleading purposes. *In re Apple & AT & TM Antitrust Litig.*, 596 F. Supp. 2d 1288, 1305-

17    1306 (N.D. Cal. 2008).

18    Neither *Epic Games* nor *Kodak* (nor any other antitrust case) has ever required antitrust plaintiffs

19    to plead or prove that plaintiffs were somehow prevented from reading a product's warranty before

20    stating a claim under Section 2 of the Sherman Act. In fact, courts have denied motions to dismiss

21    aftermarket claims despite involving warranties that purportedly disclosed the alleged aftermarket

22    restrictions. *See, e.g., Datel Holdings Ltd. v. Microsoft Corp.*, 712 F. Supp. 2d 974, 990 (N.D. Cal. 2010)

23    (denying motion to dismiss aftermarket claim despite argument by defendant that the restrictions were

24    disclosed in the product warranty).

25    It is also worth noting that—although Plaintiffs allege the Tesla Repair Restrictions include,

26    among other things, Tesla's use of its vehicle warranties and related policies to discourage Tesla owners

27    from obtaining parts or services anywhere other than Tesla (SCAC ¶ 4)—having access to Tesla's

28    warranty would not, *by itself*, apprise Plaintiffs or consumers of the fact that they would be unable to

2

purchase Tesla Compatible Parts or Tesla Repair Services from anyone other than Tesla and its authorized collision centers. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 979 (9th Cir. 2023) ("*Kodak* does not impose a requirement that a plaintiff show 'complete ignorance' of a defendant's aftermarket restrictions; it need only show that the restrictions are not 'generally known.'").

Notably, Tesla continues to argue that the warranty does *not* prevent Tesla EV owners from utilizing independent service providers, (MTD at 18:4-17), while simultaneously arguing that Plaintiffs and consumers were *aware* that Tesla's warranty prevented Tesla EV owners from utilizing independent service providers, (*id*. at 7:11-23). Tesla cannot have it both ways.

In reality, Tesla's warranty gives the false impression of a market for third party repairs.

•    The warranty states: "Tesla does not require you to perform all service or repairs at a Tesla Service Center or Tesla authorized repair facility." (SCAC ¶ 182.) This gives the false impression purchasers can actually get service or repairs outside of Tesla and its authorized facilities collision centers.

•    The FAQ on Tesla's website echoes this misrepresentation: "If you choose to take your vehicle to a non-Tesla shop for maintenance or repairs, coverage under your warranty could be affected if problems occur." (*Id*. ¶ 183.)

Tesla's warranty does not disclose the restraint Plaintiffs allege here. The warranty states, in relevant part: "Tesla strongly recommends that all maintenance, service and repairs be done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this New Vehicle Limited Warranty." (*Id*. ¶ 182.)

The warranty also does not disclose the likely economic effects of the restraint—that replacement parts, maintenance, and service will be more expensive and will continue to increase in price over time.

Even had each Plaintiff and consumer carefully read the warranty, it would not apprise them of the nature of the Tesla Repair Restrictions, or how that was likely to impact their estimate of lifecycle pricing for their Tesla.

2. ***For Plaintiffs***: *Can Plaintiffs speak to allegations regarding the lack of awareness of consumers in general besides Tesla's own misleading statements?*

**Plaintiffs' Response**:

First and foremost, the experiences of Plaintiffs themselves plausibly supports the allegation that consumers in general were unaware of the Tesla Repair Restrictions prior to purchasing their vehicles insofar as each and every Plaintiff was also unaware of them. (*See* SCAC ¶¶ 4, 10, 12, 14, 16, 21, 23, 25, and 28.)

Further supporting the plausibility of Plaintiffs' allegation that consumers were unaware of the Tesla Repair Restrictions, they cite an article published four months after the initial complaint was filed titled "Tesla Owners Share Some Unexpected Headaches of Owning Their EV." (SCAC ¶ 88, FN.38; https://www.autoblog.com/2023/07/24/tesla-owners-share-some-unexpected-headaches-of-owning-their-ev/.) If consumers were generally aware of the Tesla Repair Restrictions, the headaches described therein would not have been "unexpected."[1]

As Tesla itself acknowledges, the crucial question is whether consumers made a knowing choice to restrict their aftermarket options (*i.e.*, to only buy parts and services for their EVs from Tesla) when they made their foremarket purchase (*i.e.*, the Tesla EV itself). (MTD at 6:22-25.) The allegations above demonstrate that they did not.

