David R. Marriott (SBN 2682565)
Noah Joshua Phillips (*pro hac vice*)
Vanessa A. Lavely (*pro hac vice*)
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone:  (212) 474-1000
Facsimile:  (212) 474-3700

Christopher C. Wheeler (SBN 224872)
**FARELLA BRAUN + MARTEL LLP**
One Bush Street, Suite 900
San Francisco, California 94104
Telephone:  (415) 954-4979
Facsimile:  (415) 954-4480

*Counsel for Defendant Tesla, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| VIRGINIA M. LAMBRIX, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TESLA, INC.,<br>Defendant. | Case No. 3:23-cv-1145-TLT (Lead Case)<br>Case No. 3:23-cv-1496-TLT<br>Case No. 3:23-cv-1543-TLT<br>Case No. 3:23-cv-2035-TLT<br>Case No. 3:23-cv-2352-TLT<br><br>Judge:           Honorable Trina L. Thompson<br>Hearing Date:  April 2, 2024<br>Hearing Time:  2:00 p.m.<br><br>**DEFENDANT TESLA, INC.'S RESPONSES TO THE COURT'S QUESTIONS FOR THE HEARING** |

Defendant Tesla, Inc. respectfully submits the following responses to the questions directed to the parties by the Court in its Order titled Questions for the Hearing.

**RESPONSES TO THE COURT'S QUESTIONS FOR THE HEARING**

1. **For Plaintiffs**: Can Plaintiffs talk more about whether Plaintiffs here aware of the warranty prior to or at the time of purchase, and what practices by the Defendant occur that would prevent your everyday consumer from reading that warranty?

While the Court did not address this question to Defendant, counsel for Defendant will be prepared to address this question (and Plaintiffs' response) at the hearing and would appreciate the opportunity to submit a written response if the Court approves.

2. **For Plaintiffs**: Can Plaintiffs speak to allegations regarding the lack of awareness of consumers in general besides Tesla's own misleading statements?

While the Court did not address this question to Defendant, counsel for Defendant will be prepared to address this question (and Plaintiffs' response) at the hearing and would appreciate the opportunity to submit a written response if the Court approves.

3. **For both Parties**: Can parties discuss the difference and similarities between lifecycle pricing which is the standard from Epic Games, and average yearly cost of maintaining an EV, which the Plaintiffs cites to as evidence of anticompetitive conduct and which the Defendant cites to as evidence of awareness and the ability to estimate lifecycle costs? SCAC ¶ 204.

As used in case law, including *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946 (9th Cir. 2023), life-cycle pricing generally refers to the ability of a consumer to know how much it costs to own a durable good (like an electric vehicle) during the course of its useful life.  A consumer will of course never know, to the exact dollar, how much it will cost to own any durable good.  But in many cases, like with Tesla EVs, enough information is generally known to allow consumers to estimate with reasonable accuracy how much their product will cost in the long run.

The information needed to accurately life-cycle price a product depends on the particular product.  In the case of say, a smartphone, the cost to regularly maintain the phone might be less relevant, because consumers do not typically take their phone into a shop for tune-ups.  Instead, the cost

1

of, for example, in-app purchases may be more relevant for that product.

For an EV, the two most obvious and significant components of its life-cycle price are how much it costs to buy, and how much it costs to maintain. When purchasing a Tesla EV, consumers necessarily know what the purchase price is and there are no allegations to the contrary. And as the Court found in the Order, Plaintiffs allege that the yearly maintenance costs are known, which belies Plaintiffs' conclusory allegations that life-cycle pricing is impossible. (Order 11; SCAC ¶ 163.)

Plaintiffs may argue that unforeseeable events make EVs harder to life-cycle price, but it cannot be the case that the standard for life-cycle pricing requires precise knowledge of unforeseeable events. And, in any event, although the SCAC says that the cost for collision repairs, an unforeseeable event, varies by accident, it pleads that the average cost to repair a Tesla is known. (SCAC ¶ 204.)

Plaintiffs may also argue that other components like changing maintenance cost over time, or the cost of accessories, or other factors factor into life-cycle pricing. But a consumer does not need to have perfect information, or else the standard would be unattainable and meaningless. And in any event, there are no allegations that consumers face information costs that prevent them from readily accessing information that would allow them to take these other costs into account. In fact, the SCAC cites to public sources to allege prices for everything from Tesla mechanic labor, to the price of Tesla chargers. (*Id.* ¶¶ 101, 200-01.)

4. **For both Parties**: <u>Eastman Kodak was decided largely before the internet. Can parties speak to how the internet and greater access to information is relevant or irrelevant to Plaintiffs' alleged information costs?</u>

The greater access to information provided by the internet is highly relevant to Plaintiffs' allegations regarding information costs. Using the internet, consumers can more readily and reliably access information about potential purchases.

*No General Knowledge:* The increased information available on the internet makes it less likely that the alleged aftermarket restrictions are not generally known. *Epic Games*, 67 F.4th at 977, 981. Plaintiffs themselves cite numerous freely accessible websites that document the alleged aftermarket restrictions: (i) Tesla's SEC filings (SCAC ¶¶ 140-41; ¶¶ 156-58); (ii) a Tweet/X from Elon Musk (*id.*

2

¶ 197); (iii) Tesla's owner's manual (*id.* ¶ 186); (iv) Tesla's warranty (*id.* ¶ 181); (v) online forums (*id.* ¶¶ 187, 208); (vi) Tesla's online catalog (*id.* ¶ 203); and a 2022 Vox article (*id.* ¶ 199 & n.118).

