1

2

3                    UNITED STATES DISTRICT COURT

4                   NORTHERN DISTRICT OF CALIFORNIA

5

6    VIRGINIA M LAMBRIX, et al.,                Case No.  23-cv-01145-TLT

7                         Plaintiffs,

8               v.                              **ORDER GRANTING, IN PART, AND
                                                DENYING, IN PART, DEFENDANT'S
                                                MOTION TO DISMISS**
9    TESLA, INC.,

10                       Defendant.             **RE: DKT. NO. 135**

11

12          Virginia M. Lambrix, Sean Bose, Patrick Doyle, Adriana Ferreira, Philomena Nana-

13   Anyangwe, Jason Pratti, Anthony Adjuder, Connor Shore, and Jason Pratti (collectively,

14   "Plaintiffs"), bring this antitrust putative class action lawsuit against Tesla, Inc. ("Defendant"),

15   individually and on behalf of "all persons or entities in the United States who paid for Tesla

16   Repair Services or Tesla-Compatible Parts from March 2019 to the present." ECF No. 131, ¶ 218.

17   Plaintiffs assert causes of action for (1) Violation of Section 1 of the Sherman Act ("Section 1")

18   for Monopolization of the Tesla Repair Services Market, (2) Violation of Section 1 for

19   Monopolization of the Tesla-Compatible Parts Market, (3) Violation of Section 1 for Attempted

20   Monopolization of the Tesla Repair Services Market, (4) Violation of Section 1 for

21   Monopolization of the Tesla-Compatible Parts Market, (5) Violation of Section 2 of the Sherman

22   Act ("Section 2") for Unlawful Tying, (6) Violation of the California Cartwright Act ("CCA") for

23   Unlawful Tying, (7) Violation of the CCA for Combination in Restraint of Trade, and (8)

24   Violation of the Unfair Competition Law.

25          Before the Court is Defendant's Motion to Dismiss Plaintiffs' Second Consolidated

26   Amended Complaint. ECF No. 135.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

Having carefully considered the parties' briefs, oral arguments, relevant legal authority, and for the reasons stated below, Defendant's motion to dismiss is hereby **GRANTED, IN PART, DENIED, IN PART.** Defendant's motion is **DENIED** as to claims 1 through 5, and claim 7. Defendant's motion is **DENIED** as to claim 6, to the extent it relies on electric vehicles or parts as the tying product. As conceded in Plaintiffs' brief, Defendant's motion is **GRANTED** with prejudice as to claim 6, to the extent it relies on services as a tying product.

I.      **BACKGROUND**

   A.      **Procedural History**

   This case arises from five related lawsuits. On March 14, 2023, Plaintiff Virginia Lambrix filed a complaint against Tesla, Inc. *See* ECF No. 1. Upon filing of related case motions from various parties, and a magistrate referral, this Court related four other actions filed against Tesla to this case: *Orendain v. Tesla, Inc.*, Case No. 23-cv-01157 (N.D. Cal) (filed Mar. 15, 2023; *Bose v. Tesla, Inc.*, Case No. 23-cv-01496, (N.D. Cal) (filed Mar. 29, 2023); *Doyle v. Tesla, Inc.*, Case No. 23-cv-01543 (N.D. Cal) (filed Mar. 31, 2023); *Nana-Anyangwe v. Tesla, Inc.*, Case No. 23-cv-02035 (N.D. Cal) (filed Apr. 26, 2023). *See* ECF Nos. 21, 35, 41.

   On June 23, 2023, the Court consolidated the cases. *See* ECF No. 60. On July 17, 2024, Plaintiffs filed their first amended consolidated complaint, bringing claims under the Sherman Act, the CCA, and the UCL. ECF No. 63 ("First Consolidated Amended Complaint" or "FCAC"). Two weeks later, Defendant filed a motion to dismiss and a motion to compel arbitration for Plaintiffs Danielle Thys, Cary Phillips, and Levi Stoffal. *See* ECF Nos. 75–76. On September 27, 2023, the Court granted the motion to compel, and stayed the proceedings as to Thys, Phillips, and Stoffal. *See* ECF No. 112. On November 17, 2023, the Court granted the motion to dismiss with leave to amend, based on its finding that Plaintiffs had not "established that Tesla Repair Services and Tesla-Compatible Parts are relevant single-brand aftermarkets, which caused all their federal and state claims to fall short." ECF No. 122 ("FCAC Order"), at 16.

On December 8, 2023, Plaintiffs filed the Second Consolidated Amended Complaint. ECF No. 131 ("Second Consolidated Amended Complaint" or "SCAC"). On December 22, 2023, Defendant filed a Motion to Dismiss and Request for Judicial Notice for exhibits attached to the Motion. ECF No. 35 ("Motion").

On April 2, 2024, the Court held a hearing on the filings, granted judicial notice or incorporation by reference to Exhibits B, H, K, and L, and took the remaining filings under submission.

**B.      Facts**

Plaintiffs are individuals who reside in California, Colorado, Florida, and Maryland.  *See* SCAC ¶¶ 9–28.  They are owners or lessors of battery-electric motor vehicles ("EVs") manufactured by Tesla.  *See id.*  Tesla is a multinational automotive and clean energy company that designs, manufactures, and sells EVs that operate on public streets.  *See id.* ¶ 29.  Between 2019 and 2022, Defendant has fluctuated anywhere between 65% and 80% market share in the United States EV market.  *See id.* ¶ 53.

Because all EVs are designed differently, Plaintiffs allege that Tesla EVs can only be maintained and repaired by a service provider "who specializes in the maintenance and repair of Tesla EVs." *Id.* ¶ 58–59.  For car services, Tesla directs vehicle owners to Tesla-Owned Service Centers, Tesla-Owned Collision Centers, or Tesla-Approved Collision Centers. Plaintiffs allege that Tesla-Approved Collision ("TACCs") centers are "independently owned, [but] are forced to rely on Tesla itself to source Tesla-Compatible Parts and pricing." *Id.* ¶ 66. Plaintiffs allege that vague provisions in Tesla's warranties stating that warranties will be void or coverage may be excluded based on "improper maintenance, service or repairs," effectively prevents owners from repairing their own vehicles or using independent service-providers. *Id.* ¶ 182. Except for certain "basic maintenance services (*e.g.,* tire rotation), Plaintiffs claim that virtually all Tesla Repair

3

Services are performed" by the Tesla-Owned Centers or the Tesla-Approved Collision Centers. *Id.* ¶ 67.

