**SAVERI & SAVERI, INC.**
R. Alexander Saveri (SBN 173102)
1016 Lincoln Blvd., Suite 306
San Francisco, CA 94129
Telephone: (415) 217-6810
rick@saveri.com

**FREED KANNER LONDON & MILLEN LLC**
Matthew W. Ruan (SBN 264409)
Douglas A. Millen (appearing pro hac vice)
Michael E. Moskovitz (appearing pro hac vice)
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

*Attorneys for Plaintiffs and the Proposed Class*
[Additional counsel listed on signature page.]

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| VIRGINIA M. LAMBRIX, *et al.*, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>TESLA, INC.,<br><br>    Defendant. | Case No. 3:23-cv-1145-TLT (Lead Case)<br>Case No. 3:23-cv-1496-TLT<br>Case No. 3:23-cv-1543-TLT<br>Case No. 3:23-cv-2035-TLT<br>Case No. 3:23-cv-2352-TLT<br><br>**JURY DEMAND**<br><br>**THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**<br><br>1.  Violations of §§ 1 and 2 of the Sherman Act (15 U.S.C. 1, 2);<br><br>2.  Violations of the California Cartwright Act (Cal. Bus. & Prof. Code §§ 16720, 16726, 16727);<br><br>3.  Violations of the California Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*) |

Plaintiffs Virginia M. Lambrix, Anthony Adjuder, Patrick Doyle, Adriana Ferreira, Philomena Nana-Anyangwe, Jason Pratti, and Connor Shore (together, "Plaintiffs"), individually and on behalf of the Classes defined below, bring this action against Tesla, Inc. ("Tesla") and allege, upon their personal knowledge as to themselves and each of their own actions, and otherwise upon information and belief, including the investigation of counsel, as follows:

## NATURE OF THE ACTION

1.      This class action, brought pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720, 16726, and 16727, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, seeks relief for all persons who, like Plaintiffs, have been forced to pay supracompetitive prices and suffer exorbitant wait times to maintain and repair their Tesla vehicles as a result of Tesla's monopolization, attempted monopolization, exclusionary and unfair business conduct, and restraint of the markets for compatible replacement parts ("Tesla-Compatible Parts") and maintenance and repair services ("Tesla Repair Services") for Tesla vehicles.

2.      Historically, consumers of traditional vehicles with internal combustion engines ("ICE Vehicles") have had multiple options for maintaining and repairing their motor vehicles after purchase—they could perform the work themselves, bring their vehicle to a dealership, or bring their vehicle to an independent repair shop. Moreover, when having that maintenance or repair, the consumer would have the choice of using original equipment manufacturer ("OEM") or aftermarket replacement parts.

3.      Tesla owners, by comparison, effectively have only one option: use the Tesla "app" to schedule service with Tesla itself or, if body work needs to be performed, within the limited network of Tesla-Approved Collision Centers. Either way, their electric vehicles ("EVs") will be maintained or repaired using only Tesla OEM parts.

4.      This is because Tesla has substantial market power in the United States electric vehicle market ("EV market") and leverages that power to monopolize and restrain the aftermarkets for Tesla Repair Services and Tesla-Compatible Parts. Tesla accomplishes this using various policies, acts, and restrictions designed to constrain competition in the aftermarkets for Tesla Repair Services and Tesla-Compatible Parts (the "Repair Restrictions"), including among other things:

(a) Designing its vehicle warranties and related policies to discourage Tesla owners from obtaining parts or services anywhere other than Tesla;

(b) Designing its vehicles so that maintenance and repairs require access to diagnostic and telematic information accessible only through remote management tools exclusively accessible by Tesla; and

(c) Limiting access to its manuals, diagnostic tools, vehicle telematic data, and original equipment manufacturer ("OEM") replacement parts.

5.    Tesla then further leverages its market power in the Tesla Repair Services market to maintain its monopoly in the Tesla-Compatible Parts market, and vice versa.

6.    As a result of this anticompetitive course of conduct, Tesla has prevented independent providers from entering the Tesla Repair Services market, prevented its OEM parts manufacturers from producing Tesla-Compatible Parts for anyone other than Tesla, and prevented market entry by non-OEM, Tesla-Compatible Parts manufacturers.

7.    This, in turn, has caused Tesla owners to both suffer lengthy delays in repairing or maintaining their EVs, and pay supracompetitive prices for those parts and repairs once they are finally provided.

8.    Tesla's unlawful monopoly of the Tesla Repair Services and Tesla-Compatible Parts markets should be enjoined and dismantled, Tesla should be ordered to make its repair manuals and diagnostic tools fully available to individuals and independent repair shops at a reasonable cost, Plaintiffs and the proposed Class should be reimbursed by Tesla for the amounts they overpaid for Tesla Repair Services and Tesla Compatible Parts, and Plaintiffs and the proposed Class should be reimbursed and compensated by Tesla for the expenses they have incurred and time spent without their Tesla EVs as they endured extended wait times for those services and parts. Accordingly, Plaintiffs, individually and on behalf of all others similarly situated, seek declaratory and injunctive reliefcosts, and attorneys' fees.

## PARTIES

9.    Plaintiff Virginia M. Lambrix is an adult citizen of the state of California who resides in Sonoma County, California. Plaintiff Lambrix owns a 2016 Tesla Model S which she purchased new from Tesla. In early January 2023, Plaintiff Lambrix's Model S suffered water damage and would no longer power on. She attempted to schedule a repair through Tesla's app on the day of the incident, but all available appointments were several weeks out. Subsequently, Plaintiff Lambrix had her vehicle

towed to the closest Tesla Service Center in Corte Madera, California. It took more than three weeks for the vehicle to be repaired from the date of the failure, during which time Plaintiff Lambrix incurred costs for a rental car. In addition to the foregoing incident, Plaintiff Lambrix has paid, outside of warranty, for both Tesla Repair Services and Tesla-Compatible Parts on other occasions between March 2019 and the present (the "Class Period").

10.     Prior to purchasing her Tesla EV, Plaintiff Lambrix was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint. Moreover, Plaintiff Lambrix was led to believe—based on Tesla's public representations and statements made by Tesla's sales staff when purchasing the EV—that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and repairs promptly and in a timely manner. Plaintiff Lambrix was shocked and frustrated when informed that she had to wait weeks for her Model S to be repaired

11.     Plaintiff Anthony Adjuder is an adult citizen of the state of California who resides in Riverside County, California. Plaintiff Adjuder purchased a preowned 2014 Tesla Model S in 2021. On December 17, 2022 Plaintiff Adjuder was involved in an accident which damaged the wheel bearing of his Model S. The vehicle was towed to his home where two separate mobile tire repair companies attempted to repair his wheel. After the mobile repair companies were unable to fix the wheel, Plaintiff Adjuder filed a claim with Tesla's insurance company on December 19, 2022. The same day the vehicle was towed to a Tesla Service Center for repairs. Plaintiff Adjuder's vehicle was not returned to him until June 9, 2023, due to delayed parts. He has paid, outside of warranty, for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

12.     Prior to purchasing his Tesla EV, Plaintiff Adjuder was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint.  He believed he would be able to repair his vehicle himself and did not know Tesla restricted his access to parts and repair software. Moreover, Plaintiff Adjuder was led to believe, based on Tesla's public representations, that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and

repairs promptly and in a timely manner. Plaintiff Adjuder was shocked and frustrated when he endured a nearly six-month wait for his Model S to be repaired, due to backordered parts.

13.    Plaintiff Patrick Doyle is an adult citizen of the state of California who resides in San Mateo County, California. Plaintiff Doyle purchased a preowned 2015 Tesla Model S in 2022. Between December 2022 and March 2023, Plaintiff Doyle's Tesla was serviced six times at a Tesla Service Center. His vehicle was damaged twice by Tesla during repairs. Plaintiff Doyle has paid, outside of warranty, for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

14.    Prior to purchasing his Tesla EV, Plaintiff Doyle was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint. Moreover, Plaintiff Doyle believed that Tesla EVs required less maintenance than ICE vehicles, and when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and repairs promptly, in a timely manner. Plaintiff Doyle was shocked and frustrated by how frequently his vehicle needed to be repaired and by the fact that he could not perform repairs on his own

15.    Plaintiff Adriana Ferreira is an adult citizen of the state of Florida who resides in Broward County, Florida. Plaintiff Ferreira owns a 2018 Model 3 which she purchased new in 2018. She has paid, outside of warranty for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period. The Model 3 was Plaintiff Ferreira's first EV. Plaintiff Ferreira had her ICE vehicles maintained and repaired by the same independent repair shop for years, and she planned to continue bringing her vehicle there when she purchased her Model 3.

16.    In October of 2023, Plaintiff Ferreira—after asking a Tesla technician to check them during a previous appointment in September—took her Model 3 to the Tesla Service Center in Fort Lauderdale to inquire about having its brakes repaired. Tesla provided Plaintiff Ferreira with a quote of over $1,500 to replace the brakes. In reviewing the quote, Plaintiff Ferreira noted that the cost of parts was only $95.00 and that the labor costs were more than 90% of the estimate, which she found to be simply unacceptable.

17.    Plaintiff Ferreira then went to the independent repair shop she previously used for her ICE vehicles to obtain a quote and was informed that they were unable to order the Tesla parts needed to

repair her vehicle. Plaintiff Ferreira then contacted Tesla through its app to ask if she could buy the parts to repair the brake line. Tesla said it would not sell her the parts and that she would need to purchase them from a Tesla authorized repair shop. Accordingly, Plaintiff Ferreira then went to a Tesla-Authorized Collision Center in Pompano Beach, Florida who informed her they would not sell her any parts and, instead, provided her with a quote of $4,911 to repair the brake line. Plaintiff Ferreira continued to search for the part she needed to repair her vehicle but was unsuccessful.

18.    In November 2023, Plaintiff Ferreira had no choice but to have her vehicle repaired by Tesla so that it would be safe to drive. She returned to the Fort Lauderdale Tesla Service Center that she had started with one month earlier. Adding insult to injury, she was told the repair would only take one day, and it actually took three weeks.

19.    Prior to purchasing her Tesla EV, Plaintiff Ferreira was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint. In fact, Plaintiff Ferreira was led to believe—based on Tesla's public representations and statements made by Tesla's sales staff when purchasing the EV—that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and repairs promptly and in a timely manner. Had Plaintiff Ferreira known Tesla restricted access to its parts and she would no longer be able to work with her preferred independent repair shop, she would not have purchased a Tesla EV.

20.    Plaintiff Philomena Nana-Anyangwe is an adult citizen of the state of Maryland who resides in Prince George's County, Maryland. Plaintiff Nana-Anyangwe owns a 2016 Tesla Model S which she purchased new from Tesla. Plaintiff Nana-Anyangwe purchased her Tesla, in part, because she was led to believe their EVs required little maintenance.  Since purchasing her Tesla EV, it has been repaired by a Tesla Service Center and/or a Tesla mobile service technician on multiple occasions, including at least three repairs to the various door handles on her Model S. Plaintiff Nana-Anyangwe has paid, outside of warranty, for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

21.    Prior to purchasing her Tesla EV, Plaintiff Nana-Anyangwe was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint.

Moreover, Plaintiff Nana-Anyangwe was led to believe—based on Tesla's public representations and statements made by Tesla's sales staff when purchasing the EV—that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla would provide such maintenance and repairs promptly and in a timely manner. Plaintiff Nana-Anyangwe was shocked and frustrated when she had to repair her vehicle on multiple occasions within a short period of time.

22.     Plaintiff Jason Pratti is an adult citizen of the state of Florida who resides in St. Lucie County, Florida. Plaintiff Pratti purchased a preowned 2018 Tesla Model S in January 2023. In late-March of 2023, Plaintiff Pratti's Model S began to have battery issues and was undriveable. Plaintiff Pratti took his vehicle to an independent repair shop who informed him that they were not able to repair his vehicle due to Tesla's part and software restrictions. This was the first time Plaintiff Pratti became aware of Tesla's Repair Restrictions. Frustrated and with no choice, he brought his vehicle to a Tesla service center on May 23, 2023. The vehicle was not returned until June 21, 2023. While the vehicle was being repaired, Plaintiff Pratti was not provided with a loaner vehicle even after requesting one. The battery replacement cost was over $13,000. Plaintiff Pratti has paid, outside of warranty, for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

23.     Prior to purchasing his Tesla EV, Plaintiff Pratti was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint.  Moreover, he was unaware that he would not be able to perform repairs himself or with an independent repair shop due to Tesla's Repair Restrictions. Plaintiff Pratti was led to believe based on Tesla's public representations that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and repairs promptly and in a timely manner. Plaintiff Pratti was shocked by the high repair costs for his vehicle and by the fact that he had to wait over a month for his Model S to be repaired, without a loaner vehicle being provided.

24.     Plaintiff Connor Shore is an adult citizen of the state of Colorado who resides in Adams County, Colorado. Plaintiff Shore owns a 2023 Model 3 which he purchased new in 2023. He has paid, outside of warranty for both Tesla Repair Services and Tesla-Compatible Parts during the Class Period.

25.     On July 2, 2023, Plaintiff Shore was involved in an accident. His local Tesla service

center was unable to repair his vehicle because it did not handle collision repairs. Plaintiff Shore then went to Tesla's website to find a Tesla-Approved Collision Center. He contacted multiple Tesla-Approved Collision Centers and was surprised when he was told it would be two to four months before his Model 3 could even be inspected. Plaintiff Shore was finally able to get an appointment with a Tesla-Approved Collision Center in late July. However, to this day, the Tela-Approved Collision Center still has not been able to start repairing Plaintiff Shore's vehicle because it is still waiting for most of the necessary parts.  The Tesla-Approved Collision Center is unable to give Plaintiff Shore an arrival date for the parts or an estimate of when the repairs will be completed.  He has been without a vehicle and has incurred additional transportation costs since the accident in July of this year (*i.e.*, for over 5 months).

26.     Prior to purchasing his Tesla EV, Plaintiff Shore was not aware of any of the Repair Restrictions described in this Second Consolidated Amended Class Action Complaint.  Moreover, Plaintiff Shore was led to believe—based on Tesla's public representations and statements made by Tesla's sales staff when purchasing the EV—that Tesla EVs required less maintenance than ICE vehicles and that, when maintenance or repairs were required, Tesla's service centers and mobile service technicians would provide such maintenance and repairs promptly and in a timely manner. Plaintiff Shore was shocked and frustrated when informed that he would have to wait months for his vehicle to be repaired.

27.     Defendant Tesla is a multinational automotive and clean energy company founded in Palo Alto, California in 2003. By 2014, Tesla had become the largest automotive employer in the State of California.[1] In December 2021, Tesla moved its headquarters to Austin, Texas. Prior to this move, all of the company's policies and decisions emanated from the Palo Alto headquarters. And, despite the move, Tesla maintains manufacturing facilities in Fremont, California, where it produces the Model S, Model 3, Model X, and Model Y,[2] and, when announcing the move of its headquarters, told investors that it still planned to increase output in the California plant by 50 percent.[3]

---

[1] *See* https://www.caranddriver.com/news/a15365435/tesla-wins-california-is-now-the-states-largest-auto-employer/ (last accessed 12/7/23).

[2] *See* https://www.tesla.com/manufacturing (last accessed 12/7/23).

[3] *See* https://arstechnica.com/cars/2021/10/tesla-relocates-from-california-sets-up-new-corporate-hq-in-texas/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

28.    To that end, on February 22, 2023, Tesla announced it was taking over Hewlett-Packard's original headquarters to use as Tesla's "global engineering headquarters."[4] At a press conference held with California's Governor that same day, Tesla's CEO Elon Musk described it as "effectively a headquarters of Tesla."[5] He further stated, "We're a California-Texas company," and that it is "kind of a dual-headquartered company."[6]

29.    Using its factories, Tesla manufactures the basic electric components of its EVs (*e.g.*, electric motors/drive units, battery packs, and chargers), while other components (*e.g.*, ordinary car parts, various EV parts, and raw materials) are purchased from suppliers around the world.[7] Some of the components are acquired from a single source.[8] Moreover, some component suppliers enter into contracts with Tesla that provide, among other things, that all tooling, supplies, and materials used by the supplier to manufacture parts for Tesla are owned by Tesla.

30.    In addition to manufacturing EVs and parts, Tesla, among other things, operates over 150 service centers across the United States.[9] Forty-six of those service centers are located in California.

31.    Nonparty co-conspirators include all Tesla-Approved Collision Centers in the United States during the Class Period. In order to become Tesla-Approved Collision Centers, these nonparty entities were required to agree with Tesla to enforce the Repair Restrictions in return for the ability to offer Tesla Repair Services and Tesla-Compatible Parts. These Tesla-Approved Collison Centers benefit from the overcharges to Plaintiff and the Class for such parts and services offered. Moreover, given the costly and difficult process of becoming certified as a Tesla-Approved Collision Center, these entities are unlikely to take any risks that would jeopardize their relationship with Tesla.