---

[1] In addition, media articles published after Plaintiffs filed their initial complaint further support the plausibility of these allegations. *See, e.g.,* https://www.wsj.com/business/autos/ev-repair-expensive-eecf09fd (WALL STREET JOURNAL article from December 2023 noting the "surprising" cost of repairs and maintenance of Tesla EVs) (last accessed 4/1/24); https://www.wired.com/story/ev-repair-batteries-expensive-insurance/ (WIRED article from November 2023 noting high prices of Tesla parts relative to other brands) (last accessed 4/1/24); https://www.repairerdrivennews.com/2024/03/08/ev-claims-volume-up-40-as-repair-cost-divide-with-ice-vehicles-continues-to-expand/#:~:text=Electric%20vehicles%20continue%20to%20cost,the%20U.S.%20and%20%241%2C328%20in%E2%80%A6 (March 2024 article noting repair costs for EVs continue to unexpectedly increase) (last accessed 4/1/24).

3. ***For both Parties*:** *Can parties discuss the difference and similarities between lifecycle pricing which is the standard from Epic Games, and average yearly cost of maintaining an EV, which the Plaintiffs cites to as evidence of anticompetitive conduct and which the Defendant cites to as evidence of awareness and the ability to estimate lifecycle costs? SCAC 204.*

**Plaintiffs' Response**:

As an initial matter, *Epic Games* itself acknowledges that consumers cannot be expected to accurately estimate life-cycle pricing when, as here (*see* discussion, *supra*), they are unaware of the aftermarket restrictions at issue. *Epic Games*, 67 F.4th at 979 ("Such life-cycle pricing would be impossible if those consumers were unaware that they would be restricted to certain vendors in the aftermarket.").

Life-cycle pricing is the total cost of owning and operating a product over the lifetime of its use. With respect to EVs, this would include not only the cost of the vehicle but also, among other things, all service, maintenance, and repairs performed on the EV over the course of ownership. In other words, this not only includes regularly scheduled maintenance (*e.g.*, replacing the air filter every X number of miles), but also collision repairs (*e.g.*, following a traffic accident), unexpected component failures (*e.g.*, the rear drive unit suddenly stops working), and various other costs.

According to the U.S. Supreme Court, to accurately estimate lifecyle costs, consumers would need to obtain a whole host of information, including "data on price, quality, and availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of 'downtime,' and losses incurred from downtime," as well as "initial purchase information such as prices, features, quality, and available warranties for different machinery with different capabilities, and residual value information such as the longevity of product use and its potential resale or trade-in value." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473 (1992).

In contrast, an "average yearly maintenance cost" is nothing more than an estimate of one cost component, of one year, of ownership. Without considerably more information, it in no way approximates lifecycle pricing.

5

As explained in the relevant market section of the SCAC (¶ 104):

> EVs are complex, durable goods designed to operated for many years. Thus, calculating the life-cycle cost of operating an EV involves multiple variables, many of which can vary widely and are impossible to estimate: how long will the consumers own the EV, how many miles will they drive it, how many accidents will they get into, and how serious will those accidents be? While some limited data may be available to those who know where to look for it regarding average maintenance costs for Tesla EVs per year, for example, that data—even if uncovered by a consumer prior to purchase—is of little use when the total cost of ownership can fluctuate greatly depending on the answers to the above questions.

The SCAC further alleges that life-cycle pricing is particularly difficult to estimate for Tesla EVs because it is a new product, thus there is little information available regarding the long-term costs of ownership. (SCAC ¶ 105.)