*Information Costs:* Second, greater access to information via the internet prevents "significant" information costs that in turn prevent accurate life-cycle pricing. *Epic Games*, 67 F.4th at 977, 981. The internet sources Plaintiffs themselves cite demonstrate how much information potential purchasers of Tesla EVs have access to prior to purchasing. The websites provide estimates for the hourly rate for Tesla Repair Services, the annual cost of maintaining a Tesla, the average cost of repairing a Tesla, the coverage details of Tesla's warranty, and more, varied by Tesla model and with comparisons to other vehicle brands. (SCAC ¶ 204.) In other words, using the internet, consumers are more readily able to "inform themselves of the total cost of the 'package'—equipment, service, and parts—at the time of purchase" in order to "engage in accurate lifecycle pricing." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 473 (1992); *see also* Salil Kumar Mehra, *Information in an Antitrust Age*, 2000 U. Chi. Legal F. 219, 234-35 (2000) (explaining the impacts of "more accessible information made possible by the internet" on the evaluation of information costs in antitrust cases, including that "the internet requires a re-evaluation of the risk that a firm could use information costs to exercise or achieve market power"). With the aid of the internet, life-cycle pricing for Tesla EVs is not "difficult" or "impossible" to "acquire at the time of purchasing." *Kodak*, 504 U.S. at 473.

*Switching Costs:* Third, the advent of the internet has lessened switching costs, "the costs borne by leaving one platform to go to a different platform." *Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 946, 956 n.254 (N.D. Cal. 2021). For example, individuals looking to switch from a Tesla EV to a different vehicle can do so efficiently online using their choice of platform. And, individuals can find accessories to minimize switching costs, such as adapters for EV charging products.

5. **For Plaintiffs**: Tesla's diagnostic software and "Toolbox are technically available to individuals and individual shops. Can Plaintiff's add to how despite this, Defendant engages in anticompetitive behavior?

While the Court did not address this question to Defendant, counsel for Defendant will be prepared to address this question (and Plaintiffs' response) at the hearing and would appreciate the

3

opportunity to submit a written response if the Court approves.

6. **For both Parties**: Can parties speak to the realm in which anticompetitive conduct is distinguishable from protection of intellectual property, and why Tesla's actions are more one than the other?

None of the conduct described in the SCAC is anticompetitive. In fact, Plaintiffs challenge conduct that is obviously procompetitive, such as designing car frames out of aluminum to increase overall vehicle efficiency and functionality. The SCAC does not begin to explain how Tesla's direct-to-consumer sales model, the certification processes it employs to ensure third parties have the skills necessary to make repairs that protect passengers (while maintaining Tesla's standard of quality), and the technology and IP restrictions put in place for cybersecurity and other purposes could possibly be anticompetitive.

Plaintiffs do not and could not dispute that the conduct they characterize as anticompetitive, such as the design of Tesla's EVs, is lawful. Where challenged conduct is lawful, courts are reluctant to find such actions to be anticompetitive. *See, e.g.*, *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992) (stating "if all we are shown is a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing").

While intellectual property can be used in anticompetitive ways, the SCAC does not (and could not) allege Tesla misused its intellectual property rights in the numerous innovations incorporated into its EVs. For example, Plaintiffs complain about Tesla limiting access to its diagnostic software and related repair tools. But case law is clear that that an owner of intellectual property is entitled to limit access to its property. *See e.g.*, *SolidFX, LLC v. Jeppesen Sanderson, Inc.*, 935 F. Supp. 2d 1069, 1081 (D. Colo. 2013), *aff'd* 841 F.3d 827 (10th Cir. 2016) (stating that "antitrust laws do not negate the intellectual property holder's right to exclude others from intellectual property") (citing *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1362 (Fed. Cir. 1999)).

There are obvious procompetitive reasons for limiting access to diagnostic software and related repair tools, e.g., cybersecurity and safety concerns. Plaintiffs' allegations ring especially hollow in view of the very significant information Tesla makes available to consumers and repair/maintenance

4

competitors.  Tesla provides, for free, a range of information to diagnose and service its vehicles, including manuals and catalogues (SCAC ¶¶ 144-45) and free diagnostic software that customers can use to address common repair/maintenance needs without a subscription.

7. **For Plaintiffs**: Can Plaintiffs speak to how Tesla's service and repair market is separate from its Compatible parts market for the purposes of establishing a tying arrangement?

While the Court did not address this question to Defendant, counsel for Defendant will be prepared to address this question (and Plaintiffs' response) at the hearing and would appreciate the opportunity to submit a written response if the Court approves.

Dated: April 2, 2024

Respectfully Submitted,

By:  /s/ David R. Marriott
David R. Marriott (SBN 2682565)
Noah Joshua Phillips (*pro hac vice*)
Vanessa A. Lavely (*pro hac vice*)
**CRAVATH, SWAINE & MOORE LLP**

*Counsel for Defendant Tesla, Inc.*

Christopher C. Wheeler (SBN 224872)
**FARELLA BRAUN + MARTEL LLP**
One Bush Street, Suite 900
San Francisco, California 94104
Telephone:  (415) 954-4979
Facsimile:  (415) 954-4480

*Counsel for Defendant Tesla, Inc.*