Plaintiffs further allege that Tesla owners are "locked in" to using car parts that were specifically designed to be compatible with Teslas. *Id.* ¶ 72. Tesla manufactures some components for its EVs and purchases other components from suppliers around the world. *Id.* ¶ 156. Plaintiffs claim that Tesla restricts the availability of Tesla-Compatible Parts "by, among other things, requiring at least some of its suppliers to enter into *de facto* exclusivity agreements. preventing those suppliers from manufacturing Tesla-Compatible Parts for anyone other than Tesla." *Id.* ¶ 157.  Further, Plaintiffs assert that Tesla has imposed various roadblocks preventing independent service-providers from accessing Tesla-Compatible Parts and providing repair services to Tesla owners. Although Tesla published a catalog of its parts in 2018, "numerous parts in Tesla's catalog are unavailable for purchase" and "Tesla reportedly ignores parts requests from independent." *Id.* ¶¶ 91–92. Further, Tesla allegedly requires some purchasers to "provide a VIN number and proof of vehicle ownership before it will sell certain parts," which prevents independent entities from providing repair services to consumers. *Id.* Finally, Tesla has exclusive possession of a tool that is necessary to code and activate certain Tesla parts. *Id.* ¶ 93. Thus, many parts that can be purchased from Tesla cannot be properly installed without assistance from Tesla. *Id.* And many repairs require that the cars be put in "diagnostic" or "service" mode, and Plaintiffs allege that Tesla "geo-fenced . . . their EVs so they would only enter diagnostic or service mode when located in a Tesla Service Center or Tesla-Approved Collision Center." *Id.* ¶ 148.

Plaintiffs allege that Tesla has limited the number of the independent Tesla-Approved Collision Centers through imposition of onerous certification requirements and exposure to various competitive risks. *Id.* ¶¶ 166–174. Plaintiffs also allege that, despite Tesla's rapid growth, Tesla has chosen not to invest in development of its Service and Collision Centers. *Id.* ¶ 175. Plaintiffs assert that Tesla's actions to restrict access to parts and services has forced Tesla owners

4

to pay supracompetitive prices for parts and services, while enduring extensive wait periods to have their EVs fixed. *Id.* ¶ 192.

### C. The Second Consolidated Amended Complaint

Plaintiffs have supplemented their claims between the first and second consolidated amended complaints.  First, they clarified that none of the Plaintiffs were aware of any of the repair restrictions described in the complaint.  *See* SCAC ¶¶ 10, 12, 14, 16, 21, 23, 25, and 28. Second, they added specific allegations of price insensitivity, such that competition in the relevant markets do not affect consumer demand of parts and services.  *See id.* ¶¶ 60, 75.  Third, they clarified and added allegations to their pleading of significant information costs that prevent life-cycle pricing and high switching costs.  *See id.*  ¶¶ 89–106.  Last, they added various allegations regarding Tesla's purported anticompetitive conduct in both the EV foremarket and its aftermarkets.  *See id.*

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*  For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Still, the Court is not required to "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir.

2011) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)).  Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004); *accord Iqbal*, 556 U.S. at 678. Furthermore, "a plaintiff may plead herself out of court" if she "plead[s] facts which establish that [s]he cannot prevail on h[er] . . . claim."  *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 763 n.1 (9th Cir. 1997) (quoting *Warzon v. Drew*, 60 F.3d 1234, 1239 (7th Cir. 1995)).  "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

## III.    DISCUSSION

Plaintiffs allege eight causes of action: under Sections 1 and 2 of the Sherman Act; Sections 16720, 16726, and 16727 of the California Cartwright Act; and Section 17200 of California's UCL.  *See* SCAC ¶ 1.  Defendant argues that Plaintiffs do not state any viable claims under federal and state law.  *See* Motion, at 1.; *see also* Fed. R. Civ. P. 12(b)(6).  The Court addresses Plaintiffs' claims below, first under the Sherman Act, then under the California Cartwright Act, and finally under the UCL.

### A.    The Court applies Rule of Reason analysis to Plaintiffs' claims.

Courts categorize Sherman Act claims as either (1) per se claims, or (2) Rule of Reason claims. *Epic Games*, 67 F.4th at 974. Per se claims arise out of restraints on trade that "always or almost always tend[s] to restrict competition and decrease output." *Id.* (citing *Ohio v. American Express Co.*, 585 U.S. 529, 541 (2018)). "When a *per se* prohibition applies, we deem a restraint unlawful without any 'elaborate study of the industry' in which it occurs." *Epic Games*, 67 F.4th at 974 (citing *Ohio*, 585 U.S. at 541). Where a plaintiff does not allege a *per se* violation, their claims are subject to the Rule of Reason analysis. This analysis generally requires a plaintiff to define the relevant market and show that the "challenged restraint that harms consumers in the

6

relevant market." *Id.* at 983 (quoting *Ohio v. Am. Express Co.,* 585 U.S. 529, 543 (2018)).

"Given the costs of improperly condemning a practice across the board," courts are required to exercise "caution and judicial humility" before categorizing a practice targeted by the plaintiff as a per se violation. Typically, only "'horizontal' restraints—restraints 'imposed by agreement with competitors'—qualify as unreasonable *per se*." *Ohio*, 585 U.S. at 541. Vertical price fixing is subject to Rule of Reason analysis. *Id.*. "Hybrid conspiracies," in which a "manufacturer operates at two distinct levels . . . by acting as both a supplier and a distributor of its own products," and has an agreement with a competitor at one of these levels, are subject to the Rule of Reason. *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1481-82 (9th Cir. 1986), *modified on unrelated grounds by Dimidowich v. Bell & Howell*, 810 F.2d 1517, (9th Cir. 1987).

Here, Plaintiffs allege that its claims are based on per se violations of the Sherman Act. Plaintiffs argue that their claims are based on horizontal restraints because Tesla has entered into *de facto* exclusivity agreements with TACCs and Tesla-Compatible Parts manufacturers and distributors, while also independently providing services and selling parts. Tesla, however, is also a manufacturer of EVs, and utilizes TACCs to provide repair services to the EVs and the manufacturers to manufacture and distribute certain parts. Thus, Plaintiffs' claims are based on a "hybrid conspiracy," and are subject to the Rule of Reason.[1]

### B.   Plaintiffs sufficiently plead the relevant markets.

In most Sherman Act cases where a plaintiff alleges that a defendant harmed market competition, "[a] threshold step . . . is to accurately define the relevant market." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 992 (9th Cir. 2020). A plaintiff need not plead the existence of a

---

[1] "Only when there is a possibility that the restraint in the market in which there is a horizontal relationship will have significant procompetitive effects in the other market, as is the case when the markets are for the service and the distribution of the same product, is rule of reason analysis appropriate" for a hybrid arrangement. *Dimidowich*, 803 F.2d at 1481 n.6. To the extent Plaintiffs could allege the parts or services market do not impose restraints on the EV markets, Plaintiffs' claims may be categorized as per se violations.

market "with specificity," and a proposed market definition will survive a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect." *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (2008).

Here, Plaintiffs allege that Defendant's anti-competitive conduct harmed competition in the market for Tesla-Compatible Parts and Tesla Repair Services. Plaintiffs claim that Defendant's market power in the overall EV market enabled anti-competitive conduct in these aftermarkets. The Court evaluates the sufficiency of allegations supporting these markets below.