## JURISDICTION AND VENUE

32.    This action arises under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 4 of the Clayton Act, 15 U.S.C. § 15, the California Cartwright Act, Cal. Bus. & Prof. Code §§ 16720,

---

[4] *See* https://www.cnbc.com/2023/02/22/elon-musk-meets-with-california-gov-newsom-at-teslas-engineering-hq.html (last accessed 12/7/23).
[5] *Id*.
[6] *Id*.
[7] *See* https://www.investopedia.com/ask/answers/052815/who-are-teslas-tsla-main-suppliers.asp (last accessed 12/7/23).
[8] *See* Tesla Motors, Inc. 2015 Form 10-K at pg. 9.
[9] *See* https://www.tesla.com/findus/list/services/United+States (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

16726, and 16727, and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.* It is brought on behalf of Plaintiffs and a proposed Class of similarly situated individuals numbering more than 100, at least one of whom is a citizen of a state different from the state in which Tesla is domiciled, and with an amount in controversy exceeding $5 million, exclusive of interest and costs.

33.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 (federal question), 1332 (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

34.    This Court has personal jurisdiction over Tesla because it was headquartered in this District for most of the relevant time period, it is currently co-headquartered in this District, a substantial portion of the EVs it has sold to consumers are located within this District, and it continues to maintain a factory in this District.[10] Additional allegations identifying Tesla's relevant conduct and activities undertaken in California appear throughout this complaint. The conduct complained of herein caused injury to persons throughout the United States, but particularly within this District, and a substantial portion of the conduct complained of took place in this District.

35.    Venue is proper under 15 U.S.C. §§ 15(a) (Clayton Act) and 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391 (general venue provision). Tesla transacts substantial business within this District, maintains significant operations, including a factory, in this District, and conducts its affairs and carries out interstate trade and commerce, in substantial part, in this District.

## DIVISIONAL ASSIGNMENT

36.    Pursuant to Civil Local Rule 3-2(c) and General Order No. 44, venue for this antitrust action is proper in any courthouse in this District. Given that Defendant's business is primarily conducted in Alameda County, assignment is appropriate in the San Francisco Division. Civ. L.R. 3-2(d).

## RELEVANT MARKETS

### A.    The EV Foremarket.

37.    The EV market comprises battery-electric motor vehicles designed and sold to be operated on public streets. While there are numerous methods for getting from point A to point B, people purchase

---

[10] *See* https://www.nbcdfw.com/news/local/texas-news/tesla-officially-moves-headquarters-from-california-to-texas/2829343/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

EVs in particular because of their unique attributes, including, among other things, the ability to comfortably transport multiple individuals to specific destinations, located many miles apart, with zero carbon emissions.

38.     EVs are distinct from traditional ICE vehicles in several key ways. First, EVs are more expensive than otherwise comparably equipped ICE vehicles. According to Kelley Blue Book, in April 2022, the average sale price for an EV was $65,111 compared to $46,526 for all motor vehicles.[11] For example, the manufacturer's suggested retail prices for the 2015 Nissan Leaf and Chevrolet Volt were $29,010 and $34,345, respectively, while the average price for a comparable ICE vehicle (*e.g.*, Nissan Sentra and Chevrolet Cruz) was between $16,000 and $18,000.[12]

39.     Second, compared to ICE vehicles, EVs have a limited driving range. As of 2021, the average EV could travel 217 miles on a single charge, whereas the average ICE vehicle could travel 413 miles on a full tank of gas.[13]

40.     Third, the infrastructure for charging EVs is entirely separate and distinct from the infrastructure for refueling ICE vehicles. There are three levels of charging for EVs: level 1 (120 volt, like those in a typical household outlet); level 2 (220 volts, like those used in special outlets such as clothes dryers and EV home chargers); and level 3 (direct current, superfast chargers). For EVs, level 1 charging is not an adequate solution insofar as it typically adds only 3 to 5 miles per hour of charging.[14] Level 2 charging serves the needs of many EV owners, but requires an upfront investment cost—*i.e.*, installation by a certified electrician of a special outlet near where your EV is parked, and often involves the purchase of a special charging device such as Tesla's Wall Connector. Level 3 charging requires

---

[11] *See* https://mediaroom.kbb.com/2022-05-10-Luxury-Share-Increases-in-April,-Pushing-New-Vehicle-Average-Transaction-Prices-Higher,-according-to-Kelley-Blue-Book (las accessed 12/7/23).
[12] Shanjun Li, Lang Tong, Jianwei Xing and Yiyi Zhou, "The Market for Electric Vehicles: Indirect Network Effects and Policy Design," Journal of the Assoc. of Environmental & Resource Economists, Vol. 4, Number 1, March 2017 (available at https://www.journals.uchicago.edu/doi/10.1086/689702 (last accessed 12/7/23)).
[13] *See* https://www.visualcapitalist.com/visualizing-the-range-of-electric-cars-vs-gas-powered-cars/ (last accessed 12/7/23).
[14] *See* https://www.greencars.com/greencars-101/different-levels-of-electric-car-charging?utm_source=google&utm_medium=cpc&utm_campaign=dynamic_blogs_combined&utm_term=&gclid=CjwKCAjwh8mlBhB_EiwAsztdBMaISguVnqHbZjscBfot2AXhRtrhZXTI6Jlw78P9BG_QoEfzs18G2xoC5WMQAvD_BwE (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

access to a geographically convenient superfast charging location, such as those in the Tesla Supercharger network.

41.     Fourth, regardless of the type of charger used, EVs take longer to recharge than ICE vehicles take to refuel. Whereas the fuel tank of a typical ICE vehicle can be filled in a matter of minutes, even a level 3 supercharger takes 30-40 minutes to reach full capacity (or 30+ hours on a level 1 charger, or 2.5 to 4.5 hours on a level 2 charger).[15]

42.     Because of these differences, EVs are used for distinct purposes by consumers with distinct transportation needs as compared to ICE vehicles. EVs are more appropriate for local travel as opposed to long-distance travel, *e.g.* road trips. As such, EV owners typically drive half as much as ICE vehicle drivers—about 5,300 miles annually, according to the Energy Policy Institute at the University of Chicago.[16]

43.     At the same time, and for the same reasons, many households owning EVs also own a second vehicle. In fact, households with EVs are almost four times less likely to be a single-vehicle household.[17] For those families who own EVs and ICE vehicles, EVs are not substitutes for ICE vehicles as much as they are complements—*i.e.*, EVs and ICE vehicles serve different functions such that they are used together, and thus the price of one does not affect the ability of a firm producing the other to raise prices above competitive levels.

44.     Accordingly, consumers do not see EVs and ICE vehicles as interchangeable products. In fact, according to one recent study by the American Automobile Association ("AAA"), 96% of EV owners will *only* buy another EV for their next vehicle—i.e., regardless of the price.[18] As this study demonstrates, EV owners do not consider other types of cars, including ICE vehicles, to be reasonable substitutes for EVs.

---

[15] *Id*.

[16] *See* https://www.utilitydive.com/news/electric-vehicles-could-be-imperfect-substitutes-for-gas-powered-cars-ne/594665/ (last accessed 12/7/23).

[17] *See* https://energyathaas.wordpress.com/2021/09/20/three-facts-about-evs-and-multi-vehicle-households/ (last accessed 12/7/23).

[18] *See* https://www.realsimple.com/work-life/money/money-planning/electric-car-costs (last accessed 7/17/23); https://newsroom.aaa.com/2020/01/aaa-owning-an-electric-vehicle-is-the-cure-for-most-consumer-concerns/?icid=mag_cars (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

45.     When analyzing market definition, federal antitrust enforcement agencies use a tool called a "SSNIP test" whereby they examine whether a hypothetical monopolist could impose a small but significant non-transitory increase in price (a "SSNIP"), typically 5%, without causing a sufficient number of customers to switch to other products or services to render the SSNIP unprofitable to the monopolist.

46.     Not only do EVs already cost more than their similarly-equipped, ICE-vehicle counterparts, EV prices have increased at a faster rate.[19] For example, from January to May 2022, EV prices jumped 22% while non-EV motor vehicle prices increased only 14%.[20] Despite the occasional price decrease, Tesla in particular has been able to increase prices over time while steadily increasing overall sales.[21] As noted by one journalist, "Tesla hasn't appeared to have suffered from its price hikes over the years, as the Model 3 was the world's best-selling electric vehicle in 2021, with about 540,000 units sold."[22] Thus, Tesla's past ability to increase prices without losing sales supports the inference that the EV market is properly defined.

47.     In July 2023, Tesla entered into a pledge with over a dozen EV automakers to avoid price wars for EVs sold in China.[23] Although the participants later retracted the pledge—with the China Association of Auto Manufacturers stating it now recognized the agreement violated China's antitrust law—the fact that these EV manufacturers would enter into such a pledge in the first place supports the existence of a separate EV product market.[24] Otherwise, absent ICE vehicle manufacturers' agreement to abide by the same pledge, EV manufacturers would have been too concerned about losing sales to ICE vehicles to enter into such an agreement.

---

[19] *See* https://www.cnbc.com/2021/12/29/electric-vehicles-are-becoming-more-affordable-amid-spiking-gas-prices.html (last accessed 12/7/23) (stating that the average EV price is $10,000 higher than average price for all motor vehicles).
[20] *See* https://www.businessinsider.com/electric-vehicle-prices-rise-22-percent-fossil-fuel-14-percent-2022-6 (last accessed 12/7/23).
[21] *See* https://getjerry.com/electric-vehicles/tesla-increased-prices-across-board#not-teslas-first-price-hike (last accessed 12/7/23).
[22] *See* https://www.cnn.com/2022/03/16/cars/tesla-model-3-price-increase/index.html (last accessed 12/7/23).
[23] *See* https://electrek.co/2023/07/06/ev-automakers-tesla-nio-pledge-avoid-price-wars-china/ (last accessed 12/7/23).
[24] *See* https://www.reuters.com/business/autos-transportation/whats-behind-chinas-failed-truce-ev-price-war-2023-07-10/ (last accessed 12/7/23).

48.     The public, as well as industry analysts and insiders, also recognize EVs as a completely separate product market or, at the very least, a distinct submarket. For example, while Tesla sometimes states that it competes in the "worldwide automotive market," it also acknowledges that EVs are a distinct product market by consistently promoting "the development of the electric vehicle market" and touting its superiority and "attractiveness" compared to the ICE-vehicle market.[25]

49.     Similarly, recognizing just how distinct the EV and ICE vehicle industries are to those in the industry, Ford announced in March 2022 that it was reorganizing its company such that their ICE vehicle and EV business units would be run as completely separate businesses.[26]

50.     The manufacturing of EVs and ICE vehicles are also vastly different, requiring separate and distinct production facilities. For example, the battery packs used in EVs creates unique sourcing, production, and manufacturing challenges that ICE vehicle plants are not accustomed to tackling. Moreover, ICE vehicles are typically assembled using a rolling chassis or unibody vehicle construction, whereas EVs tend to have a "skateboard" chassis unto which motors, suspension, and brakes are attached much later in the manufacturing process. As a result, converting an ICE vehicle manufacturing facility to an EV manufacturing facility requires a total reworking of the entire assembly process.[27]

51.     Within the EV market, Tesla has long held the dominant position. For example, during the first half of 2020, registration data showed that Tesla had nearly 80% market share in the United States.[28] While other companies have since increased their EV product offerings, Tesla still controlled at least 65% of the domestic EV market in 2022, with Tesla's Model 3, Model Y, Model S, and Model X comprising the first, second, fourth, and sixth best-selling EVs in the United States, respectively.[29]

52.     For these reasons, the United States EV market is its own relevant market (or, at the very least, a legally cognizable submarket), in which Tesla has substantial market power.

---

[25] *See, e.g*., Tesla 2021 Form 10-K at 11-12.
[26] *See* https://www.reuters.com/business/autos-transportation/exclusive-ford-set-announce-plans-run-ev-ice-separate-businesses-sources-2022-03-02/ (last accessed 7/17/23).
[27] *See* https://www.stanleyengineeredfastening.com/en/News-and-Stories/From-ICE-to-EV-How-EV-Manufacturing-is-Changing-the-Game (last accessed 12/7/23).
[28] *See* https://electrek.co/2021/02/16/tesla-owns-electric-car-market-us/ (last accessed 12/7/23).
[29] *See* https://electrek.co/2023/01/09/the-top-10-best-selling-electric-vehicles-in-the-us-of-2022/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

**B.     Aftermarkets.**

**1.     The Tesla Repair Services Market.**

53.     While the Tesla Repair Services market is derivative of the EV market, it also comprises its own distinct service market.

54.     The Tesla Repair Services market comprises various services to repair and maintain Tesla EVs. Although the proposed Class includes individuals both whose Tesla EVs are still covered under warranty and those whose Tesla EVs are not, this case addresses only repair and maintenance services that are not covered under warranty.

55.     For example, a Tesla EV owner would be considered a Class member if her Model S is still covered under warranty, but she nonetheless paid for Tesla Repair Services because a particular repair was deemed by Tesla not to be covered under warranty.

There are no viable substitutes for Tesla Repair Services, and they are not interchangeable with services designed for other vehicles. Once consumers have purchased a Tesla EV, they are locked into repair and maintenance services specific to their Tesla.

56.     All EVs are designed differently and utilize different parts that are not interchangeable with other EVs.

57.     Thus, a Tesla EV owner must bring his or her EV to a service provider who specializes in the maintenance and repair of Tesla EVs.

58.     If a BMW dealership lowered repair and maintenance service prices by 5%, it would not cause Tesla EV owners to bring their EVs to be serviced at that BMW dealership because it would not have the know-how or the parts needed to conduct the repairs.

59.     It is difficult, if not impossible, for a consumer to accurately forecast how much repair and maintenance services will be required and what they will cost prior to purchasing an EV. Compounding this problem, as discussed below, Tesla misleadingly tells consumers that its EVs are specifically designed to require little or no maintenance.[30] Similarly, nowhere does Tesla disclose that it will take months (or sometimes over a year) to make necessary EV repairs.

---

[30] *See* https://www.tesla.com/service (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

60.    Absent Tesla's Repair Restrictions and the anticompetitive conduct alleged herein, the Tesla Repair Services market should include both services offered by Tesla and services offered by third-party, independent service providers. As history has demonstrated in various other markets, the existence of independent service providers promotes competition and leads not only to more service providers, but also leads to better service and lower prices.

61.    However, as a result of Tesla's Repair Restrictions and the anticompetitive course of conduct described in this Complaint, there is an insignificant number of independent service providers to whom Tesla owners may turn to repair or maintain their EVs.

62.    Because of Tesla's Repair Restrictions and the exclusionary and monopolistic conduct discussed herein, consumers in the Tesla Repair Services market suffer from lack of choice, long wait times, and supracompetitive prices.

63.    According to Tesla, a Tesla owner may choose from "two types of service appointments: Service Center visits and Mobile Service. Service Center visits require you to bring your vehicle to a Tesla Service location."[31] Tesla's "Mobile Service Technicians" perform other services at the vehicle owner's location.[32]

64.    For collision repair services, Tesla directs vehicle owners to its own Tesla Service Centers, to its own "Collision Centers" ("owned, trained, and operated by Tesla"), or to "Tesla-Approved Collision Centers" (including "Tesla-Preferred Collision Centers").[33] While Tesla-Approved Collision Centers are independently owned, they are forced to rely on Tesla itself to source Tesla-Compatible Parts and pricing. For these and other reasons dictated by Tesla and discussed in greater detail, *infra*, independent repair shops comprise an insignificant and inadequate alternative to obtaining Tesla Repair Services directly from Tesla its Tesla-Approved Collision Centers.

65.    Except for some basic maintenance services (*e.g.*, tire rotation), virtually all Tesla Repair Services are performed by Tesla or its limited network of Tesla-Approved Collision Centers.

---

[31] *See* https://www.tesla.com/support/service-visits (last accessed 12/7/23).
[32] *Id.*
[33] *See* https://www.tesla.com/support/collision-support (last accessed 12/7/23) (Non-approved body shops "can apply to order parts from Tesla for light collision work," but are not listed on Tesla's website or eligible to purchase parts necessary for structural repair.)

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

66.    For these reasons, Tesla has substantial market power in the United States Tesla Repair Services market.

67.    In addition, Tesla uses its market power in the Tesla-Compatible Parts market (discussed below) to maintain its power in the Tesla Repair Services market by restricting access to Tesla-Compatible Parts, meaning that only Tesla and its Approved Collision Centers can regularly obtain the parts necessary to perform all repairs

### 2.    The Tesla-Compatible Parts Market.

68.    While the Tesla-Compatible Parts market is derivative of the EV market, it also comprises its own distinct product market

69.    The Tesla-Compatible Parts Market comprises the various parts used to repair and maintain Tesla EVs. This case addresses only Tesla-Compatible Parts purchased by consumers, not those covered under warranty.

70.    Once consumers have purchased a Tesla EV, they are locked into using Tesla-Compatible Parts specific to their Tesla vehicle when repairing and maintaining their Tesla EVs.

71.    There are no viable substitutes for Tesla-compatible parts, and—with the exception of a handful of items such as tires—most parts are not interchangeable with parts designed for use with other manufacturers' vehicles.

72.    Thus, Tesla EV owners can only maintain and repair their Tesla EVs using Tesla-compatible parts.

73.    If the price of BMW door handles dropped by 5%, Tesla EV owners could not opt to use a BMW door handle when the door handle on their Tesla Model 3 breaks.