In fact, even sophisticated entities whose job it is to estimate lifecycle pricing for EVs and other vehicles have a difficult time accurately estimating them for Tesla EVs. For example, as noted in the SCAC, "the three largest data providers used by automotive industry professionals to estimate repair costs—CCC, Audatex, and Mitchell—do not provide information for estimating repair costs for Tesla EVs. Thus, even if consumers were sophisticated and prescient enough to try and estimate the costs of individual repairs (and ignoring the fact that, until something actually goes wrong with their EV or they get into an accident, consumers have no idea what repair parts or services will actually be needed), they would still have a difficult time estimating those costs." (SCAC ¶ 106.)

And in March 2024, the CEO of Hertz stepped down after repair and maintenance costs for the 100,000 Tesla EVs Hertz had purchased turned out to be much high than expected.[2] Hertz purchases thousands of vehicles a year, and likely employs a vast team of individuals whose sole responsibility is to estimate as best as possible the lifecycle costs of the vehicles it purchases.

Thus, Plaintiffs' experiences are not isolated or unusual. Indeed, even sophisticated purchasers such as Hertz have been surprised by the true cost of the Tesla Repair Restrictions. If Hertz, CCC, Audatex, and Mitchell cannot accurately estimate lifecycle costs for Tesla EVs—despite their sophistication, resources, and economic motivation to do so—it is certainly plausible to assume that everyday consumers are similarly unable to do so.

---

[2] *See* https://fortune.com/2024/03/15/ceo-steps-down-prices-following-purchase-teslas/ (last accessed 4/1/24).

4.   ***For both Parties***: *Eastman Kodak was decided largely before the internet. Can parties speak to how the internet and greater access to information is relevant or irrelevant to Plaintiffs' alleged information costs?*

**Plaintiffs' Response**:

*Kodak* acknowledges that "even if consumers were capable of acquiring and processing the complex body of information [needed to estimate lifecyle costs], they may choose not to do so. Acquiring the information is expensive and timely. If the costs of service are small relative to the equipment price, or if consumers are more concerned about equipment capabilities than service costs, they may not find it cost efficient to  compile the information." *Kodak*, 504 U.S. at 474-475.

The Supreme Court's remarks in *Kodak* apply every bit as much today as they did at an earlier stage of the Information Age. It requires specialized knowledge and computer equipment to become knowledgeable about the Tesla Repair Services or Tesla Compatible Parts. ¶¶ 165-166. The quantity of information on the Internet is not a substitute for the specialized knowledge necessary to repair EVs. Nor can information on an Internet search be a substitute to understanding the implications of Tesla Repair Restrictions on future repairs and replacement part purchases.

Thus, the access to additional information available on the Internet is irrelevant because Plaintiffs could not glean from the Internet the true costs of lifecycle pricing that are relevant under *Kodak* and *Epic Games*. If anything, information costs since *Kodak* was decided have increased because of the time and effort necessary to sift through the endless sea of (mostly unhelpful) information available, and the increased technical sophistication (including coding and computer programming) necessary to repair EVs.

As discussed above, CCC, Audatex, and Mitchell are unable to accurately estimate repair costs for Tesla EVs, (SCAC ¶ 106), and Hertz was unable to accurately predict lifecycle costs of its fleet of 100,000 Tesla EVs. Each of those firms have Internet access.  It cannot be said—as a matter of law on motion to dismiss, nonetheless—that Plaintiffs, armed with information gleaned from the Internet, were likely to fare any better.

5. ***For Plaintiffs***: *Tesla's diagnostic software and "Toolbox are technically available to individuals and individual shops. Can Plaintiff's add to how despite this, Defendant engages in anticompetitive behavior?*

**Plaintiffs' Response**:

As a threshold matter, the Tesla Repair Restrictions that Plaintiffs allege have successfully prevented consumers and independent service providers from conducting maintenance and repairs on Tesla EVs encompasses a host of policies, acts, and practices that extend well beyond diagnostic software. (SCAC ¶¶ 4, 138-191.) In fact, Tesla spends six and half pages addressing the various components of Tesla's anticompetitive conduct as alleged in the SCAC. (MTD at 13-19.)

More importantly, the extent to which diagnostic tools have been made available to independent service providers is a heavily disputed issue of fact. While Tesla falsely states that the SCAC "admits . . . that Tesla provides free diagnostic software that customers can use to address common repair/maintenance needs without a subscription, and directly embedded into the vehicle's screen," (MTD at 11:11-14), it cites to its own counsel's declaration. The SCAC itself says no such thing.