### 1.     Plaintiffs sufficiently plead an EV submarket.

A market is defined as "the area of effective competition – *i.e.*, the arena within which significant substitution in consumption or production occurs." *Epic Games, Inc v. Apple,* 67 F.4th 946, 975 (9th Cir. 2023) (citing *Ohio v. Am. Express Co.,* 585 U.S. 529, 543 (2018)). "A market comprises 'any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel' could profitably raise prices above a competitive level." *Id.* (citing *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). Courts determine which products are included in a certain market by evaluating what products have a "reasonable interchangeability of use or sufficient cross-elasticity of demand with each other." *Id.* (citing *Hicks v. PGA Tour, Inc.* 897 F.3d 1109, 1120 (9th Cir. 2018)). In making this determination, Courts evaluate empirical evidence, such as a Small, Significant, Non-transitory Increase in Price ("SSNIP") analysis, which uses consumer data to establish whether a "hypothetical monopolist could profitably impose a Small, Significant, Non-transitory Increase in Price above a competitive level." *Id.*

Courts also consider whether a proposed market has the "practical indicia" of an economically distinct market, including "[1] industry or public recognition of the [market] as a separate economic entity, [2] the product's peculiar characteristics and uses, [3] unique production facilities, [4] distinct customers, [5] distinct prices, [6] sensitivity to price changes, and [7] specialized vendors." *Id.* (citing *Brown Shoe v. U.S.*, 370 U.S. 294, 325 (1962)). A submarket

United States District Court
Northern District of California

8

within a general product market can constitute a distinct market for purposes of an anti-trust claim. *Hicks*, 897 F.3d at 1120; *see Lucas Automotive Engineering, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001) ("*Lucas Auto.*") (holding that tires originally sold with vintage automobiles could plausibly be a distinct submarket within the general market of all other tires which could be used for vintage automobiles).

Plaintiffs define the EV market as "battery-electric motor vehicles designed and sold to be operated on public streets." SCAC ¶ 39. The Court reiterates its holding that Plaintiffs have plausibly alleged the existence of an EV market distinct from vehicles that use internal-combustion engines ("ICE vehicles"). FCAC Order, at 9. As previously stated, EVs have peculiar characteristics and uses, traveling shorter distances and requiring frequent charging.  SCAC ¶ 44. EVs and ICE vehicles require separate manufacturing processes and production facilities.  *See id.* ¶ 52.  For example, ICE vehicle plants are not accustomed to sourcing, producing, and manufacturing battery packs for EVs.  *See id.*  Additionally, EVs are constructed with a different kind of chassis, or frame, than ICE vehicles, and as a result, ICE production facilities cannot easily be converted in EV production facilities. *Id.*

Plaintiffs further allege that EVs cost more than similarly equipped ICE vehicles.  *See id.* ¶ 40.  For example, in April 2022, the average price of EVs was above $65,000, while all other motor vehicles cost an average of $20,000 less. *See id.*  Plaintiffs claim that "consumers do not view EVs and ICE vehicles as interchangeable products"—indeed, a recent study reports that "96% of EV owners will only buy another EV for their next vehicle." *Id.* ¶ 45.  For example, Ford—a U.S. automaker—publicized its decision to reorganize its company and separate EVs and ICE vehicles into separate businesses.  *See id.* ¶ 51. As such, Plaintiffs plausibly alleged that the public and industry analysts recognize EVs as a separate product market or submarket.  *See id.* ¶ 39.

9

United States District Court
Northern District of California

Defendant argues that *In re German Automotive Manufacturers Antitrust Litigation* ("*German Auto.*) weighs against finding the existence of an EV market. The Court disagrees, as *German Auto.* presented distinct factual circumstances.  In *German Auto.,* the plaintiffs proposed a market consisting entirely of diesel engine cars. Although the complaint implicitly acknowledged that diesel engine cars competed with other cars that offered equivalent environmental and fuel-efficiency benefits, the plaintiffs' market definition excluded all such cars. Here, Plaintiffs proposed market consists of zero-emission battery-electric cars. Unlike in *German Auto.*, there are no options that offer similar or equivalent zero-emission vehicles.

  *Lucas Auto.*, however, is an insightful analog. There, the Ninth Circuit held that tire brands that were used when a vintage car was first introduced could plausibly constitute a distinct market from tire brands offered well-after the car was introduced, even though both brands could be used on the vintage car today. 275 F.3d at 768. This holding was based, in part, on evidence suggesting that vintage car consumers "absolutely insist[ed]" upon the original brand tires. *Id.* The Ninth Circuit stated that "a legitimate inference can be drawn between the categorical insistence of customers on, and to some degree their very strong preference for, [a product] and the expectation that should the price of such [product] be increased, these customers would nonetheless purchase the now-costlier version rather than substitute a less expensive, less authentic model." *Id*. Familiarly, here, Plaintiffs allege that 96% of EV owners would get an EV as their next car, which creates a "legitimate inference" that these owners would purchase a costlier version. SCAC ¶ 51.[2] Thus, Plaintiffs sufficiently plead the existence of an EV market.

---

[2] The fact that the *Lucas Auto*. Court had some evidence specific to price-inelasticity does not diminish its relevance because: (1) that court was considering a motion for summary judgment with a much higher standard, and (2) the evidence of price-inelasticity was relatively underwhelming (*e.g.,* a declarant "estimate[d]" that one-third of members of a vintage car club would be willing to pay more for original tires.) 275 F.3d at 767–68.

1

2          **2.      Plaintiffs sufficiently allege Tesla Repair Services, and the Tesla-**
           **Compatible Parts, are cognizable, single-brand aftermarkets.**

3          The relevant market can be a "single-brand aftermarket" where "demand for a good is

4   entirely dependent on the prior purchase of a durable good in a foremarket." *Epic Games*, 67 F.4th

5   at 976 (emphasis omitted). The parties disagree on the proper test for determining the existence of

6   a single brand-aftermarket. An evaluation of the relevant law is below.

7          In *Eastman Kodak Co v. Image Tech. Servs., Inc.*, 504 U.S. 451, the plaintiffs alleged that

8   Kodak, which manufactured and sold photocopiers, engaged in anticompetitive conduct that

9   harmed the aftermarket for replacement parts and servicing of Kodak photocopiers. Kodak

10  claimed that, because it did not have market power in the photocopier market, it could not

11  plausibly have market power in a single-brand aftermarket. *Id.* at 466. Kodak's reasoning went as

12  follows: because the photocopier market was a competitive market in which it did not have market

13  power, consumers in that photocopier market would be able to identify Kodak's attempts to charge

14  supracompetitive prices in the parts and services aftermarket and choose to buy a different

15  photocopier. *Id.* The existence of competition in the foremarket would discipline anti-competitive

16  conduct in the aftermarket, and it was thus irrational and implausible for Kodak to engage in anti-

17  competitive conduct in an aftermarket when it did not have market power in the foremarket. *Id.*

18  The Supreme Court rejected this argument, finding that Kodak could engage in anti-competitive

19  conduct in single-brand aftermarkets without possessing market power in the foremarket. Even if

20  there was competition in the foremarket, the Court stated that consumers may not be aware of the

21  high prices in the aftermarket because of the difficulty most consumers would face in determining

22  maintenance prices for "complex, durable equipment." *Id.* at 473–75.  The Court further held that

23  the high cost of switching photocopiers would prevent existing consumers who learned about the

24  supracompetitive prices of services and repairs from switching. Thus, these consumers would be

25

26

27

28
                                              11

"locked in" and forced to "tolerate some level of service price increases before changing equipment brands." *Id.* at 476.