74.    Absent Tesla's Repair Restrictions, the Tesla-Compatible Parts market would include not only OEM parts sold by someone other than Tesla, but also non-OEM (*a.k.a.* "aftermarket") parts. Traditionally in other markets, such as the ICE-vehicle market, the wide-availability of OEM parts and the existence of non-OEM aftermarket parts promotes competition and leads to greater supply, quicker service, and lower prices.

75.    However, because of the anticompetitive course of conduct described in this Complaint, including preventing OEMs from manufacturing and selling Tesla-compatible parts to anyone other than

Tesla, there are few if any non-OEM parts manufacturers, meanwhile Tesla limits consumer access to Tesla OEM parts.

76.    As a result, consumers in the Tesla-Compatible Parts Market suffer from lack of choice, long wait times, and supracompetitive prices. Except for some basic maintenance-related parts (*e.g.*, tires), virtually all Tesla-Compatible Parts are sold exclusively through Tesla and its Tesla-Approved Collision Centers at prices set by Tesla.

77.    Accordingly, Tesla also has substantial market power in the United States Tesla-Compatible Parts Market.

78.    In addition, Tesla uses its market power in the Tesla Repair Services market (discussed above) to maintain its power in the Tesla-Compatible Parts market by requiring all maintenance and repairs performed at Tesla and its Tesla-Approved Collision Centers to be done with only OEM parts purchased from Tesla.

**3.    Competition in the EV Foremarket Is Incapable of Disciplining the Anticompetitive Restrictions in the Tesla Repair Services and Tesla-Compatible Parts Aftermarkets.**

79.    As noted above, Tesla has substantial market power in the United States EV market with the overwhelmingly dominant share of EV sales. As a result, competition in the EV foremarket is incapable of disciplining the anticompetitive effects of the Repair Restrictions in the aftermarkets for Tesla Repair Services and Tesla-Compatible parts, as consumers have limited choices when deciding which EVs to purchase in the first place.

80.    Compounding matters, many of the recent, smaller EV entrants which have attempted to compete with Tesla in the EV foremarket— such as Rivian,[34] Lucid Motors,[35] Polestar,[36] and Fisker[37]—

---

[34] *See* https://assets.rivian.com/2md5qhoeajym/4QCZtanQpDG0oFPAhaskR0/387b5d12f8c8d9f6cf9d9b271c033190/r1t_r1s-new-vehicle-limited-warranty-guide-us-en-us-20221202.pdf (last accessed 12/7/23) at 16.
[35] *See* https://lucidmotors.com/media/document/Owner%27s+Manual+-+Lucid+Air-enUS_2022_30_1.pdf (last accessed 12/7/23) at 4, 207.
[36] *See* https://www.polestar.com/us/manual/polestar-2/2022/article/Polestar-service-program/ (last accessed 12/7/23).
[37] *See* https://www.fiskerinc.com/owners_manual/Ocean/content/en-ca/owner_guide.html (last accessed 12/7/23).

not only have limited sales volume, but they have also adopted similar policies, practices, and restrictions as the Repair Restrictions adopted by Tesla. Thus, consumers cannot escape Tesla's Repair Restrictions simply by buying a different EV because, to the extent those EV manufacturers offer any limited competition to Tesla at all, they are enacting the same repair restrictions anyway.

81.    Once a consumer purchases a Tesla EV, that consumer is locked into using Tesla Repair Services and Tesla-Compatible Parts for all maintenance and repair services, and those Tesla Repair Services and Tesla-Compatible Parts are only available through Tesla or one of its Tesla-Approved Collision Centers.

82.    When purchasing their EVs, consumers generally expect there will be an adequate network of repair shops, as well as available replacement parts, to repair and maintain their EVs during the vehicle's lifespan in a timely and efficient manner.

83.    However, while Tesla has dramatically increased EV sales in recent years, Tesla has not grown its service offerings to keep pace with the number of Tesla EVs now on the road. Today, even though Tesla EVs account for several of the top-selling EVs in the United States, there are only 184 Tesla Service Centers located in only 37 states. For a rough comparison, even ignoring all of the independent service providers available to owners of Ford motor vehicles, there are approximately 3,000 Ford dealerships distributed among all 50 state, each of which offers maintenance and repair services.

84.    Tesla's decisions (a) not to devote adequate resources to increase the number of Tesla Service Centers commensurate with the increasing volume of its EVs on the road, (b) not to authorize an adequate number of Tesla-Approved Collision Centers, and (c) to prioritize parts for the manufacturing of new EVs rather than repairs—all of which constitute either policies and practices not revealed to the public or changes in policy or practice since the time that many Tesla owners purchased their vehicles— slow many repairs down to a crawl, depriving owners of their vehicles for months at a time.

85.    As documented in recent news reports and supported by Plaintiffs' own personal experiences described above, neither the Repair Restrictions challenged herein nor their effects on the

Tesla Repair Services and Tesla-Compatible Parts markets are generally known by consumers prior to purchasing their EVs.[38]

86.    In fact, Tesla actively conceals the policies and practices underlying the Repair Restrictions. Tesla heavily publicizes how it recently made its manuals, electronic parts catalog ("EPC"), and diagnostic software called 'Toolbox" open and available to the public, giving the false impression that Tesla welcomes self-repair and the ability of independent repair shops to conduct maintenance, repair, and collision services for Tesla EVs. But in reality, Tesla's Repair Restrictions prevent individuals and independent repair shops from conducting all but the most minor repairs.

87.    Tesla does not publicize that it purposely designs its EVs so that all repairs and maintenance must be performed by Tesla and its Tesla-Approved Collision Centers using only OEM parts purchased from Tesla. Nor does Tesla publicize that, despite supposedly opening up its parts catalog and Toolbox software to the public, it does not allow independent service providers to compete against it by limiting those independent service providers' access to the parts, software, and other tools necessary to conduct all the repairs and maintenance that Tesla EVs require over their lifetime.

88.    By designing its EVs such that repairs require access to remote diagnostics and over-the-air software updates to which only Tesla has unfettered access, Tesla effectively limits anyone other than Tesla from being able to provide a full range of maintenance and repair services for its EVs. So while independent service providers can now access one version of Tesla's Toolbox diagnostic software, that version comes at a steep price and lacks the functionality of the software Tesla uses in its own shops (known as "Garage"). Toolbox costs $3,000 per year to use, and does not cover all operations, such as turning on certain parts once they are installed, meaning that Tesla owners literally have no choice but to go to Tesla for such repairs.

89.    Nor does Tesla publicize that it limits access to Tesla-Compatible Parts. While Tesla did open its parts catalog to the public in 2018, consumers must submit an application to Tesla in order to actually make purchases or even view prices. More importantly, even if an applicant is ultimately allowed to purchase replacement parts from Tesla, numerous parts in Tesla's catalog are unavailable for purchase.

---

[38] *See, e.g.*, https://www.autoblog.com/2023/07/24/tesla-owners-share-some-unexpected-headaches-of-owning-their-ev/ (last accessed 12/7/23).

While some are listed as "Over-the-Counter (No VIN)," many parts are listed as "Not for Resale" or "Restricted." This means that some parts simply cannot be purchased—and, accordingly, some repairs simply cannot be performed—without taking the EV to Tesla.

90.     Moreover, despite Tesla's parts catalog being accessible online, Tesla creates additional roadblocks designed to deter independent service providers from actually purchasing the parts needed for repairs and maintenance. For example, Tesla reportedly ignores parts requests from independent service providers. Other times, Tesla requires those wishing to purchase certain Tesla Replacement Parts to provide a VIN number and proof of vehicle ownership before it will sell certain parts. This not only inhibits independent service providers' ability to fix consumers' Tesla EVs sitting in their shops, it also prevents them from warehousing parts (*i.e.*, to ensure timely repairs can be made in the future).

91.     Additionally, many parts used for maintenance and repairs of Tesla EVs will not function properly until they are "coded" (*i.e.*, an electronic device is used to supply the part with the necessary digital codes to operate and be recognized by and communicate with the EV). There are no aftermarket tools available to supply these codes therefore, even if an independent service  provider manages to get its hands on the part needed to repair a Tesla EV, oftentimes that independent service provider must make ask the customer to make an appointment with Tesla so that the part can be "coded" by Tesla itself.

92.     Similarly, Tesla actively markets its EVs by claiming, when it comes to service, Tesla EVs require "Minimal Maintenance" and offer "Maximum Convenience."[39] In particular, Tesla touts that their EVs have fewer moving parts that could possibly need to be replaced as compared to ICE vehicles.[40] They also tout how, because of Tesla's use of over-the-air software updates, remote diagnostics, and mobile service technicians "the need to visit a [Tesla] Service Center is reduced."[41]

93.     Such public statements give consumers the misleading impression that Tesla EVs require less maintenance and fewer repairs and that, when such maintenance and repairs are needed, Tesla EV owners will be able to get them performed quickly and easily. In reality, this is far from Tesla owners' actual experiences.

---

[39] *See* https://www.tesla.com/service (last accessed 12/7/23).
[40] *Id.*
[41] *See* https://www.tesla.com/support/vehicle-maintenance (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

94.    As discussed more fully below, Tesla EVs actually require more maintenance and service than ICE vehicles, scoring lower in reliability rankings such as J.D. Power and Consumer Reports. And as evidenced by Plaintiffs' own experiences and those of other Tesla owners reflected in online bulletin boards and in investigative journalism pieces, getting a Tesla repaired—especially when needed collision work—is not only more expensive, it can also take months if not years due to the lack of available replacement parts.

95.    For these reasons, at best, Tesla is not "forthcoming" about its real policies and practice; at worst, Tesla actively conceals its post-sale policies prior to purchase.

96.    Unfortunately, switching to another brand of EV to avoid the expensive repair/parts costs and excessive wait times is not an economically feasible option. As an initial matter, the cost of a Tesla EV dwarfs the cost of an individual maintenance or repair service, so—even ignoring Tesla's market power in the EV market—it is not reasonable or rational for a Tesla EV owner to switch to a different EV in order to avoid the high prices and low supply of an individual Tesla Repair Service or Tesla-Compatible Part needed for a repair.

97.    In other words, after making what is often one of the biggest purchases of their lives, Tesla owners cannot simply sell their EV and buy a new one. The cost of a Tesla EV currently ranges from $38,990 (for a Model 3 Rear-Wheel Drive with no options) to $117,130 (for a fully loaded Model X Plaid).[42] Not only is this a high dollar value in absolute terms, it is often financed through a loan or lease with specified contract terms, some of which have early termination or payoff fees.

98.    Making matters worse, due in part to expensive maintenance and repair costs and the associated increases in insurance premiums, Tesla EVs have some of the lowest resale values in both the EV market and the automotive industry generally.  For example, between June 2022 and June 2023, the price of a preowned Tesla Model 3 dropped 30.5% and the price of a preowned Tesla Model X dropped 21.3%; meanwhile, over the same period, the price of a preowned Jaguar E-PACE and Hyundai Ioniq

---

[42] *See* https://www.tesla.com/modelx/ (last accessed 12/7/23); https://www.tesla.com/model3 (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

both dropped 16.2%, while the national average for all preowned motor vehicles was a drop of 3.6%.[43]
Thus, selling their Tesla EVs and buying another manufacturer's EV would require most owners to take
a substantial loss.

99.    In addition, many Tesla EV owners purchase peripheral or complementary products that
only work with their Tesla EVs. For example, many Tesla EV owners purchase level 2 chargers to charge
their EVs quickly and effectively at home. Tesla's Wall Connector costs $475 and requires installation
by a qualified electrician, which can cost an additional thousand dollars or more.[44] Because Tesla EVs
use a different charging standard (SAE J3400) than other EVs that utilizes a different connector, those
consumers who invested in a level 2 charger for homes, such as Tesla's Wall Connector, may not be able
to use that those chargers in the event they switch EVs and, instead, they would have to pay to replace
that level 2 charger with one compatible with their new EV, thus making any switch even more expensive
as a result of these sunk costs.

100.    Collectively, these transactional and sunk costs are substantial enough to prevent Tesla
EV owners from readily switching to other EVs once they become aware of Tesla's Repair Restrictions
or their anticompetitive effects (*i.e*, supracompetitive prices, excessive wait times, and general
diminished quality) on the Tesla Repair Services and Tesla-Compatible Parts aftermarkets.

101.    Even if consumers somehow know of Tesla's Repair Restrictions (despite the fact that
Tesla does not publicize them and, in fact, actively misleads the public about them), it is difficult, if not
impossible, for a consumer to accurately forecast how much money will need to be spent on parts and
services over the lifetime of an EV prior to purchase (*i.e*., "life-cycle cost").

102.    EVs are complex, durable goods designed to be operated for many years. Thus, calculating
the life-cycle cost of operating an EV involves multiple variables, many of which can vary widely and
are impossible to estimate: how long will the consumers own the EV, how many miles will they drive it,

---

[43] *See* https://electrek.co/2023/07/11/tesla-leads-large-drop-used-electric-car-value-model-3-down-30/
(last accessed 12/7/23); https://www.autoblog.com/2023/07/24/tesla-owners-share-some-unexpected-headaches-of-owning-their-ev/ (last accessed 12/7/23) (according to one electrician, level 2 charger
installation costs about $1,600).
[44] *See* https://shop.tesla.com/product/wall-connector (last accessed 12/7/23);
https://www.reddit.com/r/TeslaModelY/comments/10h68vn/fair_price_for_wall_charger_electrician_install/ (last accessed 12/7/23).

how many accidents will they get into, and how serious will those accidents be? While some limited data may be available to those who know where to look for it regarding average maintenance costs for Tesla EVs per year, for example, that data—even if uncovered by a consumer prior to purchase—is of little use when the total cost of ownership can fluctuate greatly depending on the answers to the above questions.

103.    EVs are a relatively new product and Tesla is a relatively new producer. Thus, there is little information available regarding the long-term costs of ownership.  Moreover, even if a consumer could anticipate what kind of maintenance and repair parts and services he or she will ultimately need, there is relatively little information available the costs of individual repairs.

104.    Indeed, the three largest data providers used by automotive industry professionals to estimate repair costs—CCC, Audatex, and Mitchell—do not provide information for estimating repair costs for Tesla EVs. Thus, even if consumers were sophisticated and prescient enough to try and estimate the costs of individual repairs (and ignoring the fact that, until something actually goes wrong with their EV or they get into an accident, consumers have no idea what repair parts or services will actually be needed), they would still have a difficult time estimating those costs.

### C.    The Relevant Geographic Market.

105.    The relevant geographic market for each of the product/service markets discussed above is the United States.

106.    Motor vehicles designed to operate on public streets in the United States must meet stringent regulatory requirements that are specific to this country. Accordingly, certain motor vehicles are designed specifically for the American market, and American consumers generally do not purchase and import motor vehicles designed for use outside the United States.

107.    Similarly, American Tesla owners do not and would not turn to parts manufactured for sale outside the United States as a result of shipping costs and the fact that, because of differing regulatory requirements, parts designed for use in foreign markets may not be compatible with parts designed for use in the United States.

108.    Lastly, American Tesla owners do not and would not turn to service providers located outside of the United States when servicing or repairing their EVs, as the cost and wait times associated with moving vehicles and parts back and forth between countries would not be economically viable.

**D.    Barriers to Entry.**

109.    Significant barriers to entry exist in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets which enable Tesla to maintain its market power.

110.    As discussed above, all three markets are impacted by complex regulatory and licensing requirements. Moreover, *de novo* entry into any of the EV and Tesla-Compatible Parts markets would require substantial capital investments in manufacturing facilities and creation of a nationwide distribution network.

111.    Most importantly, Tesla's own conduct challenged in this Complaint has created substantial barriers to entry into the Tesla Repair Services and Tesla-Compatible Parts markets. Because of Tesla's anticompetitive and monopolistic practices, a new entrant in either of these markets would effectively be limited to competing for customers who either were no longer under warranty or who were willing and able to risk voiding their Tesla EV warranties. Moreover, they would need to service those customers without reasonable access to the manuals, diagnostic software, telematic data, and replacement parts necessary to properly service and maintain Tesla EVs. Further allegations concerning Tesla's imposed barriers to entry appears at Section C, *infra*.

## ADDITIONAL FACTUAL ALLEGATIONS

**A.    Historical Background: The Right-to-Repair Movement and Guaranteeing Every Consumer's Right to Maintain and Repair Their Property Themselves or at the Independent Provider of Their Choice.**

112.    Tesla is not the first manufacturer to restrict consumers' ability to maintain and repair the products they purchase by limiting access to tools and components, or otherwise creating barriers designed to hinder independent repair. Many manufacturers, spanning a wide variety of industries, have similarly tried to force purchasers to utilize the manufacturers' own maintenance and repair services.

113.    The "right-to-repair" movement refers to concerted efforts, including proposed and enacted government legislation, aimed at protecting consumers' ability to maintain and repair the products they purchase however they see fit, rather than being compelled to utilize the manufacturers' offered services.

114.    In 2012, Massachusetts voters passed a ballot initiative requiring OEMs selling motor vehicles in that state to "provide access to their diagnostic and repair information system through a non-

proprietary vehicle interface." Although legislators in Massachusetts repealed the law a year later and replaced it with a compromise provision giving OEMs more time to make required technical changes, other states began passing similar statutes.