Rather, Plaintiffs specifically allege that consumers and independent service providers lack access to the diagnostic software necessary to repair Tesla EVs. (SCAC ¶ 147 ("Even if a replacement part can be obtained, independent repair shops lack the tools and software needed to render those parts operable and to have them recognized by Tesla's onboard computers."); ¶ 148 (alleging Tesla uses "geo-fenc[ing]" to prevent diagnostics from running anywhere but at Tesla or its authorized collision centers).)

Plaintiffs allege that the diagnostic software called "Toolbox" that was made available to the public (at a steep price) is illusory because Tesla still blocks independent repair shops from using these tools to repair Plaintiffs' automobiles. (*Id.*) Thus, Tesla's public statements made about "Toolbox," manuals, and replacement parts being made publicly available are misrepresentations because the provision of Tesla Repair Services requires access to tools and software Tesla refuses to provide to independent service providers. (SCAC ¶¶ 88-90.)

6. ***For both Parties:*** *Can parties speak to the realm in which anticompetitive conduct is distinguishable from protection of intellectual property, and why Tesla's actions are more one than the other?*

**Plaintiffs' Response**:

"Antitrust law seeks to promote and protect a competitive marketplace for the benefit of the public." *Image Tech. Servs., Inc. v. Eastman Kodak Co*., 125 F.3d 1195, 1214 (9th Cir. 1997). Intellectual property protections, on the other hand, promote innovation and creativity. *Id*. at 1214-15.

While the two overlap and sometimes conflict, it is axiomatic that intellectual property rights do not bestow immunity from the application of antitrust laws. *See id*. at 1215 ("neither patent nor copyright holders are immune from antitrust liability"); *FTC v. Actavis, Inc*., 570 U.S. 136, 147 (2013) (holding that the fact that an agreement "fall[s] within the scope of the exclusionary potential of [a] patent" does not necessarily "immunize the agreement from antitrust attack").

Plaintiffs here allege that the Tesla Repair Restrictions have successfully excluded independent service providers and aftermarket (*i.e*., non-OEM) parts suppliers from entering the markets for Tesla Repair Services and Tesla-Compatible Parts. (SCAC ¶ 6.) Such conduct is anticompetitive and violates the antitrust laws, regardless of intellectual property rights. *See, e.g., Kodak*, 125 F.3d at 1216 ("Section 2 of the Sherman Act condemns exclusionary conduct that extends natural monopolies into separate markets."); *In re Deere & Co. Repair Serv. Antitrust Litig*., No. 3:22-CV-50188, 2023 WL 8190256, at *34 (N.D. Ill. Nov. 27, 2023) (denying motion to dismiss antitrust claims and holding that aftermarket restrictions which "excludes competitors at the cost of Deere's customers' choices to perform their own repairs or have a local repair shop perform the repairs, even when they could perform the repairs faster, better, and cheaper, which is anticompetitive conduct").

As this is a motion to dismiss, Tesla has not asserted any intellectual property rights or affirmative defenses related thereto. At later stages in the litigation, Tesla will be permitted to raise affirmative defenses; it can also attempt to argue that such intellectual property rights render the Tesla Repair Restrictions reasonable restraints of trade.

7. ***For Plaintiffs:*** *Can Plaintiffs speak to how Tesla's service and repair market is separate from its Compatible parts market for the purposes of establishing a tying arrangement?*

**Plaintiffs' Response**:

The SCAC alleges two aftermarkets: Tesla Repair Services, (SCAC ¶¶ 55-69), and Tesla-Compatible Parts, (SCAC ¶¶ 70-80). While these two markets are inter-related insofar as they are both derivative of the EV foremarket, they are nonetheless separate product markets.

Under the antitrust laws, two products exist in separate products when consumers, given a choice, opt to purchase the goods from different firms rather than a single firm. *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 975 (9th Cir. 2008) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 86 (D.C. Cir. 2001)). This remains true even for complementary products where demand for one product hinges entirely on demand for the other product. *Surgical Instrument Serv. Co., Inc. v. Intuitive Surgical, Inc.*, 571 F. Supp. 3d 1133, 1139 (N.D. Cal. 2021) (citing *Kodak*, 504 U.S. at 462-63).