Subsequently, the Ninth Circuit elaborated on the *Kodak* holding when presented with similar claims where a defendant allegedly harmed a single-brand aftermarket without market power in the foremarket. The Ninth Circuit found that contractual obligations were not a "cognizable source of market power." Thus, circumstances in which a "consumer's selection of a particular brand in the competitive market [was] the functional equivalent of a contractual commitment," could not form the basis for antitrust claims. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d at 1047 (citing *Forsyth v. Humana*, 114 F.3d 1467, 1476 (9th Cir. 1997))

Recounting the history of *Kodak* and *Newcal*, the Ninth Circuit discussed the issues presented by a lack of power in the foremarket in *Epic Games*¸ and aggregated the various considerations, stating:

> "to establish a single-brand aftermarket, a plaintiff must show: (1) the challenged aftermarket restrictions are 'not generally known' when consumers make their foremarket purchase; (2) 'significant' information costs prevent accurate life-cycle pricing; (3) 'significant' monetary or non-monetary switching costs exist; and (4) general market-definition principles regarding cross-elasticity of demand do not undermine the proposed single-brand market."

67 F.4th at 977.

Here, Defendant alleges that Plaintiffs must meet all four *Epic Games* factors to establish its single-brand aftermarket. Plaintiffs, however, argue that these factors only apply to cases in which defendants do not have market power in the foremarket. Plaintiffs claim that, because they allege that Defendant has market power in the EV market, and the *Epic Games* factors derive from concerns about a lack of market power in the foremarket, these factors do not apply. This Court agrees.

The *Kodak* Court established the information and switching costs factors to address Kodak's argument that it was impossible for a defendant to have market power in an aftermarket

12

without having market power in the foremarket. *Eastman Kodak*, at 504 U.S. at 467. In fact, the *Kodak* Court explicitly declined to extend its analysis to a situation in which a defendant has a market power in the foremarket. *Id.* at 465 n.10 (declining to address respondents' argument that Kodak had market power in the foremarket because it was not raised in their opposition to the petition for certiorari, and stating that it would decide the case on the "premise . . . that competition exists in the equipment market."). The Ninth Circuit, in *Newcal* and *Epic Games*, acknowledged that these factors were established to determine whether competition in the foremarket would be able to "discipline" a defendant's conduct in the aftermarket. *See Newcal*, 513 F.3d at 1050; *Epic Games*, 67 F.4th at 946. In both cases, the Ninth Circuit recognized that these inquiries were intended to evaluate whether consumers "ma[d]e a knowing choice to restrict their aftermarket options when they decide in the initial (*competitive*) market to enter a [] . . . contract." *Epic Games,* 67 F.4th at 980–81 (emphasis added) (citing *Newcal*, 513 F.3d at 1050).[3]

From a practical perspective, the relevance of information costs, switching costs, and general knowledge of restrictions is reduced where a defendant has market power in the foremarket. Market power is defined as the power to "force a purchaser to do something he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 2080. Consumers in a foremarket within which a company has market power have minimal ability to discipline the company's conduct in aftermarkets, regardless of information costs, switching costs, and general awareness of restrictions.

---

[3] For example, in *Forsyth v. Humana, Inc.*, plaintiffs proposed a submarket that consisted of acute care hospitals used by consumers insured by Humana, as supported by the fact that the vast majority of Humana insureds used one acute care hospital as a result of Humana's contractual disincentives. 114 F.3d at 1476. The Ninth Circuit rejected this argument because the boundaries of the market were defined by the consumers' contractual obligations to Humana, which was an improper basis to establish a market. *Id.* The Court held, however, that "to succeed in the face of the contractual tie-in created by the insurance policies, the plaintiffs would have to make a showing of monopoly power in the health insurance market, and there is no evidence of this." *Id.*

United States District Court
Northern District of California

The Court finds that Plaintiffs have (1) sufficiently alleged that Defendant has market power in the EV foremarket, and (2) sufficiently alleged the existence of single-brand aftermarkets for Tesla Repair Services and Tesla-Compatible Parts. *Arguendo*, even if Plaintiffs have not properly alleged market power in the EV market, Plaintiffs properly alleged the existence of these aftermarkets under the *Epic Games* factors.

### a.   Plaintiffs sufficiently plead that Tesla possesses market power in the EV Market.

Market power is defined as the power to "force a purchaser to do something he would not do in a competitive market." *Eastman Kodak*, 504 U.S. at 2080. "The existence of such power ordinarily is inferred from the seller's possession of a predominant share of the market." "Courts generally require a 65% market share to establish a prima facie case of market power." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997) (citing *American Tobacco Co. v. United States*, 328 U.S. 781, 797 (1946)); *see Dreamstime.com, LLC v. Google LLC*, 54 F. 4th 1130, 1137 n.5 (9th Cir. 2022).

Here, Plaintiffs allege that Defendant had 65% to 80% market share in the EV foremarket during the class period. SCAC ¶ 53. This factor is uncontested by Defendant. Consequently, the Court finds that Defendant properly alleged market power in the EV foremarket.

### b.   Plaintiffs sufficiently plead the existence of aftermarkets for Tesla Repair Services and Tesla-Compatible Parts under general market definition principles.

Plaintiffs must demonstrate that their proposed aftermarkets show the absence of interchangeability and cross-elasticity of demand. In *Eastman Kodak*, the Supreme Court held that the respondents' services and parts aftermarkets met this criterion "[b]ecause service and parts for Kodak equipment [were] not interchangeable with other manufacturers' service and parts, the relevant market from the Kodak equipment owner's perspective [was] composed of only those companies that service Kodak machines." 504 U.S. at 482.

Here, Plaintiffs allege that Tesla's electric vehicles "are designed differently and utilize different parts that are not interchangeable with other EVs." SCAC ¶ 58. A "Tesla EV owner must bring his or her EV to a service provider who specializes in the maintenance and repair of Tesla EVs." *Id.* ¶ 59. Thus, service and parts for Teslas are not interchangeable with other EV manufacturers. As a result, the aftermarkets are properly limited to Tesla-Compatible Parts and Tesla Repair Services.

Defendant claims that Plaintiffs insufficiently plead that the proper geographic market for these aftermarkets is the United States. According to Defendant, a geographic market should be limited to the area "where buyers can turn for alternative sources of supply," and Plaintiffs do not explain how "repair services in New Jersey could plausibly be a substitute for repair services in California for a Tesla owner." Motion, at 19 (citing *Reilly v. Apple, Inc.*, 578 F. Supp. 3d 1098, 1109 (N.D. Cal. 2022)). A market should "reflect commercial realities." *U.S. v. Grinnell Corp.*, 384 U.S. 563, 572 (1966). Even where a consumer may primarily receive services from a local provider, a geographic market that covers that the entire United States is appropriate where "the business of providing such a service is operated on a national level." *Id.* at 572. For purposes of a motion to dismiss, Plaintiffs have plausibly alleged that the Defendant implemented its policies on a nationwide level.[4]

        **c.**      **Even if Plaintiffs were required to satisfy the *Epic Games* factors, Plaintiffs sufficiently plead the existence of aftermarkets.**

Regardless of the existence of market power in the foremarket, Plaintiffs' allegations satisfy the *Epic Games* factors for purposes of surviving a motion to dismiss.