115. Facing the potential for a variety of right-to-repair statutes with differing statutory requirements, in January 2014, motor vehicle manufacturers and trade groups representing independent repair shops and manufacturers of aftermarket parts entered into a Memorandum of Understanding (the "2014 MOU") creating a broad right to repair the signatory automotive manufacturers' motor vehicles across the United States. Every major car manufacturer except Tesla signed onto the 2014 MOU.[45]

116. Notably, however, the 2014 MOU failed to address telematics—the data transmitted wirelessly from the vehicle to the manufacturer. Without access to telematic data, independent repair shops are unable to effectively service today's "connected" vehicles. In response, in or around 2019, various states (California, Georgia, Hawaii, Illinois, Indiana, Massachusetts, Minnesota, Missouri, Montana, North Dakota, Nevada, New Hampshire, New Jersey, New York, Oregon, South Dakota, Vermont, Virginia, Washington, and West Virginia) began considering additional right-to-repair legislation. For example, Massachusetts had a ballot initiative that would require OEMs to make telematics available to independent repair shops, which voters passed with overwhelming support in November 2020.[46] Such efforts are still underway, which Tesla has actively fought.[47]

117. Just this month, the parties to the 2014 MOU formally reaffirmed their commitment to the 2014 MOU. Immediately effective upon its July 11, 2023 transmittal to the Chairs and Ranking Members of several relevant Congressional committees, the 2023 Automotive Repair Data Sharing Commitment pledged that independent repair facilities would have access to *the same* diagnostic and repair information

---

[45] *See* Nixing the Fix: An FTC Report to Congress on Repair Restrictions ("Nixing the Fix"), at pg. 45, n.249 https://www.ftc.gov/system/files/documents/reports/nixing-fix-ftc-report-congress-repair-restrictions/nixing_the_fix_report_final_5521_630pm-508_002.pdf (last accessed 12/7/23).
[46] *See* https://www.autocare.org/news/latest-news/details/2020/11/04/Consumers-to-Automakers-We-Want-the-Right-to-Repair-Our-Vehicles-6620 (last accessed 12/7/23).
[47] *See* https://electrek.co/2020/10/14/tesla-fights-right-to-repair-initiative-over-cybersecurity-concerns/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

that the signatory automotive manufacturers make available to authorized dealer networks.[48] The commitment applies to all vehicle technologies "regardless of powertrain" and also, for the first time, applies to telematic data needed to diagnose and repair a vehicle if not otherwise available.[49]

118.    According to the Automotive Service Association, the Society of Collision Repair Specialists, and the Alliance for Automotive Innovation, the 2023 Automotive Data Sharing Commitment "was created with one group of people in mind: vehicle owners. It recognizes and reaffirms the belief that consumers should have access to safe and proper repairs throughout a vehicle's lifecycle."[50] The parties committed to working together in support of federal legislation consistent with the Commitment and noted that the commitment "guarantees consumers a range of service options for their vehicles," thus fostering competition in vehicle repairs.[51] Tesla, who again refused to participate, remains an outlier from these pro-competitive commitments.

119.    According to the Federal Trade Commission ("FTC"), another way manufacturers have restricted consumers' ability to self-repair or utilize independent maintenance and repair services—besides limiting access to information, tools, and replacement parts—is by voiding vehicle warranties when maintenance or repair services are performed by anyone other than the dealer.[52]

120.    But, as explained by the FTC, manufacturers sometimes also restrict consumers from self-repair or utilizing independent maintenance and repair services even when their warranties do not explicitly require that all such services be performed by the manufacturer.[53] This is accomplished by, among other things:

- designing products in such a way as to complicate or prevent repairs, or to make independent repairs less safe;

---

[48] *See* https://www.autosinnovate.org/about/advocacy/right-to-repair/1%20-%20National%20Automotive%20Repair%20Data%20Sharing%20Commitment%20July%202023.pdf (last accessed 12/7/23).
[49] *Id.*
[50] *Id.*
[51] *Id. See also* https://www.autosinnovate.org/posts/letters/1-%20Letter%20to%20Congress%20Automotive%20Repair%20Data%20Sharing%20Commitment%20July%202023.pdf (last accessed 12/7/23).
[52] *See* Nixing the Fix at pg. 6.
[53] *Id.*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

- making parts and repair information unavailable;

- implementing policies or making statements that steer consumers to the manufacturer's repair networks and to the use of OEM parts;

- disparaging non-OEM parts and independent repair;

- application of patent rights and enforcement of trademarks;

- software locks and firmware updates; or

- end-user license agreements.[54]

121.    Thus, manufacturers like Tesla can and do utilize various methods to discourage consumers from maintaining and repairing their own purchased goods or from having them serviced by independent repair shops.

122.    As explained by the U.S. Department of Justice ("DOJ") in a recent Statement of Interest filed in another right-to-repair class action, such repair restrictions harm consumers in at least three ways:

- "First, repair restrictions can drive independent repair shops out of business by raising their costs or denying them key inputs, which, in turn, leaves consumers with fewer choices."

- "Second, manufacturers' restrictions can delay repairs" by, among other things, "cutting the number of repair shops available to consumers," thus resulting in "fewer options for their time-sensitive repairs" or otherwise "stymie[ing]" independent repairs.

- "Third, restrictions on repair aftermarkets can raise prices and reduce quality."[55]

123.    On July 9, 2021, President Biden issued his Executive Order on Promoting Competition in the American Economy which, among other things, included the following provision:

> To address persistent and recurrent practices that inhibit competition, the Chair of the FTC, in the Chair's discretion, is also encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority, as appropriate and consistent with applicable law, in areas such as:
> …
> (ii) unfair anticompetitive restrictions on third-party repairs or self-repair of items….[56]

124.    As acknowledged by the White House's accompanying fact sheet, "[p]owerful equipment manufacturers … use proprietary repair tools, software, and diagnostics to prevent third-parties from

---

[54] *Id.*

[55] Statement of Interest of the United States, *In re: Deere & Company Repair Servs. Antitrust Litig.*, Case No. 3:22-cv-50188 (N.D. Ill. Feb. 13, 2023) [ECF No. 118], at pg. 2.

[56] *See* https://www.whitehouse.gov/briefing-room/presidential-actions/2021/07/09/executive-order-on-promoting-competition-in-the-american-economy/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

performing repairs."[57] Therefore, one of the reasons for the Executive Order was to "[m]ake it easier and cheaper to repair items you own by limiting manufacturers from barring self-repairs or third-party repairs of their products," which is why the Executive Order "[e]ncourages the FTC to limit powerful equipment manufacturers from restricting people's ability to use independent repair shops or DIY repairs."[58]

### B.    Tesla and the Emergence of the EV Market.

125.    Tesla was founded in Palo Alto, California, in 2003, with the goal of producing EVs. Its first vehicle, the Roadster, was released in 2008. That same year, Elon Musk became the CEO and product architect, positions he still holds today (although the latter position has since been renamed "Technoking").[59] The original manufacturing facility, known as "Nummi," continues to operate today and is described by Tesla as "our hub for Model S, Model 3, Model X and Model Y production" and as "one of the largest manufacturing sites in California."[60] Between 2008 and 2012, Tesla produced and sold approximately 2,400 Roadsters worldwide.[61]

126.    In 2009, Tesla unveiled the Model S, a full-size sedan priced at $57,400 and deliveries of the Model S began in June 2012.[62] Unlike the Roadster, which had a production capacity of several hundred vehicles per year, the Model S had a production capacity of 400 vehicles per week.[63] Between 2015 and 2022, Tesla sold over 329,000 Model S sedans in the United States.[64]

127.    Tesla followed the success of the Model S with the Model X, a mid-size SUV announced in 2013 and delivered to consumers beginning in late-2015.[65] The entry-level version, the Model X 75D,

---

[57] See https://www.whitehouse.gov/briefing-room/statements-releases/2021/07/09/fact-sheet-executive-order-on-promoting-competition-in-the-american-economy/ (last accessed 12/7/23).

[58] Id.

[59] See https://ir.tesla.com/corporate/elon-musk (last accessed 12/7/23).

[60] See https://www.tesla.com/fremont-factory (last accessed 12/7/23).

[61] See https://www.businessinsider.com/tesla-roadster-history-2016-3 (last accessed 12/7/23).

[62] See https://www.tesla.com/blog/tesla-motors-sets-new-pricing-awardwinning-model-s (last accessed 12/7/23).

[63] See Tesla Fourth Quarter & Full Year 2012 Shareholder Letter, https://www.tesla.com/blog/tesla-motors-sets-new-pricing-awardwinning-model-s (last accessed 12/7/23).

[64] See https://carfigures.com/us-market-brand/tesla/model-s (last accessed 12/7/23).

[65] See https://www.theverge.com/2015/9/29/9414415/tesla-model-x-suv-launch-date (last accessed 12/7/23).

started at $81,200.[66] Between 2015 and 2022, Tesla sold over 142,000 Model X SUVs in the United States.[67]

128.    Next, in 2016, Tesla introduced its first mass-market EV, a mid-size sedan called the Model 3 priced around $35,000.[68] And in 2019, it unveiled the Model Y, a compact SUV priced at $47,000.[69] Between 2017 and 2022, Tesla sold over 741,000 Model 3 sedans in the United States[70] and, between 2020 and 2022, Tesla sold over 292,000 Model Y SUVs in the United States.[71]

129.    By October 2022, Tesla had sold over 3 million EVs worldwide[72], generating $134 billion USD in EV sales and leasing revenue.[73] In the United States alone, Tesla sold approximately 1.5 million EVs between 2015 and 2022.[74]

130.    Due in large part to Tesla's success, adoption of EVs has accelerated dramatically. EV registrations in the United States increased 536% between 2016 and 2021, from 87,000 per year to 466,000 per year.[75]

131.    In addition to selling EVs, Tesla also operates approximately 160 service centers in the United States.[76] According to its Form 10-Ks filed with the United States Securities and Exchange Commission ("SEC"), Tesla has generated $12 billion USD in "Services & Other" Revenue, which includes, among other things, non-warranty after-sales vehicle services.[77]

---

[66] See https://getjerry.com/electric-vehicles/evolution-tesla-model-x-2016-2019#2016-the-model-x-joins-the-tesla-family (last accessed 12/7/23).
[67] See https://carfigures.com/us-market-brand/tesla/model-x (last accessed 12/7/23).
[68] See https://www.cnn.com/2022/03/16/cars/tesla-model-3-price-increase/index.html (last accessed 12/7/23).
[69] See https://www.theverge.com/2019/3/14/18264446/tesla-model-y-suv-compact-announcement-price-release-date-features-elon-musk (last accessed 12/7/23).
[70] See https://carfigures.com/us-market-brand/tesla/model-3 (last accessed 12/7/23).
[71] See https://carfigures.com/us-market-brand/tesla/model-y (last accessed 12/7/23).
[72] See https://cars.usnews.com/cars-trucks/features/how-many-cars-has-tesla-sold (last accessed 12/7/23).
[73] Tesla Form 10-Ks for 2015-2021.
[74] See https://www.goodcarbadcar.net/tesla-us-sales-figures/ (last accessed 12/7/23).
[75] See https://www.iea.org/data-and-statistics/charts/electric-car-registrations-and-sales-share-in-china-united-states-europe-and-other-regions-2016-2021 (last accessed 12/7/23).
[76] A list of all U.S. Tesla Service Centers can be found at https://www.tesla.com/findus/list/services/united%20states (last accessed 12/7/23).
[77] Tesla Form 10-Ks for 2015-2021.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

132.    One of the drivers behind Tesla's success has been the development of its Supercharger network, with Tesla owning and operating over 1,500 Supercharger locations throughout the United States, covering 52 states/territories and 1,116 American cities.[78] California alone has 305 Supercharger locations.

133.    As a result, Tesla's automotive sales figures keep rising. Since 2015, Tesla has sold over 3.5 million cars representing nearly $200 billion USD in revenue worldwide.





[78] *See* https://www.scrapehero.com/location-reports/Tesla%20Superchargers-USA/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

134.    The number of Tesla store and service locations and the number of vehicles in Tesla's Mobile Service Fleet have also grown, but at a much slower pace when compared to the number of Tesla EVs on the road.





135.    The slow pace of Tesla's service growth is most apparent when comparing the number of Tesla's Mobile Service Fleet and service locations[79] to the cumulative number of Tesla EVs delivered over time—*i.e.*, the approximate number of Tesla EVs actually on the road.



C.    **Tesla Purposely Designs Its Vehicles Such That Repairs and Maintenance Require Access to Diagnostic Information, Telematics, and Tesla-Compatible Parts, But Then Limits Access to Them.**

136.    According to Tesla, one of the key advantages of EVs over ICE vehicles is that EVs require less maintenance and result in fewer repairs. In fact, Tesla has long touted how "[w]ith no regularly scheduled maintenance and fewer moving parts to repair, we design every Tesla vehicle with the goal of eliminating the need for service. Paired with remote diagnostics and over-the-air software updates that regularly improve your car, you'll spend less time in the shop and more time on the road."[80]

137.    In practice, Tesla has fallen far short of these goals and promises. According to one recent analysis by J.D. Power, Tesla EVs experience 226 problems per 100 vehicles, whereas ICE vehicles, on

---

[79] Tesla's SEC filings do not break out Tesla sales by location, nor do they differentiate between new stores versus new service locations. Therefore, these values are global and include new store locations as well as new service locations.

[80] *See* https://www.tesla.com/service (last accessed 12/7/23).

average, experience 175 problems per 100 vehicles.[81] As a result, Tesla ranks poorly in reliability rankings. JD Power recently found that Tesla had the third-worst reliability score of all motor vehicle manufacturers.[82] Meanwhile, Consumer Reports recently ranked Tesla second-to-last in reliability.[83]

138.    By designing its EVs such that repairs require access to remote diagnostics and over-the-air software updates, Tesla effectively limits anyone other than Tesla from being able to provide maintenance and repair services for its EVs.

139.    As described by Tesla in a communication to its investors: "Our vehicles are designed with the capability to wirelessly **upload data to _us_** via an on-board system with cellular connectivity, **allowing _us_ to diagnose and remedy** many problems before ever looking at the vehicle. When maintenance or service is required, a customer can schedule service by contacting **one of _our_ Tesla service centers** or _**our**_ **Tesla mobile technicians** can perform an array of services from a customer's home or other remote location."[84]

140.    To ensure that the owners of its EVs utilize only Tesla service centers and mobile technicians, Tesla "has historically made it really hard for tinkerers [and independent repair shops] to be able to repair and modify [Tesla] cars by limiting access to documentation and parts."[85]

141.    Indeed, Massachusetts residents, thanks to its right-to-repair statute, are the only ones who were initially provided access to Tesla repair manuals and parts information.

142.    In or around August 2021, Tesla made some of its service manuals available online. These manuals originally required the purchase of a $3,187 annual subscription.[86] But in or around May 2022, Tesla's website was revised to reflect that subscription costs were now complimentary.[87] However,

---

[81] *See* https://www.jdpower.com/business/press-releases/2022-us-initial-quality-study-iqs (last accessed 12/7/23).
[82] *See* https://www.jdpower.com/business/press-releases/2021-us-vehicle-dependability-study-vds (last accessed 12/7/23).
[83] *See* https://insideevs.com/news/549130/consumerreports-tesla-reliability-poor-2021/ (last accessed 12/7/23).
[84] *See* Tesla 2017 Form 10-K at 16 (emphases added).
[85] https://electrek.co/2018/10/29/tesla-parts-catalog-model-3-model-s-model-x-roadster-public/ (last accessed 12/7/23).
[86] *See* https://insideevs.com/news/587165/tesla-service-manuals-now-free-of-charge-grab-them-while-you-can/ (last 12/7/23).
[87] *Id. See also* https://service.tesla.com/service-subscription (last accessed 12/7/23).

diagnostic software still requires an annual subscription of $3,000 per year.[88] As discussed more fully below, the diagnostic software Tesla made available to the public is severely limited and grossly inadequate for purposes of performing anything but minor repairs.

143.     Tesla also has limited access to the parts needed to repair its EVs. While Tesla did open its parts catalog to the public in 2018,[89] consumers must submit an application to Tesla in order to actually make purchases or even view prices.[90] More importantly, even if an applicant is ultimately allowed to purchase replacement parts from Tesla, numerous parts in Tesla's catalog are only available for purchase by Tesla Approved Collision Centers. In particular, while some parts are listed as "Over-the-Counter (No VIN)," many parts are listed as "Not for Resale" or "Restricted."

144.     Tesla creates additional roadblocks designed to deter independent repair shops. For example, Tesla reportedly ignores parts requests from independent repair shops. Other times, Tesla requires those wishing to purchase certain Tesla Replacement Parts to provide a VIN number and proof of vehicle ownership before it will sell certain parts. This not only inhibits independent repair shops' ability to fix consumers' Tesla EVs sitting in their shops, it also prevents them from warehousing parts (*i.e.*, to ensure timely repairs can be made in the future).