Historically, consumers of traditional internal combustion engine vehicles had the choice not only of having their vehicle serviced at a dealership or independent service provider, but also of using OEM or non-OEM replacement parts. (SCAC ¶ 3.) Those non-OEM replacement parts could be purchased not only from the independent service provider, but from various parts retailers (*e.g.*, Pep Boys). The existence of separate firms—some specializing only in one product and not the other—indicates that the two markets are distinct.

As such, tying claims can and here do exist between the various distinct product/service markets at issue: EVs, Tesla-Compatible Parts, and Tesla Repair Services.

Dated: April 2, 2024

By:   */s/ R. Alexander Saveri*
      R. Alexander Saveri (SBN 173102)
      **SAVERI & SAVERI, INC.**
      706 Sansome Street
      San Francisco, CA 94111
      Telephone: (415) 217-6810
      rick@saveri.com

      *Interim Liaison Counsel for the Proposed Class*

10

Matthew W. Ruan (SBN 264409)
Douglas A. Millen
Michael E. Moskovitz
**FREED KANNER LONDON & MILLEN LLC**
Matthew W. Ruan (SBN 264409)
Douglas A. Millen (appearing pro hac vice)
Michael E. Moskovitz (appearing pro hac vice)
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Telephone: (610) 234-6486
kjustice@fklmlaw.com

*Interim Lead Counsel for the Proposed Class*

Stuart G. Gross (SBN 251019)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 671-4628, ext.10
sgross@grosskleinlaw.com

Richard D. McCune
David C. Wright
**McCUNE LAW GROUP, McCUNE WRIGHT
AREVALO VERCOSKI KUSEL WECK
BRANDT, APC**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: (909) 557-1250
rdm@mccunewright.com
dcw@mccunewright.com

Derek Y. Brandt
Leigh M. Perica
Connor P. Lemire
**McCUNE LAW GROUP, McCUNE WRIGHT AREVALO VERCOSKI KUSEL WECK BRANDT, APC**
231 North Main Street, Suite 20
Edwardsville, IL 62025
Tel: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Jill M. Manning (State Bar No. 178849)
**PEARSON WARSHAW, LLP**
555 Montgomery Street, Suite 1205
San Francisco, California 94111
Telephone: (415) 433-9000
Facsimile: (415) 433-9008
jmanning@pwfirm.com

Daniel L. Warshaw (State Bar No. 185365)
Michael H. Pearson (State Bar No. 277857)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
mpearson@pwfirm.com

Jon A. Tostrud (State Bar No. 199502)
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 278-2640
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

Brian P. Murray
Lee Albert
**GLANCY PRONGAY & MURRAY, LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

12

Blaine Finley
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Ave., N.W., Suite 200
Washington, D.C. 20016
Telephone: (202) 789-3960
Facsimile: (202) 589-1813
bfinley@cuneolaw.com

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE COTTRELL
KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
MWeiler@schneiderwallace.com

Michelle C. Clerkin
**SPIRO HARRISON & NELSON**
228 Park Avenue South
New York, NY 10003
Telephone: (917) 634-2244
mclerkin@shnlegal.com

Peggy Wedgeworth
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN**
100 Garden City Plaza
Garden City, NY 11530
Telephone: (646) 515-1269
pwedgeworth@milberg.com

Arthur Stock
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
astock@milberg.com

Brian D. Clark
Kyle Pozan
Eura Chang
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981

13

bdclark@locklaw.com
kjpozan@locklaw.com
echang@locklaw.com

William G. Caldes
Jeffrey J. Corrigan
Icee N. Etheridge
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Fax: (215) 496-6611
BCaldes@srkattorneys.com
JCorrigan@srkattorneys.com
IEtheridge@srkattorneys.com

Garrett D. Blanchfield
Brant D. Penney
**REINHARDT WENORD & BLANCHFIELD**
First National Bank Building, Suite W1050
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirms.com
b.penney@rwblawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*