---

[4] Defendant incorrectly claims that this Court already found in its prior order that Plaintiffs failed to allege price sensitivity. Motion, at 10. The language from the Court's order that Defendant cites to for this contention addresses Plaintiffs' allegations regarding price insensitivity in the EV market, not in the Tesla-Compatible Parts or Tesla Services Market. FCAC Order, at 9 ("Plaintiffs do not allege that EVs are insensitive.")

1

2

3

4

5

6

7

8

9

10

11

United States District Court
Northern District of California

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(i)      **Plaintiffs sufficiently allege they were generally unaware.**

The first requirement, that the restrictions in the aftermarket are not generally known, is a "crucial" one. *Epic Games*, 67 F.4th at 977 (quoting *Eastman Kodak,* 504 U.S. at 477). This unawareness requirement places "the burden on a plaintiff to 'rebut the economic presumption that . . . consumers make a knowing choice to restrict their aftermarket options' when they make a foremarket purchase." *Id.* (quoting *Newcal,* 513 F.3d at 1050). "*Kodak* does not impose a requirement that a plaintiff show 'complete ignorance' of a defendant's aftermarket restrictions; it need only show that the restrictions are not 'generally known.'" *Id.* at 979 n.10. While the Ninth Circuit has not defined what, exactly, "amounts to general unawareness," a plaintiff must present at least some evidence to fulfill this prong. *Id.* at 979 n.10.

Plaintiffs provide an assortment of evidence that makes a plausible showing that consumers were generally unaware of the aftermarket restrictions. In the SCAC, Plaintiffs cite an article depicting Tesla owners that have experienced "unexpected headaches" with their cars, which speaks to a general lack of consumer awareness of the alleged issues with Tesla EVs prior to purchase. SCAC ¶ 87. Further, the SCAC indicates that Plaintiffs and consumers, generally, were not aware of the repair restrictions and service center limitations described in the complaint. *See id.* ¶¶ 10–28, 84–87.

Notably, Plaintiffs go further. They reason that consumers were unaware of the repair restrictions in their warranties because Tesla misleads consumers into believing their EVs require little to no maintenance, have fewer moving parts, and receive over-the-air software updates. *See id.* ¶¶ 61, 94–95. *See id*. Despite Tesla publicizing freely available manuals, its electronic parts catalog, and Toolbox diagnostic software, Plaintiffs allege that Tesla restricts individual shops and car owners from conducting everything but the most minimal repair. *See id.* ¶ 88.

To this point, Defendant argues that Plaintiffs concede that consumers are knowledgeable of Tesla's restrictions as they are "*now* widely documented." Motion, at 7 (emphasis added). The

16

critical and relevant inquiry is whether Tesla purchasers were generally unaware of aftermarket restrictions *at the time of foremarket purchase*. If the Court were to follow Defendant's logic, the filing of this litigation could have made Tesla's shortcomings and restrictions widely known, thereby precluding Plaintiffs from pleading their case.

Several of the Plaintiffs purchased their Tesla EVs prior to the articles, tweets, and online forums presented in the Second Consolidated Amended Complaint. Based on evidence cited by Plaintiffs, it is plausible that a significant portion of Tesla purchasers were unaware of their vehicles' forthcoming service and repair issues at the time of purchase. *See, e.g.,* SCAC ¶ 87.

Plaintiffs must also sufficiently plead that they "did not knowingly enter a contract" that would lock them into the aftermarkets associated with their foremarket Tesla EV. *Epic Games*, 67 F.4th at 977. Plaintiffs' unawareness hinges on whether Plaintiffs were aware of the aftermarket restrictions contained in their EV warranty. Tesla's Parts, Body, & Paint Repair Limited Warranty states that the warranty "may be voided, or coverage may be excluded, due to lack of or improper maintenance, installation, service or repairs." SCAC ¶¶ 182–86. Though Plaintiffs cite, and Defendant highlights, an article describing consumers choosing "not to use independent repair shops or aftermarket parts . . . for fear of losing warranty coverage," it is plausible that consumers, generally, were and remain unaware of these repair restrictions. SCAC ¶ 189. It is also plausible that consumers learned of these issues after their Tesla EV purchase, either after coming across such an article, or running into their own maintenance issue. In either case, consumer awareness, conceivably, arose after purchase.

**(ii)      Plaintiffs sufficiently plead significant information costs.**

The second requirement is that "'significant' information costs prevent accurate life-cycle pricing." *Epic Games*, 67 F.4th at 977; *see also Eastman Kodak*, 504 U.S. at 473–74. For example, in *Eastman Kodak*, the Supreme Court held that photocopiers were "complex, durable equipment" that presented significant information costs because they required a "sophisticated

17

analysis," including "availability of products needed to operate, upgrade, or enhance the initial equipment, as well as service and repair costs, including estimates of breakdown frequency, nature of repairs, price of service and parts, length of 'downtime,' and losses incurred from downtime." *Id.* at 473–74.

Electric vehicles are as complex, if not more so, than the photocopiers addressed in *Eastman Kodak*. Plaintiffs plausibly allege that "[i]t is difficult, if not impossible, for a consumer to accurately forecast how much repair and maintenance [] will be required" for their EVs.  SCAC ¶ 103. Further, Plaintiffs allege that Tesla's public misstatements distort the lifecycle costs for Tesla. These alleged misrepresentations could plausibly hinder consumer ability to accurately price the life of their vehicle at the time of purchase and make knowledgeable purchasing decisions. S*ee Eastman Kodak*, 504 U.S. at 473 ("For the service-market price to affect equipment demand, consumers must inform themselves of the total cost of the "package"—equipment, service, and parts—at the time of purchase; that is, consumers must engage in accurate lifecycle pricing.").

Plaintiffs also claim that lifecycle pricing is impossible because EVs are "a relatively new product and Tesla is a relatively new producer."  SCAC ¶ 105.  Because of the recency of this industry, common variables of EV ownership may be extremely difficult to determine at the time of purchase, "including the number of accidents one may have, how many miles the car will drive, and how long the buyer will own the car," making lifecycle pricing difficult.  *Id.* at ¶ 104.

Plaintiffs further allege that three of the largest data providers used by automotive industry professionals to estimate repair costs have no data on Tesla EVs.  *See* SCAC ¶ 106.  Thus, even if a consumer wanted to and could synthesize the data presented to them to accurately price a Tesla, they may not have the critical means to do so. Although the SCAC does provide an alternative source for maintenance costs, s*ee* SCAC ¶¶ 204, 122, this does not defeat their argument.  While average yearly maintenance cost is one of the significant components to accurate lifecycle pricing

18

United States District Court
Northern District of California

of a vehicle, it does not include the cost of collisions which can be significant. Further, it is not clear when this information was posted online, and whether consumers would have had access as early as 2019.