145.     Even if a replacement part can be obtained, independent repair shops lack the tools and software needed to render those parts operable and to have them recognized by Tesla's onboard computers. For example, many replacement parts must be "coded" using a device connected to the EV's OBD port before the Tesla EV will recognize and communicate with the replacement part. Since Tesla does not make the tools and software available to supply these codes, independent service shops that manage to obtain a Tesla-compatible replacement part and have the know-how to install it still must have their customers make an appointment with Tesla itself in order to have that part coded.

146.     In another example, many repairs require the Tesla EV to go into "diagnostic mode" or "service mode." However, Tesla "geo-fenced" (*i.e.*, utilized the EVs GPS to determine its location and to limit certain functionalities to operate only in pre-defined geographic areas) their EVs so they would only

---

[88] *Id*.
[89] *See* https://electrek.co/2018/10/29/tesla-parts-catalog-model-3-model-s-model-x-roadster-public/ (last accessed 12/7/23).
[90] *See* https://epc.teslamotors.com/#/catalogs (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

enter diagnostic or service mode when located in a Tesla Service Center or Tesla-Approved Collision Center.

147.    Not surprisingly, given the limited nature of the public access Tesla has granted to its manuals, diagnostic software, and replacement parts, Tesla owners still have few if any options for servicing their EVs, other than scheduling a service appointment with Tesla.

148.    The insufficient availability of replacement parts and repair services follows from a series of decisions Tesla made in the design and distribution of Tesla vehicles and replacement parts, each intended to increase Tesla's profits to the detriment of its customers. Tesla's decision making has been influenced by two critical facts. First, because the repair and replacement parts business was expected to eventually become highly profitable in the long-term, Tesla's incentive was to keep as much of the market share for that business as it could. Second, in the short-term, repairs and replacement have not been as profitable for Tesla as sales of new vehicles, so Tesla had an incentive to minimize its capital investment in repairs relative to sales of new cars.[91]

| **Automotive Sales** (in millions) | 2022 | 2021 | 2020 |
|---|---|---|---|
| Revenue | $67,210 | $44,125 | $24,604 |
| Cost of Revenue | $49,599 | $32,415 | $24,684 |
| Gross Profit Margin | 28.2% | 26.5% | 19.9% |
| **"Services and Other"** | | | |
| Revenue | $6,091 | $3,802 | $2,306 |
| Cost of Revenue | $5,880 | $3,906 | $2,671 |
| Gross Profit Margin | 3.4% | (2.9%) | (15.6%) |

The two factors, taken together, explain why Tesla has erected barriers to prevent the development of independent service centers sufficient to meet demand, while simultaneously failing to adequately invest in Tesla-owned facilities. The end result: unconscionable delays and unreasonable prices for repairs and maintenance of Tesla EVs.

---

[91] Data from 2022 Tesla, Inc. Form 10-K at 49. "Services and Other" includes replacement parts. *Id.* at 56. Segment revenue and costs includes operations outside of the United States.

149.    Tesla created the conditions that made timely, reasonably priced Tesla Repair Services and Tesla Replacement Parts unavailable to EV owners in order to maximize its own profits. The steps included:

(a)    while other car manufacturers sell vehicles through independent dealers, who provide and profit from servicing vehicles, Tesla sells directly to consumers, so an "organic" source of repair services does not exist;

(b)    Tesla designed its vehicles to require non-standard parts and materials throughout, even when not strictly required, to assure that replacement parts from non-Tesla manufacturers would not be available, and increasing its future profits on replacement parts;

(c)    Tesla has also created barriers to the establishment of independent Tesla repair shops, as exist for other vehicles. Tesla vehicles can be repaired only with full access to information from Tesla's diagnostic software, which is only made available to Tesla itself and, to some extent, Tesla's certified collision centers, eliminating the possibility of obtaining many kinds of repairs from independent repair shops;

(d)    Tesla requires extensive investment and training of personnel of all collision shops that sought Tesla certification, while also entering competition with the certified collision shops, thus making investment in a Tesla collision certification a risky proposition for those shops;

(e)    despite the actions it had taken to discourage independent collision shops from obtaining Tesla certifications and hinder independent repair shops' ability to effective repair Tesla vehicles, Tesla also made a woefully inadequate investment in company-owned Tesla Service Centers and Collision Centers;

(f)    in periods when Tesla was able to sell all of the cars it could produce, Tesla allocated substantially all parts to the manufacture of new vehicles instead of making them available to customers who needed repair and replacement parts; and

(g)    for some parts, Tesla declines to permit any repairs even at its own Tesla Service Centers or at Tesla-Approved Collision Centers, instead requiring replacement of the entire module or assembly (*e.g.*, batteries, which can cost over $15,000).

1

## 1.    Absence of Dealer-Based Repair Center Network

150.    Unique among U.S. vehicle manufacturers, Tesla does not sell its cars through independent dealerships. Rather, all new Tesla vehicles are sold directly by Tesla from its own stores and galleries. Independent dealers associated with other manufacturers provide servicing for the cars that they sell, and earn a significant portion of their profits from servicing. Dealers recognize that they have every incentive to provide the best possible service in order to secure future sales. Since the dealers sell cars as well as replacement parts, manufacturers also have incentives to provide these dealers with adequate supplies of replacement parts and support needed to allow their repair centers to operate efficiently.

151.    The absence of a Tesla dealer network removes many of the incentives to make parts and support available to customers. Tesla's profit margins are currently greater on sales and leasing than on services, so it has limited its investment in the service centers as much as possible. Moreover, since the independently owned Tesla-Approved Collision Centers do not sell Tesla EVs, they are a minuscule part of Tesla's overall business compared to the role independent dealers play with respect to other auto manufacturers. Thus, Tesla has little incentive to certify additional collision facilities or provide them with the resources they need, particularly replacement parts.

## 2.    Barriers to Availability of Non-Tesla Replacement Parts

152.    From its first sales, Tesla designed most of its car parts to be incompatible with replacement parts manufactured by other companies. For example, car frames are made of aluminum, which cannot be repaired through cold welding. Many repair shops do not work on aluminum frames at all, and those that do typically charge about twice as much as for steel frames.

153.    Tesla's decision to avoid standardized parts used elsewhere in the auto industry means that there is absolutely no alternative to Tesla replacement for the vast majority of parts. Thus, Tesla has the ability to control both pricing and supply of parts that may be needed for repairs.

154.    As discussed above, Tesla manufactures some components for its EVs, while it purchases other components from suppliers around the world. As stated by Tesla itself:

> Our vehicles use over 3,000 purchased parts which we source globally from over 350 suppliers. We have developed close relationships with several key suppliers particularly in the procurement of cells and other key system parts. While we obtain components from multiple sources in some cases, similar to other automobile

manufacturers, many of the components used in our vehicles are purchased by us from a single source.[92]

155.    Tesla further restricts the availability of both OEM and non-OEM Tesla-Compatible Parts by, among other things, requiring at least some its suppliers to enter into *de facto* exclusivity agreements preventing those suppliers from manufacturing Tesla-compatible parts for anyone other than Tesla.

156.    For example, a contract between Tesla and Panasonic filed with the SEC in 2014 states:

> The tooling, jibs, dies, gauges, fixtures, molds, patterns, other equipment (collectively, the "Tooling"), as well as the supplies, materials, and other tangible property that are or will be used by Seller to manufacture, store, and transport Goods, or used to develop or make Goods for Tesla (such Tooling, supplies, materials and other tangible property shall collectively be referred to as "Property") will be owned by Tesla if Tesla has [***] ("Tesla Property").[93]

157.    Such contract provisions are intentionally designed to prevent Tesla's OEM parts suppliers from producing Tesla-compatible parts for anyone other than Tesla. Absent such contract provisions, Tesla's OEM parts suppliers could sell Tesla-compatible parts to parties other than Tesla (*e.g.*, automotive parts distributors), who could then resell them to Tesla owners and independent repair shops, thus promoting competition in the Tesla-Compatible Parts market.

### 3.    Barriers to Development of Non-Certified Tesla Repair Facilities

158.    Tesla Repair services are available through Tesla Service Centers and Collision Centers, which are owned and operated by Tesla itself, and through Tesla-Approved Collision Centers. However, as the number of Tesla EVs on the road has increased over the years, the number and capacity of these centers has never been sufficient to meet demand.

159.    While all vehicle manufacturers offer repairs through their dealers and also certify independent repair facilities to provide repairs, there are thousands of repairers throughout the United States that offer repairs and replacement parts without a manufacturer certification. These facilities typically work only on vehicles whose warranties have expired, and they generally compete with certified and dealer facilities by offering lower prices. Tesla has effectively prevented the development of more than a small handful of Tesla-Approved Collision Centers that handle body work on Tesla vehicles.

---

[92] Tesla Motors, Inc. 2015 Form 10-K at pg. 9.
[93] https://www.sec.gov/Archives/edgar/data/1318605/000119312516735804/d253219dex102.htm (redacted portion filed confidentially and unavailable online) (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

There is no list of approved independent repair shops to repair or maintain other aspects of Tesla vehicles, including mechanical work.

160.    In fact, Tesla has taken legal action—including sending cease-and-desist letters and filing lawsuits—to prevent independent repair shops from offering Tesla Repair Services.[94]

161.    Non-certified repair shops typically use parts from alternative suppliers, and as discussed above, there is no supplier for Tesla replacement parts other than Tesla. While Tesla sells some replacement parts on its website, it has not been a dependable parts supplier even to its own service centers and Tesla-Approved Collision Centers, let alone to the few non-certified independent repair shops that have attempted to enter the market.

162.    For instance, even though Tesla now makes its parts catalog available, Tesla inhibits non-certified facilities' ability to obtain many Tesla-Compatible parts and conduct repair business by limiting parts availability to those who own the specific model the parts pertain to and who have the vehicle registered in their own name. This inhibits independent repair shops' ability to obtain many parts on anything other than an as-needed basis and prevents them from warehousing parts.

163.    Additionally, Tesla EVs are designed to require Tesla diagnostic software to determine what parts need to be replaced and/or repaired. Tesla is the only supplier of this software, and while it has made a software package called "Toolbox" available to independent facilities, this does not provide sufficient information for many kinds of repairs. Some repairs require access to codes purposely not available on Toolbox, while others require access to Tesla's "Garage" software, but that is not made available outside of Tesla repair facilities. For example, many parts used to build, repair, and maintain Tesla EVs are electronic components that must be programmed at the manufacturer and turned on by Tesla once installed on the vehicle. This is not possible using the version of Toolbox made available to the general public.

164.    Tesla's unique car and car part designs also require specialized tools and knowledge to make repairs, making the establishment of independent shops extremely difficult and costly.

---

[94] *See* https://futurism.com/the-byte/tesla-fired-fixes-roadsters-carl-medlock (last accessed 12/7/23); https://www.motorauthority.com/news/1124787_meet-the-guy-keeping-tesla-roadsters-on-the-road (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Accordingly, there are only a handful of non-certified repair locations in the United States, providing Tesla Repair Services to an insignificant share of the market.

### 4.    Barriers to Development of Tesla-Approved Collision Centers

165.    Before 2017, Tesla did not have any of its own collision repair facilities. Instead, it certified a limited number of independent body shops to serve as collision repair facilities.[95] However, to obtain certification, a body shop was required to send its technicians to California to receive classroom and hands-on training, a substantial expense. It also required certified body shops to use specific aluminum welding equipment.[96] Consequently, repair services were effectively unavailable in many parts of the United States.

166.    Beginning in mid-2017, in connection with the marketing of the Model 3, Tesla permitted technicians to take on-line training courses instead to receive certifications. However, the amount of training was still substantially greater than what was required by competing manufacturers for similar certifications, and the number of certified body shops remained very limited.

167.    Currently, mechanics are required to take 33 online courses to obtain certification to provide structural repairs to damaged Tesla EVs.[97] Compensating employees for time spent attending these courses remains a substantial expense for body shops that wish to gain Tesla certification.

168.    The requirements to become a Tesla-Approved Collision Center remain onerous, including requirements to purchase extensive and very expensive equipment required for body work on cars with aluminum or partially aluminum bodies.[98] Much of the equipment must be purchased from Tesla. For example, the required Tesla Onboarding kit, available only from Tesla, is currently listed at $23,377. One source estimates the cost of acquiring the minimal equipment set necessary to obtain

---

[95] "Tesla-Owned Collision Repair Shops: Coming Later This Year" https://www.bodyshopbusiness.com/tesla-owned-collision-repair-shops-coming-later-year/ (last accessed 12/7/23).
[96] " Updated Tesla Collision Repair Standards Establish Structural, Satellite Certification Levels," https://www.bodyshopbusiness.com/updated-tesla-collision-repair-standards-establish-structural-satellite-certification/ (last accessed 12/7/23).
[97] https://service.tesla.com/docs/Public/TeslaApprovedCollisionCenters/Tesla_Body_Repair_Program_Training_Overview.pdf (last accessed 12/7/23).
[98] https://service.tesla.com/docs/Public/TeslaApprovedCollisionCenters/Tesla_Approved_Body_Shops_Global_Master_Tooling_List.pdf (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

certification at between $80,00 and $240,000, and notes that both the process and the cost is different and costlier than obtaining certification from other manufacturers.[99] The same source notes, "Model 3, in particular, is very complex. This is primarily because it uses a mix of aluminum, steel, and composites. The unusual combination allows Tesla to balance affordability and functionality. However, this approach presents a unique set of challenges to certified body shops."[100]

169.    One Collision Center that received certification described the process as follows:

> The popularity of the Tesla, in certain regions, has been so high that Tesla's plan to control the vetting of the repair shops became a much bigger task than they expected. To be on the Tesla authorized shop program the process can be lengthy. It starts with the shop sending Tesla and application that they meet or are close to some strict minimum criteria. Then Tesla contacts the shop and discusses with them the additional equipment and training that will be required to be on the program. This required equipment list is large and expensive. The tools have to be ordered, shipped and installed before Tesla can verify. Once the equipment is ready, Tesla will do a virtual tour and verify the tool serial numbers to validate the shop has the equipment available to repair the car correctly.

> After the tooling is all set, Tesla will require that the shop personnel receives the training to repair the Tesla correctly. Most of the Technician training can be done online, but it is extensive and usually takes weeks. When the shop is complete, Tesla will give the shop final approval and list them as a certified collision repair facility on their website. This can take a few weeks between approval and website update.[101]

170.    Tesla has also developed a reputation for treating its certified Collision Centers poorly. Tesla-Approved Collision Centers compete both with other Tesla-Approved Collision Centers, and with Tesla's own Collison Centers. Tesla has been gradually building out its own service centers, and has promised to open additional centers every year. A body shop considering investing in the equipment and training necessary to become a Tesla-Approved Collision Center must weigh the risk that its sole supplier of certification, and also of parts, may choose to go into competition with it.

---

[99] "How to Become a Tesla Certified Body Shop, https://electricvehiclesfaqs.com/become-a-tesla-certified-body-shop/ (last accessed 12/717/23).
[100] Id.
[101] "Why Tesla Model 3 Parts Delays Are Improving," https://collisionprosinc.com/why-tesla-model-3-parts-delays-are-improving/#:~:text=Tesla%20Parts%20Shortages,even%20months%20on%20some%20parts (last accessed 12/7/23).

171.     In 2021, the risk to a body shop of investing in Tesla certification was made clear when Tesla contacted a large number of certified technicians by email to offer them job opportunities to work in Tesla Service Centers, where they could take advantage of their Tesla repair training that had been financed by their previous employer.[102] Tesla has made the opening of a Tesla-Approved Collision Center a large and risky investment, so it is unsurprising that the number of certified collision centers remained very limited and service is often unavailable when it is needed by Tesla EV owners.

172.     During most if not all of the Class Period, Tesla has designed, coordinated, and implemented the independent Collision Center certification process from its California base. This includes, among other things, the design of the training and certification program, the equipment and tools used in the program, and until mid-2017, the hands-on training, all of which took place in California. Even after mid-2017, equipment and tools necessary for certification still must be sourced from Tesla in California, the online training and certification program design, availability, and operation still originate in California, and Tesla's strategy regarding independent Collision Center certification is designed and implemented from California.

### 5.     Tesla's Failure to Invest Sufficiently In Company-Owned Service Centers

173.     Despite the extensive steps Tesla has taken to limit the availability of service from independent repair facilities, Tesla has not yet made an adequate investment in company-owned facilities, apparently because there is greater short-term profit potential in manufacturing. In March 2017, Tesla had only 65 service centers in the United States, in 22 states,[103] leaving very large swaths of the country completely without available servicing. By November 2020, there were 122 service centers in 34 states.[104] Today, there 184 service centers in 37 states.[105] For a rough comparison, there are 2,941 Ford dealerships,

---

[102] https://electrek.co/2021/09/30/tesla-angers-certified-shops-recruit-techs-they-paid-to-train/ (last accessed 12/7/23); Dana Caldwell, "Tesla recruiting email solicits certified employees, https://www.repairerdrivennews.com/2021/09/29/those-tesla-emails-soliciting-your-certified-employees-you-may-have-a-legal-leg-to-stand-on/ (last accessed 12/717/23).
[103] https://web.archive.org/web/20170318182225/https://www.tesla.com/findus/list/services/United%20States (last accessed 12/7/23).
[104] https://web.archive.org/web/20201125074520/https://www.tesla.com/findus/list/services/United%20States (last accessed 12/7/23).
[105] https://www.tesla.com/findus/list/services/United%20States (last accessed 12/7/23).

each of which offers service, distributed among all 50 states.[106] In sum, Tesla has not made a sufficient investment in service or collision enters to meet the needs of Tesla EV owners.