Regardless, Plaintiffs identify inconsistencies in Tesla's sales and services that add additional barriers to lifecycle pricing. Plaintiffs allege that Tesla sells its parts inconsistently both to its own service centers and TACCs, which can frustrate a consumer's vehicle price knowledge while keeping that consumer in the dark about how much the EV will cost long-term. *See* SCAC ¶ 163. Plaintiffs further document a recurring practice by Tesla of refusing maintenance following routine trivial fixes by third-party repair shops, or charging the full price to replace an out-of-warranty part with minimal damage. *Id.* ¶¶ 188, 206–08. Plaintiffs have met their pleading burden under this prong. It is beyond the scope of these proceedings to delve further into the distinctions between the appropriate lifecycle pricing mechanisms and the mechanisms Plaintiffs use to demonstrate market power, and ultimately becomes a question for the fact finders.

### (iii)     Plaintiffs sufficiently plead high switching costs.

Third, a plaintiff must show that costs prohibit consumers from switching between market goods such that a locked-in effect in the relevant market occurs. *See Epic Games*, 67 F.4th at 979–80; *Eastman Kodak Co.*, 504 U.S. at 476–77 ("If the cost of switching is high, consumers who already have purchased the equipment . . . will tolerate some level of service-price increases before changing equipment brands."). Switching costs must be "significant" to define a market. *Eastman Kodak*, 504 U.S at 473; *See Klein v. Facebook, Inc.*, 580 F. Supp. 3d 743, 781 (C.D. Cal. 2022) (holding that social media services have a high switching cost because users will be reluctant to switch to a new platform "unless many other users make the switch simultaneously"). A plaintiff need not make an extensive showing of switching costs; among other things, a plaintiff can point to the "heavy initial outlay" of the foremarket good and brand-specific purchases. *Eastman Kodak*, 504 U.S at 477.

United States District Court
Northern District of California

In *Eastman Kodak*, the Court stated that evidence showing "the heavy initial outlay for Kodak equipment, combined with the required support material that works only with Kodak equipment, ma[de] switching costs very high for existing Kodak customers." 504 U.S. at 477.  In other words, the high cost of Kodak's complex foremarket equipment relative to and combined with the restricted, necessary services and parts in the aftermarket made for high switching costs.

Plaintiffs tell a similar story here.  Tesla EVs range from $40,000 to $110,000, and a purchase can be "one of the biggest purchases" in a consumer's life.  SCAC ¶ 99.  Plaintiffs also allege these purchases are often financed through loan or lease with specified contract terms that exacerbate the total cost.  *See id.* Plaintiffs further allege that Tesla EVs have some of the lowest resale values in the EV market, making Tesla owners suffer a substantial loss if they were to make a brand switch.  *See* SCAC ¶ 100.  This is in addition to the EV owners' purchase of peripheral products that only work with Tesla EVs, like home chargers that cost around $400.  SCAC ¶ 101. And even if they did make the switch to another EV brand, consumers could not escape Tesla's approach to alleged repair restrictions as other EV brands "not only have limited sales volume, but . . . have also adopted similar policies, practices, and restrictions as . . . Tesla."  SCAC ¶ 82. The high initial cost, investment required for peripheral products, and limited exit options sufficiently support the existence of switching costs.

## C.   Monopolization and Attempted Monopolization under Section 2 of the Sherman Act

The Second Consolidated Amended Complaint alleges that Defendant monopolized, or attempted to monopolize, the markets for Tesla Repair Services and Tesla-Compatible Parts, in violation of Section 2 of the Sherman Act.  SCAC ¶¶ 242–263; 15 U.S.C. § 2.  The Court addresses each of these allegations in turn. A Section 2 monopolization claim "has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or

maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570–71.

> ### a. Plaintiffs sufficiently plead that Tesla possesses monopoly power in the relevant markets.

A plaintiff must establish that a defendant possesses monopoly power, which is the ability "to control prices or exclude competition." *Grinnell*, 384 U.S. at 571. Antitrust plaintiffs can establish that a defendant possesses monopoly power via direct or indirect evidence. To establish monopoly power via direct evidence, a plaintiff must provide "direct proof of injury to competition," including "evidence of restricted output and supracompetitive prices." *Forsyth,* 114 F.3d at 1476. To prove monopoly power via "indirect evidence," the plaintiff must "(1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output." *Id.*

Here, Plaintiffs provided direct and indirect evidence of monopoly power in the Telsa Repair Services and Tesla-Compatible Parts markets.

> ### i. Plaintiffs sufficiently plead monopoly power in the Tesla Repair Services market.

Plaintiffs provided sufficient direct and indirect evidence of monopoly power in the Tesla Repair Services market to survive a motion to dismiss.

For direct evidence, Plaintiffs allege that Tesla has restricted output by reducing supply of service-providers. Tesla has accomplished this, in part, by refusing to invest in its own service center infrastructure, and limiting the growth of TACCs. *Id. ¶* 151. Though Tesla EV sales have increased substantially, service offerings have not. *Id.* ¶ 85. This has created delay and allowed Tesla to charge supracompetitive prices.

Plaintiffs also provided sufficient indirect evidence of monopoly power. As discussed above, Plaintiffs sufficiently defined the Tesla Repair Services market. Further, Plaintiffs plead

United States District Court
Northern District of California

that Tesla has a dominant share of this market because virtually all Tesla services are performed by Tesla or its "limited network of Tesla-Approved Collision Centers," of which Tesla maintains such tight control over that they are not competitors. *Id.* ¶ 67. This is because they must rely on Tesla to source Tesla-Compatible Parts and to set pricing. *See id.* ¶ 66. To become a TACC**,** body shops must purchase expensive equipment and undergo extensive training. *Id.* ¶¶ 170–72.

Plaintiffs also sufficiently allege the existence of barriers to entry into the Tesla Repair Services aftermarket. Tesla maintains its power over service due to the unique, computer-like nature of its EV. Only Tesla can provide the full range of EV repairs and maintenance. SCAC ¶ 90. It does this, Plaintiffs claim, by designing Tesla EVs to require remote diagnostic and software updates that only it can provide. *Id.* Even if independent service providers have access to the Toolbox software which offers some repair services, it is limited, expensive, and inadequate to the point that consumers must still report to Tesla for such repairs. *Id.* ¶¶ 90, 144, 165. Indeed, many of the parts used for maintenance and repairs will not function until they are coded by Tesla, and no other provider can code these parts. *Id.* ¶¶ 92, 138-43, 147–50. Thus, Plaintiffs sufficiently plead monopoly power in the Tesla Repair Services market.

ii. **Plaintiffs sufficiently plead monopoly power in the Tesla-Compatible Parts market.**

Plaintiffs also provided direct and indirect evidence of monopoly power in the Tesla-Compatible Parts markets to survive a motion to dismiss. For direct evidence, Plaintiffs allege that Tesla has excluded manufacturer competitors and restricted output preventing Original Equipment Manufacturers ("OEMs") from selling "to anyone other than Tesla." *Id.* ¶ 77. Plaintiffs also allege that though Tesla may sell parts directly to consumers, it only does so on a limited basis. *Id.*

Plaintiffs also provide indirect evidence of monopoly power. Plaintiffs make the same indirect argument as to Defendant's near total control over the repair services market. Plaintiffs further plausibly allege the significant barriers to entry and increased output for potential

competitors. For example, once consumers purchase a Tesla, similar to services, they are locked

into the Tesla-Compatible Parts aftermarket. Like *Kodak*, Plaintiffs allege there is no viable

substitute for Tesla parts and that most Tesla-Compatible parts are not interchangeable with other

EV parts. SCAC ¶ 72. Tesla's batteries, for instance, cannot be serviced or replaced by anyone

but Tesla. *Id.* ¶ 179. Indeed, many of the parts used for maintenance and repairs will not function

until they are coded by Tesla, and no other provider can code these parts. SCAC ¶¶ 92–93.