**6.     Tesla's Failure to Allocate Sufficient Parts to Repair**

174.     Until 2022, demand for new Tesla EVs was generally greater than supply, as Tesla had a limited capacity to manufacture new vehicles. Consequently, many customers had to wait for months or longer to receive vehicles they had ordered.

175.     Aware that it has higher profit margins on sales of new cars than on sales of replacement parts, and in order to maximize profits, Tesla responded to parts shortages by prioritizing assembly of new vehicles over providing replacement parts for older vehicles, leaving repair customers waiting for months for parts to arrive.

**7.     Product Design that Prevents Repair of Costly Parts**

176.     Tesla intentionally designs its EVs and the parts that go into them so that they are nearly impossible to repair if they are damaged. Instead, entire modules and assemblies must be replaced rather than repaired.

177.     For example, neither Tesla nor Tesla-Approved Collision Centers will repair damaged battery packs, even for relatively minor damage.[107] Replacements of a battery pack generally cost well over $15,000. A few non-certified independent repair facilities have managed to complete some limited repairs on battery packs, saving consumers significant amounts.[108] However, the extremely small number of repair shops willing to attempt such repairs makes this option effectively unavailable to most Tesla owners.

---

[106] https://www.scrapehero.com/location-reports/Ford%20Motor%20Company-USA/ (last accessed 12/7/23).

[107] Kevin Killough, "Tesla Batteries are impossible to Repair, Are Trashed for Minor Damage" https://cowboystatedaily.com/2023/03/27/tesla-batteries-are-impossible-to-repair-are-trashed-for-minor-damage/ (last accessed 12/7/23).

[108] Fred Lambert, "Tesla tried to charge $22,500 for new battery pack when a $5,000 repair did the trick". https://electrek.co/2021/09/13/tesla-battery-pack-replacement-repair/ (last accessed 12/7/23); "Tesla wanted him to pay $22500 to replace a battery pack, we did it for 75% less," https://www.youtube.com/watch?v=T7Q0nNkQTCo (last accessed 12/7/23); Rich Rebuilds, "Tesla wanted $16,000 to fix this NEW Model 3, we did it for $700! The importance of Right to REPAIR!" https://www.youtube.com/watch?v=vVSw3KSevEc&t=110s (last accessed 12/7/23); Gruber Motor Company, "Impossible to Repair TESLA Batteries," https://www.youtube.com/watch?v=B_HMpJ4REyE (last accessed 12/7/23).

178.     As a result, the cost of repairing these issues is substantially higher than it would otherwise be but for Tesla's conduct.

**E.      Tesla's Warranty and Related Policies Threaten Owners That They May Lose Warranty Coverage If They Service Their EVs Anywhere Other Than Tesla.**

179.     Another way in which Tesla limits those who purchase its EVs from repairing their own vehicles or using independent repair shops is through its warranty and related policies. While Tesla's new vehicle warranties do not expressly require owners to purchase parts and service for their Tesla EVs only through Tesla's app, they strongly discourage owners from obtaining parts or services anywhere else, at the risk of voiding their warranties.

180.     According to Tesla's New Vehicle Limited Warranty for Model S, Model X, and Model 3 EVs sold in the United States and Canada:

> Although Tesla does not require you to perform all service or repairs at a Tesla Service Center or Tesla authorized repair facility, ***this New Vehicle Limited Warranty may be voided or coverage may be excluded due to improper maintenance, service or repairs***. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools and supplies with respect to your vehicle and, in certain cases, may employ the only persons or be the only facilities authorized or certified to work on certain parts of your vehicle. ***Tesla strongly recommends that all maintenance, service and repairs be done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this New Vehicle Limited Warranty***.[109]

181.     Echoing the warranty policies, the "Frequently Asked Questions" section of Tesla's Vehicle Warranty webpage includes the following:

> **Do I have to take my vehicle to the Tesla Service Center?**
>
> With over-the-air software updates, remote diagnostics and the support of our Mobile Service technicians, the need for a Service Center visit is reduced. If your vehicle does require service, you can schedule a service appointment in the Tesla app. ***If you choose to take your vehicle to a non-Tesla shop for maintenance or repairs, coverage under your warranty could be affected if problems occur***.[110]

182.     Similarly, the Tesla Parts, Body & Paint Repair Limited Warranty only covers "Tesla branded an manufactured parts purchased directly from Tesla over-the-counter, online or purchased and

---

[109] https://www.tesla.com/sites/default/files/downloads/tesla-new-vehicle-limited-warranty-en-us.pdf (last accessed 12/7/23) (emphases added).

[110] *See* https://www.tesla.com/support/vehicle-warranty (last accessed 12/7/23) (emphases added).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

installed by Tesla Service or Tesla Body Shops."[111] Moreover, labor charges to repair or replace covered parts are only covered under Tesla's parts warranty "[i]f the Part or Used Part was installed by Tesla."

183.    The Tesla Parts, Body & Paint Repair Limited Warranty further warns that it will "not cover damage or malfunction directly or indirectly caused by … improper repair or maintenance, including use of non-genuine Tesla accessories or Parts."[112] It continues:

> Although Tesla does not require you to perform all maintenance, service or repairs at a Tesla Service Center or Tesla authorized repair facility, **this Tesla Parts, Body and Paint Limited Warranty may be voided, or coverage may be excluded, due to lack of or improper maintenance, installation, service or repairs**. Tesla Service Centers and Tesla authorized repair facilities have special training, expertise, tools and supplies with respect to Tesla Parts, Body and Paint repairs, and, in certain cases, may employ the only persons, or be the only facilities authorized or certified to work on Tesla Parts, Body and Paint. **Tesla strongly recommends that you have all maintenance, service and repairs done at a Tesla Service Center or Tesla authorized repair facility in order to avoid voiding, or having coverage excluded under, this Tesla Parts, Body and Paint Limited Warranty**.[113]

184.    None of these admonitions specifies what "improper maintenance, service or repairs" can or will adversely affect a Tesla warranty, further chilling any Tesla owner's consideration of using independent service providers or parts. Tesla's owners' manuals more explicitly prohibit the use of non-OEM, Tesla-compatible parts, instead instructing owners only to use parts purchased from and installed by Tesla:

---

[111] *See* https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last accessed 12/7/23).

[112] https://www.tesla.com/sites/default/files/downloads/tesla-parts-accessories-body-repair-limited-warranty-en-us.pdf (last accessed 12/7/23).

[113] *Id.*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TESLA | Model 3 Owner's Manual  Search ☓

## Parts, Accessories, and Modifications

⌄ Model 3 Owner's Manual
⌄ Overview
⌄ Opening and Closing
⌄ Seating and Safety Restraints
⌄ Driving
⌄ Autopilot
⌄ Active Safety Features
⌄ Using the Touchscreen
⌄ Charging
⌄ Maintenance
    Maintenance Service Intervals
    Tire Care and Maintenance
    Cleaning
    Wiper Blades and Washer Jets
    Fluid Reservoirs
    Jacking and Lifting
    **Parts and Accessories**
⌄ Specifications
⌄ Roadside Assistance
⌄ Consumer Information

Use only genuine Tesla parts and accessories. Tesla performs rigorous testing on parts to ensure their suitability, safety, and reliability. Purchase these parts from Tesla, where they are professionally installed and where you can receive expert advice about modifications to Model 3. Accessories are available for purchase from Tesla stores or online at www.tesla.com.

 **Note**
Some accessories may not be available in your market region.

Tesla is unable to assess parts manufactured by other distributors and therefore accepts no responsibility if you use non-Tesla parts on Model 3.

⚠ **Warning**
Installing non-approved parts and accessories, or performing non-approved modifications, can affect the performance of Model 3 and the safety of its occupants. Any damage caused by using or installing non-approved parts, or by performing non-approved modifications, is not covered by the warranty.

© Tesla 2022     Feedback     Download PDF

185.     Online forums, such as www.teslamotorsclub.com, are replete with stories by Tesla owners of Tesla invalidating warranties or otherwise refusing to honor warranties because owners had non-OEM, Tesla-compatible parts installed on their EVs.

186.     In one example, Tesla refused to replace a cracked window under warranty, instead charging an owner $460, because the owner had installed a completely unrelated part—an aftermarket

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1    puddle light—at the bottom of the car door.[114]

2    187.    However, it is even more common to find Tesla owners on these forums choosing not to

3    use independent repair shops or aftermarket parts in the first instance for fear of losing warranty coverage.

4    188.    In addition, Tesla's "Unsupported or Salvaged Vehicle Policy" warns "[r]epairs performed

5    to bring a salvaged vehicle back into service may not meet Tesla standards or specifications and that is

6    why the vehicle is unsupported."[115] Among other things, vehicles designated "unsupported" by Tesla have

7    their warranties voided and access to Tesla's Supercharger network is permanently disabled.[116]

8    189.    Thus, if a Tesla owner's EV is deemed a salvaged vehicle and the owner has it repaired

9    anywhere other than Tesla, Tesla can unilaterally designate the vehicle as "unsupported," thus voiding the

10   vehicle's warranty and preventing the owner from using Tesla's Supercharger network, substantially

11   impacting vehicle charging and the ability to travel long distances in the Tesla EV. Moreover, according

12   to some sources, Tesla not only disables supercharging on Tesla's Supercharger network, it also prevents

13   vehicles from accessing third-party fast charging networks.[117]

14   **F.    Tesla's Monopolization of the Tesla Repair Services and Tesla-Compatible Parts Markets Has Led to Artificially Inflated Prices, Decreased Supply, and Burdensome Wait Times.**

15

16   190.    The lack of competition in the Tesla Repair Services and Tesla-Compatible Parts markets

17   caused by Tesla's misconduct has resulted in artificially inflated prices, insufficient supply, and excessive

18   wait times for Tesla owners looking to maintain or repair their EVs.

19   191.    But for Tesla's anticompetitive and monopolistic course of conduct, Tesla owners would

20   have similar maintenance and repair options as purchasers of traditional ICE vehicles—*i.e.*, they would

21   be able to service their EVs themselves, at an independent repair shop, or at Tesla using OEM or non-

22   OEM parts purchased from a retailer, independent repair shop, or Tesla itself. Such competition would

23   inevitably lead to increased supply and lower prices.

24

25   _____

     [114] *See* https://teslamotorsclub.com/tmc/threads/tesla-claims-warranty-is-void-due-to-aftermarket-

26   puddle-lights.236475/ (last accessed 12/7/23).

     [115] *See* https://www.tesla.com/legal/additional-resources#unsupported-or-salvaged-vehicle-policy (last

27   accessed 12/7/23).

     [116] *Id.*

28   [117] *See* https://insideevs.com/news/399152/tesla-disable-fast-charging-salvage/ (last accessed 12/7/23).

192.    Instead, Tesla owners are forced to buy Tesla Repair Services and Tesla-Compatible Parts only from or through Tesla. Not only has this resulted in Tesla owners paying artificially inflated prices for Tesla Repair Services and Tesla-Compatible Parts, but they also have been forced to suffer exorbitant wait times in receiving those parts and services from Tesla, suffering further injury in the form of that delay and additional expenses engendered by that delay.

193.    The shortage in available service appointments and the frequency of backordered OEM parts can be directly attributed to the lack of independent repair shops and non-OEM replacement parts caused by Tesla's anticompetitive conduct.

194.    Making matters worse, Tesla has not increased its service capacity at a sufficient pace to keep up with its growth in EV sales.

195.    Elon Musk acknowledged Tesla's service-related shortcomings via Twitter: "Just reviewed Tesla's service locations in North America & realized we have major gaps in geographic coverage! Sorry for this foolish oversight." (Twitter, @elonmusk, Oct. 16, 2018 at 6:30pm).

196.    This has forced many Tesla EV owners to drive or tow their vehicles to Tesla Service Centers located many miles away in order to obtain Tesla Repair Services and Tesla-Compatible Replacement Parts.

197.    While the Repair Restrictions themselves are not generally known by consumers and, in fact, Tesla has actively concealed their existence, the shortcomings in Tesla service (*e.g.*, excessive wait times) are now widely documented (*i.e.*, have garnered recent attention from journalists). For example, in an investigative piece done by Vox's Recode, journalists obtained over 1,000 consumer complaints filed with the FTC about Tesla, more than 120 of which "discussed specific problems with service, delays, and parts."[118] As further elaborated upon by Recode, "[t]he complaints point to all sorts of problems with the experience of owning a Tesla vehicle, including an inadequate number of service centers, limited stock of replacement parts, bad communication, poor manufacturing quality, and long wait times for repair appointments."[119] This makes it all the more important for Tesla to continue concealing from prospective

---

[118] *See* https://www.vox.com/recode/23318725/tesla-repair-mechanic-delay-electric-vehicles-ev (last accessed 12/7/23).
[119] *Id.*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Tesla purchasers that, once they buy a Tesla EV, they will be forced to purchase all Tesla Repair Services and Tesla-Compatible Parts from Tesla and its Tesla-Approved Collision Centers as a result of the Repair Restrictions.

198.    Assuming one can get a service appointment, the cost of maintaining and repairing a Tesla is higher than it should be:

> The two biggest problems with repairing a Tesla are the wait time and cost. Owners often wait weeks and even months for simple jobs to be finished. When an owner does get their car repaired, the costs are often outlandish. [One right-to-repair advocate] said that some shops charge upwards of $200 an hour for labor alone. … "Imagine coughing up $200 an hour for a diagnostic fee. That's McLaren prices."[120]

199.    While Tesla charges $200 an hour or more for Tesla Repair Services, the average hourly rate for mechanic work in the United States is between $75 and $130.[121]

200.    In addition to the higher labor costs, Tesla replacement parts are also more expensive than they would otherwise be but for Tesla's anticompetitive conduct.

201.    For example, a brand new OEM front drive unit for the Ford Mustang Mach-E (Part#: 7B000) can be purchased directly from Ford for $2,094.28.[122] Tesla's online catalog, by comparison, states that the front drive unit assembly for the Model 3 (Part # 1120960-10-H) is "Restricted." However, a used Tesla front drive unit sells online for $9,500.[123]

202.    Taking labor and parts both into account, it should come as no surprise that maintenance costs for Tesla vehicles are higher than for other motor vehicles. Although the actual life-cycle cost of owning a Tesla EV will vary widely based on many variables that are nearly impossible to estimate, the average cost to maintain a Tesla EV is $832 per year, whereas the average cost for all motor vehicles sold in the United States is only $652 per year.[124] Similarly, although the cost of collision repairs vary

---

[120] *See* https://www.vice.com/en/article/93wy8v/newly-passed-right-to-repair-law-will-fundamentally-change-tesla-repair (last accessed 12/7/23).
[121] *See* https://www.repairsmith.com/blog/how-much-does-mechanic-charge-per-hour/ (last accessed 12/7/23).
[122] https://parts.ford.com/shop/en/us/engine/engine-electrical/drive-13813527-1 (last accessed 7/17/23).
[123] https://stealthev.com/product/tesla-front-drive-unit/ (last accessed 12/7/23).
[124] *See* https://jalopnik.com/advisor/tesla-maintenance-cost/ (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1  widely by severity of the accident, the average cost to repair a Tesla is $5,552, which is $1,347 more than

2  the average ICE vehicle repair and $1,078 more than non-Tesla EVs.[125]

3      203.    The lack of supply and higher prices are compounded by Tesla's practice of simply

4  replacing parts or whole assemblies instead of devising repairs to address the issue.

5      204.    For example, according to one Tesla service employee speaking to a reporter who test

6  drove a Model Y, "the company only allows the service center to replace whole sections of the interior,

7  and not replace small parts (and even then, many small parts cannot be removed/replaced at all without

8  replacing the whole thing)."[126]

9      205.    As another example, it is widely discussed on Tesla forums that 2018 and earlier Model S

10  Performance models have a defective rear-drive unit containing a faulty seal that often results in a small

11  leak, causing the part to fail.[127] Although a small handful of independent repair shops have apparently

12  engineered an inexpensive fix for this problem, Tesla tells owners of these vehicles that the cost of

13  replacing the rear-drive unit is $7,500 and, oftentimes, recommends that the owner "scrap" the car.[128]

14      206.    In yet another example, one Tesla Model 3 lessee accidentally drove over some road

15  debris which then struck and damaged the vehicle's coolant system, causing coolant to leak from the

16  battery pack.[129] After towing the vehicle to a Tesla service center, the lessee was informed that the

17  damage was not covered by warranty, that the battery could not be repaired and would need to be

18  replaced, and that the cost of the replacement was $16,000. Later, the lessee was put in contact with an

19  independent repair shop that had seen this issue before and devised a fix costing only $700.