Plaintiffs further allege Tesla also prevents OEMs from manufacturing and selling Tesla-

Compatible Parts to anyone other than Tesla. SCAC ¶ 144. Thus, potential parts competitors face

numerous barriers to entry into the market, and Plaintiffs sufficiently plead monopoly power in the

Tesla-Compatible Parts market.

> **b.** **Plaintiffs sufficiently plead willful acquisition of power and anticompetitive conduct.**

Defendant recognizes, and Plaintiffs concede, that monopoly power on its own is not a

violation of the Sherman Act. "Mere possession of monopoly power, and the concomitant

charging of monopoly prices, is . . . an important element of the free market system."

*Dreamstime.com, LLC*, 54 F.4th at 1137. The possession of monopoly power "will not be found

unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns*

*Inc. v. Law Offs. of Curtis V. Trinko*, 540 U.S. 398, 407 (2004). To this end Plaintiffs plead that

Tesla's conduct is anticompetitive. Plaintiffs plead that a series of Tesla decisions led to

insufficient availability of replacement parts and repair services to increase Tesla's profits.

Plaintiffs claim Tesla was incentivized to keep as much market share of the aftermarkets as it

could with the expectation that these markets would become profitable in the long term. *See*

SCAC ¶ 151. This promise of profits explains, Plaintiffs allege, Tesla's anticompetitive conduct

and why it has not invested further into the service and parts aftermarkets. *See id.* ¶ 150. Beyond

Tesla's barriers to entry, limited diagnostic tools, misrepresentations, and warranty woes,

United States District Court
Northern District of California

Plaintiffs allege Tesla has de facto exclusivity agreements preventing OEM and suppliers from manufacturing Tesla-Compatible Parts for anyone other than Tesla. *See id.* ¶¶ 157–58. Tesla has also authored cease and desist letters preventing independent repair shops from offering Tesla repair services. *See id.* ¶ 162.

It is important not to confuse allegations of anticompetitive conduct with stifling the innovation of a unique and cutting-edge consumer good. Anticompetitive conduct does not include "product improvement" nor innovations that attract consumers to a particular product due to price, service, or terms advantages. *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 999 (9th Cir. 2010). The existence of the alleged markets, market power, and anticompetitive conduct are "factual question[s]" that "remain open for resolution" either for or against Plaintiffs. *Newcal*, 513 F.3d at 1051. At this stage of the proceedings, Plaintiffs have sufficiently alleged monopolization, or alternatively, attempted monopolization, in the Tesla Repair Services and Tesla-Compatible Parts markets in violation Section 2 of the Sherman Act.

### D.      Tying Claims under Section 1 of the Sherman Act

Plaintiffs further allege that Defendant's unlawful tying arrangement violates Section 1 of the Sherman Act. SCAC ¶¶ 264–75. A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Kodak*, 504 U.S. at 461. To establish the existence of a tie, a plaintiff must demonstrate that the arrangement includes two or more distinct products, that the tie is "forc[ing] the buyer into a purchase of a tied product," and that the tie is unlawful. *Id.*

Here, Plaintiffs allege three separate tying arrangements: (1) the Tesla EV Market foremarket is tied to both the Tesla-Repair Services and Tesla-Compatible Parts aftermarkets (2) the Tesla-Compatible Parts aftermarket is tied to the Tesla Repair Services aftermarket, and (3) the

Tesla Repair Services aftermarket is tied to the Tesla-Compatible Parts aftermarket. *See* SCAC ¶¶ 269–71.  As discussed below, Plaintiffs have sufficiently plead both prongs.

### 1.    Plaintiffs sufficiently allege the existence of distinct products.

To constitute two separate products, "[t]here must be sufficient consumer demand so that it is efficient for a firm to provide" the products separately. *See Eastman Kodak*, 504 U.S. at 462 (citing *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984)).  "The efficiency showing may be inferred from 'more readily observed facts.'  These include consumer requests to offer the products separately, disentangling of the products by competitors, analogous practices in related markets, and the defendant's historical practice." *Epic Games*, 67 F.4th at 995; *see Eastman Kodak*, 504 U.S. at 463 (finding sufficient at the 12(b)(6) stage allegations that "consumers would purchase service without parts" and that the defendant had sold them "separately in the past.")

In *Epic Games*, the Ninth Circuit Court of Appeals found the district court "clearly erred" by not focusing on two products' sufficient consumer demand when the district court found no tie. 67 F.4th at 996.  Contrary to Apple's assertion, Apple's app distribution software and in-app purchasing (IAP) platform could be separate markets because Apple separated them in other contexts. *Id.*  The court further found that because other companies sought to develop their own IAPs, there was evidence of efficiency in and a separate market for the tied product. *Id.*

The Supreme Court in *Eastman Kodak* held that a tying arrangement existed between two aftermarket products: Kodak parts and Kodak service. 504 U.S. at 463. The Court held that petitioner provided sufficient evidence that "[a]t least some consumers would purchase service without parts, because some service does not require parts, and some consumers, those who self-service for example, would purchase parts without service." *Id.*  Kodak argued that there could never be separate markets service for service and parts because there is no demand for parts separate from service. *Id.* The Court, however, rejected this line of thinking because it would lead to the illogical result that there could not separate markets for "cameras and film, computers and

25

software, or automobiles and tires." *Id.* The Court also concluded that Kodak's attempts to bifurcate customers with different pay-rates—depending on whether they "serviced their own machines or received third-party maintenance"—suggested product separation. *Id.* at 462.

Here, focusing on the first alleged tie, Tesla EVs in the foremarket can be separated from the parts and services aftermarkets. Plaintiffs bring their claims because of Tesla's chosen practice to limit access to its service and parts to only Tesla and its approved providers, eroding Tesla's service quality and secondary market value. *See* SCAC ¶¶ 3, 7. Plaintiffs also make the contrast between automobile providers like Ford and their relatively abundant service and parts provisions and that of Tesla's. *See id.* ¶ 85. That collision centers and body shops outside of Tesla are seeking to receive training, equipment, and parts suggests that, like the in-app purchasing platform in *Epic Games*, there is efficiency and separation between Tesla EVs and its aftermarkets.