20

21

22
---

[125] *See* https://insideevs.com/news/692356/tesla-repairs-cost-more-than-gas-
23  cars/#:~:text=Repairs%20for%20Tesla%20EVs%20cost,more%20than%20non%2DTesla%20EVs (last
24  accessed 12/7/23).
[126] https://cleantechnica.com/2021/05/02/tesla-model-y-big-family-test-mostly-good-but-there-might-be-
25  one-death-star-type-weakness/ (last accessed 12/7/23).
[127] *See* https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-replacement-and-
26  cost.226436/ (last accessed 12/7/23).
[128] *See* https://teslamotorsclub.com/tmc/threads/out-of-warranty-drive-unit-failure-service-center-
27  recommends-to-scrap-the-car.273103/ (last accessed 12/7/23).
[129] *See* https://getjerry.com/insights/costly-tesla-fix-shows-right-to-repair-matters#a-tesla-drivers-
28  dilemma (last accessed 12/7/23).

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

207.    Such examples demonstrate how right-to-repair legislation and the lack of independent repair shops directly impact Tesla EV owners.

**G.    There Are No Legitimate Procompetitive Reasons for Tesla's Misleading Statements Regarding Right-to-Repair**

208.    As discussed above, Tesla not only refused to sign on to the 2014 MOU, it also actively fought passage of Massachusetts Ballot Question 1—the initiative aimed at providing consumers and independent repair shops with access to wireless telematics systems like the ones used by Tesla. Today, Tesla remains a holdout while other vehicle manufacturers in the Alliance for Automotive Innovation have not only reaffirmed their commitments to the 2014 MOU, but increased its scope to include telematic systems.

209.    In opposing Ballot Question 1, Tesla sent a letter to its Massachusetts customers urging them to vote against the initiative, arguing, among other things, that the measure would open vehicles to cyber-attacks.[130] Tesla provided no evidence to substantiate this claim.

210.    In its recent report to Congress regarding the impact of repair restrictions on consumers and independent repair shops, the FTC addressed the arguments made by manufacturers generally, not specific to Tesla, to justify their repair restrictions. Ultimately, the FTC's extensive investigation found "there is scant evidence to support manufacturers' justifications for repair restrictions."[131] In addition to cybersecurity, the FTC addressed and refuted several other concerns identified by manufacturers in defending their repair restrictions, including safety, quality of service, liability/reputational harm, and consumer's design preferences.

211.    With respect to cybersecurity, the FTC found that "[t]he record contains no empirical evidence to suggest that independent repair shops are more or less likely than authorized repair shops to compromise or misuse customer data."[132]

212.    With respect to safety, the FTC noted that there was no factual support for manufacturers' assertions that "authorized repair persons are more careful or that individuals or independent repair shops

---

[130] *See* https://fighttorepair.substack.com/p/teslas-a-vocal-opponent-of-the-right (last accessed 12/7/23).
[131] Nixing the Fix at pg. 6.
[132] *Id.* at 31.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

fail to take appropriate safety precautions, or that independent repair workers who enter homes pose more of a safety risk to consumers than authorized repair workers."[133]

213.    With respect to quality of service, the FTC pointed to a Consumer Reports survey indicating that "consumers who used independent repair shops were more satisfied with repairs than those who used factory service," as well as a submission by the Auto Care Association that noted "70-75% of consumers use independent repair shops due mostly to trust, convenience, and price," before concluding "[t]he record does not establish that repairs conducted by independent repair shops would be inferior to those conducted by authorized repair shops if independent repair shops were provided with greater access to service manuals, diagnostic software and tools, and replacement parts as appropriate."[134]

214.    With respect to liability/reputational harm, the FTC described how, despite asking for data on the assertions made by manufacturers, "[m]anufacturers provided no empirical evidence to support their concerns about reputational harm or potential liability resulting from faulty third party repairs."[135]

215.    Finally, with respect to purportedly consumer-driven design choices, the FTC noted that "[r]ight to repair advocates argue that consumers care about repairability, in addition to aesthetic design, but do not have the necessary information at the point of sale to purchase products that are repairable."[136] Ultimately, the FTC concluded that both sides relied upon anecdotal evidence and that this particular question remains open and requires further research regarding "the tradeoffs consumers are willing to make when fully informed about repairability."[137]

## CLASS ACTION ALLEGATIONS

216.    Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of themselves and as representatives of a class of consumers (the "Nationwide Class") defined as follows:

> All persons or entities in the United States who paid for Tesla Repair Services or Tesla-Compatible Parts from March 2019 to the present (the "Class Period").

---

[133] *Id*. at 28.
[134] *Id*. at 38.
[135] *Id*. at 33.
[136] *Id*. at 34.
[137] *Id.*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

> Excluded from the Class are Tesla, any entity in which Tesla has an interest, any of Tesla's parents, subsidiaries, affiliates, officers, directors, legal representatives, successors and assigns, all Tesla-Approved Collision Centers, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

217. In addition or in the alternative to the Nationwide Class, Plaintiffs bring this lawsuit under Federal Rules of Civil Procedure 23(a) and (b)(2) on behalf of themselves and as representatives of a class of consumers (the "California Class") defined as follows:

> All persons or entities who paid for Tesla Repair Services or Tesla-Compatible Parts from March 2019 to the present (the "Class Period") in California.

> Excluded from the Class are Tesla, any entity in which Tesla has an interest, any of Tesla's parents, subsidiaries, affiliates, officers, directors, legal representatives, successors and assigns, all Tesla-Approved Collision Centers, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

218. Together, these classes or a combination thereof shall be collectively referred to herein as the "Class."

219. Plaintiffs reserve the right to modify these definitions and/or to propose subclasses, as appropriate, based on further investigation and discovery.

220. This action is being brought and may be properly maintained as a class action as it satisfies the numerosity, commonality, typicality, and adequacy requirements of the Federal Rules of Civil Procedure, Rules 23(a).

221. Numerosity. The members of the proposed Class are so numerous that joinder of all members would be impracticable. The exact number of Class members is unknown to Plaintiffs at this time, but it is estimated to number in the hundreds of thousands. The identity of Class members is readily ascertainable from Tesla's records.

222. Typicality. Plaintiffs' claims are typical of the claims of the proposed Class because Plaintiffs paid Tesla for Tesla Repair Services and Tesla-Compatible Parts during the Class Period, and their claims arise from the same anticompetitive course of conduct by Tesla.

223. Adequacy. Plaintiffs will fairly and adequately represent the interests of the Class members. Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class members.

Plaintiffs are represented by attorneys experienced in the prosecution of class action litigation generally, and in antitrust litigation specifically, who will vigorously prosecute this action on behalf of the Class.

224.    <u>Commonality</u>. There are multiple questions of law and fact common to the Class members, including:

(a) whether Tesla is a monopolist in the United States EV market;

(b) whether Tesla is a monopolist in the United States Tesla Repair Services market;

(c) whether Tesla is a monopolist in the United States Tesla-Compatible Parts market;

(d) whether Tesla designed its warranty- and related-policies to discourage Tesla owners from obtaining Tesla Repair Services or Tesla-Compatible Parts from anyone other than Tesla;

(e) whether Tesla designed its vehicles such that maintenance and repairs require access to diagnostics and telematics accessible only through remote management tools exclusively accessed by Tesla;

(f) whether Tesla unreasonably restricted access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts;

(g) whether Tesla used its contracts with OEM parts manufacturers to prevent other, non-OEM parts manufacturers from producing Tesla-Compatible Parts;

(h) whether Tesla's course of conduct was anticompetitive;

(i) whether Tesla's course of conduct constitutes an unreasonable restraint of trade;

(j) whether, absent Tesla's course of conduct, independent repair shops would have entered the Tesla Repair Services or Tesla-Compatible Parts markets in the United States;

(k) whether market entry by other participants would have encouraged competition, resulting in lower prices or greater supply of Tesla Repair Services or Tesla-Compatible Parts in the United States; and

(l) whether Tesla's conduct should be enjoined or whether other appropriate equitable relief is warranted.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

225.    <u>Injunctive relief</u>. Tesla has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole pursuant to Federal Rule of Civil Procedure, Rule 23(b)(2).

## INTERSTATE TRADE & COMMERCE

226.    Tesla's anticompetitive conduct has taken place in, and negatively affected the continuous flow of, interstate trade and commerce in the United States in that, among other things, it has:

(a) sold EVs, Tesla Repair Services, and Tesla-Compatible Parts to customers online and through its physical store locations throughout the United States;

(b) used the instrumentalities of interstate commerce to provide such goods and services throughout the United States;

(c) in furtherance of its anticompetitive scheme alleged herein, traveled between states and exchanged communications through interstate wire communications and via the United States mail; and

(d) through the anticompetitive scheme alleged herein, affected billions of dollars of commerce.

## ANTITRUST INJURY

227.    Tesla's anticompetitive conduct had the following effects, among others:

(a) competition has been restrained or eliminated with respect to Tesla Repair Services and Tesla-Compatible Parts, thus depriving purchasers of Tesla Repair Services and Tesla-Compatible Parts of the benefits of free and open competition;

(b) the prices paid for Tesla Repair Services and Tesla-Compatible Parts have been fixed, raised, stabilized, or maintained at artificially inflated levels; and

(c) in addition to paying artificially inflated prices, purchasers of Tesla Repair Services and Tesla-Compatible Parts have suffered excessive wait times to receive parts and services, which oftentimes has also forced them to pay out-of-pocket for alternative means of transportation, such as rental cars.

228.    The purpose and effect of this anticompetitive course of conduct was to exclude competition and to raise, fix, or maintain the price for Tesla Repair Services and Tesla-Compatible Parts. As a direct and foreseeable result, during the Class Period, Plaintiffs and the proposed Class paid supracompetitive prices for Tesla Repair Services and Tesla-Compatible Parts and suffered lengthy delays in the repair and service of their Tesla EVs, incurring additional injury and expenses related thereto.

229.    By reason of the antitrust violations alleged herein, Plaintiffs and the proposed Class have sustained injury to their businesses or property.

230.    The nature of Plaintiffs' and the Class Members' injuries is grounded in overcharges, delays, inferior service caused by Tesla's anticompetitive conduct and that of its co-conspirators, and are exactly the type of injuries that the antitrust laws were intended to forestall.

231.    Some Plaintiffs and many Class Members purchased Tesla Repair Services or Tesla-Compatible Parts from Tesla Service Centers, which are owned and operated by Tesla itself.

232.    Some Plaintiffs and many Class Members purchased Tesla Repair Services or Tesla-Compatible Parts from Tesla-Approved Collision Centers, who operate as co-conspirators with Tesla in enforcing the Repair Restrictions challenged herein.

233.    All Tesla-Approved Collision Centers abide by and benefit from Tesla's Repair Restrictions. Tesla also sets the prices that the Tesla-Approved Collision Centers charge for Tesla-Compatible Parts (*i.e.*, because they all must be purchased from Tesla and are itemized on all maintenance and service invoices).

234.    Similarly, all Tesla-Approved Collision Centers must submit rate surveys to Tesla outlining how much they charge for maintenance, repair, and collision services, which Tesla must ultimately approve.

235.    As a result of the conspiracy between Tesla and the Tesla-Approved Collisions Centers, both are able to benefit from the sale of Tesla Repair Services and Tesla-Compatible Parts at supracompetitive prices and the ability to maintain market share despite offering overpriced, low-quality repair and maintenance services, as a result of the lack of competition.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

236.    In addition, regardless of whether Tesla-Approved Collision Centers are considered co-conspirators, there is no realistic possibility that any Tesla-Approved Collision Center would sue Tesla for violations of the antitrust laws. As set forth above, Tesla-Approved Collision Centers spend a significant amount of money and effort to be certified by Tesla. Any lawsuit would create the risk that the Collision Center could lose the certification from Tesla and/or lose the ability to get Tesla-Compatible Parts from Tesla. This would have a dire financial impact on any Tesla-Approved Collision Center.

237.    Furthermore, Tesla-Approved Collision Centers are neither the object nor the victim of Tesla's Repair Restrictions. The overcharges for Tesla Repair Services or Tesla-Compatible Parts were borne by Plaintiffs and the Class, regardless of whether they received those parts and services from a Tesla Service Center or a Tesla-Approved Collision Center.

238.    Because Plaintiffs and the Class paid the full amount of the overcharges and experienced the delays and inferior quality associated with having their Tesla EVs serviced, maintained, and repaired in aftermarkets monopolized by Tesla, there is only one level of purchasers in the distribution chain that suffered these harms. As a result, there is no risk of duplicative recovery.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Monopolization of the Tesla Repair Services Market**
**(All Plaintiffs, on behalf of the Nationwide Class)**

239.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

240.    This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

241.    Tesla has monopoly power in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets, including the ability to control prices and exclude competition in those markets.

242.    Tesla willfully and intentionally engages in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly in the Tesla Repair Services market.

243.    This anticompetitive conduct, which has unreasonably restrained and threatens to continue unreasonably restraining competition in the Tesla Repair Services market, includes at least the following:

    (a)    Implementing vehicle warranties and other policies designed to actively discourage Tesla EV owners from obtaining Tesla Repair Services other than those offered by and through Tesla, thus tying the purchase of Tesla Repair Services to the purchase of Tesla EVs;

    (b)    Designing its EVs such that most maintenance and repairs require access to diagnostics and telematics accessible only through remote management tools exclusively accessed by Tesla; and

    (c)    Limiting access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts.

244.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services, experiencing shortages of available service appointments and long wait times in receiving Tesla Repair Services (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

## **SECOND CLAIM FOR RELIEF**

**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Tesla Repair Services Market**
**(All Plaintiffs, on behalf of the Nationwide Class)**

245.    Plaintiffs re-allege and incorporates by reference all the allegations above as if fully set forth herein.

246.    Even assuming Tesla did not have monopoly power in the Tesla Repair Services market, at a minimum, Tesla has a dangerous probability of success in acquiring monopoly power in that market.

247.    Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla Repair Services market.

248.    Tesla's predatory, exclusionary, and anticompetitive conduct as alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to monopolize the Tesla Repair Services market. The unlawful objective of Tesla's attempt to monopolize the Tesla Repair Services market is to control prices and restrain competition.

249.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services, experiencing shortages of available service appointments and long wait times in receiving Tesla Repair Services (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shop.

## THIRD CLAIM FOR RELIEF

**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Monopolization of the Tesla-Compatible Parts Market**
**(All Plaintiffs, on behalf of the Nationwide Class)**

250.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

251.    This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

252.    Tesla has monopoly power in the EV, Tesla Repair Services, and Tesla-Compatible Parts markets, including the ability to control prices and exclude competition in those markets.

253.    Tesla willfully and intentionally engages in predatory, exclusionary, and anticompetitive conduct with the design, purpose, and effect of unlawfully maintaining its monopoly in the Tesla-Compatible Parts market.

254.    This anticompetitive conduct, which has unreasonably restrained and threatens to continue unreasonably restraining competition in the Tesla-Compatible Parts market, includes at least the following:

(a) Implementing vehicle warranties and other policies designed to actively discourage Tesla EV owners from obtaining Tesla-Compatible Parts other than those offered by and through Tesla, thus tying the purchase of Tesla-Compatible Parts to the purchase of Tesla EVs;

(b) Limiting access to its manuals, diagnostic tools, vehicle telematic data, and OEM replacement parts; and

(c) Using its contracts with OEM parts manufacturers to limit the availability of Tesla-Compatible Parts from any source other than Tesla.

255.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla-Compatible Parts, experiencing parts shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of utilizing Tesla-Compatible Parts from sources other than Tesla to service, repair, and maintain their EVs.

### **FOURTH CLAIM FOR RELIEF**

**VIOLATION OF § 2 OF THE SHERMAN ACT, 15 U.S.C. § 2**
**Attempted Monopolization of the Tesla-Compatible Parts Market**
**(All Plaintiffs, on behalf of the Nationwide Class)**

256.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

257.    Even assuming Tesla did not have monopoly power in the Tesla-Compatible Parts market, at a minimum Tesla has a dangerous probability of success in acquiring monopoly power in those markets.

258.    Tesla willfully and intentionally engages in the predatory, exclusionary, and anticompetitive conduct described herein with the design, purpose, and effect of attempting to monopolize the Tesla-Compatible Parts market.

259.    Tesla's predatory, exclusionary, and anticompetitive conduct alleged herein presents a dangerous probability that Tesla will succeed, to the extent it has not succeeded already, in its attempt to

monopolize the Tesla-Compatible Parts markets. The unlawful objective of Tesla's attempt to monopolize the Tesla-Compatible Parts market is to control prices and restrain competition.

260.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla-Compatible Parts, experiencing parts shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of utilizing Tesla-Compatible Parts from sources other than Tesla to service, repair, and maintain their EVs.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
**Unlawful Tying**
**(All Plaintiffs, on behalf of the Nationwide Class)**

261.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

262.    An unlawful tying arrangement exists, and constitutes a *per se* violation of Section 1 of the Sherman Act, where a seller conditions the sale of a good or service in one market in which the seller has market power (the "tying" product) upon the buyer's agreement to (a) buy a second good or service (the "tied" product) from the seller or (b) refrain from buying that same good or service from a competing seller.

263.    Tesla EVs, Tesla Repair Services, and Tesla-Compatible parts are all separate and distinct products and services. Tesla has market power in all three markets.

264.    Moreover, consumers cannot reasonably estimate the total aggregate cost of all Tesla Repair Services and Tesla-Compatible Parts that will need to be purchased over the lifetime of their EVs at the time of purchase, and Tesla affirmatively gives consumers the false impression that this total aggregate cost will be lower than for other motor vehicles.