Between services and parts, Plaintiffs sufficiently allege there is sufficient demand and efficiency because service and parts have been sold separately in the past and are still sold separately. In *Eastman Kodak*, the Court found that Kodak's "policy of allowing customers to purchase parts on condition that they agree to service their own machines suggests that the demand for parts can be separated from the demand for service." 504 U.S. at 462 n.5. Similarly, Tesla's warranty discourages Tesla EV owners from receiving service outside of Tesla by suggesting that the warranty "may be voided or coverage may be excluded due to improper maintenance, service or repairs." SCAC ¶¶ 182–83. Further, Tesla's over-the-air software updates and diagnostic reports do not require any parts. *See* SCAC ¶¶ 94–95. This separation of consumers who received Tesla service and those who went outside of Tesla to receive service suggests the existence of a separate market for its parts and a separate market for service and repair.

**2.      Plaintiffs sufficiently plead that the tying scheme coerced consumers.**

"Even where a transaction involves separate products, it is not necessarily a tie; the seller must also 'force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'"  *Epic Games*, 67 F.4th at 996 (citing *Jefferson Parish*, 466 U.S. at 12).

Plaintiffs allege that consumers attempt to receive both services and parts outside of Tesla, but are coerced into forgoing those options to stay within warranty.  *See* SCAC ¶ 189. Specifically, Tesla forces consumers to purchase the tied product by threatening to void warranties if consumers use non-Tesla certified service providers or if they use non-OEM parts.  *See id*.; *See Jefferson Parish*, 466 U.S. at 12 (The seller must also "force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms.").  In *Eastman Kodak*, the plaintiffs were forced to receive services from only Kodak due to unique machine parts, similarly, Tesla EV owners are limited in their options to receive service and parts due to Tesla's market power in the EV submarket and Tesla's own conduct.  *See Eastman Kodak*, 504 U.S. at 482.  The EV parts and repair aftermarkets for Tesla EVs and other EVs/ICE vehicles are not substitutes for each other, meaning there is no cross elasticity of demand; this further aides Plaintiffs in their argument.  *See* SCAC ¶¶ 57-59.

Finally, Plaintiffs allege that Tesla excludes competition in the repairs and parts market by limiting diagnostic tools and manuals (*Id.* ¶¶ 226(f), 246(c)) and misleading consumers (*Id.* ¶¶ 61, 94-95).  Plaintiffs claim that there is an insignificant number of independent service providers because of Tesla's Repair Restrictions.  Even the TACCs which are "independent", are not really because they must rely on Tesla to source Tesla-Compatible Parts and pricing.  *Id.* ¶ 66. Thus, Plaintiffs have sufficiently plead that Tesla's tying scheme coerces customers into undesired purchases.

27

United States District Court
Northern District of California

### 3.   Plaintiffs sufficiently plead that the ties are unlawful.

"A tie can be unlawful pursuant to either a modified per se rule or the Rule of Reason. A tie is per se unlawful if (1) the defendant has market power in the tying product market, and (2) the "tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *Epic Games*, 67 F.4th at 996–97 (quoting *Blough v. Holland Realty, Inc.*, 574 F.3d 1084, 1089 (9th Cir. 2009)). As discussed above, Plaintiffs have sufficiently plead that Tesla possesses market power in all three markets. Further, given that Plaintiffs alleged that Tesla controls "virtually all" of the commerce in the Tesla-Compatible Parts and Tesla Repair Services markets, it is plausible to infer that these tying arrangements would affect a "not insubstantial volume of commerce" in these markets. Thus, Plaintiffs have sufficiently plead tying claims.

### E.   Plaintiffs sufficiently allege unlawful tying in violation of the Cartwright Act.

"The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq., was modeled after the Sherman Act." *County of Tuolumne v. Sonora Comm. Hosp.*, 236 F.3d 1148, 1160 (2001). However, the Cartwright Act is distinct in that it does not apply claims in which "the tying item is a service." *Morrison v. Viacom, Inc.*, 66 Cal. App. 4th 534, 546 (1998). In their opposition, Plaintiffs appeared to concede that they were prohibited from asserting a tying claim under the Cartwright Act based on Tesla Repair Services as the tying product. Oppo., at 21 fn.13 ("Tesla asserts that Plaintiffs' Cartwright Act claim alleging Tesla Repair Services as a tying product must be dismissed. . . . Regarding that aspect and only that aspect of Plaintiffs' claim, Tesla is correct.") As such, Plaintiffs' Cartwright Act claim is dismissed to the extent it is based on a Tesla Repair Services as the tying product. Plaintiffs' Cartwright Act claims alleging that EVs and Tesla-Compatible Parts as the tying products are maintained.

1

2

### F.     Plaintiffs sufficiently plead a combination in restraint of trade in violation of the Cartwright Act.

Plaintiffs claim that Defendant's *de facto* exclusivity agreements with the TACCs and manufacturers constitute horizontal restraints that are per se violations of the Cartwright Act. The Ninth Circuit has held that California courts would agree with its holding that hybrid agreements are not per se violations. *Dimidowich*, 803 F.2d, at 1481–82. Thus, Plaintiffs' claims are subject to the Rule of Reason.  Plaintiffs, again, argue that these restraints are *per se* violations of the law. However, as stated above, plaintiff has not sufficiently plead that this hybrid conspiracy is a per se violation. Thus, the Rule of Reason applies to these claims. The Rule of Reason applies "essentially the same" regardless of "whether the alleged antitrust violation" is based on concerted or independent. As previously noted, Plaintiffs' allegations regarding *de facto* exclusivity agreements were sufficient to form the basis for independent unlawful restraints of trade. As such, these allegations are sufficient to form the basis for concerted restraints on trade.

### G.     Plaintiffs sufficiently plead a violation of the California Unfair Competition Law (UCL).

Plaintiffs allege that defendant violated the UCL which prohibits any unlawful, unfair, or fraudulent business practice.  *See id.* ¶¶ 303, 310.  The statute's "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Abbott Labs. v. Superior Court*, 9 Cal. 5th 642, 651 (2020) (citing *Kasky v. Nike, Inc.* 27 Cal.4th 939, 949 (2002)).  "By proscribing any unlawful business practice, section 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Abbott Labs.*, 9 Cal. 5th at 651. (Internal citation omitted). Here, Plaintiffs assert that Tesla engaged in both unlawful and unfair business practices.  SCAC ¶¶ 303, 310.  Since Plaintiffs have sufficiently pled the elements for relief under the Sherman Act and Cartwright Act, Plaintiffs sufficiently plead unlawful business practices in violation of the UCL.

United States District Court
Northern District of California

**V.     CONCLUSION**

The Court finds that Plaintiffs have plausibly alleged a cause of action for monopolization and unlawful tying under the Sherman act and causes of action under the Cartwright and California UCL.

Accordingly, for the foregoing reasons the Court **DENIES** Defendant's Motion as to claims 1 through 5 and 7. The Court further **DENIES** claim 6 to the extent it relies on EVs or Tesla-Compatible Parts as a tying product. The Court **GRANTS** Defendant's Motion, with prejudice, as to claim 6 to the extent it relies on services as a tying product.

This resolves docket number 135.

**IT IS SO ORDERED.**

Dated: June 17, 2024

TRINA L. THOMPSON
United States District Judge

30