265.    By virtue of the anticompetitive conduct alleged herein, Tesla has engaged in three separate tying arrangements.

266.    First, Tesla leverages its market power in the EV market (*i.e.*, the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla Repair Services and Tesla-Compatible Parts (*i.e.*, the tied products and services) only from or through Tesla or Tesla-Approved Collision Centers, thus restraining competition in those markets and excluding other sellers of the tied products and services.

267.    Second, Tesla leverages its market power in the Tesla-Compatible Parts market (*i.e.*, the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla Repair Services (*i.e.*, the tied services) only from or through Tesla or its Tesla-Approved Collision Centers, thus restraining competition in the Tesla Repair Services market and excluding other sellers of Tesla Repair Services.

268.    Third, Tesla leverages its market power in the Tesla Repair Services market (i.e., the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla-Compatible Parts only from or through Tesla and its Tesla-Approved Collision Centers, thus restraining competition in the Tesla-Compatible Parts market and excluding other sellers of Tesla-Compatible Parts.

269.    All three of these tying arrangements affected a substantial amount of interstate commerce and Tesla has a substantial economic interest in sales of Tesla EVs, Tesla Repair Services, and Tesla-Compatible Parts.

270.    There are no legitimate procompetitive business justifications for Tesla's unlawful tying arrangements.

271.    In the event that Tesla's anticompetitive course of conduct is not deemed to be a *per se* violation of Section 1 of the Sherman Act, it also constitutes a violation under both the rule of reason and a "quick look" analysis, as an observer with even a rudimentary understanding of economics could readily conclude that the conduct in question has had an anticompetitive effect on, and unreasonably restrained competition in, the markets for Tesla Repair Services and Tesla-Compatible Parts.

272.    As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type that the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services and Tesla-Compatible Parts, experiencing shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise

would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

### SIXTH CLAIM FOR RELIEF

**VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT,**
**CAL. BUS. & PROF. CODE § 16720, *et seq.***
**Unlawful Tying**
**(All Plaintiffs, on behalf of the Nationwide Class or,**
**in the alternative, on behalf of the California Class)**

273.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

274.    The Cartwright Act, Cal. Bus. & Prof. Code § 16720, *et seq*., prohibits, *inter alia*, the combinations to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726. For the purposes of the Cartwright Act, a combination is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

275.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." Cal. Bus. & Prof. Code § 16727.

276.    Tesla EVs, Tesla Repair Services, and Tesla-Compatible Parts are all separate and distinct products and services, and Tesla has market power in all three markets. As detailed above, by virtue of its market power in these markets, Tesla has unlawfully engaged in three tying arrangements.

277.    First, Tesla leverages its market power in the EV market (*i.e.*, the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla Repair Services and Tesla-Compatible Parts (*i.e.*, the tied products and services) only from or through Tesla and its Tesla-Approved Collision Centers, thus restraining competition in those markets and excluding other sellers of the tied products and services.

278.     Second, Tesla leverages its market power in the Tesla-Compatible Parts market (*i.e.*, the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla Repair Services (*i.e.*, the tied services) only from or through Tesla and its Tesla-Approved Collision Centers, thus restraining competition in the Tesla Repair Services market and excluding other sellers of Tesla Repair Services.

279.     Third, Tesla leverages its market power in the Tesla Repair Services market (i.e., the tying product) to coerce Plaintiffs and the proposed Class into purchasing Tesla-Compatible Parts only from or through Tesla and its Tesla-Approved Collision Centers, thus restraining competition in the Tesla-Compatible Parts market and excluding other sellers of Tesla-Compatible Parts.

280.     These tying arrangements impact a substantial amount of commerce.

281.     There are no legitimate procompetitive business justifications for Tesla's unlawful tying arrangements.

282.     Tesla has thus engaged in *per se* illegal tying arrangements, and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Tesla's conduct or its purported justifications. Even if Tesla's conduct does not form one or more *per se* illegal ties, an assessment of the tying arrangements would demonstrate that they are unreasonable under the Cartwright Act, and therefore illegal.

283.     As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type that the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla Repair Services and Tesla-Compatible Parts, experiencing shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

284.     It is appropriate to bring this action under the Cartwright Act because Tesla has a headquarters and principal palace of business in California and for a substantial portion—if not the entirety—of the Class Period, Tesla directed the conduct at issue and undertook overt acts in furtherance of Tesla's anticompetitive scheme in California.

## SEVENTH CLAIM FOR RELIEF

**VIOLATION OF THE CALIFORNIA CARTWRIGHT ACT,
CAL. BUS. AND PROF. CODE § 16720,** *et seq.*
**Combination in Restraint of Trade**
**(All Plaintiffs, on behalf of the Nationwide Class or,
in the alternative, on behalf of the California Class)**

285.    Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

286.    The Cartwright Act, Cal. Bus. and Prof. Code § 16720, *et seq.*, prohibits, *inter alia*, the combinations to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726. For the purposes of the Cartwright Act, a combination is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

287.    Tesla not only manufactures EVs, it also manufactures many of the parts used to build, maintain, and repair those EVs. As such, Tesla is not only a purchaser of Tesla-Compatible Parts manufactured by its OEM parts suppliers, it is also a horizontal competitor of those OEM parts suppliers.

288.    Tesla requires at least some of its suppliers to enter into *de facto* exclusivity agreements, preventing those suppliers from manufacturing Tesla-compatible parts for anyone other than Tesla. Were it not for Tesla's anti-competitive conduct, the Tesla-Compatible Parts market would include not only OEM parts sold by someone other than Tesla, but also non-OEM (*a.k.a.* "aftermarket") parts. Thus, Tesla's conduct restricts the availability of both OEM and non-OEM Tesla-Compatible Parts, artificially reducing the output and increasing the price of these items.

289.    Similarly, Tesla also provides Tesla Repair Services and, but for the conspiracy alleged herein, would be a horizontal competitor of its Tesla-Approved Collision Centers.

290.    Tesla further requires its Tesla-Approved Collision Centers to enter into *de facto* exclusivity agreements, requiring them to adhere to Tesla's Repair Restrictions and preventing them from conducting repairs and maintenance for Tesla EVs using parts other than those sold and supplied by Tesla.

291.    Taken together, these agreements with its OEM suppliers and with its Tesla-Approved Collision Centers constitute horizontal group boycotts which are *per se* illegal under the Cartwright Act.

292.     Moreover, since these agreements have successfully managed to prevent any other meaningful competitors from entering the Tesla Repair Services or Tesla-Compatible Parts markets, they have foreclosed all meaningful competition and affected virtually 100% of the commerce in those aftermarkets.

293.     This and other conduct constitutes a combination in restraint of trade in violation of §§ 16720 and 16726.

294.     There are no meaningful procompetitive justifications for Tesla's conduct.

295.     As alleged above, Tesla has market power in both the Tesla Repair Services and Tesla-Compatible Parts markets in the United States. The conduct described herein forecloses competition in a substantial share of those markets.

296.     As a direct and proximate result of Tesla's anticompetitive and monopolistic conduct, Plaintiffs and the proposed Class have suffered, and will continue to suffer, injuries of the type that the antitrust laws were intended to prevent, including, among other things, paying supracompetitive prices for Tesla-Compatible Parts, experiencing shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and being generally deprived of the competitive benefits which otherwise would have resulted from the option of obtaining OEM and non-OEM Tesla-Compatible Parts.

297.     It is appropriate to bring this action under the Cartwright Act because Tesla has a headquarters and principal place of business in California and for a substantial portion—if not the entirety—of the Class Period, Tesla directed the conduct at issue and undertook overt acts in furtherance of Tesla's anticompetitive scheme in California.

## EIGHTH CLAIM FOR RELIEF

### VIOLATION OF THE UNFAIR COMPETITION LAW,
### CAL. BUS. & PROF. CODE § 17200, *et seq.*
### (All Plaintiffs, on behalf of the Nationwide Class or,
### in the alternative, on behalf of the California Class)

298.     Plaintiffs re-allege and incorporate by reference all the allegations above as if fully set forth herein.

299.    California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* ("the UCL"), prohibits any unlawful, unfair, or fraudulent business practice. Tesla's conduct, the effect and purpose of which is to harm competition, to further Defendant's monopolies, and to raise the prices for Tesla Repair Services and Tesla-Compatible Parts, violates the UCL.

300.    Tesla's conduct, as detailed above, violates the Sherman Act, and the Cartwright Act, and therefore constitutes unlawful conduct under § 17200.

301.    In addition, although not brought as a separate claim, Tesla's conduct also violates the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.* ("MMWA").

302.    Section 102(c) of the MMWA prohibits warrantors of consumer products from conditioning warranties "on the consumer's using, in connection with such product[s], any article or service (other than article or service provided without charge under the terms of the warranty) which is defined by brand, trade, or corporate name," unless the warrantor obtains a waiver from the FTC. 15 U.S.C. § 2302(c).

303.    Section 700.10 of the Code of Federal Regulations provides further guidance as to the types of tying conduct prohibited by Section 102(c) of the MMWA. It states in relevant part:

> No warrantor may condition the validity of a warranty on the use of only authorized repair service and/or authorized replacement parts for non-warranty service and maintenance (other than an article of service provided without charge under the warranty or unless the warrantor has obtained a waiver pursuant to section 102(c) of the Act, 15 U.S.C. 2302(c).

304.    As an example, Section 700.10 further states "a provision in the warranty such as, 'use only an authorized "ABC" dealer' or 'use only "ABC" replacement parts,' is prohibited where the service or parts are not provided free of charge pursuant to the warranty."

305.    While Tesla's warranties do not expressly require that Tesla EV owners utilize only Tesla Repair Services or Tesla-Compatible Parts purchased from Tesla, Tesla makes it clear that this is an implicit requirement by, among other things, "strongly recommend[ing]" that all services be performed and parts purchased from Tesla and threatening to void warranty coverage if they are purchased elsewhere. Similarly, Tesla's parts warranty only extends coverage if the parts are purchased directly

from Tesla through its website or purchased and installed by Tesla itself, further preventing Tesla owners from having their EVs serviced by independent repair shops.

306.    The purpose and effect of these statements and policies is to communicate to Tesla EV owners that, in order to maintain warranty coverage, they must purchase all non-covered Tesla Repair Services and Tesla-Compatible Parts from Tesla. Such conduct violates the MMWA or, at the very least, the policy or spirit of the MMWA.

307.    Tesla's conduct is also "unfair" under § 17200, irrespective of the violation of any other law. This conduct is immoral, unethical, oppressive, outrageous, unscrupulous, and substantially injurious to consumers, including Plaintiffs and the proposed Class, and the conduct's impacts on Plaintiffs and the proposed Class significantly outweigh any theoretical reason or justification therefor. Moreover, at the very least, such conduct also threatens an incipient violation of the antitrust laws and MMWA, and violates the policy or spirit of those laws insofar as it significantly harms or threatens competition in the alleged aftermarkets for Tesla Repair Services and Tesla-Compatible Parts.

308.    Plaintiffs and the proposed Class were directly and proximately harmed by Tesla's conduct because, as a direct and foreseeable result of said conduct, Plaintiffs and the proposed Class were forced to pay supra-competitive prices for Tesla Repair Services and Tesla-Compatible Parts during the Class Period, experienced shortages and long wait times in receiving Tesla Repair Services and Tesla-Compatible Parts (and incurring additional injury and expenses related thereto), and were generally deprived of the competitive benefits which otherwise would have resulted from having the option of servicing, repairing, and maintaining their EVs themselves or through independent repair shops.

309.    Plaintiffs seek to enjoin Tesla from further unlawful and/or unfair acts or practices, to obtain restitutionary disgorgement of all monies and revenues wrongfully obtained by Tesla as a result of such practices, and all other relief allowed under California Business & Professions Code § 17200.

310.    Plaintiffs and the Class members are entitled to seek equitable relief because monetary damages are an inadequate remedy to address Tesla's ongoing market restraints.

311.    Because they in fact suffered injury as a result of Defendant's conduct, Plaintiffs and the proposed Class have standing to bring this claim under California's Unfair Competition Law. It is appropriate to bring this action under the UCL because Tesla has a headquarters and principal place of

business in California and for a substantial portion—if not the entirety—of the Class Period, Tesla directed the conduct at issue and undertook overt acts in furtherance of Tesla's anticompetitive scheme in California.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Class defined herein, respectfully request that this Court:

A.    Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and appoint Plaintiffs and Plaintiffs' attorneys to represent the Class.

B.    Adjudge and decree that misconduct alleged herein violates Sections 1 and 2 of the Sherman Act, Sections 16720, 16726 and 16727 (Cartwright Act) and Section 17200 (UCL) of the California Business and Professions Code.

C.    Grant injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including, among other things: (i) an order permanently enjoining and restraining Tesla, and its officers, directors, agents, servants, employees, attorneys, and all other persons acting or claiming to act on their behalf from continuing to engage in the wrongful acts described herein; and (ii) requiring Tesla to provide access to manuals, diagnostic tools, and vehicle telematic data, at a reasonable cost, to individuals and independent repair shops.

D.    Award Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees.

## DEMAND FOR JURY TRIAL

312.    Plaintiffs hereby demand a trial by jury for all claims so triable.

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

1

2   Dated: February 18, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

**SAVERI & SAVERI, INC.**

By:   */s/ Matthew W. Ruan*
Matthew W. Ruan (SBN 264409)
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com

*Interim Lead Counsel for the Proposed Class*

R. Alexander Saveri (SBN 173102)
1016 Lincoln Blvd., Suite 306
San Francisco, CA 94129
Telephone: (415) 217-6810
rick@saveri.com

*Interim Liaison Counsel for the Proposed Class*

Douglas A. Millen
Michael E. Moskovitz
**FREED KANNER LONDON
& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com
dmillen@fklmlaw.com
mmoskovitz@fklmlaw.com

Kimberly A. Justice
**FREED KANNER LONDON
& MILLEN LLC**
923 Fayette Street
Conshohocken, Pennsylvania 19428
Telephone: (610) 234-6486
kjustice@fklmlaw.com

Stuart G. Gross (SBN 251019)
**GROSS KLEIN PC**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 671-4628, ext.10
sgross@grossklein.com

70

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Richard D. McCune
David C. Wright
**McCUNE LAW GROUP, McCUNE WRIGHT
AREVALO VERCOSKI KUSEL WECK
BRANDT, APC**
3281 East Guasti Road, Suite 100
Ontario, California 91761
Tel: (909) 557-1250
rdm@mccunewright.com
dcw@mccunewright.com

Leigh M. Perica
Connor P. Lemire
**McCUNE LAW GROUP, McCUNE WRIGHT
AREVALO VERCOSKI KUSEL WECK
BRANDT, APC**
231 North Main Street, Suite 20
Edwardsville, IL 62025
Tel: (618) 307-6116
dyb@mccunewright.com
lmp@mccunewright.com
cpl@mccunewright.com

Derek Yeats Brandt
**BRANDT LAW LLC**
132 North Kansas Street
PO Box 66
Edwardsville, IL 62025
Tel: (312) 543-9198-6116
derek@brandlawllc.com

Daniel L. Warshaw (State Bar No. 185365)
Michael H. Pearson (State Bar No. 277857)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile: (818) 788-8104
dwarshaw@pwfirm.com
mpearson@pwfirm.com

Jon A. Tostrud (State Bar No. 199502)
**TOSTRUD LAW GROUP, P.C.**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 278-2640
Facsimile: (310) 278-2640
jtostrud@tostrudlaw.com

Brian P. Murray
Lee Albert
**GLANCY PRONGAY & MURRAY, LLP**

71

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
bmurray@glancylaw.com
lalbert@glancylaw.com

Blaine Finley
**FINLEY PLLC**
1455 Pennsylvania Ave., NW, Suite 400
Washington, DC 20004
Telephone: (281) 723-53407904
bfinley@finley-pllc.com

Matthew S. Weiler (SBN 236052)
**SCHNEIDER WALLACE COTTRELL
KONECKY, LLP**
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Telephone: (415) 421-7100
MWeiler@schneiderwallace.com

Michelle C. Clerkin
**SPIRO HARRISON & NELSON**
228 Park Avenue South
New York, NY 10003
Telephone: (917) 634-2244
mclerkin@shnlegal.com

Peggy Wedgeworth
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN**
100 Garden City Plaza
Garden City, NY 11530
Telephone: (646) 515-1269
pwedgeworth@milberg.com

Arthur Stock
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Telephone: (865) 247-0080
astock@milberg.com

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Brian D. Clark
Kyle Pozan
Eura Chang
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Ave S, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Fax: (612) 339-0981
bdclark@locklaw.com
kjpozan@locklaw.com
echang@locklaw.com

William G. Caldes
Jeffrey J. Corrigan
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Fax: (215) 496-6611
BCaldes@srkattorneys.com
JCorrigan@srkattorneys.com

Garrett D. Blanchfield
Brant D. Penney
**REINHARDT WENORD & BLANCHFIELD**
First National Bank Building, Suite W1050
332 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100
g.blanchfield@rwblawfirms.com
b.penney@rwblawfirm.com

*Attorneys for Plaintiffs and the Proposed Class*

THIRD CONSOLIDATED AMENDED CLASS ACTION COMPLAINT